ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE (181542)
jforge@rgrdlaw.com
RACHEL L. JENSEN (211456)
rjensen@rgrdlaw.com
THOMAS R. MERRICK (177987)
tmerrick@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
ambere@zhlaw.com
HELEN I. ZELDES (220051)
helenz@zhlaw.com
ALREEN HAEGGQUIST (221858)
alreenh@zhlaw.com
AARON M. OLSEN (259923)
aarono@zhlaw.com
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiff and Proposed Class

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ART COHEN, Individually and on Behalf of All Others Similarly Situated, ) ) ) Plaintiff, ) ) vs. ) ) DONALD J. TRUMP, ) ) Defendant. ) | Case No.  **'13 CV 2519 DMS RBB** <br><br> CLASS ACTION <br><br> COMPLAINT FOR VIOLATIONS OF 18 U.S.C. §1962(c) |

883445_1

Plaintiff Art Cohen ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and all others similarly situated, against Donald J. Trump ("Defendant" or "Defendant Trump").   Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to him.

## NATURE OF THE ACTION

1.     Defendant ensnared Plaintiff and thousands of other student-victims in a fraudulent scheme nationwide to sell real estate seminars and mentorships ("Live Events") by trading on the Trump moniker. Defendant uniformly misled Plaintiff and the Class that they would learn Donald Trump's real estate secrets through him and his handpicked professors at his elite "University."  The misleading nature of the enterprise is embodied by its very name.  That is because, though Defendant promised "Trump University," he delivered neither Donald Trump nor a University.

2.     Defendant expressly set out to leverage Donald Trump's fame and expertise as a real estate mogul by creating "Trump University," which Defendant marketed as a premier institution of higher learning rivaling Wharton Business School, and with which Trump was so integrally involved, students would effectively be learning from him.[1] Defendant marketed Trump University as 'the next best thing to being Trump's "Apprentice,"' referencing Trump's hit reality television series.

3.     In a promotional video for Trump University posted on YouTube, embedded in email blasts, and shown at Trump University Live Events (hereinafter, the "Main Promotional Video"), Trump himself promised would-be student-victims:

> We're going to have ***professors and adjunct professors*** that are absolutely terrific.  Terrific people.  Terrific brains.  Successful.  The best.  We are going to have the best of the best.  And, honestly, if you don't learn from them, ***if you don't learn from me***, if you don't learn from the people that we're going to be putting forward, and these are all people that are ***handpicked by me***, then, you're just not gonna make it in

---

[1]     As detailed herein, Trump University changed its name to Trump Entrepreneur Initiative on June 2, 2010.

terms of the world of success.  And that's okay, but you're not gonna make it in terms of success.[2]

4.    Defendant mass mailed to Plaintiff and the Class a "Special Invitation from Donald J. Trump" to the free introductory Live Event, adorned with the Trump University coat of arms and promising: "***My hand-picked instructors and mentors will show you how to use real estate strategies . . . .***"  The letter continues that with "ongoing support from your own ***Team of Trump Experts*** – you'll have what you need to succeed!"  The letter closes with Donald J. Trump's name, signature, and Trump University's address at 40 Wall Street, 32nd Floor, New York, NY 10005.

5.    Trump gave himself a prominent, if not exclusive, role in the national advertising campaign for "Trump University."  However, Trump did not fulfill the promises he made to student-victims around the country – he did not teach students his coveted real estate investing "secrets" at the Live Events, he did not contribute in any meaningful way to the curriculum for the Live Events, and he did not handpick the Live Event seminar instructors and mentors who "taught" student-victims at 3-day Live Events and Elite mentorship programs – both of which were upsells from the free introductory Live Event called the "Preview."

6.    Almost immediately after Trump founded Trump University, the New York State Education Department ("NYSED") wrote to Donald Trump on May 27, 2005, warning him that using the name "University" was illegal without a license, and asked Trump to stop using the name "Trump University."  Instead of complying, Defendant's agents created a fictitious office in Dover, Delaware, and then Defendant continued to brazenly operate illegally out of his 40 Wall Street office in New York, New York for five years.  On March 30, 2010, the NYSED wrote to Donald Trump and again advised that use of the title "University" in the name of his corporation was "misleading" and illegal.  On June 15, 2010, NYSED wrote to Trump University

---

[2]    Emphasis is supplied and citations and internal quotation marks omitted here and throughout, unless otherwise noted.

883445_1

directing Defendant to cease any further training until Trump University obtained a license to operate as an institution of higher learning.  The NYSED demanded: "*All current students should be refunded*" and warned that failure to comply with the law "may result in disciplinary action."  Defendant did not give students refunds, but did stop offering and selling Live Events shortly thereafter in or about August 2010. However, Defendant has made multiple statements that he intends to resume Trump University courses in the future.

7.     At least 11 Attorneys General and the U.S. Department of Justice have received numerous complaints about Trump University; the Texas Attorney General's investigation into misleading advertisements by Trump University ultimately led to the suspension of Live Events in that state; and a year after the filing of a related class action in this Court, the New York Attorney General launched an investigation into Trump University's deceptive practices.  And, due to Defendant's misleading advertisements and marketing of Trump University as a "University," the Better Business Bureau ("BBB") refused to accredit Trump University and gave it a D- grade due to the many complaints lodged by consumers.

8.     Plaintiff brings this class action on behalf of himself and all other similarly-situated consumers who purchased Trump University Live Events throughout the United States, asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO Statute"), 18 U.S.C. §1962(c).

9.     Plaintiff seeks damages and equitable relief on behalf of himself and the Class, including, but not limited to: treble their monetary damages; restitution; injunctive relief; punitive damages; costs and expenses, including attorneys' and expert fees; interest; and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiff and the Class.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because Plaintiff's claims arise under the RICO Statute,

1  18 U.S.C. §1962. The Court has diversity jurisdiction under 28 U.S.C. §1332 because

2  Plaintiff resides in California, and Defendant resides in New York. This Court also

3  has original jurisdiction over this action under the Class Action Fairness Act of 2005,

4  28 U.S.C. §1332(d)(2) ("CAFA"), as to the named Plaintiff and every Class Member,

5  because the proposed Class contains more than 100 members, the aggregate amount in

6  controversy exceeds $5 million, and Class Members reside across the United States

7  and are therefore diverse from Defendant.

8      11.   This Court has personal jurisdiction over Defendant because he has

9  significant minimum contacts with this State, and intentionally availed himself of the

10  laws of California by transacting a substantial amount of business throughout the State

11  and this District, including but not limited to, the promotion, marketing, advertising,

12  and sale of Trump University Live Events throughout California and San Diego

13  County, and on the Internet to consumers located throughout California and San

14  Diego County.

15      12.   Venue is proper under 18 U.S.C. §1965(a), because Defendant is subject

16  to personal jurisdiction in this District as alleged above, and Defendant has agents

17  located in this District.

18                          **PARTIES**

19  **A.    Plaintiff**

20      13.   Plaintiff Art Cohen is a businessman and resident of the state of

21  California. Cohen learned about Trump University in 2009 when he saw an

22  advertisement in the San Jose Mercury News, which is delivered daily to his home.

23  Cohen believes that he also received by mail a "special invitation" to Trump

24  University from Donald Trump, which included 2 VIP tickets to the free seminar.

25  Cohen was lured in by Donald Trump's name and reputation as a real estate expert.

26  Cohen attended the Preview Live Event at the Fremont Marriott Silicon Valley in

27  Fremont, California, on April 29, 2009, where Cohen was shown the Main

28  Promotional Video. Based on Defendant's misrepresentations and material omissions

that he would receive Donald Trump's real estate secrets from his handpicked "professors" and mentors at his "University," Cohen purchased the $1,495 Fast Track to Foreclosure Real Estate Retreat, which he attended from May 8-10, 2009, at the Sheraton Palo Alto Hotel in Palo Alto. At the 3-day event, Cohen was upsold to the Gold Elite program, which he purchased on May 10, 2009, for $34,995, plus the interest and finance charges paid to his credit card.

14.     Plaintiff would not have paid for any of the Trump University programs had he known that he would not have access to Donald Trump's real estate investing secrets, that Trump had no meaningful role in selecting the instructors for the Live Events, and/or that Trump University was not a "University," as Defendant had represented to him.

**B.     Defendant**

15.     Donald J. Trump resides in the State of New York. Trump was a founder and Chairman, officer, director, managing member, principal and/or controlling shareholder of Trump University. Defendant Trump is also Chairman of the board of directors, President and CEO of the Trump Organization, a conglomerate of companies which includes Trump University.

16.     Defendant Trump received revenues paid to Trump University from Plaintiff and other Class Members through two or more shell companies, including DJT University Managing Member LLC (now DJT Entrepreneur Managing Member LLC), a New York Limited Liability Company, and DJT University Member LLC (now DJT Entrepreneur Member LLC), a New York Limited Liability Company.

17.     Defendant Trump has conducted substantial business within the State of California, including this District.

18.     Defendant Trump approved, authorized, either specifically and/or tacitly directed, ratified and/or participated in the acts complained of herein engaged in by Trump University and its personnel.

# COMMON FACTUAL ALLEGATIONS

**A.    The Scheme**

19.    Defendant Trump and others, including but not limited to, the former President of Trump University, Michael Sexton, devised and executed a scheme to make tens of millions of dollars by marketing Trump University as both: (1) a learning institution with which Donald Trump was so integrally involved that students would effectively be learning from him because, among other reasons, they would be learning his real estate secrets from instructors whom he had handpicked; and (2) an actual university with a faculty of professors and adjunct professors.

20.    This "Scheme" was fueled by a national advertising campaign, the cornerstone of which was the Main Promotional Video. Defendant Trump caused the Main Promotional Video to be published to YouTube online so it would be viewed by prospective student-victims throughout the country. Trump University operated an extensive advertising campaign with an annual budget at one time of $6 million, and a database of over one million current and potential customers, which it targeted with frequent email blasts. These e-blasts contained misrepresentations and/or links to view the Main Promotional Video on YouTube, and/or Trump University's Facebook page, Twitter account, and/or LinkedIn profile. When Trump University introduced the Donald Trump "signature" campaigns (featuring Donald Trump's signature in letters and ads) including "Are YOU My Next Apprentice?" and "Learn From the Master," consumer responses jumped by over 50%. And though personnel knew it was false to claim the instructors were handpicked by Defendant Trump, Defendant continued to use this catch-phrase as a marketing hook.

21.    Other methods and means that Defendant Trump and others used to execute and perpetuate the Scheme included the following:

(a)    Defendant Trump reviewing and approving advertisements before they were released, which featured quotes from Defendant Trump himself, such as: "I

1  can turn anyone into a successful real estate investor, including you. – Donald

2  Trump."

3           (b)     Using Defendant Trump's name, photos and/or quotes for all Live

4  Events, website and advertising, and the website home page displayed a large photo of

5  Defendant Trump along with the message from him: "Are YOU My Next Apprentice?

6  Prove it to me!"



20          (d)     Using advertisements featuring Defendant Trump and his image

21  with quotes such as: "Don't think you can profit in this market? You can. And I'll

22  show you how. Learn from my handpicked experts how you can profit from the

23  largest real estate liquidation in history."

24          (e)     Sending emails to thousands or tens of thousands consumers from

25  Trump University's one million customer database that featured Defendant Trump's

26  photo with the words: "Are you My Next Apprentice," and stated: "76% of the

27  world's millionaires made their fortunes in real estate. Now it's your turn. My father

28  did it, I did it, and now I'm ready to teach you how to do it too." The signature block

1    at the bottom of the email read, Donald J. Trump, Chairman, Trump University, and

2    above that is Defendant Trump's actual signature.



**I want people who want success.**

If you Think BIG and believe you've got what it takes to succeed, I want you!

76% of the world's millionaires made their fortunes in real estate. Now it's your turn. My father did it. I did it, and now I'm ready to teach you how to do it too.

My team of real estate experts at Trump University is coming to your area in the next few days to conduct my Free Intro Apprenticeship Workshop. If you think you've got what it takes to be my next Apprentice, step up and attend. You should also bring along a trusted partner. This is YOUR opportunity to create wealth and take control of your own financial future with proven strategies that work in the current real estate market.

Attend the Free Intro Apprenticeship Workshop to learn how to:

1.   Buy properties from banks at DEEP discounts
2.   Use short sales to CONTROL property
3.   Increase your financial POWER with leverage
4.   Negotiate PROFITABLE deals that meet your goals
5.   Attend and learn how to develop the CONFIDENCE to succeed in real estate



I'm also going to give you my "Secrets of Real Estate Marketing" investor toolkit (a $50 value) absolutely FREE when you attend.

Don't waste time - seating is very limited and my Trump Workshops always fill up fast.

See you at the top!



Donald J. Trump
Chairman, Trump University

22        (f)    Sending signed letters through the mails to consumers nationwide,

23    with Defendant Trump's name and signature at the bottom, stating: "[N]o course

24    offers the same depth of insight, experience and support as the one bearing my name .

25    . . . *My hand-picked instructors and mentors will show you how to use real estate*

26    *strategies* to: [s]upplement or even replace your income, [s]ecure your long-term

27    financial future . . . [s]tart profiting today!  Now is the time to create your financial

28    legacy. *You can do it*, even if you only have five or ten hours a week to spare. With

our simple instructions and practice exercises – *and ongoing support from your own Trump Team of Experts – you'll have what you need to succeed!*" (Second emphasis in original). The letter closed with Donald J. Trump's name, signature, and address, at 40 Wall Street, 32nd Floor, New York, NY 10005.

(g)  Sending substantially-similar signed letters through the mails to consumers nationwide addressed as "Dear Friend" from Donald Trump promising: "Come to my *free* class. In just 90 minutes, my hand-picked instructors will share my techniques, which took my entire career to develop," and signed "Sincerely, Donald Trump" with Defendant Trump's signature. (Emphasis in original). The letter enclosed two "VIP" tickets to an upcoming Preview Live Event in the consumer's area.

(h)  Delivering to student-victims, who were in the midst of the Trump University $1,495 Fulfillment Live Event and whom Trump University was trying to persuade to sign up for the Elite program, a personalized (addressed to them by name) letter from Donald J. Trump. The letter bore the Trump logo at the top of the letter and the words "From the Office of Donald J. Trump." The letters stated:

> Success in real estate begins with great training and proven strategies. Without education you don't stand a chance.
>
> I know how to make money in real estate. I've been doing it for a long time with a lot of success. My family has been a leader in real estate since my father – Fred Trump – started building residential homes in New York City 75 years ago. My father was my mentor and he taught me a lot. Now I want to teach you how to make money in real estate. To be my apprentice you need to Think BIG and really want to succeed. More than anything, you need to take action.
>
> ### Do YOU have What It Takes to Be My Next Apprentice?
>
> I only work with people who are committed to succeed. I founded Trump University back in 2005 to teach go-getters how to succeed in real estate. My team at Trump University is filled with real estate experts . . . proven winners. We're the best of the best and we know what works. If you think you have what it takes to be my next apprentice, prove it to me.
>
> We've trained thousands of real estate investors over the years and we know you will be most successful when you work with a partner. . . .

1
2
3

   If you're serious about making money and safeguarding your future, learn to invest in real estate. Trump University will teach you how. We'll *give **you the best training*** and the confidence to succeed. If you think you've got what it takes to be my next Apprentice, come prove it to me and my team.

4   The letter closes with "See you at the top!" And, it is signed, "Donald J. Trump,

5   Chairman, Trump University."

6          (i)     Promising students that "[t]here are many real estate investment

7   seminars available but this is the only one designed by Donald Trump's personal

8   advisors, to show you step-by-step how to create quick cash immediately, and how to

9   build a large monthly cash flow WITHOUT using any of your own money or credit."

10          (j)     Enforcing the uniform deceptive portrayal of Trump University

11   through policies and procedures, including Marketing Guidelines, the PlayBook, and

12   standardized PowerPoint presentations and scripts that instructors were contractually

13   required to use.  For example, the Marketing Guidelines were designed to "ensure

14   brand, tone and message across all Trump University's marketing efforts."   The

15   "tone" required by those Marketing Guidelines was to "Think of Trump University as

16   a real University with a real Admissions process, *i.e.*, not everyone who applies, is

17   accepted." The Guidelines also required that personnel use the term "faculty" which

18   was to be marketed as comprised of Donald Trump's "top experts."

19          (k)     Sending scripts containing misrepresentations to instructors for use

20   at the Live Events through the interstate wires, such as the Preview Script sent from

21   Michael Sexton to primary instructors, including James Harris and Stephen Goff.  The

22   speaker was required to use the official Trump University script and PowerPoint, and

23   not make any changes without prior authorization pursuant to the PlayBook and

24   his/her contract.  Defendant Trump has concealed this speaker script that was used to

25   execute his Scheme.  Excerpts of the concealed speaker script include:

26
27
28

883445_1

- 10 -

**Trump University**
**Preview Script – Version 3.0**

Slide 01:   Trump University Title Slide

Slide 02:   The Trump University Apprenticeship Program

Ladies and gentlemen, I'd like to welcome you to our presentation tonight on behalf of Mr. Donald Trump and Trump University. My name is [Lecturer name], I'm a member of the faculty at Trump University. Let's talk a little about Donald Trump.

Slide 03:   Trump Montage

Who here thinks they know Donald Trump? Hands up. Very good. Let's play this little game to get you in the mood of things.

\*         \*         \*

I remember one to time Mr. Trump said to us over dinner, he said "real estate is the only market that when there is a sale going on people run from the store". You don't want to run from the store.

\*         \*         \*

First   we will show you Donald Trump's negotiating system. Nobody negotiates better than Donald. We'll show you how he does it, why he does it, and how you can make it work for you. We will share with you marketing pieces for both finding and selling properties, and again I'll say this to you as I have before. One of the critical things is being able to get out of a property when the time is right for you. And that is what we'll show you how to do.

\*         \*         \*

Slide 57:   Risk Free Guarantee

Making money may not be enough for some of you.  You have lost thousands in the markets, but you worry about the $1495 that you pay here tonight.

(Trial Close): Some of you are still worried.  You say: I am convinced that Trump University is the real deal.  I am convinced that Donald Trump can teach me how to make money in real estate.  I am convinced that I don't have a chance of recovering my 401k losses unless I do something.

\*         \*         \*

Slide 58:   **Take Control of Your Life**

When you enroll in Trump University and make use of our systems, specific knowledge and continuing support, you will be taking control of your life. You will create a new normal for yourself; one that is much more enjoyable and rewarding than your current situation.

Follow the proven practices, philosophy and guidance of Donald Trump.

(l)     Promising students in blogs posted on Trump University's website that Defendant Trump would be actively involved in Trump University and its courses:

Trump University ***grew out of my desire to impart my business knowledge, accumulated over the years***, and my realization that there is a huge demand for practical, convenient education that teaches success.

***I want the people*** who go to Trump University ***to succeed, and I plan to do my part to help them. I'm not just putting my name on this venture; I plan to be an active presence*** in the curricula. The website, www.trumpuniversity.com, will include such features as "***Ask Mr. Trump," in which I answer your questions***; the ***blog*** you're reading now; ***video clips of me***; and more. ***My words, ideas, and image will also be woven into the courses we create***. The reason I'm playing such an active role in Trump University is that I truly believe in the power of education . . . . [T]he people who go to Trump University want to be successful, and ***I'm on their side***.

Another blog written under Defendant Trump's name promised: "***I have to believe in whatever I put my name on***, and it has to reflect who I truly am. To do otherwise would be a disservice to me, my loyal customers, and prospective customers."

(m)     Promising that he would personally select and answer students' questions in a forum called "Ask Donald Trump," when the questions were selected and the answers written by a same ghost writer (who was not a real estate expert).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17  **B.    The Truth**

18          22.     Defendant knew that these representations were false, that Defendant

19  Trump was not actively involved in Trump University's Live Events, did not select or

20  interview Trump University's Live Event instructors or mentors, that Defendant

21  Trump offered no input into the actual instruction provided to Trump University's

22  student-victims, that a ghost writer wrote the Donald Trump blogs and wrote most or

23  all of the answers to the "Ask Donald Trump" questions and that Trump University

24  did not have a faculty of professors and adjunct professors, but rather independent

25  contractors paid commissions for sales.  In other words, Defendant promised Trump

26  University, but delivered neither Donald Trump nor a University.

27

28

### 1.    Not Donald Trump

23.    Though Defendant Trump represented that he would be so integrally involved that Trump University was effectively learning from him, Defendant Trump's involvement was "completely absent," as Defendant Trump has admitted in court filings.  Defendant Trump had virtually no involvement in determining, nor was he even aware of, what the instructors actually taught or what the courses were.

24.    Though Defendant Trump represented that all of Trump University's instructors would be handpicked by him, thus implying that students would get the next best thing to Defendant Trump himself, it was Sexton and COO David Highbloom who interviewed the instructors and was in charge of hiring instructors. It was also Sexton – not Defendant Trump – who would know what, if any, education, professional experience, testing, and/or licenses was required of instructors.  In most cases, Defendant Trump did not even know who the instructors or mentors were, nor had he met them.

25.    Though the entirety of Defendant Trump and Trump University's marketing and advertising campaigns were centered around Defendant Trump's real estate expertise and access to Defendant Trump's coveted real estate "secrets," Trump University did not teach Donald Trump's real estate "secrets" as promised.  Rather, Sexton (who had no real estate experience) was responsible for compiling course materials and largely handed this task over to third parties in the industry such as Dynetech, Mark Dove, and David Early.

### 2.    Not a University

26.    Though Defendant portrayed Trump University as a University with an admissions process and "Ivy League quality" rivaling Wharton Business School, Trump University was unaccredited and unlicensed to operate as an institution of higher learning.  Trump University provided no degrees, no credits, no licenses, nor anything else of marketable value to student-victims.

27.    Though Donald Trump in the Main Promotional Video and elsewhere represented to would-be students that they would be taught by a faculty of "professors and adjunct professors," Trump University had no such faculty.    Rather, the instructors were high-pressure salespeople hired as independent contractors and paid on a commission basis based on the number and amount of Live Event sales made.

28.    The Trump University PlayBook (*see* below) refers to students as "Buyers" and directs "instructors" to prepare to "Sell, Sell, Sell!"

**C.    Trump University "Live Events"**

29.    Defendant literally had a "PlayBook" for his Scheme and nationwide advertising campaign to mislead student-victims.    The PlayBook contains a chart depicting the upsell scheme executed across the country.

30.    Specifically, Defendant first lured consumers in with a free 90-minute Live Event called the Preview.    The Preview is used to persuade students to purchase the $1,495 "one year apprenticeship" course called the Fulfillment.    If student-victims purchased the Fulfillment, Defendant used the Live Event to convince them to purchase Trump University's $35,000 Gold Elite program.    Even then, after investing nearly $36,500, students still do not receive Defendant Trump's "secrets" they were promised, but are constantly subjected to upsells of additional Live Events, products and books.

31.    The Preview and Fulfillment were standardized through PowerPoint presentations.    For the upsell, speakers used standardized slides and worked from the same script.    There are detailed instructions in the PlayBook, down to where the speakers and coordinators stand, the temperature of the room and music to be played during the Introduction – "Money, Money, Money" from The Apprentice show.

**1.    The Preview**

32.    Trump University conducted a massive advertising campaign with a multi-million dollar annual budget for the Preview, through mainstream newspapers, its website, online newspapers, Facebook, Twitter, YouTube, radio, email blasts, and

direct mail.  Seven to ten days prior to the Preview, ads proclaimed: Donald Trump is "ready to share – with Americans like you – his best advice on investing in today's 'once-in-a-lifetime' real estate market" directly from "***Donald Trump's hand-picked instructors*** a ***systematic method*** for investing in real estate that anyone can use effectively."   Defendant mailed letters from Donald Trump inviting consumers to learn from "one of ***my world-class instructors***" about Defendant Trump's "***proven system*** for profitable real estate investing that anyone can use, right away, to score big profits in today's market."  A L.A. Times article quoted Donald Trump as saying that "[i]nvestors nationwide are making millions in foreclosures . . . and so can you!"[3] Other advertisements urged consumers to "Learn from the Master" – Donald Trump," that "It's the next best thing to being his Apprentice," and promised would-be students that they would learn "insider success secrets from Donald Trump."





---

[3]    David Lazarus, *Trump's a grump about column on his 'priceless' tips*, L.A. Times, Dec. 16, 2007, http://www.latimes.com/business/la-fi-lazarus16dec16,0,1670633.column.  When Lazarus attended the Pasadena Hilton Trump seminar, he "learned by attending the seminar, the event was a two-hour sales pitch for a three-day workshop that would cost people $1,495."  *Id.*

[4]    Screen shot from http://www.trumpurealestate.com/market-Phoenix.html?cid=726078 (last visited February 3, 2010).

[5]    Screen shot from http://www.trumpuniversity.com/ (last visited February 3, 2010).

1



2

3

4

5

6

7      33.    At the Preview, students were greeted by a large screen projector and two

8  tall banners of Donald Trump's photo. The presentation opens with the song "Money,

9  Money, Money," and the Main Promotional Video is shown.

10     34.    The instructor is introduced as one of Donald Trump's top instructors

11  who was ***hand selected*** because of his ***expertise*** and knowledge in the real estate

12  business.

13     35.    The speaker induces the audience to trust in the Donald Trump name and

14  "family" by walking through the history of the Trump Organization and Defendant

15  Trump's 'humble beginnings.'  The speaker tells the audience that 76% of all

16  millionaires are created from real estate – that "anyone can do it," and that "it's not

17  easy, but it's simple if you know what you're doing, and we'll teach you what you

18  need to know." He states that the mission of Trump University is to "train, educate

19  and mentor entrepreneurs on achieving financial independence through real estate

20  investing" the Donald Trump way.

21

22

23

24

25

26

27

28

[6]    Screen shot from http://www.trumptactics.com/ (last visited February 3, 2010).

36.     The speaker emphasizes that on the television show, "The Apprentice," Donald Trump could only work one-on-one with one person a year, so he created Trump University – not to make money for himself, but so that he could teach others. With this program, "Mr. Trump takes you through an entire apprenticeship for one year."  The speaker emphasizes that "***Trump University is owned, lock, stock and barrel by Mr. Trump – it's his 'baby,' his company***, designed to help him accomplish his goal of leaving a legacy."  The presentation plays on consumers' trust in the Donald Trump name, The Apprentice show, Defendant Trump's wealth and Defendant Trump's real estate expertise.  Student-victims are shown slides that portray Trump University as the latest Donald Trump achievement.

---

[7]     These and the following slides are from the official approved Trump University PowerPoint presentation which was presented at a February 12, 2010 Preview Live Event advertised to prospective customers via email blast, and provided in an online Live Webinar format on or about February 12, 2010.

1

2

3

4

5

6

7

8

9

10

11

 



12   37.    Throughout, the instructor portrays him or herself as knowledgeable in

13   the Donald Trump way of investing and that he or she is close to Defendant Trump

14   through firsthand accounts of Defendant Trump.

15   38.    The instructor also plays on the fears of the audience, which includes a

16   significant percentage of senior citizens.  "How many of you lost a lot of your 401k

17   investment in the market?  How many of you are retired or want to retire?  How many

18   of you want to leave a legacy or property to your children or grandchildren?"  The

19   speaker encourages attendees, including the elderly, to cash out their 401K's or

20   increase their credit limits so they can supposedly make a higher return on their

21   investments in the foreclosure market.  Consumers are told these strategies will make

22   them money – they are time-tested strategies that have been in the Trump family for

23   75 years.  Consumers are told they will pay off their credit cards, pay off their cars,

24   and fully fund their retirement.

25

26

27

28



39.    The staff at the Live Events are taught to close sales "armed with objections and rebuttals" set forth in the PlayBook and to "work the room with special attention to team members in ***possession of a credit card that needs to be run***."

**2.    The Fulfillment**

40.    The Preview was a 90-minute advertisement to persuade attendees to sign up for the "Fulfillment," which purportedly provides a one-year "Comprehensive Real Estate Education." However, for $1,495 the Fulfillment is a 3-day workshop plus a phone number to call a "client advisor." Defendant promises mentors who will be available for a full year. ***"Other people don't have anyone to call, but you've got Trump. You'll call 40 Wall Street and they'll walk you through it."*** The emphasis is on persuading consumers that in signing up for Trump University, they can join the Trump "family."

41.    At the Fulfillment, the Main Promotional Video is shown and/or students are given personally-addressed letters from Defendant Trump.

42.    At the end of Day 1, the students are asked to fill out a detailed financial goal statement presumably to help them with their financial goals. Instead, these statements are used for Trump University personnel to assess the liquid assets that each student has to spend on the next Trump University program.

43.    Students are told at the Preview that the Fulfillment is "all you need." However, at the Fulfillment, student-victims are told what they really need is the Gold Elite program for $34,995 to get a "full education," including a 3-day in-person

mentorship with a full year of ongoing support from a Trump handpicked multimillionaire mentor. To make the upsell, instructors make standardized pitches using a separate PowerPoint slide presentation.

44.    The PlayBook directed personnel to convince student-victims that the 3-day Fulfillment is not enough (even though it was pitched as such at the Preview) and emphasized that all personnel must follow this procedure to ensure sales of Elite programs.

45.    During the Fulfillment, the speakers pressure students to raise their credit card limits on the pretext of purchasing property.  At the end of the workshop, Defendant's representatives asked students to use their credit cards to purchase the Gold Elite program for $34,995.  If they were unable to persuade students to purchase at this level (or if students did not have sufficient funds or credit), Defendant's representatives would encourage the students to purchase the "Trump Silver Elite" program for $19,495, the "Trump Bronze Elite" program for $9,995, or an Elite mentorship for approximately $25,000. Each of these prices was pitched as "one-day-only" sales off the "regular" prices of $48,490 for Gold, $23,490 for Silver and $10,995 for Bronze.

46.    Defendant's  representatives did not warn students they were likely to incur finance charges, interest fees and late fees by charging the program on their credit cards, but would tell students they would quickly make the money back. Defendant's representatives also did not tell students that by increasing their credit limits, they could damage their credit scores. And Defendant's representatives never warned students that by "maxing out" their credit cards, their credit scores could drop even more significantly.

### 3.    The Elite Mentorship Program

47.    The Gold Elite program was sold on the promise of a mentorship with Defendant Trump's handpicked real estate experts who would personally teach them

1 │ Donald Trump's real estate strategies.  Instead, none of the mentors was handpicked
2 │ by Donald Trump or trained in his investing "secrets."

3 │     48.    During the Gold Elite program, there was still constant up-sell pressure to
4 │ purchase other Trump University affiliate programs and products, varying in price
5 │ from $495 to $9,995.  As a result, Class Members could ultimately spend upwards of
6 │ $70,000 after being lured in by a free Live Event.

7 │ **D.**     **Governmental Investigations into Trump University**

8 │     49.    In addition to the actions of the NYSED described above, Maryland and
9 │ Massachusetts required Trump University to change its name for all Live Events held
10 │ in those states.

11 │     50.    Attorneys General in 11 states and the U.S. Department of Justice
12 │ received numerous complaints against Defendant and Trump University, and at least
13 │ two Attorneys General launched investigations.  In January 2010, Texas Attorney
14 │ General Greg Abbott's office launched a probe of Defendant and Trump University's
15 │ advertising and business practices after getting two dozen complaints. Abbott said he
16 │ was probing "possibly deceptive trade practices" dating back to 2008.  Abbott's
17 │ investigation resulted in Defendant's ultimate suspension of all Live Events in Texas
18 │ in May 2010.

19 │     51.    In May 2011, the New York State Attorney General's Office also
20 │ launched an investigation into whether Donald Trump and Trump University
21 │ "engaged in illegal business practices."  The investigation was described by the New
22 │ York Times as "the latest problem" in "a string of consumer complaints, reprimands
23 │ from state regulators and a lawsuit from dissatisfied former students," and was
24 │ prompted by about a dozen complaints concerning Trump University that Attorney
25 │ General Eric T. Schneiderman found to be "credible" and "serious."[8]

---

[8]    *See* Michael Barbaro, *New York Attorney General Is Investigating Trump's For-Profit School*, New York Times, May 19, 2011.

52.     Florida Attorney General Bill McCollum's office has been reportedly "reviewing" 20 or more complaints from consumers who paid up to $35,000 for various Live Events.

**E.     The BBB Gives Trump University a Failing Grade**

53.     The BBB refused to accredit Trump University due to its misleading marketing, explaining that amongst other things, its classification as a "school/academy/college/university" with "professors" was misleading to a reasonable consumer.

> Another factor contributing to your firm's ineligibility [for accreditation as a BBB business] is your firm's name "Trump University," which may potentially lead reasonable consumers to believe that your firm is an academic institution. As you acknowledged in your correspondence dated 1/4/2010, your firm does not meet the established definition of a "university." However, your instructors and program experts are referred to as "professors" and "faculty" in your promotional materials and on your web site. Both terms are potentially misleading as they are generally reserved for the teaching and administrative staff and members holding academic rank in an educational institution.

54.     The BBB also found Trump University's website misleading in stating:

> Trump University's School of Real Estate is accredited and we back up our assertions with unequalled educational and mentoring tools, such as retreats, phone and email coaching and on-site coaching, where we actually send a Donald Trump recommended real estate professional to your town to work with you for 3 days.

55.     In addition, the BBB also found, that Trump University's classification as a "School/Academy/College/University" is misleading:

> [Trump University's] services, as listed in your promotional materials and on your web site, are inconsistent with the established definition for this classification as you do not grant academic degrees or certification and do not appear to have recognized academic charter. Further, your company does not appear to be recognized as an academic institution that is accredited by accrediting agencies recognized by the Secretary of Education.

56.     For these reasons, along with numerous consumer complaints, the BBB gave Trump University a "D-" rating. After Defendant changed Trump University's name in mid-2010, Defendant demanded an "A+" evaluation, and when the BBB was unable to issue a good "grade" due to ongoing consumer complaints, Defendant

Trump called the BBB and his lawyer threatened to sue the BBB. As a result, the BBB changed Trump University's "grade" to "NR" for "Not Rated."

## RICO ALLEGATIONS

### A.     The Trump University Enterprise

57.     Trump University, LLC (now The Trump Entrepreneur Initiative LLC) is a limited liability company registered in New York with its principal place of business at 40 Wall Street, New York, New York. Trump University is one of the companies in the Trump Organization conglomerate located in New York, New York. After a related class-action lawsuit was filed in this District, Trump University changed its name to "The Trump Entrepreneur Initiative" on or around June 2, 2010.

58.     Trump University has never been an accredited University or held a license to operate out of the State of New York as an educational institution. Trump University does not offer any degrees, licenses or credits.

59.     Defendant Trump and Trump University created a "fictitious office" at 160 Greentree Drive, Suite 101, Dover, Delaware 19904, in response to the NYSED's demand that it cease operating as a "University" without a license in New York in 2005. The Dover address appears on mass emails sent to Plaintiff and the Class. However, Trump University has never operated out of Dover, Delaware.

60.     Trump University also maintained a sales call center in Utah.

61.     At all times relevant hereto, Trump University conducted substantial business throughout the State of California, including marketing, advertising, and hosting Live Events in San Diego County and all over the State of California.

62.     At all times relevant hereto, Trump University acted for or on behalf of Donald Trump in undertaking the acts and/or omissions alleged herein.

63.     Trump University, LLC (now The Trump Entrepreneur Initiative LLC) is an "enterprise" within the meaning of 18 U.S.C. §1961(4), through which Defendant Donald J. Trump conducted the pattern of racketeering activity described herein. Throughout its existence, the Trump University Enterprise engaged in, and its

1  activities affected interstate commerce because it involved commercial activities
2  across state lines, including national marketing campaigns, multi-state Live Events,
3  and the solicitation and receipt of money from victims located throughout the country.

4       64.    Defendant Donald J. Trump exercised substantial control over the affairs
5  of the Trump University Enterprise, through among other methods and means, the
6  following:

7            (a)    Providing the initial operating capital and holding an
8  approximately 93% ownership stake;

9            (b)    Creating and approving marketing and advertising materials, which
10 featured his name, likeness (in most), and voice (in the Main Promotional Video);

11           (c)    Selecting both the original name of Trump University and, five
12 years later approving the change to the current name of The Trump Entrepreneur
13 Initiative;

14           (d)    Regularly reviewing financial records; and

15           (e)    Negotiating and authorizing others to negotiate significant
16 contracts, such as the lease for the Enterprise's headquarters.

17      65.    Defendant Trump was a knowing and willing participant in the Scheme,
18 and reaped revenues and/or profits therefrom.

19      66.    The Trump University Enterprise has an ascertainable structure separate
20 and apart from the pattern of racketeering activity in which Defendant Trump has
21 engaged.  The Trump University Enterprise is separate and distinct from Donald J.
22 Trump.

23 **B.    Pattern of Racketeering Activity**

24      67.    Defendant Trump, who is a person associated-in-fact with the Trump
25 University Enterprise, knowingly, willfully, and unlawfully conducted or participated,
26 directly or indirectly, in the affairs of the enterprise through a pattern of racketeering
27 activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c).  The
28 racketeering activity was made possible by the regular and repeated use of the

facilities, services, distribution channels, and employees of the Trump University Enterprise.

68.   Defendant Trump committed multiple "Racketeering Acts," as described below, including aiding and abetting such acts.

69.   The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.   Further, the Racketeering Acts were continuous, occurring on a regular (daily) basis throughout a time period beginning in mid-2007 and, upon information and belief, continuing through at least 2010.

70.   Defendant Trump participated in the operation and management of the Trump University Enterprise by directing its affairs, as described above.

71.   In devising and executing the Scheme, Defendant Trump and Trump University personnel committed acts constituting indictable offenses under 18 U.S.C. §§1341 and 1343, in that he devised and knowingly carried out a material scheme or artifice to defraud or to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.   For the purpose of executing the Scheme, Defendant committed these Racketeering Acts, which number in the thousands, intentionally and knowingly, with the specific intent to advance the Illegal Scheme.

72.   Defendant used thousands of mail and interstate wire communications to create and perpetuate the Scheme through virtually uniform misrepresentations, concealments and material omissions.

73.   Defendant's fraudulent use of the mails and wires included the following items and communications sent by Defendant and Trump University personnel, to Plaintiff and third parties via U.S. mail, commercial carrier, interstate wire, and/or other interstate electronic media:

(a)   Throughout the relevant time period, including on or about the dates set forth below, Defendant Trump and Trump University personnel, caused to be

delivered by mail or by a private or commercial interstate carrier, or received therefrom, according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, the items described above, including those alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| Donald J. Trump, New York | Art Cohen, California | March or April 2009 | "Special Invitation from Donald J. Trump" to attend Preview in Fremont, California |
| Donald J. Trump, New York | Sonny Low, California | March or August 2009 | "Special Invitation from Donald J. Trump" to attend Preview in San Diego, California |

(b)    Throughout the Class Period, including on or about the dates set forth below, Defendant Trump and Trump University personnel, for the purpose of executing the above-described Scheme caused to be transmitted in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| Trump University, New York | Art Cohen, California | August 26, 2009 | Email to Art Cohen regarding link to Main Promotional Video |
| Trump University, New York | Art Cohen, California | April 29, 2009 | Email to Art Cohen regarding one full year of ongoing support |
| Michael Sexton at Trump University, New York | David Early, Arizona | April 14, 2009 | Email attaching Preview Script – Version 3.0 |
| Michael Sexton at Trump University, New York | Mark Anthony, California | April 14, 2009 | Email attaching Preview Script – Version 3.0 |

| From | To | Date | Description |
|------|-----|------|-------------|
| Michael Bloom, New York | David Early, Arizona; Michael Sexton, New York; April B. Neumann, New York | April 14, 2010 | Email regarding sales script |
| Art Cohen, California | American Express, North Carolina | April 2009 | Credit card transaction in the amount of $1,495 for Art Cohen's purchase of the Fulfillment Seminar |
| Trump University, New York | Art Cohen, California | May 11, 2009 | Email confirmation of credit card transaction in the amount of $34,995 for Art Cohen's purchase of the Gold Elite program |

## CLASS ACTION ALLEGATIONS

74. Plaintiff brings this class action on behalf of himself individually and all others similarly situated, pursuant to Federal Rule of Civil Procedure 23.

75. The proposed Class consists of all persons who purchased Live Events from Trump University throughout the United States from January 1, 2007 to the present. Excluded from the Class are Trump University, its affiliates, employees, officers and directors, persons or entities that distribute or sell Trump University products or programs, the Judge(s) assigned to this case, and the attorneys of record in this case. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

76. This action is properly brought as a class action because:

(a) The proposed Class is so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable;

(b) The disposition of Plaintiff's and proposed Class Members' claims in a class action will provide substantial benefits to both the parties and the Court;

(c)     The proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same fashion;

(d)     There are questions of law and fact common to the proposed Class which predominate over any questions that may affect particular Class Members. Such common questions of law and fact include but are not limited to:

(i)     Whether Defendant engaged in a fraudulent scheme;

(ii)     Whether Donald Trump violated 18 U.S.C. §1962;

(iii)     Whether Plaintiff and Class Members have been harmed and the proper measure of relief;

(iv)     Whether Plaintiff and Class Members are entitled to an award of treble, punitive damages, attorneys' fees and expenses; and

(v)     Whether, Plaintiff and Class Members are entitled to equitable relief, and if so, the nature of such relief.

(e)     Plaintiff's claims are typical of the claims of the members of the proposed Class. Plaintiff and Class Members have been injured by the same wrongful practices of Defendant. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of all Class Members and are based on the same legal theories;

(f)     Plaintiff will fairly and adequately protect the interests of the Class in that he has no interests antagonistic to those of the other Class Members, and Plaintiff has retained attorneys experienced in consumer class actions and complex litigation as counsel;

(g)     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(i)     Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against

1   them and absent Class Members have no substantial interest in individually

2   controlling the prosecution of individual actions;

3          (ii)      This action will promote an orderly and expeditious

4   administration and adjudication of the proposed Class claims, economies of time,

5   effort and resources will be fostered and uniformity of decisions will be insured;

6          (iii)     Without a class action, Class Members will continue to

7   suffer damages, and Defendant's violations of law will proceed without remedy while

8   Defendant continues to reap and retain the proceeds of his wrongful conduct; and

9          (iv)      Plaintiff knows of no difficulty that will be encountered in

10  the management of this litigation which would preclude class certification.

11         77.   Defendant and his agents had, or have access to, address information for

12  the Class Members, which may be used for the purpose of providing notice of the

13  class action.

14         78.   Plaintiff seeks damages and equitable relief on behalf of the Class on

15  grounds generally applicable to the entire proposed Class.

**COUNT**

**Violations of the Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. §1962(c)**

79.   Plaintiff re-alleges and incorporates by reference the above allegations

contained in the paragraphs above as if fully set forth herein.

80.   This claim arises under 18 U.S.C. §1962(c), which provides in relevant

part:

(c)   It shall be unlawful for any person employed by or
associated with any enterprise engaged in, or the activities of which
affect, interstate or foreign commerce, to conduct or participate, directly
or indirectly, in the conduct of such enterprise's affairs through a pattern
of racketeering activity . . . .

81.   At all relevant times, Defendant Donald J. Trump was a "person" within

the meaning of 18 U.S.C. §1961(3), because he was "capable of holding a legal or

beneficial interest in property." Defendant Trump was associated with the Trump

University Enterprise and conducted and participated in that enterprise's affairs though a pattern of racketeering activity, as defined by 18 U.S.C. §1961(5), consisting of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. §1962(c).

82.   The Trump University Enterprise was created and/or used as a tool to carry out the Scheme and pattern of racketeering activity.

83.   Defendant Trump has committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343, within the past ten years. The multiple acts of racketeering activity that they committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

84.   Defendant Trump's predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) include, but are not limited to:

(a)   **Mail Fraud**: Defendant Trump violated 18 U.S.C. §1341, by sending or receiving, or causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the Scheme, which amount to a material scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials include but are not limited to, letters promoting the Scheme and bearing Defendant Trump's signature or image; and

(b)   **Wire Fraud**: Defendant Trump violated 18 U.S.C. §1343, by transmitting and receiving, or causing to be transmitted or received, materials by wire for the purpose of executing the Scheme, which amounts to a material scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials transmitted and/or received include but are not limited to, interstate credit card transactions, emails promoting the Scheme, and the Main Promotional Video.

85.   Defendant Trump knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose.   Defendant Trump either knew or recklessly disregarded that these were material misrepresentations and omissions.

86.   Defendant Trump and Trump University obtained money and property belonging to Plaintiff and the Class as a result of these violations.   Plaintiff and other Class Members have been injured in their business or property by Defendant Trump's overt acts of mail and wire fraud.

87.   Plaintiff and the Class have been injured in their property by reason of Defendant Trump's violations of 18 U.S.C. §1962, including the price paid for the Live Events, which collectively amount to tens of millions of dollars, plus interest and late fees incurred on their credit cards.   In the absence of Defendant Trump's violations of 18 U.S.C. §1962, Plaintiff and the Class would not have incurred these losses.

88.   Plaintiff's and the Class's injuries were directly and proximately caused by Defendant Trump's racketeering activity.

89.   Defendant knew and intended that Plaintiff and the Class would rely on the Scheme's fraudulent representations and omissions.   Defendant Trump knew and intended Plaintiff and the Class would pay fees as a result of same.

90.   Under the provisions of 18 U.S.C. §1964(c), Plaintiff is entitled to bring this action and to recover their treble damages, the costs of bringing this suit and reasonable attorneys' fees.

91.   Defendant Trump is accordingly liable to Plaintiff and the Class for three times their actual damages as proved at trial plus interest and attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray this Court to enter a judgment against Defendant that:

A.    Certifies the Class under Rule 23 of the Federal Rules of Civil Procedure, as well as any appropriate subclasses, appointing Plaintiff as Class Representative, and appointing his attorneys as counsel to represent the Class;

B.    Awards actual, compensatory, statutory, consequential damages;

C.    Awards punitive and treble damages;

D.    Awards equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendant's ill-gotten gains, to ensure an effective remedy;

E.    Awards Plaintiff and Class Members the costs of this action, including reasonable attorneys' fees and expenses and expert fees;

F.    Enjoins Defendant from continuing to falsely market and advertise, conceal material information from the public, and commit unlawful and unfair business acts and practices; orders Defendant to engage in a corrective notice campaign, and requires Defendant to refund to Plaintiff and all Class Members the funds paid;

G.    Awards declaratory relief;

H.    Awards pre-judgment and post-judgment interest at the highest rate allowed by law; and

I.    Grants such further relief as this Court may deem just and proper.

DATED: October 18, 2013

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE
RACHEL L. JENSEN
THOMAS R. MERRICK

*/s/ Jason A. Forge*
JASON A. FORGE

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
HELEN I. ZELDES
ALREEN HAEGGQUIST
AARON M. OLSEN
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiff and Proposed Class