ROBBINS GELLER RUDMAN
 & DOWD LLP
JASON A. FORGE (181542)
jforge@rgrdlaw.com
RACHEL L. JENSEN (211456)
rjensen@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
ambere@zhlaw.com
HELEN I. ZELDES (220051)
helenz@zhlaw.com
ALREEN HAEGGQUIST (221858)
alreenh@zhlaw.com
AARON M. OLSEN (259923)
aarono@zhlaw.com
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiff and Proposed Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ART COHEN, Individually and  on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> DONALD J. TRUMP, <br><br> Defendant. | No. 3:13-cv-02519-GPC-WVG <br><br> <u>CLASS ACTION</u> <br><br> PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE AND APPOINTMENT OF CLASS COUNSEL <br><br> JUDGE:  Hon. Gonzalo P. Curiel <br> DATE:  September 26, 2014 <br> CTRM:  2D (Scwhartz) <br> TIME:  1:30 p.m. |

**[FILED UNDER SEAL]**

949331_1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   SUMMARY OF FACTS PROVED THROUGH COMMON EVIDENCE ................................................................................... 3

    A.    Trump's Uniformly Represented Integral Involvement ...................... 4

        1.    The Main Promotional Video Assured Trump's Integral Involvement ................................................................ 6

        2.    Trump's Marketing Assured His Integral Involvement ........... 6

        3.    The Playbook ......................................................... 8

        4.    PowerPoint Presentations and Scripts ......................... 9

    B.    Trump Uniformly Held out His Enterprise as a University ............... 11

    C.    Common Evidence of Trump's Control over the Enterprise ............. 12

III.  CLASS CERTIFICATION IS PROPER AND WARRANTED ................. 13

    A.    Applicable Legal Standards ................................................. 13

    B.    The Requirements of Rule 23(a) Are Readily Met ........................... 14

        1.    The Class Is Sufficiently Numerous ......................... 14

        2.    There Are Questions of Fact or Law Common to the Class ........................................................................ 14

        3.    Plaintiff's Claims Are Typical of the Class ........................... 15

        4.    Plaintiff Will Adequately Represent the Class ........................ 16

        5.    Plaintiff's Counsel Are Qualified to Serve as Class Counsel Pursuant to Rule 23(a) and (g)(1) ............................. 16

    C.    The Requirements of Rule 23(b)(3) Are Readily Met ....................... 17

        1.    Common Issues of Law and Fact Will Predominate ............... 17

            a.    The RICO Claim Will Turn on Common Proof ............ 17

            b.    Trump University's Records Will Be Used to Calculate Each Class Member's Damages ..................... 22

        2.    Class Treatment Is Superior in This Case ......................... 23

IV.  CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ..........................................................................17

*Bateman v. Am. Multi-Cinema, Inc.,*
  623 F.3d 708 (9th Cir. 2010) ...........................................................13

*BCS Servs. v. Heartwood 88, LLC,*
  637 F.3d 750 (7th Cir. 2011) ............................................................22

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) ..............................................................3

*Butler v. Sears,*
  702 F.3d 359 (7th Cir. 2012) ............................................................17

*Carlson v. Chisholm-Moore Hoist Corp.,*
  281 F.2d 766 (2d Cir.1960) (Friendly, J.) ........................................22

*Carter v. Berger,*
  777 F.2d 1173 (7th Cir. 1985) ..........................................................22

*Cartwright v. Viking Indus., Inc.,*
  No. 2:07-cv-02159-FCD-EFB, 2009 U.S. Dist. LEXIS 83286
  (E.D. Cal. 2009) ................................................................................24

*Cedric Kushner Promotions, Ltd. v. King,*
  533 U.S. 158 (2001) ..........................................................................18

*Crawford v. Honig,*
  37 F.3d 485 (9th Cir. 1994) ..............................................................16

*Dukes v. Wal-Mart Stores, Inc.,*
  603 F.3d 571 (9th Cir. 2010) ..............................................................3

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ............................................................13

**Page**

*Friedman v. 24 Hour Fitness USA, Inc.*,
  No. CV 06-6282 AHM, 2009 U.S. Dist. LEXIS 81975
  (C.D. Cal. Aug. 25, 2009) ........................................................................ 18

*Garner v. Healy*,
  184 F.R.D. 598 (N.D. Ill. 1999) ............................................................... 21

*Greenwood v. Compucredit Corp.*,
  No. C 08-04878 CW, 2010 U.S. Dist. LEXIS 3839
  (N.D. Cal. Jan. 19, 2010) .......................................................................... 19

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ....................................................... 15, 17, 24

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .................................................................... 15

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992) ........................................................................... 20, 23

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) .................................................................... 18

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
  268 F.R.D. 652 (S.D. Cal. 2010) ......................................................... 3, 21

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
  No. 3:05-cv-1018-GPC-WVG, 2013 U.S. Dist. LEXIS 20314
  (S.D. Cal. Feb. 14, 2013) (Curiel, J., presiding) .................................... 20

*In re Neurontin Mktg. & Sales Practices Litig.*,
  712 F.3d 60 (1st Cir.) ................................................................................ 21

*In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*,
  122 F.R.D. 251 (C.D. Cal. 1988) .............................................................. 18

*Juhline v. Ben Bridge Jeweler, Inc.*,
  No. 11cv2906-WQH-NLS, 2012 U.S. Dist. LEXIS 129413
  (S.D. Cal. Sept. 11, 2012) ............................................................ 14, 20, 23

**Page**

*Kennedy v. Jackson Nat'l Life Ins. Co.*,
   No. C 07-0371 CW, 2010 U.S. Dist. LEXIS 63604
   (N.D. Cal. June 23, 2010) ...................................................................... 21

*Lee v. Carter-Reed, LLC*,
   4 A.3d 561 (2010) ................................................................................... 23

*Leyva v. Medline Indus.*,
   716 F.3d 510 (9th Cir. 2013) ................................................................. 22

*Maiz v. Virani*,
   253 F.3d 641 (11th Cir. 2001) ............................................................... 22

*Makaeff v. Trump Univ., LLC*,
   715 F.3d 254 (9th Cir. 2013) ................................................................... 6

*Makaeff v. Trump University, LLC*,
   No. 10-cv-00940 ............................................................................*passim*

*McKenzie v. Fed. Express Corp.*,
   275 F.R.D. 290 (C.D. Cal. 2011) .......................................................... 19

*McMahon Books, Inc. v. Willow Grove Assocs.*,
   108 F.R.D. 32 (E.D. Pa. 1985) .............................................................. 18

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   238 F.R.D. 482 (C.D. Cal. 2006) ...................................................... 18, 21

*Oki Semiconductor Co. v. Wells Fargo Bank*,
   298 F.3d 768 (9th Cir. 2002) ........................................................... 20, 21

*Pac. Gas & Elec. Co. v. Howard P. Foley Co.*,
   No. 85-2922 SW, 1993 U.S. Dist. LEXIS 21414
   (N.D. Cal. July 27, 1993) ....................................................................... 22

*Peterson v. H&R Block Tax Servs.*,
   174 F.R.D. 78 (N.D. Ill. 1997) .............................................................. 21

*Pfizer Inc. v. Kaiser Found. Health Plan, Inc.*,
   __ U.S. __, 134 S. Ct. 786, 187 L. Ed. 2d 594 (2013) ................................21, 22

1

2
**Page**

3

4

*Reves v. Ernst & Young,*
507 U.S. 170 (1993) ........................................................................ 18

5

6

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479 (1985) ........................................................................ 18

7

8

*Sykes v. Mel Harris & Assocs. LLC,*
285 F.R.D. 279 (S.D.N.Y. 2012) .................................................... 14

9

10

*Taylor v. Sturgell,*
553 U.S. 880 (2008) ........................................................................ 14

11

12

*United States v. Kennedy,*
726 F.3d 968 (7th Cir. 2013) .......................................................... 23

13

14

*United States v. Peterson,*
538 F.3d 1064 (9th Cir. 2008) ........................................................ 19

15

*Wal-Mart Stores, Inc. v. Dukes,*
__ U.S. __, 131 S. Ct. 2541 (2011) ................................................ 14

16

**STATUTES, RULES AND REGULATIONS**

17

18

18 U.S.C.
§1962 ............................................................................................... 22

19

§1962(c) ...................................................................................... 1, 18
§1964(c) ........................................................................................... 22

20

21

RICO .......................................................................................... *passim*

22

Federal Rules of Civil Procedure
Rule 23 ....................................................................................... *passim*

23

Rule 23(a) ................................................................................ 14, 16
Rule 23(a)(1) ................................................................................... 14

24

Rule 23(a)(2) ................................................................................... 14

25

Rule 23(a)(3) ................................................................................... 15

26

Rule 23(a)(4) ................................................................................... 16
Rule 23(b)(3) ................................................................. 13, 17, 23, 24

27

Rule 23(g) .................................................................................... 1, 17

28

Rule 23 (g)(1) ............................................................................ 16, 17

1

2                                                                                    **Page**

3

**SECONDARY AUTHORITIES**

4

5   Jed S. Rakoff, RICO: CIVIL & CRIMINAL LAW & STRATEGY, (Supp. 2013)

        §4.02[3]........................................................................................................23

6

Ninth Circuit Manual of Model Criminal Instructions

7          8.121 ...........................................................................................................19

        8.124 ...........................................................................................................19

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Art Cohen
2  ("Plaintiff"), by and through his undersigned counsel, respectfully moves for class
3  certification.  Plaintiff requests that the Court appoint him Class Representative and
4  appoint his counsel to serve as Class Counsel pursuant to Rule 23(g).

## I.  INTRODUCTION

6  Defendant Donald J. Trump promised prospective students across the country
7  the same thing: "both an institution with which [he] was integrally involved as well as
8  'an actual university with a faculty of professors and adjunct professors.'"  Dkt. No.
9  21 at 10-11 (quoting ¶19).[1]  Through his eponymous "Trump University," Trump
10 delivered the same thing to all those whom he convinced to pay to enroll:  neither
11 himself nor a university.  Despite his promises, Trump played no meaningful role in
12 selecting Trump University's Live Events instructors or shaping its curricula.  And
13 throughout the years that Trump marketed this institution as "Trump University," he
14 did so in defiance of a personal directive from the New York State Education
15 Department ("NYSED") to stop referring to his institution as a "university" because it
16 did not meet any of the qualifications for this title.  Ex. 1.[2]  As the Court has
17 recognized, Plaintiff has distilled these allegations into a Complaint that "alleges a
18 single cause of action under a federal statute, alleging fraud and racketeering on behalf
19 of a nationwide class."  Dkt. No. 21 at 7.

20  If Plaintiff can prove his allegations, he and the rest of the proposed class will
21 prevail.  If not, Trump will prevail.  What this means is that this case can be litigated
22 one time for thousands, or it can be litigated one at a time by thousands.  Plaintiff's
23 Complaint was strong enough to defeat all of Trump's arguments to dismiss it – even

---

[1]  Here, and throughout, references to "¶" or "¶¶" are to the Complaint for Violations of 18 U.S.C. §1962(c) ("Complaint") (Dkt. No. 1), unless otherwise noted.

[2]  Here, and throughout, unless otherwise noted, references to "Ex." are to the exhibits attached to the Declaration of Jason A. Forge in support of the instant motion, filed concurrently herewith, and emphasis is added and internal citations and quotations are omitted.

1   under the heightened pleading standards that apply to fraud complaints – so this case
2   does not present the risk that class-action status will elevate a frivolous lawsuit into
3   one that can be exploited to extract a settlement.  Therefore, this case can deliver all of
4   the benefits of a class action (*e.g.*, judicial economy, access to court, avoidance of
5   inconsistent rulings, etc.) without the potential detriment of exploitation through
6   unwarranted leverage.

7        In the related action of *Makaeff v. Trump University, LLC*, No. 10-cv-00940,
8   this Court certified California, Florida, and New York consumer protection claims,
9   and California and Florida elder abuse claims based on the same underlying scheme.
10  *Makaeff* Dkt. No. 298.   The Court found commonality and predominance were
11  satisfied due to "substantial evidence of common misrepresentations made to all
12  putative class members," including common questions about misrepresentations that
13  Trump University was an actual university and that Trump "was heavily involved in
14  TU" and "hand-picked" the Live Event instructors.  *Id.* at 14-15, 20.

15       Plaintiff's Complaint presents an even stronger case for class treatment because
16  it consists of a single claim under the federal Racketeer Influenced and Corrupt
17  Organizations Act ("RICO").   A single federal claim can deliver even greater
18  efficiencies than *Makaeff* because this one claim applies to all students throughout the
19  nation, so one case and one set of elements will resolve all claims:  either Trump was
20  integrally "involved" in Trump University's Live Events, or he was not; and either it
21  was misleading for Trump to market his enterprise as Trump "University" or it was
22  not.  The common answers to these common questions will determine whether the
23  entire Class prevails or fails – but they will do so as one.

24       Accordingly, Plaintiff respectfully moves to certify the nationwide Class
25  alleged in his Complaint.  *See* ¶75.

26
27
28

## II.     SUMMARY OF FACTS PROVED THROUGH COMMON EVIDENCE

As detailed in Plaintiff's Complaint,[3] Trump sold real estate seminars and mentorships ("Live Events") through "Trump University," which he marketed nationally as a premier institution of higher learning rivaling Wharton Business School and with which he was so integrally involved, students would effectively be learning from him.  ¶¶1-2.  The gateway to these Live Events was a free Preview Seminar, which uniformly began with a promotional video in which Trump promised

> We're going to have ***professors and adjunct professors*** that are absolutely terrific. . . .  We are going to have the best of the best.  And, honestly, if you don't learn from them, ***if you don't learn from me***, if you don't learn from the people that we're going to be putting forward, and ***these are all people that are handpicked by me***, then, you're just not gonna make it in terms of the world of success.  And that's okay, but you're not gonna make it in terms of success.

¶3; *see* Ex. 2 (the "Main Promotional Video").[4]  Trump signed and mass mailed "special invitations" that also promised "hand-picked"/"***my*** world-class" instructors and a team of "Trump Experts."  ¶4; Exs. 3-5.  He was the lone star of a national advertising campaign that featured his name, likeness, and quotes about "Trump University" and its embodiment of his philosophies – all of which misleadingly portrayed to consumers that attending "Trump University" would be tantamount to learning from Trump himself.  ¶¶5, 19-21; Exs. 4, 8-12.

In truth, however, Trump would later admit that his involvement in "Trump

---

[3]   "On a motion for class certification, the Court 'is bound to take the substantive allegations of the complaint as true.' *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir. 1975). However, the Court is 'explicitly requir[ed] . . . to probe behind the pleadings if doing so is necessary to make findings on the Rule 23 certification decision.' [*Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571, 589 (9th Cir. 2010)]." *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 659 (S.D. Cal. 2010) ("*Nat'l W. I*").

[4]   *See* Ex. 6 at TU 52954 (Playbook scripted that the Main Promotional Video be played at the beginning of each Preview).  TU Former Instructor Martin similarly testified the Main Promotional Video was played at the beginning of every Preview seminar.  Ex. 7 (Martin Dep.) at 109:10-19.

University" was "completely absent." ¶23.[5]  Indeed, he had no substantive role in designing the curricula for "Trump University" Live Events or selecting the persons who would teach the curricula at those events. ¶¶22-24. Ex. 13 (DJT Dep.) at 102:24-105:3, 106:11-22, 111:14-114:6, 120:1-4.  Trump's use of the very name of the vehicle for his fraud, "Trump University," was a fraud unto itself inasmuch as: (1) it further implied his personal involvement; and, more importantly, (2) throughout the time Trump was marketing "Trump University" Live Events, he was defying a directive from the NYSED.  ¶6.  That directive came in the form of a May 27, 2005 letter the NYSED sent to Trump himself, which informed Trump that his business was unqualified to hold itself out as a "university" and directed him to stop using the name "Trump University." *Id.*; Ex. 1. Nevertheless, Trump marketed "Trump University" to all proposed Class members. ¶¶6, 20.

Trump assured the consistency of his representations by: (1) making them himself, as in the Main Promotional Video (*see* Ex. 2); (2) reviewing Trump University's advertisements[6]; (3) providing a "Playbook" to every instructor/speaker/mentor, which was "an aggregation of all the standard operating procedures, rules, regulations that governed how [Trump University] as an organization behaved and acted out in the field"[7]; and (4) providing PowerPoint presentations and scripts. Ex. 15 at TU 48770; Ex. 16 at 48961; Ex. 17 (Sommer Decl.), ¶9; Exs. 18, 145.

### A.    Trump's Uniformly Represented Integral Involvement

Trump's integral involvement was ***the selling point*** for Trump University. As Trump University's President testified, its consistent marketing theme was the

---

[5]    *Makaeff* Dkt. No. 32 at 5-6.

[6]    *See* Ex. 14 (Sexton Dep.) at 398:7-20.

[7]    *See* Ex. 14 (Sexton Dep.) at 163:10-15, 196:16-197:20.

1    "overarching messaging of Donald Trump's an expert in real estate."[8]   Market

2    research showed the Trump brand "motivated" consumers and enjoyed household

3    name recognition, second only to Bill Gates for entrepreneurship.[9]   Trump contends

4    that his brand is possibly **the** top brand for real estate, he could not imagine "anybody

5    being much more of an expert" than him in real estate, and valued his brand at over

6    $3 billion.[10]   Indeed, Trump marketed Trump University as providing his unique

7    insights into real estate accumulated over his career, touting:  "[N]o course offers the

8    same depth of insight, experience and support as the **one bearing my name**."[11]   Trump

9    thought consumers were likely drawn in due to his name, and intended that people

10   trust and want to learn from him.[12]

11        As the Ninth Circuit observed in reversing the denial of the plaintiff's anti-

12   SLAPP motion in *Makaeff*:

13            Trump University has not been shy about touting its connection to
             its eponymous creator. Evoking Trump's well-known reality television
14           series, Trump University's advertisements promise that enrolling in
             **Trump University is "the next best thing to being [Trump's]**
15           **Apprentice**." Its advertisements prominently showcase Trump's photo
             while urging consumers to "**[l]earn from the Master**," and promising to
16           teach Trump's "insider success secrets."  The home page of Trump
             University's website features Trump's photo next to the words: "Are
17           YOU My Next Apprentice? Prove it to me!" Trump University students
             are shown a slide depicting Trump University as the latest of Donald
18           Trump's achievements, alongside such feats as buying the "Taj Mahal"
             casino in Atlantic City and completing the "Trump Tower" in
19

20   [8]   Ex. 14 (Sexton Dep.) at 459:3-18.  TU distinguished itself based on Trump's
     involvement.  Ex. 7 (Martin Dep.) at 154:19-156:16, 182:6-19.

21
     [9]   Ex. 14 (Sexton Dep.) at 114:12-117:24; *see also id.* at 68:8-24 (Sexton's idea for
22   TU came during the first season of Trump's TV show, The Apprentice, and "thought
     [the Trump brand] would be a very effective – very, very effective way to connect
23   with people").

24   [10]   Ex. 13 (DJT Dep.) at 36:5-19, 44:1-21, 82:20-22.  *See* Ex. 14 (Sexton Dep.) at
     163:16-164:3 (testifying that the Trump "brand was critical to the business").

25   [11]   Ex. 19 at TU-LOW0000059.

26   [12]   Ex. 13 (DJT Dep.) at 50:6-9, 50:23-51:2.  *See, e.g.*, Ex. 20 at TU 59131, 59154,
     59156, 59163.  Ads proclaimed: Trump is "ready to share – with Americans like you –
27   his best advice on investing in today's 'once-in-a-lifetime' real estate market." Ex. 21
     at TU 130436.

28

1   Manhattan.

2 *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 258-59 (9th Cir. 2013).

3   In Trump's assessment:  "When I speak, people listen.  And, when I send out

4 invitations, people attend . . . ."[13]  And that is exactly what happened.

### 1. The Main Promotional Video Assured Trump's Integral Involvement

   As described above, Trump's Main Promotional Video was inescapably uniform inasmuch as the same video was posted on Trump University's website and played at the start of each Preview.  Ex. 22 (Trump University Website); Ex. 6 at TU 52954.  This video also undeniably represented that by enrolling in Trump University, students would effectively be learning from Trump:  "We are going to have the best of the best.  And, honestly, if you don't learn from them, ***if you don't learn from me***, if you don't learn from the people that we're going to be putting forward, and ***these are all people that are handpicked by me***, then, you're just not gonna make it in terms of the world of success."  *See* Ex. 2.

### 2. Trump's Marketing Assured His Integral Involvement

   Trump "conducted an aggressive advertising campaign" for Trump University, which "included online, social media, local and national newspaper, and radio advertisements for free introductory seminars."[14]  As this Court found, Trump's "multi-media promotional campaign" was "uniform, highly orchestrated, concentrated and focused on its intended audience."[15]  This advertising campaign uniformly conveyed two deceptive themes: (1) Trump's integral involvement (*i.e.*, learning from him by learning his real estate secrets/techniques through his handpicked professors

---

[13] Ex. 3 at TU 62081.

[14] *Makaeff*, 715 F.3d at 268-69; *see also* Ex. 14 (Sexton Dep.) at 229:14-231:19; Ex. 23 (chart with dates and locations of advertisements); Ex. 24 (Advertisements Chart).

[15] *Makaeff* Dkt. No. 298 at 22 & n.13.

1  and instructors); and (2) Trump University was a "university."[16]  Trump blanketed the

2  country with mass mailed "Special Invitation[s] from Donald J. Trump" to consumers

3  adorned with a coat of arms that urged:

4      Come to *my* free class.  In just 90 minutes, ***my hand-picked instructors***
       will share ***my techniques***, which took my entire career to develop.  Then,
5      just copy exactly what I've done to get rich.[17]

6      Trump-approved advertisements ran in mainstream newspapers and proclaimed

7  that students would effectively learn from him:  "***Donald Trump's handpicked***

8  ***instructor*** a ***systematic method*** for investing in real estate that anyone can use

9  effectively," and assured that "***I*** can turn anyone into a successful real estate investor,

10  including ***you***."[18]  Trump University's website promised students they would "Learn

11  from the Master" and that it was the "next best thing to being [Trump's] Apprentice"

12  because students would have access to "Insider success ***secrets from Donald***

13  ***Trump***."[19]

14      Of course, the free Previews were the cornerstone of Trump's marketing

15  campaign.  After beginning with the Main Promotional Video, the Preview instructors

16  were introduced as follows:  "It is now my pleasure to introduce one of ***Donald***

17  ***Trump's top instructors***.  He has been ***hand selected*** because of his ***expertise*** and

18  knowledge in the real estate business . . . ."[20]  Yet, Trump did not meet, let alone

19  select, any of the Preview instructors.  ¶5; Ex. 26 (Sexton NY AG Exam.) at 157:13-

20  15; Ex. 14 (Sexton Dep.) at 360:19-361:5; Ex. 13 (DJT Dep.) at 106:1-22.  And, once

21  upsold to the $1,495 Fulfillment seminar, personnel pressured students into buying the

22

23  [16]  *See, e.g.*, Ex. 24 (Advertisements Chart).

24  [17]  Ex. 4 at TU 25265-66.

25  [18]  Ex. 11, 21 at TU 130436.  "Any time we had a new ad, we [Sexton and Trump]
      would discuss it."  Ex. 14 (Sexton Dep.) at 398:7-12.

26  [19]  Ex. 25 at TU-PLTF00364-66.

27  [20]  Ex. 6 at TU 53041.  TU Former Instructor Martin said the "hand selected"
28  representation was a consistent theme.  *See* Ex. 7 (Martin Dep.) at 138:13-25.

$34,995 Gold Elite program by asking what they "could accomplish in real estate with every single resource Mr. Trump has at his disposal . . . and most importantly a **hand selected Trump certified multimillionaire mentor**."[21]   Students were constantly sold on purported access to Trump, his secrets and his people, but never got them.[22]

### 3.    The Playbook

Trump literally had a "PlayBook" for his scheme.  The PlayBook was a step-by-step guide to the Live Events – *i.e.*, the upsell scheme from Preview to $1,495 Fulfilment to $34,995 Gold Elite – which personnel were required to follow.[23]   The PlayBook spelled out the advertising campaign and carefully choreographed the Live Events, down to playing "Money Money Money" (Ex. 6 at TU 52949) and the Main Promotional Video at the beginning of each Preview (*id.* at 52954), as well as a scripted introduction for each speaker as a "one of Donald Trump's top instructors [who] has been hand selected."  *Id.* at 53041.  Once upsold to the Fulfillment, Trump had students prepare detailed financial "profile sheets" under the guise of investment preparation, but personnel secretly used that information to "determine who has the most and least liquid assets and rank them using" a scale from less than $2,000 to over $35,000, for the purpose of "Identifying Buyers" for the Elite packages.[24]   If the student balked at the steep price tag, the PlayBook provided scripts to overcome their objections.  *See, e.g.*, Ex. 6 (2010 PlayBook) at TU 53063; Ex. 21 at TU 130511.

---

[21]   Ex. 6 at TU 53062.

[22]   *See, e.g.*, Ex. 7 (Martin Dep.) at 58:19-59:1 (Trump University instructor neither met Trump nor taught Trump's techniques).

[23]   *See Makaeff* Dkt. No. 298 at 10 (describing PlayBook); Exs. 6, 21, 27-28 (2007-2010 PlayBooks); Ex. 14 (Sexton Dep.) at 196:16-198:10; The Live Events upsell scheme was as follows:  TU lured consumers to a "free" orientation (the "Preview," "The Front End," Profit from Foreclosures, or "PFF"), which was used to push students to a $1,495 3-day workshop (the "Fulfillment," "The Back End, Fast Track to Foreclosures," or "FTF"), which was used to push students to the Elite packages (*i.e.*, $34,995 Trump Gold Elite, $19,495 Trump Silver Elite, and $9,995 Trump Bronze Elite).  *See* Ex. 6 (2010 PlayBook) at TU 52938.

[24]   *Compare* Ex. 6 at TU 52969 (2010 PlayBook) *with* Ex. 29 (student goal setting sheet).

1    Personnel were not taught to convey Trump's real estate secrets, but were

2    trained in how to "plant seeds" for the sale and give the consumer "***just enough***

3    ***information to want more***."[25]   All personnel had to follow the procedures because, as

4    the PlayBook warned:

> 5    If all Trump U team members are following these procedures it will
>      greatly improve our chances to sell elite packages.  ***Even one***
> 6    ***coordinator giving them the impression three days is enough that can***
>      ***hurt sales.***  People will always take the path of least resistance; do not
> 7    give them the option.

8    Ex. 6 at 53059-60.

9    ### 4.    PowerPoint Presentations and Scripts

10   Trump University's instructors followed the Playbook's mandated consistency

11   through PowerPoint presentations and scripts that uniformly emphasized Trump's

12   integral involvement.  ¶¶21(i) & (j); Ex. 20 at 59131, 59154, 59156, 59163; Ex. 30 at

13   TU 59177 ("Why Am I Here?  Trump Called."), 59203 ("I [Trump] challenge

14   you . . . ."); Ex. 31 at 5-9; Ex. 18 at TU 154667-70.  Instructors were required to

15   follow these presentations and scripts and could not modify them "without prior

16   approval."[26]  The slides and scripted talking points falsely perpetuated the theme of

17   Trump's involvement, promising students would learn to invest "the Trump way"

18   from him and his handpicked instructors, and included references to instructors dining

19   with Trump, which a former instructor has admitted was a lie.[27]

20   These PowerPoint presentations and/or scripts for the free Preview and three-

21   day Fulfillment Seminar share consistent traits: (1) prominent display of the Trump

22   University logo and images of Donald Trump; (2) quotes/philosophies attributed to

---

23

24   [25]  Ex. 6 (2010 PlayBook) at TU 53059; Ex. 17 (Sommer Decl.), ¶4 ("[TU] personnel
     only provided enough information to get students to sign up for the next seminar or
25   program.").

26   [26]  Ex. 6 (2010 PlayBook) at TU 53004 ("TU presentations must be approved in
     advance and [speaker] may not change or modify presentation/slides without prior
27   approval."); Ex. 14 (Sexton Dep.) at 318:12-19.

28   [27]  *See* Ex. 7 (Martin Dep.) at 137:8-138:25, 149:18-24, 151:24-153:20.

1  Trump; (3) statements that the instructors were "hand-picked" or "hand selected" by

2  Donald Trump or the "TU founders;" and (4) promotion of paid Live Events.  Ex. 32

3  (pp.1-52 of Ex. 39 to *Makaeff* Dkt. No. 138); Exs. 18, 20, 31, 33.  Although instructors

4  did not use the identical words, a sample of transcribed seminar recordings confirms

5  that they did convey the same theme of being "hand-picked" by Donald Trump.

6  Ex. 34A.

7      There is abundant evidence that Trump's uniformly represented integral

8  involvement was completely false.  For example, Trump has made the judicial

9  admission that his ***involvement was "completely absent***."[28]  Indeed, Trump did not

10  participate in the Live Events, did not teach or mentor students, could not identify a

11  single program or what students received as part of any program, and does not even

12  know if students received a degree.[29]  Instead, Trump marketed Trump University, but

13  turned over the staffing and curriculum to the President, Michael Sexton, who lacked

14  real estate experience.[30]  Sexton has admitted: "None of our instructors at the live

15  events were hand picked by Donald Trump."[31]

16      But a recitation of all the evidence showing Trump's lack of substantive

17  involvement would be a distraction from what matters for class-certification purposes:

18  the facts and evidence either side could possibly offer regarding Trump's integral

19  involvement, or lack thereof, would be identical for all proposed class members.

20  Trump was either integrally involved with Trump University or he was not, but this

21  answer (and the evidence supporting it) cannot vary from student-to-student.

22

23  [28]  *Makaeff* Dkt. No. 32 at 5-6.

24  [29]  Ex. 13 (DJT Dep.) at 86:15-24, 107:10-19, 119:18-120:1-4, 130:14-20; Ex. 26
25  (Sexton NYAG Exam.) at 160:22-61:2, 163:8-11, 167:20-68:8; Ex. 7 (Martin Dep.) at
   58:14-20.

26  [30]  Ex. 13 (DJT Dep.) at 87:1-10 (Sexton responsible for TU courses); Ex. 14 (Sexton
27  Dep.) at 393:8-17 (Sexton had no real estate experience).

28  [31]  Ex. 26 (Sexton NYAG Exam.) at 157:13-15.

**B.      Trump Uniformly Held out His Enterprise as a University**

Although Trump used several different entities to extract "tuition" from students over the years, as pled, this case is limited only to students of "Trump University." ¶75.  Trump personally used this name to refer to his enterprise, along with a ubiquitous code of arms (¶¶21(b) and (m), 35, 36, 38; Exs. 4, 10-12, 20, 30, 31, 33) and many other indicia of an accredited university (*e.g.*, references to "faculty," "professors and adjunct professors," "curriculum," "accredit[ed]," and "tuition" used liberally on Trump University's website, in its marketing guidelines, advertisements, the Main Promotional Video, PowerPoint presentations, sales scripts in the PlayBook,[32] and Trump's self-proclaimed favorable comparison to the "best business school" that he attended (*see* Ex. 2)).

Trump also had "Marketing Guidelines" designed to "ensure brand, tone and *message consistency* across all Trump University's marketing efforts" regardless of medium.[33]  The Guidelines required use of "Ivy League quality" as a "Catch Phrases/Buzz Word[s]," referred to "faculty" comprised of Trump's "top experts," and a "tone" that makes one "Think of Trump University as a real University with a real Admissions process, *i.e.*, not everyone who applies, is accepted." ¶21(j).[34]  Clearly Trump set out to convey, and did convey, that "Trump University" was an actual accredited university.  *Makaeff* Dkt. No. 298 at 8-9.  It was not.

Once again, however, Plaintiff will not burden the Court with comprehensive merits evidence about the deceptiveness of this uniform portrayal.  For example, there

---

[32]  *See, e.g.*, Ex. 34B; Ex. 8 (Marketing Guidelines); Ex. 28 (2007 PlayBook) at TU 130313-18 (script demonstrates admissions ploy, starting with initial sales call "interview" before passing off consumer to another salesperson who is called the "Program Director," who decides if consumer is among "select group of people" who will get in).

[33]  Ex. 8 (Marketing Guidelines) at TU-DONNELLY00000014, TU-DONNELLY0000002 (purpose was to "define and establish [TU]'s branding strategy across *all* communication mediums both in visual and copy form").

[34]  Ex. 8 (Marketing Guidelines) at TU-DONNELLY00000015-17.

is no question that Trump University was not an accredited university and had no license to operate as an educational institution.[35]  It had no "faculty" of "professors and adjunct professors" for Live Events – Live Event instructors and mentors were independently contracted high-pressure salesmen with no threshold educational level and paid on commission for sales.[36]  And despite the ploy of an admissions process, the only real qualification was the means to pay, even if that meant a "student" had to raise their credit limits to do so, as Trump's personnel urged.[37]

But this case is not about precisely what it means for an institution to qualify as a "university."  Rather, the common question this case raises is practically rhetorical: was it materially misleading for Trump to market his institution as a "university," without revealing that, in 2005, the NYSED had written to Trump personally and directed him to stop calling his business a "university" because it did not come close to meeting the requirements to use such a title.[38]  As is true for the question concerning Trump's level of involvement with "Trump University," the question concerning the deceptiveness of Trump's use of the name "Trump University," and the corresponding indicia of legitimacy, must be proved or rebutted with the same evidence, and the answer cannot vary from student-to-student.

### C.   Common Evidence of Trump's Control over the Enterprise

Though Trump did not make good on his promises of integral involvement in the Live Events, he controlled the Trump University enterprise through a 93% ownership stake, the position of Chairman, and by making and reviewing marketing

---

[35]  The affidavit of Carole Yates, Director of the NYSED's Bureau of Proprietary School Supervision, presents a compelling chronology of Trump's defiance and deceptiveness regarding his marketing of a "university."  *See* Ex. 35 (Yates Affidavit).  This chronology will prove  the same deception for all students.

[36]  Ex. 17 (Sommer Decl.), ¶¶5-6; Ex. 36 (Highbloom Dep.) at 126:9-27:1; *see also* Ex. 7 (Martin Dep.) at 60:5-22 (TU instructor only paid sales commissions).

[37]  *See* Ex. 37 (Schnackenberg Decl.), ¶12; Ex. 38 (Nicholas Decl.), ¶¶10-11.

[38]  ¶6; *See also* Ex. 1.

1    materials.[39]   Trump was also Trump University's lone Managing Member, which

2    meant, *inter alia*, only he or someone he authorized could approve all "significant

3    contracts."   *See* Ex. 14 (Sexton Dep.) at 106:19-108:16.   Trump largely ignored

4    Trump University's corporate form and shared important roles with family members

5    who were not officers, directors or employees of Trump University.   *See* NY AG

6    Verified Cmpt., ¶¶149-161; Ex. 39 (Matejek NY AG Exam.) at 34:7-35:22.   For

7    example, the only persons who were signatories to Trump University's bank accounts

8    were Trump, his children, and Trump Organization's CFO.   *Id.*   Once again, though,

9    Plaintiff is not using this motion to prove that Trump controlled the Trump University

10   enterprise, but rather to demonstrate that the same evidence will yield the same answer

11   to this question of control for all student-victims.   It is not possible that Trump

12   controlled Trump University vis-à-vis some students, but not others.

## III.   CLASS CERTIFICATION IS PROPER AND WARRANTED

### A.   Applicable Legal Standards

Courts certify a class pursuant to Rule 23 when:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims of the
> class; and (4) the representative parties will fairly and adequately protect
> the interests of the class[,]

and the class satisfies Rule 23(b)(3)'s predominance and superiority requirements.

Fed. R. Civ. P. 23.

In deciding Plaintiff's motion for class certification, the Court "'examine[s] the

merits of the underlying claim . . . inasmuch as it must determine whether common

questions exist; not to determine whether class members could actually prevail on the

merits of their claims.'"   *Makaeff* Dkt. No. 298 at 12 (quoting *Ellis v. Costco

Wholesale Corp.*, 657 F.3d 970, 981 n.8 (9th Cir. 2011)).   The Court has broad

discretion to grant class certification.   *See Bateman v. Am. Multi-Cinema, Inc.*, 623

---

[39]   ¶¶15-16, 64; Verified Petition of NY AG, ¶¶132, 143 (N.Y. Sup. Ct. filed Aug. 24, 2013) ("NY AG Verified Cmpt."). Ex. 14 (Sexton Dep.) at 398:7-20.

1  F.3d 708, 712 (9th Cir. 2010).

2  **B.**   **The Requirements of Rule 23(a) Are Readily Met**

3  In making its decision, this Court examines Plaintiff's showing on each of the

4  requisite prongs of Rule 23, "starting with Rule 23(a) requirements of numerosity,

5  commonality, typicality, and adequate representation." *Makaeff* Dkt. No. 298 at 12.

6  All of Rule 23(a)'s factors are readily met here.[40]

7  **1.**   **The Class Is Sufficiently Numerous**

8  "To justify class certification, the Court must first find that the putative class is

9  'so numerous that joinder of all members is impracticable.'" *Makaeff* Dkt. No. 298 at

10  13 (quoting Fed. R. Civ. P. 23(a)(1)). As in *Makaeff*, the members of the proposed

11  nationwide class "number in the thousands." *Id.*; *see also* Ex. 40 (Covais Decl.),

12  ¶¶6(a)-(c). Thus, numerosity is met here.

13  **2.**   **There Are Questions of Fact or Law Common to the Class**

14

15  "Rule 23(a)(2) requires Plaintiff to demonstrate that 'there are questions of law

16  or fact common to the class.'" *Id.* (quoting Fed. R. Civ. P. 23(a)(2)). The Supreme

17  Court has said that, to satisfy commonality, "even a single common question will do."

18  *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2556 (2011).

19  Here, Plaintiff's RICO claim readily satisfies commonality, as it focuses on

20  Trump's scheme and common course of conduct, which ensnared Plaintiffs and the

21  other Class Members alike. *See, e.g.*, *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D.

22  279, 290 (S.D.N.Y. 2012) (RICO claim alleging scheme to file false affidavits to

23  procure default judgments met commonality). As Plaintiff here alleges that the

24  _____

[40]  Arguably Trump is precluded from re-litigating this and other Rule 23 factors

25  under the doctrine of issue preclusion (or collateral estoppel), which "bars successive
litigation of an issue of fact or law actually litigated and resolved in a valid court

26  determination essential to the prior judgment, even if the issue recurs in the context of
a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Many of the Rule 23

27  considerations here are identical to those decided in *Makaeff*, the factors were actually
litigated there, the Court's class certification decision is final, and Trump is a

28  defendant in *Makaeff*. *See Juhline v. Ben Bridge Jeweler, Inc.*, No. 11cv2906-WQH-
NLS, 2012 U.S. Dist. LEXIS 129413, at *7-*8 (S.D. Cal. Sept. 11, 2012).

1   Class's "injuries derive from defendants' alleged 'unitary course of conduct,'" he has

2   sufficiently "identified a unifying thread that warrants class treatment." *Id.*

3   Further, in *Makaeff*, the Court found that Trump's "tightly orchestrated

4   promotional campaign exposed class members to the alleged deceptive and misleading

5   representations that are at issue here." *Makaeff* Dkt. No. 298 at 15. The promotional

6   campaign in *Makaeff* is the same as alleged here. Thus, similar to *Makaeff*, common

7   questions for Plaintiff's RICO claim will be whether Trump represented to

8   prospective students the opportunity to effectively learn from him through a university

9   with which he was integrally involved; and, if so, whether such representations were

10   materially misleading. As in *Makaeff*, commonality is met here.

### 3.    Plaintiff's Claims Are Typical of the Class

12   "The Court must determine whether the claims or defenses of the representative

13   parties are typical of the claims or defenses of the class." *Makaeff* Dkt. No. 298 at 15

14   (citing Fed. R. Civ. P. 23(a)(3)). The class representative's claim need only be

15   "reasonably co-extensive with those of absent class members; they need not be

16   substantially identical." *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020

17   (9th Cir. 1998)). "'The purpose of the typicality requirement is to assure that the

18   interest of the named representative aligns with the interests of the class.'" *Id.*

19   (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Where

20   the plaintiff suffered a similar injury and other class members were injured by the

21   same course of conduct, typicality is satisfied. *Id.*

22   Here, the same course of conduct that injured Plaintiff also injured other class

23   members – or no one was injured. After Plaintiff saw an ad in the newspaper and (he

24   believes) received a "special invitation" from Trump by mail, he attended a typical

25   Preview seminar. *See* Dkt. No. 21 at 2; Ex. 41 Declaration of Art Cohen in Support of

26   Plaintiff's Motion for Class Certification ("Cohen Decl."), ¶3. As Trump intended,

27   like everyone else, Plaintiff was "[d]rawn in by Defendant's name and reputation."

28   Dkt. No. 21 at 2; Ex. 41 (Cohen Decl.), ¶4. During the Preview, Plaintiff saw and

heard that representations about Trump's integral involvement with the actual "university," as did all other class members, including such representations in Trump's Main Promotional Video. "Plaintiff then paid $1,495 to Trump University to attend a real estate retreat, where he subsequently purchased a 'Gold Elite' program for $34,995."[41]   Plaintiff would not have attended or paid for the programs, but for Trump's scheme that sold him on empty promises of access to Trump, his real estate secrets, and hand-picked "professors" at his "university." *See* Dkt. No. 21 at 2; Ex. 41 (Cohen Decl.), ¶¶5-8.  Because the scheme that harmed Plaintiff is the same as to the entire Class, typicality is readily met. *See Makaeff* Dkt. No. 298 at 16-17.

### 4.   Plaintiff Will Adequately Represent the Class

"Rule 23(a)(4) requires the representative parties to fairly and adequately protect the interests of the class."   *Id.* at 17 (citing Fed. R. Civ. P. 23(a)(4)). "Adequate representation 'depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.'"   *Id.* (quoting *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1994)).  As in *Makaeff*, Plaintiff does not have any interests antagonistic to absent Class members and will vigorously protect the interests of the Class.  Ex. 41 (Cohen Decl.), ¶9.  Plaintiff, like each Class member, has a strong interest in proving Trump' fraudulent scheme, establishing its unlawfulness, and obtaining redress.  Plaintiff understands his duties as a representative, agrees to consider the interests of absent Class members, and has, and will continue to, actively participate in this litigation.  *See id.*, ¶¶9-10.

### 5.   Plaintiff's Counsel Are Qualified to Serve as Class Counsel Pursuant to Rule 23(a) and (g)(1)

Under Rule 23(a), adequacy also "'depends on the qualifications of counsel for the representative[].'"  *Makaeff* Dkt. No. 298 at 17 (quoting *Crawford*, 37 F.3d at 487).

---

[41]   Dkt. No. 21 at 2; Ex. 41 (Cohen Decl.), ¶¶6-7; *see also* Ex. 40 (Covais Decl.), ¶¶6(b)-(d) (Plaintiffs purchases are typical of other class members).

And, "Rule 23(g)(1) requires the Court to appoint class counsel." *Id.* at 34.  In making its determination under Rule 23(g), the Court considers:  "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.*

In *Makaeff*, Plaintiffs demonstrated the undisputed qualifications of their counsel (*see* Ex. 42 (Jensen Decl.), Ex. 43 (Eck Decl.)), and the Court was satisfied that counsel met the criteria of Rule 23.  *See Makaeff* Dkt. No. 298 at 34.  The Court's finding should apply here.

## C.    The Requirements of Rule 23(b)(3) Are Readily Met

"Under Rule 23(b)(3), a plaintiff must show (i) 'that the questions of law or fact common to class members predominate over any questions affecting only individual members,' and (ii) that a class action is 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Makaeff* Dkt. No. 298 at 17 (quoting Fed. R. Civ. P. 23(b)(3)).  This case satisfies both predominance and superiority.

### 1.    Common Issues of Law and Fact Will Predominate

"Predominance is a question of efficiency." *Butler v. Sears*, 702 F.3d 359, 362 (7th Cir. 2012).  "The central Rule 23(b)(3) inquiry is whether 'the proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Makaeff* Dkt. No. 298 at 18 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594 (1997)). "If common questions 'present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication,' then 'there is clear justification for handling the dispute on a representative rather than on an individual basis[.]'" *Id.* (quoting *Hanlon*, 150 F.3d at 1022).

#### a.    The RICO Claim Will Turn on Common Proof

The Ninth Circuit favors class treatment of fraud claims stemming from a "common course of conduct," such as the scheme to defraud here. *Cf. Makaeff* Dkt.

1   No. 298 at 30 (citing *In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir.
2   2006)); *see, e.g.*, *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 492 (C.D.
3   Cal. 2006) (common questions about the "overarching fraudulent scheme" to sell
4   deferred annuities predominated on plaintiffs' RICO claims).  With respect to RICO,
5   "[t]he issues of law and fact in making out a RICO violation will generally be
6   common to all Plaintiffs' claims, because Plaintiffs are asserting a single fraudulent
7   scheme by the defendants which injured each plaintiff."  *In re United Energy Corp.
8   Solar Power Modules Tax Shelter Inv. Sec. Litig.*, 122 F.R.D. 251, 255-56 (C.D. Cal.
9   1988) (citing *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 38-39
10  (E.D. Pa. 1985)); *accord Friedman v. 24 Hour Fitness USA, Inc.*, No. CV 06-6282
11  AHM (CTx), 2009 U.S. Dist. LEXIS 81975, at *22-*23 (C.D. Cal. Aug. 25, 2009)
12  ("Common issues frequently predominate in RICO actions that allege injury as a
13  result of a single fraudulent scheme.").

14       The elements of Plaintiff's RICO claim include Defendant's "'(1) conduct (2)
15  of an enterprise (3) through a pattern (4) of racketeering activity.'"  Dkt. No. 21 at 5
16  (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); *Cedric Kushner
17  Promotions, Ltd. v. King*, 533 U.S. 158, 160 (2001).  Plaintiff must also show harm to
18  his business or property by the racketeering activity.  *Id.*  As to each of these elements,
19  every class member would prove them with the same evidence, and the answer would
20  be the same as to each class member.  For example, Trump either did or did not
21  "conduct" the Trump University enterprise.  "In order to 'participate, directly or
22  indirectly, in the conduct of such enterprise's affairs," one must have some part in
23  directing those affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (quoting 18
24  U.S.C. §1962(c)).  It is apparent that this element, as well as the remaining three, must
25  be proved (or not) through common proof about Trump's relationship vis-à-vis Trump
26  University, not individual student-victims.  Therefore, both the proof and the answer
27  as to each element will be the same as to each student-victim.

28       In order to establish the predicate acts of mail and wire fraud, Plaintiff must

prove that: (1) Trump devised a scheme to defraud by means of false or fraudulent pretenses; (2) the statements made or facts omitted were material – that is, they had a natural tendency to influence, or were capable of influencing a person to part with money or property; (3) Trump acted with the intent to defraud – that is, the intent to deceive or cheat; and (4) Trump used, or caused to be used, the mails or wires in furtherance of the scheme. *See* Ninth Cir. Manual of Model Crim. Instrs. 8.121 and 8.124. It is well-established that whether or not a statement or omission is material – that is, "capable of influencing" – is an objective test. *See, e.g.*, *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) ("'capable of influencing' is an objective test, which looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end'"). It is clear from these elements that the proof of the alleged predicate acts will concern Trump's scheme itself and its ***objective*** effect. Therefore, whether Trump targeted one or one million student-victims, the proof and determination as to each element will be the same.

Specifically, Plaintiff will prove Trump engaged in a scheme to defraud consumers in the sale of Trump University Live Events with common proof of his conduct and knowledge, corporate policies and procedures, such as the PlayBook and Marketing Guidelines; uniform advertising and marketing campaign; personnel contracts; scripted PowerPoint presentations; formers instructors' testimony; and correspondence with entities such as the NYSED and the BBB. If Plaintiff succeeds in proving Trump's scheme, the claims of all other class members will be more than substantially advanced; they will be proved. *See McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 299-300 (C.D. Cal. 2011).

Any minor differences in the specific language of Trump's expressions of his universal representations of teaching students through a "university" with which he was integrally involved are irrelevant. *See, e.g.*, *Greenwood v. Compucredit Corp.*, No. C 08-04878 CW, 2010 U.S. Dist. LEXIS 3839, at *12 (N.D. Cal. Jan. 19, 2010) ("minor differences in wording between a few solicitation versions does not defeat

typicality"). There simply is not a single piece of marketing material that does not convey Trump's integral involvement through a combination of several or all of the following: personal quotes/philosophies/real estate techniques, first-person promises, his name, and his image. Exs. 3-6, 9, 30, 44. This is epitomized by the Main Promotional Video and the name "Trump University" (along with its crest, references to "professors," etc.).

Likewise, RICO does not require Plaintiff to prove individual reliance. *See Bridge*, 553 U.S. at 660 ("RICO's text provides no basis for imposing a first-party reliance requirement."). RICO requires only "but for" and proximate causation – *i.e.*, a direct relation between the misconduct and the injury. *See In re Nat'l W. Life Ins. Deferred Annuities Litig*., No. 3:05-cv-1018-GPC-WVG, 2013 U.S. Dist. LEXIS 20314, at *12 (S.D. Cal. Feb. 14, 2013) (Curiel, J., presiding) ("*Nat'l W. II*") (denying defendant's motion for decertification). Proximate causation under RICO "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654 (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 272, n.20 (1992)). Instead, proximate causation is generally satisfied if the injury is "a foreseeable and natural consequence" of the scheme. *See id.* at 658. The scheme need not be the "sole cause" of the injury; it is sufficient to show the defendant's misconduct was "a substantial factor in the sequence of responsible causation." *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 773 (9th Cir. 2002).

Here, the causal relationship between Trump's scheme and the student-victims is the same for everyone. The natural and intended consequence of Trump's uniform representations and omissions was that Plaintiff and the Class would purchase the Trump University Live Events **because of Trump's integral involvement with this "university."** That is why Trump's involvement with this "university" was the focus of all marketing materials. That is why Trump's Main Promotional Video kicked off every Preview seminar. Indeed, Trump himself has proclaimed that, "When I speak,

1  people listen.  And, when I send out invitations, people attend . . . .”  *See* Ex. 3 at TU

2  62081.  Trump sold would-be students on ***his*** integral involvement with a “university”

3  in which ***his*** instructors would teach ***his*** real estate techniques.  Under these

4  circumstances, it would be almost irrational to say that Trump’s representations were

5  not “a substantial factor in the sequence of responsible causation.”   *Oki*

6  *Semiconductor*, 298 F.3d at 773.   As this Court found in *Makaeff*, “[t]here is

7  substantial evidence that class members paid for TU seminars for reasons that track

8  the advertising and promotional information provided in the highly orchestrated

9  campaign.” *Makaeff* Dkt. 298 at 22.

10        This “‘common sense’ or ‘logical explanation’ for the behavior of plaintiffs and

11  the members of the class” is a completely acceptable method of proving causation.

12  *Nat’l W. I*, 268 F.R.D. at 665-66; *Negrete*, 238 F.R.D. at 491; *Kennedy v. Jackson*

13  *Nat’l Life Ins. Co.*, No. C 07-0371 CW, 2010 U.S. Dist. LEXIS 63604, at *28 (N.D.

14  Cal. June 23, 2010) (allowing inference of RICO causation where annuities were

15  allegedly worth less than represented); *Garner v. Healy*, 184 F.R.D. 598, 602 (N.D.

16  Ill. 1999) (classwide proof of RICO causation permissible where car “wax” product

17  was not actually “wax”); *Peterson v. H&R Block Tax Servs.*, 174 F.R.D. 78, 85 (N.D.

18  Ill. 1997) (classwide presumption of RICO causation permissible where class paid

19  fees for services for which they were ineligible).

20        Just last year, the First Circuit confronted a similar question in another RICO

21  case involving allegations of the defendants’ off-label promotion of the drug

22  Neurontin.  *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 68 (1st Cir.)

23  *sub nom*, *Pfizer Inc. v. Kaiser Found. Health Plan, Inc.*, __ U.S. __, 134 S. Ct. 786,

24  187 L. Ed. 2d 594 (2013).  Although *In re Neurontin* was not a class action, the

25  question on appeal was whether the District Court had erred by not requiring the

26  plaintiff-health-benefits-providers to prove on a prescription-by-prescription basis that

27  the defendants’ “allegedly fraudulent marketing campaign caused the plaintiffs to pay

28  for more Neurontin prescriptions for bipolar disorder than they otherwise would have

1  paid." *Id.*  The first Circuit affirmed, observing that,

2  > A tort plaintiff need not "prove a series of negatives; he doesn't have to 'offer evidence which positively exclude[s] every other possible cause of
3  > the accident.'" [*BCS Servs. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011)] (alteration in original) (quoting *Carlson v. Chisholm-Moore*
4  > *Hoist Corp.*, 281 F.2d 766, 770 (2d Cir. 1960) (Friendly, J.)). "Once a plaintiff presents evidence that he suffered the sort of injury that would
5  > be the expected consequence of the defendant's wrongful conduct," the burden shifts to the defendant to rebut this causal inference. *Id.* at 758.

6  *Id.*

7  Here, too, given that Plaintiff and the Class paid great sums of money for

8  "Trump University," but received neither Trump nor a university, proximate cause for

9  purposes of the RICO claim will be simple to resolve on a classwide basis.  *Id.*

10  **b.    Trump University's Records Will Be Used to
11  Calculate Each Class Member's Damages**

12  Finally, "the amount of damages, even if it is an individual question, does not

13  defeat class certification." *Makaeff* Dkt. No. 298 at 27 (citing *Leyva v. Medline Indus.*,

14  716 F.3d 510, 513-14 (9th Cir. 2013)).  "'At class certification, plaintiff must present

15  a likely method for determining class damages, though it is not necessary to show that

16  his method will work with certainty at this time.'"  *Id.*

17  In *Makaeff*, the Court found appropriate the plaintiffs' proposed method of

18  calculating damages "based on the amount Plaintiffs and other class members paid,

19  plus interest." *Id.*  Here, too, there will be "a post-judgment administrative proceeding

20  where [Trump University's] records will be used to distribute checks to class members

21  based on the amount that they paid." *Id.*  The only difference here is the Class is

22  entitled to treble damages and attorneys' fees under the RICO Statute.  *See* 18 U.S.C.

23  §§1962 and 1964(c).

24  Plaintiff's method of calculating damages based upon trebled refunds is

25  appropriate.  Courts have emphasized:  "***A plaintiff injured by civil RICO violations***

26  ***deserves a complete recovery***[.]"  *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001);

27  *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir. 1985) (holding that, under RICO, "the

28  directly injured party should receive a complete recovery, no matter what"); *Pac. Gas*

& *Elec. Co. v. Howard P. Foley Co.*, No. 85-2922 SW, 1993 U.S. Dist. LEXIS 21414, at *8-*9 (N.D. Cal. July 27, 1993) ("A plaintiff prosecuting a civil RICO claim is entitled to complete recovery for the harm that proximately results from the predicate acts.").  And RICO provides flexible concepts of causation and damages to ensure a defendant is held liable "'for the consequences of that person's own acts.'"  *See Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 268).  Plaintiff may recover all damages that are the "foreseeable and natural consequence[s]" of the fraud.  *See id.* at 658.  This includes the return of monies paid by him.  *See* Jed S. Rakoff, RICO: CIVIL & CRIMINAL LAW & STRATEGY, §4.02[3] (Supp. 2013).

The damages the student-victims suffered here are analogous to the losses suffered by a victim who pays for fraudulent artwork.  Last year, the Seventh Circuit concluded that the "actual loss" attributable to such a fraud and the appropriate amount of restitution is the ***entire amount paid*** "for artwork that turned out to be fraudulent."  *United States v. Kennedy*, 726 F.3d 968, 974 (7th Cir. 2013); *see also Lee v. Carter-Reed, LLC*, 4 A.3d 561 (2010) (approving class-damages theory of full refunds for fraudulent fat-reduction pills).  As alleged, Trump misled student-victims as to the very essence of what they would receive.  Instead of effectively learning from Trump by learning his real estate techniques from his handpicked instructors at an actual "university," instructors whom Trump neither met nor selected presented students with curricula to which Trump did not contribute or review, and Trump orchestrated all of this through an entity that he called a "university" in defiance of a direct order from the NYSED.  Like the recipient of fraudulent artwork, Trump's student-victims are entitled to the entire amount they paid for this fraudulent "education."  Certainly, this "proposed method of calculating damages does not defeat predominance or render the case unmanageable."  *Makaeff* Dkt. No. 298 at 27.

### 2.    Class Treatment Is Superior in This Case

"Rule 23(b)(3) requires that class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Makaeff* Dkt. No.

1    298 at 32 (quoting Fed. R. Civ. P. 23(b)(3)).  Superiority "requires determination of

2    whether the objectives of the particular class action procedure will be achieved in the

3    particular case.'"  *Id.* (quoting *Hanlon*, 150 F.3d at 1023).  Two key factors for

4    "determining superiority are the 'extent and nature of any litigation concerning the

5    controversy already commenced by or against members of the class,' and 'the likely

6    difficulties in managing a class action.'"  *Id.*

7        As in *Makaeff*, a class action is superior here because, "while individual class

8    members' interests are not minuscule, they have little interest in individually

9    controlling actions based on the potential amount in damages." *Makaeff* Dkt. No. 298

10   at 33.  Further, while this Court has certified certain California, Florida, and New

11   York claims, Class members from the rest of the country are not included and "courts

12   'often certify class actions arising from similar facts.'"  *Id.* at 34 (quoting *Cartwright*

13   *v. Viking Indus., Inc.*, No. 2:07-cv-02159-FCD-EFB, 2009 U.S. Dist. LEXIS 83286, at

14   *48 (E.D. Cal. 2009)).  Therefore, class certification will promote even greater

15   efficiency here as it will allow Class Members nationwide to seek redress through this

16   action.  Such an approach will present no manageability problems because only one

17   claim applies to all Class Members.

18        Finally, this Court has rejected Trump's argument that the pendency of the NY

19   AG state court action defeats superiority.  *Id.* at 33.

20

21

22

23

24

25

26

27

28

## IV.    CONCLUSION

Plaintiff respectfully requests that: (1) the Court certify the RICO claim for nationwide classwide treatment; (2) the Court appoint Plaintiff as Class Representative; and (3) the Court appoint Plaintiff's counsel to serve as Class Counsel.

DATED:  June 16, 2014                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE
RACHEL L. JENSEN


                                                 s/ Jason A. Forge
                                          JASON A. FORGE

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
HELEN I. ZELDES
ALREEN HAEGGQUIST
AARON M. OLSEN
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiff and Proposed Class

## DECLARATION OF SERVICE

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on June 16, 2014 declarant served PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE AND APPOINTMENT OF CLASS COUNSEL via email to the parties listed below:

Counsel for Defendants:

Jill A. Martin (jmartin@trumpnational.com)
c/o Trump National Golf Club Los Angeles
One Trump National Drive
Rancho Palos Verdes. CA 90275

Nancy L. Stagg
(nstagg@foley.com, smoreno@foley.com)
Benjamin J. Morris
(bmorris@foley.com; vgoldsmith@foley.com)
FOLEY & LARDNER LLP
3579 Valley Centre Dr., Suite 300
San Diego. CA 92130-3302

Attorneys for Plaintiff and Proposed Class:

Amber L. Eck (ambere@zhlaw.com;
robyns@zhlaw.com; winkyc@zhlaw.com)
Aaron M. Olsen (aarono@zhlaw.com)
ZELDES, HAEGGQUIST & ECK LLP
625 Broadway, Suite 1000
San Diego. CA 92101

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 16, 2014, at San Diego, California.

_____
s/ Melissa Bacci
MELISSA BACCI

949331_1

3:13-cv-02519-GPC-WVG

# Mailing Information for a Case  3:13-cv-02519-GPC-WVG Cohen v. Trump

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,robyns@zhlaw.com

- **Jason A Forge**
  jforge@rgrdlaw.com,llendzion@rgrdlaw.com,tholindrake@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jill Ann Martin**
  jmartin@trumpnational.com,lvincent@trumpnational.com

- **Benjamin James Morris**
  bmorris@foley.com,vgoldsmith@foley.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **Nancy L. Stagg**
  nstagg@foley.com,smoreno@foley.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)