# EXHIBIT 12
# [Filed Under Seal]

Exhibit 12
- 234 -



CONFIDENTIAL

TU 60666

Exhibit 12
- 235 -



# A Personal Message from Donald Trump

I congratulate you! You made one smart decision when you enrolled in my breakthrough workshop. It seems that you're a doer, not a dreamer.

Only doers get rich.

I know that in these three packed days, you will learn everything needed to make a million dollars or more within the next twelve months. I chose your instructor from among hundreds of very smart people who would love the job. This is someone with all the talent and real-world experience to guide you to success.

What I don't know is this: Will you act on what you learn? Let's be real here: No one is going to hand you a million bucks just because you attend my workshop. To be sure, the money is out there waiting for you, but you have to go and get it. You have to take action, and not just once.

Action must become your second nature.

You've made the first step – great. You took the plunge and committed to your education. But I don't want you waiting until the workshop before you take your next steps to wealth.

That's why I've asked my team to create Real Estate Breakthrough. Make no mistake, with this Action Journal in your hands, your journey to wealth is starting right now.

Notice the word "now" — the favorite word of every successful entrepreneur. Real estate investment is a business. Take your business seriously and learn to love the word "now."

For those willing to learn and act, the real estate market today is awash with financial opportunity. Take to heart the advice I am giving you here, and there is no limit to the wealth you can create.

All success!

*Donald J. Trump*

Donald J. Trump
Chairman, Trump University

CONFIDENTIAL

TU 60667

Exhibit 12
- 236 -

# EXHIBIT 14
# [Filed Under Seal]

Exhibit 14
- 255 -

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

       Plaintiffs,

                        CASE NO.: 10 CV 0940 EIG (WVG)

  -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

       Defendants.

-----------------------------------------------

VIDEOTAPED DEPOSITION of MICHAEL SEXTON

August 22, 2012

New York, New York


Reported by:
Eileen Mulvenna
CSR/RMR/CRR
Job No. 10003486

Exhibit 14
- 256 -

CONFIDENTIAL

Michael Sexton                                                      Makaeff v. Trump University

**Page 1**

** CONFIDENTIAL ** CONFIDENTIAL **
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
CASE NO.: 10 CV 0940 EIG (WVG)
-------------------------------------------x
TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

       Plaintiffs,

  -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

       Defendants.

-------------------------------------------x

August 22, 2012
9:57 a.m.

VIDEOTAPED DEPOSITION of MICHAEL SEXTON,
30(b)(6) Witness in the above-captioned matter,
taken by Plaintiffs, held at 725 Fifth Avenue,
New York, New York, before Eileen Mulvenna,
CSR/RMR/CRR, Certified Shorthand Reporter,
Registered Merit Reporter, Certified Realtime
Reporter and Notary Public of the State of
New York.

**Page 2**

```
 1    ** CONFIDENTIAL ** CONFIDENTIAL **
 2   A P P E A R A N C E S :
 3
 4
 5    ROBBINS GELLER RUDMAN & DOWD, LLP
      Attorneys for Plaintiffs
 6       655 West Broadway
         Suite 1900
         San Diego, California  92101
 7    BY:  RACHEL L. JENSEN, ESQ.
         rachelj@rgrdlaw.com
 8
 9         -and-
10
11    ZELDES & HAEGGQUIST, LLP
         625 Broadway
         Suite 906
12       San Diego, California 92101
      BY:  AMBER L. ECK, ESQ.
13       ambere@zhlaw.com
         AARON M. OLSEN, ESQ.
14       aarono@zhlaw.com
15
16
17    YUNKER & SCHNEIDER
      Attorneys for Defendants
         655 West Broadway
18       Suite 1400
         San Diego, California  92101
19    BY:  DAVID K. SCHNEIDER, ESQ.
         dks@yslaw.com
20
21
22   A L S O  P R E S E N T :
23
      Richard Ramos, Videographer
24
25
```

**Page 3**

```
 1    ** CONFIDENTIAL ** CONFIDENTIAL **
 2              STIPULATIONS
 3
 4        IT IS HEREBY STIPULATED AND AGREED,
 5   by and between the attorneys for the respective
 6   parties herein, that filing and sealing be and
 7   the same are hereby waived.
 8
 9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form of the
11   question, shall be reserved to the time
12   of the trial.
13
14        IT IS FURTHER STIPULATED AND AGREED
15   that the within deposition may be signed and
16   sworn to before any officer authorized to
17   administer an oath, with the same force and
18   effect as if signed and sworn to before the
19   officer before whom the within deposition was
20   taken.
21
22
23
24
25
```

**Page 4**

```
 1          SEXTON - CONFIDENTIAL
 2        THE VIDEOGRAPHER:  Good morning.
 3   This is Tape No. 1 of the videotaped
 4   deposition of Michael Sexton in the matter
 5   of Tarla Makaeff, et al., versus Trump
 6   University LLC, et al., in the United
 7   States District Court for the Southern
 8   District of California.
 9        This deposition is being held at The
10   Trump Organization located at
11   725 5th Avenue, New York, New York 10022 on
12   August 22, 2012, at approximately 9:57 a.m.
13        My name is Richard Ramos and I'm the
14   legal video specialist.  The court reporter
15   is Eileen Mulvenna.
16        Will counsel please introduce
17   themselves beginning with the party
18   noticing this proceeding.
19        MS. JENSEN:  Yes.  Good morning.  My
20   name is Rachel Jensen from Robbins Geller
21   Rudman & Dowd, and I'm here representing
22   the plaintiffs.
23        MS. ECK:  Amber Eck of Zeldes &
24   Haeggquist representing the plaintiffs.
25        MR. OLSEN:  Aaron Olsen, Zeldes &
```

1 (Pages 1 to 4)

Exhibit 14
- 257 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

1   SEXTON - CONFIDENTIAL
2   psychographics.
3       A.   It is.
4       Q.   What were your years of employment
5   there?
6       A.   I want to say 2000 to 2002.
7       Q.   And for all of these positions,
8   Accenture and then Digital Discovery and then
9   Install, did you leave these positions
10  voluntarily to pursue the next position?
11      A.   Yes, I did.
12      Q.   Then after Install, for what
13  companies did you work?
14      A.   I worked for -- I started a company
15  called Katon Direct.
16      Q.   Can you spell that?
17      A.   K-A-T-O-N.
18           It was called Katon Partners when we
19  launched it.  And that's a -- that was a
20  technology-driven health care recruitment
21  company.
22      Q.   Can you explain that?
23      A.   Yes.  So traditionally if you need
24  to hire a nurse, put an ad out on Monster or the
25  newspaper and you hope people see your ad and
                                        Page 61

1   SEXTON - CONFIDENTIAL
2   apply for the job.  Or you hire -- for a higher
3   level job, you may hire a headhunter to go out
4   and find somebody.
5           So for licensed professionals, you
6   can literally get everybody that legally can fill
7   that job.  And what we did is we got the universe
8   of people that had the required licensure to fill
9   a specific job.  And then rather than hope people
10  saw the ad, employers would come to us and say, I
11  want four registered nurses at this location.
12          We had all the licensed
13  professionals that can legally fill that role, so
14  we could very effectively and efficiently contact
15  everybody in a drive range around that location,
16  because commute time is a key indicator of job
17  satisfaction, and reach out to them and say, hey,
18  there's this job, are you interested?
19          So it's a much more proactive way to
20  make what people always refer to as that passive
21  job candidate -- make them aware that there's an
22  opening close to them.
23      Q.   And when did you start the company?
24      A.   Probably 2003 or late 2002,
25  somewhere in there.
                                        Page 62

1   SEXTON - CONFIDENTIAL
2       Q.   And what was your position there?
3       A.   I was partner.
4       Q.   How many partners did you have?
5       A.   Three at the time.
6       Q.   And how many employees did you have?
7       A.   When I left, maybe a dozen.
8       Q.   When did you leave?
9       A.   It would have been the winter of
10  2004, so sometime before the new year.
11      Q.   And why did you leave?
12      A.   I left to start Trump University.
13      Q.   And do you still have an interest in
14  Katon?
15      A.   I do not.
16      Q.   Is this Katon -- is Katon still in
17  business?
18      A.   It is.
19      Q.   So do you -- strike that.
20           Did you sever all ties when you left
21  Katon in terms of equity interest and so forth?
22      A.   Yes, I did.
23      Q.   Accenture is still in business,
24  isn't it?
25      A.   Yes.
                                        Page 63

1   SEXTON - CONFIDENTIAL
2       Q.   Digital Discovery?
3       A.   I don't know.
4       Q.   Install?
5       A.   No.
6       Q.   When did that company go out of
7   business?
8       A.   Shortly after 9/11.
9       Q.   Was it related to 9/11?
10      A.   Yes, it was.
11      Q.   Was it in one of the towers or --
12      A.   No, it was a funding issue.  It was
13  scheduled to close to allow us to expand.  And
14  that environment -- post 9/11, nobody was lending
15  money -- or investing money.
16      Q.   Is that why you left and started
17  another company?
18      A.   Yes, it is.
19      Q.   Could you take me through and -- the
20  process of starting Trump University, whose idea
21  was Trump University?
22      A.   It was my idea.
23      Q.   And did you present that directly to
24  Mr. Trump?
25      A.   I did.
                                        Page 64

16 (Pages 61 to 64)

Exhibit 14
- 258 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | SEXTON - CONFIDENTIAL |
| 2 | Q. How did you come to meet Mr. Trump? |
| 3 | A. One of my former partner's |
| 4 | brother-in-law was a golfing friend of |
| 5 | Mr. Trump's. |
| 6 | Q. Former partner's brother-in-law? |
| 7 | A. Yes. |
| 8 | Q. Was a golfing buddy? |
| 9 | A. Yes. |
| 10 | Q. And who was that? |
| 11 | A. His name a Jonathan Spitalny. |
| 12 | Q. Could you spell his last name. |
| 13 | A. S-P-I-T-A-L-N-Y. |
| 14 | Q. And was Jonathan involved in the |
| 15 | starting of Trump University as well? |
| 16 | A. He was involved in the -- not in the |
| 17 | operational portion of starting the company, but |
| 18 | in the negotiations to start the company. |
| 19 | Q. And when you say "negotiations," do |
| 20 | you mean negotiations with Mr. Trump? |
| 21 | A. Yes, I do. |
| 22 | Q. And how was he involved? |
| 23 | A. He was present at the early |
| 24 | meetings, obviously he arranged for the early |
| 25 | meetings, and continued to be involved through -- |

Page 65

1    SEXTON - CONFIDENTIAL
2    through the negotiation of the contract.
3         Q.   And did he have an interest in Trump
4    University?
5         A.   Yes, he did.
6         Q.   Do you know what his interest was?
7         A.   I believe it's 3.5 percent.
8         Q.   Does he still have an interest in
9    Trump University?
10        A.   I don't know.
11        Q.   How did you have the idea to start
12   Trump University?
13        A.   The business was going well, and we
14   were looking for additional services that we
15   could provide to our target market health care
16   professionals.
17        Q.   I'm sorry, when you say "business,"
18   you mean Katon?
19        A.   Katon, yes.
20             And I started looking at
21   specifically the requirements for health care
22   professionals to get continuing education credits
23   to maintain a licensure and was exploring
24   offering those educational training products
25   through the Internet, an e-learning platform.

Page 66

1    SEXTON - CONFIDENTIAL
2    And that's where -- the genesis.
3             The idea was that -- running the
4    numbers found that the acquisition cost to get a
5    new customer in a pretty commoditized environment
6    was too high.  And so started thinking about what
7    other -- if there's a brand in that -- in that
8    industry you could license to differentiate
9    yourself from the other continuing education
10   providers.
11            And that's where -- that's what kind
12   of got the thinking if you can do it in that
13   area, why limit yourself just to health care?
14   Why not -- other small business owners that have
15   a need for business education that aren't
16   adequately being served today, if we could
17   license a brand that could cut through the
18   clutter and connect with small/midsize
19   businesses, that would be a compelling business.
20        Q.   What do you mean by "cut through the
21   clutter"?
22        A.   So if you're -- anybody that's tried
23   to market to small business owners or even
24   executives at midsize businesses, middle market
25   companies know that it's very -- it's difficult

Page 67

1    SEXTON - CONFIDENTIAL
2    to reach them because, you know, they're busy
3    people.  And if you had a brand, it would make --
4    it would make it much more compelling from a
5    marketing standpoint to be able to connect with
6    them and effectively communicate what you were
7    offering.
8         Q.   And the idea of brand, did that make
9    you think of Donald Trump?
10        A.   It did.  It was -- if I recall, it
11   was during the first season of The Apprentice.
12   And it seemed like a long time ago, but they
13   were -- made quite a splash because there
14   were a number of courses being taught at
15   traditional four-year colleges, lessons learned
16   about the -- from The Apprentice, management
17   lessons from The Apprentice.
18            And it kind of caught my attention
19   that the brand had transcended real estate to be
20   something much bigger, more of an entrepreneurial
21   brand in many people's mind.  And I thought it
22   was -- from a brand equity standpoint, I thought
23   it would be a very effective -- very, very
24   effective way to connect with people.
25        Q.   I was just thinking who says that TV

Page 68

17 (Pages 65 to 68)

Exhibit 14
- 259 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | SEXTON - CONFIDENTIAL |
| 2 | watching isn't productive. |
| 3 | A. That's right. |
| 4 | Q. So this came to you in a flash |
| 5 | thinking about The Apprentice? |
| 6 | A. It did. |
| 7 | Q. And -- and then -- and then Jonathan |
| 8 | put you in touch with Mr. Trump? |
| 9 | A. He did. |
| 10 | Q. And when was the first time you met |
| 11 | with Donald Trump? |
| 12 | A. It would have been in 2004. I |
| 13 | imagine the summer of 2004. |
| 14 | Q. And not to belabor the point, but in |
| 15 | that conversation, the first meeting, as it were, |
| 16 | was it you and Jonathan and Mr. Trump? |
| 17 | A. And a partner of mine, Richard |
| 18 | Kaskel. |
| 19 | Q. Who is Richard Kaskel? |
| 20 | A. He was my partner at Katon Partners. |
| 21 | Q. And did he also have an equity |
| 22 | interest in Trump University? |
| 23 | A. No. |
| 24 | Q. Did he have any role in Trump |
| 25 | University? |

Page 69

1   SEXTON - CONFIDENTIAL
2       A.    Originally our strategy was to
3   license the brand. And he would have had a role
4   if we had gone down that path. We didn't, so he
5   didn't.
6       Q.    And what would -- I'm sorry. Is he
7   an attorney or --
8       A.    No, no. He was just a business
9   person.
10      Q.    Okay. Okay. Why did you decide not
11  to go down -- I think you said that path?
12      A.    That path.
13          During the course of multiple
14  meetings with Mr. Trump and other members of the
15  Trump organization, Mr. Trump kind of -- it
16  changed at his direction from a licensing
17  agreement to an equity ownership.
18      Q.    And you mean, by "equity ownership,"
19  his equity ownership?
20      A.    Correct. Rather than us raising
21  money in the financial markets and licensing his
22  brand to build the business, he wanted to put his
23  own money in. He thought it was a compelling
24  concept. And rather than an arm's length
25  license, he would, in fact, be equity partner.

Page 70

1           SEXTON - CONFIDENTIAL
2       Q.    And was he -- was his equity
3   interest about roughly 93 percent?
4       A.    92 1/2, I believe. No, you're
5   right, 93. No, I'm sorry, I don't remember. 92
6   or 93.
7       Q.    Sure.
8           And do you recall how much of his
9   own money he invested?
10          MR. SCHNEIDER: I'm going to object.
11  The court's already ruled it's not
12  appropriate for the case.
13          I instruct you not to answer.
14          The court's already ruled on this,
15  Rachel.
16          MS. JENSEN: The court did not rule
17  as to the amount of money that he invested
18  in the company.
19          MR. SCHNEIDER: He did. You --
20  you've asked in documents. You've asked
21  him redacted documents for his capital
22  contribution, how much money has been paid
23  to Mr. Trump, how much money was put into
24  the company. And every time the judge has
25  ruled, now twice, that monies to or from

Page 71

1           SEXTON - CONFIDENTIAL
2   Donald Trump are not relevant to your case.
3           MS. ECK: My recollection is that
4   the question was in regard to money paid to
5   Donald Trump and not in regard to money
6   that Donald Trump paid.
7           MR. SCHNEIDER: That's not accurate.
8           MS. JENSEN: That's correct.
9           MR. SCHNEIDER: You all brought a
10  motion seeking to get the capital
11  contributions on the limited liability
12  operating agreement. And you lost. That
13  included the capital contributions in the
14  limited -- in the operating agreement that
15  were redacted. And you asked the court to
16  remove the redaction so you could see the
17  contributions made by the partners, and the
18  court said no.
19          MS. JENSEN: My recollection is that
20  it was the monies that were paid to. But
21  again, you know, I want to keep moving, so
22  we'll reserve on that. And we might come
23  back to that.
24  BY MS. JENSEN:
25      Q.    So in your initial meetings, besides

Page 72

18 (Pages 69 to 72)

Exhibit 14
- 260 -

CONFIDENTIAL

**Michael Sexton**                                    **Makaeff v. Trump University**

| | |
|---|---|
| 1  SEXTON - CONFIDENTIAL | 1  SEXTON - CONFIDENTIAL |
| 2  asked for it this week, we produced it this | 2  annually? |
| 3  morning and -- | 3  A.   It actually never changed from the |
| 4  (Discussion off the record.) | 4  original agreement. |
| 5  BY MS. JENSEN: | 5  Q.   Was it an annual amount? |
| 6  Q.   In case I didn't ask this question | 6  A.   Yes, it was.  Paid out every two |
| 7  on the record. | 7  weeks. |
| 8  Again, I'm -- how much of a pay | 8  Q.   And was it contingent on revenues? |
| 9  reduction did you take in terms of dollar | 9  A.   No, it was not. |
| 10  amounts? | 10  Q.   Was it contingent on profits? |
| 11  A.   10 percent. | 11  A.   No, it was not. |
| 12  (Discussion off the record.) | 12  Q.   Just to clarify, by "original |
| 13  Q.   How were you compensated -- how were | 13  agreement," do you mean your employment |
| 14  you compensated by Trump University? | 14  agreement? |
| 15  MR. SCHNEIDER:  Are you asking for a | 15  A.   I do. |
| 16  dollar amount?  Are you trying to invoke | 16  Q.   And I take it that your employment |
| 17  the objection?  I'll make it.  I'm not sure | 17  agreement was part of the negotiations for Trump |
| 18  if you're asking if he received a paycheck | 18  University -- |
| 19  every two weeks, or are you asking for the | 19  A.   Yes, it was. |
| 20  dollar amount. | 20  Q.   -- we were talking about previously? |
| 21  BY MS. JENSEN: | 21  And I don't want to ask you |
| 22  Q.   I'm asking -- I'll say were you paid | 22  questions that I think I know the answers to, so |
| 23  by a flat salary? | 23  you were originally the president; correct? |
| 24  A.   I was paid a management fee. | 24  A.   Correct. |
| 25  Q.   Was that management fee set | 25  Q.   And did your title ever change? |
| Page 101 | Page 102 |
| 1  SEXTON - CONFIDENTIAL | 1  SEXTON - CONFIDENTIAL |
| 2  A.   It did not. | 2  MR. OLSEN:  Can I have the Bates |
| 3  Q.   Did your responsibilities or job | 3  numbers again? |
| 4  duties ever change? | 4  MS. JENSEN:  It's TU129757. |
| 5  A.   No, they did not. | 5  BY MS. JENSEN: |
| 6  MS. JENSEN:  David, do you have | 6  Q.   Mr. Sexton, is this the employment |
| 7  additional copies of the employment | 7  agreement for your employment with Trump |
| 8  agreement? | 8  University? |
| 9  MR. SCHNEIDER:  I think I did make a | 9  A.   Yes, it is. |
| 10  couple of copies. | 10  Q.   If you can turn to the last page of |
| 11  MS. JENSEN:  Okay.  That's a | 11  the document, which is -- I don't know -- do you |
| 12  document I do not have in the binders for | 12  see the heading, "Schedule A"? |
| 13  you because I just received it. | 13  A.   Yes, I do. |
| 14  MR. SCHNEIDER:  (Handing document to | 14  Q.   And there is a list from number 1 to |
| 15  the witness.) | 15  10 for employees' duties and responsibilities? |
| 16  MS. JENSEN:  But I would like to | 16  A.   Uh-huh. |
| 17  introduce this document as Exhibit No. 2. | 17  Q.   Does that fairly portray what your |
| 18  It is entitled the "Employment Agreement," | 18  duties and responsibilities were while at Trump |
| 19  it is Bates ranges TU129757 to 71, which I | 19  University? |
| 20  will ask the court reporter to mark as | 20  (Witness peruses the exhibit.) |
| 21  Exhibit No. 2. | 21  A.   Yes, it was -- yes, it does. |
| 22  (Plaintiffs' Exhibit 2, Bates Nos. | 22  Q.   And were you the person primarily |
| 23  TU129757 through 72, Employment Agreement, | 23  responsible for each one of these duties and |
| 24  marked for identification.) | 24  responsibilities? |
| 25  (Discussion off the record.) | 25  A.   Yes, I was. |
| Page 103 | Page 104 |

26 (Pages 101 to 104)

**www.aptusCR.com**

Exhibit 14
- 261 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

SEXTON - CONFIDENTIAL

1
2      Q.    Looking at Schedule A, is there
3  anybody else who had primary responsibility for
4  these duties and responsibilities?
5      A.    Well, number 6, certainly Steven
6  Matejek, our controller.
7      Number 9, certainly our chief
8  marketing officer.
9      Q.    I'm sorry, that's Michael Bloom?
10     A.    Correct.
11     But other than that, yes.  And,
12  look, number 3 was kind of a collaborative
13  effort.
14     Q.    Collaborative effort?
15     A.    With -- it's pretty high level
16  talking about business processes.  If there was a
17  customer service business process, it would be
18  David Highbloom.  If it was a marketing business
19  process, it would be Michael Bloom.  But
20  certainly I worked in collaboration with them.
21     Q.    Thank you.
22     Where did you report location-wise?
23  Where did you show up every morning?
24     A.    Well, initially we didn't have
25  offices, so it was kind of pre -- pre venture.

Page 105

SEXTON - CONFIDENTIAL

1
2  We worked out of here, this building, at times.
3  We -- again, I don't recall the exact date, but
4  we got offices at 40 Wall Street relatively
5  quickly.  And that's where -- that's where we
6  remained in a different -- two different office
7  spaces there for the remainder of the term.
8      Q.    I'm sorry, so you had two different
9  office spaces at 40 Wall --
10     A.    We started in a very small space and
11  then, as we grew a bit, we got a slightly bigger
12  space.
13     Q.    Did you have an office at Trump
14  Organization -- you said in the beginning?
15     A.    No, we were never given an office.
16  If we needed to use a conference room, we'd use a
17  conference room.
18     Q.    Okay.  Fair enough.
19     Did you report to anyone?
20     A.    You know, technically, I don't know.
21  I mean, technically, Mr. Trump is the managing
22  member.  Practically speaking, Allen Weisselberg
23  is the CFO.
24     Q.    CFO of Trump Organization?
25     A.    Correct.

Page 106

SEXTON - CONFIDENTIAL

1
2      Again, reporting is a little --
3  there's kind of the reporting from a -- the
4  operating agreement standpoint.  You know, I
5  didn't report to anybody in Trump Organization
6  from an organizational hierarchy standpoint.
7      Q.    I'm sorry, I just want to make sure
8  I understand your question -- your answer.
9      A.    Sure.
10     Q.    So from an operating agreement
11  standpoint.  So, again, are you referring to the
12  members?
13     A.    Correct.  The LLC.  So I reported --
14  inasmuch as I had to report the managing in
15  Schedule A to the managing member financial
16  results, I'm using report in one way.  If you're
17  asking who -- from an organizational development
18  standpoint or hierarchy standpoint who I reported
19  to here, I didn't report to anybody.
20     Q.    So you did have a responsibility to
21  report the financials to the managing member?
22     A.    The overall performance of the
23  business.
24     Q.    Correct.
25     And then also I see, on number 10,

Page 107

SEXTON - CONFIDENTIAL

1
2  there's a parenthetical next to "Negotiating
3  significant contracts."
4      A.    Uh-huh.
5      Q.    It says, "With approval of a
6  managing member or another person authorized by
7  Donald Trump."
8      What types of contracts would be
9  significant enough to warrant preapproval?
10     A.    The BSG contract would be a good
11  example.  We certainly didn't have many, but
12  that's the one that sticks in my mind as --
13     Q.    Any others?
14     A.    Maybe the rent, the office lease
15  at -- yes, I'm sure the office lease at 40 Wall.
16  Other than that, I can't recall.
17     Q.    And then in terms of people who
18  reported to you, is it fair to say that everybody
19  else at Trump University ultimately reported to
20  you?
21     A.    Yes, it is.
22     Q.    Did you have anybody directly report
23  to you?
24     A.    Yes.
25     Q.    And who was that?

Page 108

www.aptusCR.com

Exhibit 14
- 262 -

CONFIDENTIAL

**Michael Sexton**                                    **Makaeff v. Trump University**

SEXTON - CONFIDENTIAL
1
2      A.   David Highbloom, who is the chief
3  operating officer.  I mean, it evolved over time,
4  right.  So if you want a snapshot, towards the
5  end, it was Michael Bloom as the chief marketing
6  officer, Steven Matejek as the controller.  I
7  guess April Neumann as the director of
8  operations.
9          (Discussion off the record.)
10     Q.   Trump University was registered to
11 do business in New York; correct?
12     A.   Yes.
13     Q.   Was it registered to do business in
14 any other state?
15     A.   Yes.
16     Q.   What other states?
17     A.   It's A long list.  We had operations
18 in Illinois, where we had a -- our Greg Saunders,
19 who we spoke of earlier, was effectively our CTO,
20 lived and worked out of his home.
21          And Ben Mueller from Florida.
22          Chief learning officer by the name
23 of Roger Schank.
24     Q.   Sorry, what was his title, chief
25 learning officer?

Page 109

SEXTON - CONFIDENTIAL
1
2      A.   Learning officer, uh-huh.
3      Q.   And could you spell Roger's last
4  name for the record?
5      A.   I believe it's S-C-H-A-N-K.
6          We had a fulfillment, logistics kind
7  of pick, pack and ship fulfillment warehouse that
8  we contracted with out in Arizona.  And then we
9  filed to do businesses in states where we were
10 going to appear in the course of business.
11     Q.   Do you recall what states -- what
12 states you were registered with?
13     A.   I would just be guessing, but
14 California, Florida, New York, New Jersey,
15 Maryland, Virginia.  Every state where we would
16 routinely conduct business.
17     Q.   And do you mean by "routinely
18 conduct business" the live events or --
19     A.   Correct.  And/or have a
20 presence.  I think they call it nexus, where --
21 where we had an employee or some kind of ongoing
22 operation like the logistics facility --
23     Q.   Sure.
24     A.   -- in Phoenix.
25     Q.   Did you have any employees in

Page 110

SEXTON - CONFIDENTIAL
1
2  California?
3      A.   No, we did not.
4      Q.   Did you have any other nexus in
5  California?
6      A.   No, we did not.
7      Q.   Is there an entity called Trump U
8  CA?
9      A.   I believe there is, yes.
10     Q.   And what was its relationship to
11 Trump University LLC?
12     A.   I didn't deal with the specific
13 corporations, but I believe it was a company that
14 we set up to ensure we paid the proper taxes in
15 Canada.  I know -- again, I wasn't directly
16 involved with that, but I know we had to go
17 through a fair amount of paperwork,
18 administrative to do business in Canada.  That
19 was part of it.
20     Q.   So the "CA" stands for Canada?
21     A.   Yes, it does.
22     Q.   Besides the offices at 40 Wall
23 Street, did Trump University also have an office
24 at 399 Pine Road, Briarcliff Manor, New York?
25     A.   No.

Page 111

SEXTON - CONFIDENTIAL
1
2      Q.   Do you know -- does that address
3  ring a bell?
4      A.   It doesn't to me.  I know Mr. Trump
5  has I think a golf course in Briarcliff Manor,
6  but I don't know the address of it.
7      Q.   Moving to the Trump University
8  operating agreement, did Trump University
9  entered -- enter into a license with Donald Trump
10 to use the name Trump?
11     A.   I don't recall if that was a
12 specific part of the operating agreement.
13     Q.   I'm going to direct your
14 attention --
15     A.   Should I do something with this?
16     Q.   You can put it actually back into
17 the binder -- I'm sorry, that one wasn't in the
18 binder before.  Could you put it in the left-hand
19 pocket right there.
20          (Witness complies.)
21     Q.   That would be great.  Thanks.
22          I'd like to direct your attention to
23 a document labeled TU62027 through 56.  Perhaps
24 your counsel can help you --
25          MR. SCHNEIDER:  Which binder?

Page 112

28 (Pages 109 to 112)

**www.aptusCR.com**

Exhibit 14
- 263 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|
| 1  SEXTON - CONFIDENTIAL | 1  SEXTON - CONFIDENTIAL |
| 2  MS. JENSEN:  These are all labeled | 2  **Q.   It says that the company will enter** |
| 3  numerically, and it says on the binder what | 3  **into a license agreement with Trump, which** |
| 4  the Bates ranges are. | 4  **states, among other things, the rights of the** |
| 5  THE WITNESS:  This goes up to 56 | 5  **company for the use of the name "Trump" as part** |
| 6  or -- | 6  **of the name of the company in the form and on the** |
| 7  MR. SCHNEIDER:  So what is the | 7  **terms satisfactory to the manager?** |
| 8  number? | 8  A.   Yes, I do. |
| 9  MS. JENSEN:  It should be the one | 9  **Q.   Does that refresh your recollection** |
| 10  after that. | 10  **as to whether there was a license agreement?** |
| 11  62027. | 11  A.   Yes, appears to be. |
| 12  We'll ask that it be marked as | 12  **Q.   Whose idea was it to use the name** |
| 13  Exhibit No. 3. | 13  **Trump in the name of the organization?** |
| 14  (Plaintiffs' Exhibit 3, Bates Nos. | 14  A.   It was mine.  We wouldn't have |
| 15  TU62027 through 56, Operating Agreement, | 15  approached the Trump Organization and Donald |
| 16  marked for identification.) | 16  Trump specifically unless we intended to use that |
| 17  BY MS. JENSEN: | 17  name as part of the branding. |
| 18  **Q.   Could you please turn to page No. 6.** | 18  **Q.   So that was always part of the plan?** |
| 19  **I'm sorry, before we get there, do** | 19  A.   Right. |
| 20  **you recognize that this is the operating** | 20  **Q.   To which -- it sounds like Mr. Trump** |
| 21  **agreement of Trump University?** | 21  **agreed?** |
| 22  A.   It appears to be, yes. | 22  A.   Yes, he agreed. |
| 23  **Q.   Turning to page No. 6, do you see** | 23  **Q.   Why did you want to use the name** |
| 24  **the heading for "Name"?** | 24  **Trump?  I understand that it's -- from your prior** |
| 25  A.   Yes, I do. | 25  **testimony, I'm not trying to misstate anything,** |
| Page 113 | Page 114 |

| | |
|---|---|
| 1  SEXTON - CONFIDENTIAL | 1  SEXTON - CONFIDENTIAL |
| 2  it was for brand purposes.  Can you explain that | 2  **Q.   Do you remember the name of the** |
| 3  a little bit more? | 3  **survey?** |
| 4  A.   We thought it was a very | 4  A.   You know, I believe it was Intuit, |
| 5  aspirational and inspirational brand that could | 5  actually.  I believe it was Intuit who conducted |
| 6  motivate people.  And going back to the earlier | 6  the survey. |
| 7  testimony, at this point in time, the Trump brand | 7  **Q.   You don't recall the name of the** |
| 8  really transcended real estate. | 8  **survey, sitting here?** |
| 9  And there was actually a survey -- | 9  A.   No.  That was seven years ago. |
| 10  we'd done a fair amount of research into what | 10  **Q.   Was the survey released in 2004?** |
| 11  brands really do represent the best of | 11  A.   I believe it's 2004. |
| 12  entrepreneurship in America.  And there was a | 12  **Q.   Just curious, what was the number** |
| 13  survey done by a recognized company, I forget, | 13  **one?** |
| 14  maybe it was Microsoft, and Trump was the number | 14  A.   I believe it was Bill Gates. |
| 15  two recognized brand for entrepreneurship very | 15  **Q.   Would have made sense, if it was a** |
| 16  specifically in America. | 16  **Microsoft survey.** |
| 17  And we felt it was the most | 17  A.   That's why I was thinking Microsoft. |
| 18  compelling brand out there that would -- that | 18  **Q.   Right.** |
| 19  would be accessible to a broad range of people | 19  A.   But, again, it wasn't lost on us |
| 20  who would understand kind of instantly when you | 20  that colleges -- four-year colleges and some |
| 21  put that name what it stood for. | 21  community colleges were actually teaching courses |
| 22  **Q.   Did you keep that survey in your** | 22  based on lessons learned from the program.  So it |
| 23  **records?** | 23  clearly -- clearly people were motivated by it, |
| 24  A.   I don't recall.  I'm sure it was | 24  so we thought it was a very, very good brand. |
| 25  referenced in -- you know, in early documents. | 25  **Q.   And by "motivated," do you mean** |
| Page 115 | Page 116 |

29 (Pages 113 to 116)

Exhibit 14
- 264 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| | |
|---|---|
| 1      SEXTON - CONFIDENTIAL | 1      SEXTON - CONFIDENTIAL |

1         SEXTON - CONFIDENTIAL
2 motivated to buy?
3     A.   Motivated to do -- to act. We did a
4 fair amount of research on small business owner
5 market. And historically, it's been a very, very
6 difficult market to crack because small business
7 owners are typically more worried about making
8 payroll and the day-to-day operations of the
9 business as opposed to investing in building
10 their education and training to grow the
11 business.
12     And so many companies had kind of
13 gone down that path and been frustrated by --
14 even though everybody agrees -- surveys will show
15 they know they need to do specific things to
16 improve their financial performance and grow the
17 business, but they don't have time to do it.
18     So we were looking for something
19 that was aspirational that would get people to
20 get up and act.
21     Q.   And, I'm sorry, by "act," do you
22 mean sign up for the program?
23     A.   To engage in the training and
24 education, right.
25     Q.   Okay. So -- I mean, the end result

Page 117

1         SEXTON - CONFIDENTIAL
2 would be to buy the product; right?
3     MR. SCHNEIDER: Well, he's answered
4 this two or three times now, Rachel. You
5 keep asking. He said it's to do
6 something --
7     MS. JENSEN: I know. I understand.
8 I'm trying to flush it out, David.
9     MR. SCHNEIDER: What you want is the
10 answer that -- what you want is the answer
11 to buy, but he's twice now told you that's
12 not what it was. He said it's to do
13 something, to get businesses to move
14 into --
15     MS. JENSEN: No, I understand. I'm
16 trying to flush it out further. So that's
17 what --
18     MR. SCHNEIDER: That's not what your
19 question was. You said, it's this; right?
20 And he said, no, it's X. And you go, okay,
21 but really it's this; right? And he said,
22 no. And you said, okay, but it's to buy --
23     MS. JENSEN: Are you instructing
24 your client not to answer?
25     MR. SCHNEIDER: If you harass him, I

Page 118

1         SEXTON - CONFIDENTIAL
2 will.
3     MS. JENSEN: I'm not harassing. I'm
4 absolutely not harassing. So let me ask my
5 questions and let him give me the answers.
6 And right now you're -- you're coaching
7 him, so --
8     MR. SCHNEIDER: No, he's answered
9 it -- I let him answer twice, and then on
10 the third time, you're trying to
11 recharacterize it. That's improper.
12     MS. JENSEN: No, I'm not trying to
13 recharacterize it at all. I'll trying to
14 flush it out.
15     I think the question is still
16 pending.
17     (Record read.)
18     THE WITNESS: Again, we were kind of
19 thinking about it. When you build a
20 business, you have to understand who your
21 market is and what their need is. And if
22 their need's not currently being met by
23 other products or services on the market,
24 then there's an opportunity.
25     So the opportunity for us was to get

Page 119

1         SEXTON - CONFIDENTIAL
2 people engaged in training and education
3 with a specific purpose of building their
4 business. So when we talk about acting and
5 motivating, we were trying to act -- get
6 small business owners to act on their own
7 behalf to build their skill base so that
8 they could grow their business and achieve
9 their goals.
10 BY MS. JENSEN:
11     Q.   And they -- they would do so how? I
12 guess I'm not understanding the end --
13     A.   Sure.
14     Q.   -- the end result here.
15     A.   So the end result is, if I can give
16 a store owner in Idaho an opportunity to take a
17 marketing class from Don Sexton, a tenured
18 professor at Columbia Business School, for $300,
19 I want to do everything I can to get him to take
20 that class because that class is fundamentally
21 going to change the way he approaches his
22 business.
23     And that's not -- that was never
24 available anywhere at that time. And to the best
25 of my knowledge, you start seeing a little bit of

Page 120

30 (Pages 117 to 120)

Exhibit 14
- 265 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|
| 1       SEXTON - CONFIDENTIAL | 1       SEXTON - CONFIDENTIAL |

**Page 121 (left column)**

1         **SEXTON - CONFIDENTIAL**
2 it being available now, but that was a very
3 compelling value proposition from my standpoint.
4     Q.   And so for purposes of this
5 hypothetical, did Don Sexton offer these courses
6 through Trump University?
7     A.   Yes, he did.
8     Q.   Online?  They're online courses?
9     A.   Yes.
10     Q.   Did he ever teach at a live event?
11     A.   No.  We specifically wanted him as a
12 subject matter expert for the e-learning courses.
13     Q.   Besides the equity that you
14 discussed earlier as to Donald Trump, did he --
15 was there consideration given on behalf of Trump
16 University to obtain the license agreement?
17     MR. SCHNEIDER:  Objection.  Vague.
18     THE WITNESS:  No.  Everything was
19 included in this operating agreement.
20 BY MS. JENSEN:
21     Q.   Okay.  Was -- the operating
22 agreement, was that written up by Trump
23 Organization?
24     A.   Yes, it was.
25     Q.   Jason Greenblatt?

**Page 122 (right column)**

1         **SEXTON - CONFIDENTIAL**
2     A.   Yes.
3     Q.   Do you have an understanding at that
4 time as to why Trump Organization was providing
5 legal services for Trump University's operating
6 agreement?  Was there an agreement that Trump
7 Organization would provide legal services for
8 Trump University?
9     A.   I can't talk to what happened before
10 the formation of the company, how Greenblatt was
11 acting on behalf of the managing member.  I don't
12 know.  I will say subsequent to that, we had --
13 you know, we used one of the few things we used
14 the Trump Organization for as a shared service
15 was the legal department, if that's your
16 question.
17     Q.   Yes.  Thank you.
18     A.   For part of our agreements.
19     Q.   Was that in a side agreement or in
20 writing anywhere?
21     A.   No, it wasn't.  No.
22     Q.   I understand that you left the
23 company, according to your testimony today,
24 July 31, 2010.  At that time, were there
25 discussions about filing for bankruptcy?

**Page 123 (left column)**

1         **SEXTON - CONFIDENTIAL**
2     A.   Just to clarify, that's my last
3 formal day.  I helped with transition.  Obviously
4 no compensation, but helped manage a transition
5 for, you know, I don't know a month and a half
6 after that, something like that, as-needed.
7        Were there discussions about
8 bankruptcy?
9     MR. SCHNEIDER:  Those would be
10 discussions outside of the presence of any
11 counsel.
12     THE WITNESS:  I can't think of any
13 time we discussed that outside of the
14 presence of counsel.
15 BY MS. JENSEN:
16     Q.   Do you know whether there's an
17 ongoing discussion about whether to file for
18 bankruptcy on behalf of Trump University?
19     MR. SCHNEIDER:  Objection.
20 Foundation.
21     And, first, I doubt there's a
22 foundation, but -- about what's currently
23 going on, but any information that you
24 personally have unrelated to counsel --
25     THE WITNESS:  I have no information.

**Page 124 (right column)**

1         SEXTON - CONFIDENTIAL
2     MS. JENSEN:  Just for the future,
3 David, if you could please finish -- I
4 mean, wait to start talking until after I
5 finish my question.  I was still asking my
6 question.  So I want to make sure we have a
7 clean record for this deposition.
8     MR. SCHNEIDER:  Well, the question
9 said, "Do you know whether there's any
10 ongoing discussion about whether to file
11 for bankruptcy on behalf of Trump
12 University?"
13     And then I made my objection on
14 foundation.  So were you not finished with
15 that question?
16     MS. JENSEN:  You were starting to
17 talk before I had finished that question.
18 So apparently we have a very proficient
19 court reporter who can still clean it up.
20 But I'm saying for a clean record --
21     MR. SCHNEIDER:  Sure.
22     MS. JENSEN:  -- and also for
23 courtesy, if you could please wait
24 until I've finished, I'd appreciate it.
25 That's all I'm asking.

31 (Pages 121 to 124)

Exhibit 14
- 266 -

C O N F I D E N T I A L

**Michael Sexton**                                   **Makaeff v. Trump University**

SEXTON - CONFIDENTIAL

1    to do.  We were the exact opposite.
2           And that was our position, was it's
3    not about ivy tower.  It's about practical, at
4    the time very cost-effective, very, very
5    high-quality education delivered tactically and
6    quickly to your computer.  You know, so, no, I
7    don't -- we went to great pains to make it clear
8    this wasn't my intent, it wasn't traditional
9    education.
10       **Q.    It was for e-learning?**
11       A.    Correct.  Not only e-learning, this
12   is continuing ed for working adults.  And this is
13   very practically focused education to help build
14   specific skills that could help business people
15   achieve their goals.
16       **Q.    And you've used the term "continuing**
17   **education" a couple of times.  To be clear, did**
18   **Trump University offer any credits for continuing**
19   **legal requirements -- I mean, continuing**
20   **education requirements?**
21       A.    "Continuing education" is a very
22   broad term.  It doesn't -- a portion of it infer
23   continuing ed credits; but continuing ed is --
24   you can go to a learning annex and you can take
25
Page 157

SEXTON - CONFIDENTIAL

1    continuing ed course; right?
2           We -- we were certified by the -- by
3    IACAT to offer continuing ed credits.  It's
4    I-A-C-A-T.  I forget what the acronym stands for,
5    but we went through that certification process
6    and received -- received approval grant
7    continuing ed credits for -- for our courses.
8        **Q.    Did Trump University ever seek**
9    **accreditation to become a university?**
10       A.    No, never.
11       **Q.    And besides the names Trump**
12   **University LLC, Trump University CA LLC, and**
13   **Trump Entrepreneur Initiative LLC, did Trump**
14   **University ever operate under another name?**
15       A.    I believe there's another name in
16   Canada.  Again, I believe that Delaware Corp. --
17   there was a Canadian -- they don't call them LLCs
18   out there, they call them something else.
19   Something else.  But I believe that fed into the
20   Delaware Corp.  And I believe we called it Trump
21   Education in Canada.  So that would be the only
22   other name that would appear, that I can recall.
23       **Q.    Was it Trump Education, perhaps?**
24       A.    Trump Education, but it's Trump
25
Page 158

SEXTON - CONFIDENTIAL

1    Education like U -- ULC or something.
2        **Q.    Was the brand name Trump U used in**
3    **Maryland and the D.C. area?**
4        A.    We did use Trump U in certain
5    states.
6        **Q.    Why was that term used in certain**
7    **states?**
8        A.    I believe the states that used that
9    were additional states that regulated the word
10   "university."
11       **Q.    When you say "additional states," do**
12   **you mean besides New York?**
13       A.    Yes.
14       **Q.    Why did you feel the need to use**
15   **Trump U instead of Trump University in those**
16   **states?**
17       A.    I think in Maryland, we may have
18   gotten a call from the education department,
19   something like that.  I guess Massachusetts,
20   probably something similar.  And we just agreed
21   to change, and the -- and the state was happy
22   with that.
23       **Q.    So to be clear, did you start off**
24   **using the term "Trump University" in those states**
25
Page 159

**SEXTON - CONFIDENTIAL**

1    **and then you changed that --**
2        A.    Yes, we did.
3        **Q.    -- after you got that phone call?**
4        A.    Yes.
5        **Q.    And in -- New York, it's my**
6    **presumption you didn't get a call until May of**
7    **2010, or did you get a call before then from --**
8        A.    No, we got a call -- if it's --
9    spring of 2010, sometime in that time frame.
10       **Q.    Right.**
11       A.    Yes.  And it was brought to our
12   attention that there was an issue with the name
13   and we quickly changed it.
14       **Q.    Do you have an understanding of**
15   **why -- why they waited until spring of 2010?**
16            MR. SCHNEIDER:  Objection.  Calls
17   for speculation.
18            THE WITNESS:  When was this -- when
19   was this lawsuit filed?
20            MR. SCHNEIDER:  April or May of
21   2010.
22            THE WITNESS:  I would suspect that
23   was the cause for . . .
24
25
Page 160

40 (Pages 157 to 160)

Exhibit 14
- 267 -

CONFIDENTIAL

Michael Sexton                                          Makaeff v. Trump University

```
 1        SEXTON - CONFIDENTIAL
 2   BY MS. JENSEN:
 3        Q.   That's fine.  Anyway, it doesn't
 4   matter what I think.
 5        A.   I would suspect.  I don't know.
 6        Q.   Okay.  Okay.  Sure.
 7             How was the name Trump Entrepreneur
 8   Initiative chosen?
 9        A.   We brainstormed a number of
10   different names, shared them with Mr. Trump.  And
11   I think we all agreed that Trump Entrepreneur
12   Initiative captured -- was kind of a very
13   mission-oriented name that captured what we were
14   trying to do, to create a creative generation of
15   entrepreneurs out there.
16        Q.   So that decision was made in
17   conjunction with Donald Trump?
18        A.   Yes, it was.
19        Q.   And who else contributed to that
20   decision?
21        A.   Michael Bloom.  I know Mr. Trump
22   asked other people's opinions as well internally.
23        Q.   Are you familiar with a document
24   called the playbook?
25        A.   Yes, I am.
                                        Page 161
```

```
 1        SEXTON - CONFIDENTIAL
 2        Q.   Who created that document?
 3        A.   David Highbloom did, with assistance
 4   from April Neumann.
 5        Q.   Do you know when --
 6        A.   Probably others within that team.
 7        Q.   Do you know when it was created?
 8        A.   I believe the first one was created
 9   prior to an annual meeting in Atlanta, Georgia in
10   I believe December of 2008.
11        Q.   Was it updated over time?
12        A.   It was.  It was -- it was treated as
13   kind of a living document that evolved as we
14   added regulations, rules.  I know the big updates
15   came -- in addition to updates over time, the big
16   updates came prior to annual training.  So that
17   would have been December of '09 and December of
18   '10 as well, in New Orleans and Las Vegas,
19   respectively.
20        Q.   I'm sorry, were there annual
21   meetings after you left in July 2010?
22        A.   No.  Did I mess up the dates again?
23        Q.   That's okay.
24        A.   Move all those back again.
25        Q.   So Atlanta 2007?
                                        Page 162
```

```
 1        SEXTON - CONFIDENTIAL
 2        A.   Yes.
 3        Q.   New Orleans in 2008?
 4        A.   Yes.
 5        Q.   And Las Vegas in 2009?
 6        A.   Thank you, yes.  That also solves
 7   the mystery.
 8        Q.   You threw me off there.
 9        A.   Those dates are killing me.
10        Q.   Okay.  And what was the purpose of
11   the playbook?
12        A.   It was -- it was an aggregation of
13   all the standard operating procedures, rules,
14   regulations that governed how we as an
15   organization behaved and acted out in the field.
16        Q.   Going back to the name, when you
17   were changing the name to Trump Entrepreneur
18   Initiative, did you consider any names that did
19   not have Trump in them?
20        A.   No, we did not.
21        Q.   And why was it important to retain
22   the name Trump?
23        A.   We believed it had brand equity.
24   There was value to it.  Certainly from a
25   continuity standpoint, it made a tremendous
                                        Page 163
```

```
 1        SEXTON - CONFIDENTIAL
 2   amount of sense; but at the end of the day, the
 3   brand was critical to the business.
 4        Q.   When the New York Department of
 5   Education contacted Trump University, do you know
 6   whether it did so by letter?
 7        A.   It did so by letter, yes.
 8        Q.   And to whom was it addressed?  Do
 9   you know?  Was it addressed to you?
10        A.   I believe it was.  I believe it was.
11        Q.   What did Trump University do in
12   response to the letter?
13        A.   We spoke to Joseph Frey at the
14   Department of Education.
15        Q.   Can you spell Joseph's name for the
16   record?
17        A.   Last name F-R-E-Y.
18             We obviously referred it immediately
19   to counsel as well.
20        Q.   By "counsel," who do you mean?
21        A.   George Sorial.
22        Q.   George Sorial, for the record, is
23   with?
24        A.   Trump Organization.
25        Q.   And did you -- did you -- did you
                                        Page 164
```

41 (Pages 161 to 164)

Exhibit 14
- 268 -

CONFIDENTIAL

**Michael Sexton**                                    **Makaeff v. Trump University**

| |
|---|

SEXTON - CONFIDENTIAL

1
2 ever respond by letter or in writing?
3     A.   I didn't.
4     Q.   **Do you know whether Trump University**
5 **did?**
6     A.   I don't know.  I imagine we did.  I
7 don't know.
8     Q.   **Do you know whether any documents**
9 **were produced to the New York Department of**
10 **Education?**
11     A.   I don't believe so, but I don't know
12 for sure.
13     Q.   **Do you know who would know?**
14     A.   George Sorial.
15     Q.   **Would -- George Sorial would also**
16 **know if there was any letter of response to the**
17 **New York Department of Education?**
18     A.   Yes.
19     Q.   **And to your understanding, did the**
20 **New York Department of Education notify Trump**
21 **University that the use of the term "university"**
22 **violated the rules of the board of regents?**
23     A.   Yes.
24     Q.   **And, again, that was by a letter as**
25 **well, that same letter that you received?**

Page 165

SEXTON - CONFIDENTIAL

1
2     A.   Yes.
3     Q.   **So to tie this up, in -- the upshot**
4 of this investigation, as I understand it, was
5 that Trump University changed its name; correct?
6     A.   (Witness nods head in the
7 affirmative.)
8     Q.   **Were there any other consequences or**
9 **actions taken as a result of that investigation?**
10     A.   No.
11     Q.   **Were there any fines imposed?**
12     A.   No.
13     Q.   **Penalties?**
14     A.   No.
15     Q.   **Anything else?**
16     A.   No.
17     Q.   **Besides the companies that we've**
18 **discussed, does Trump University have any parent**
19 **company?**
20     A.   No.
21     Q.   **Actually, let me take that**
22 **disclaimer out of there.**
23          **Does Trump University have a parent**
24 **company?**
25     A.   No.

Page 166

SEXTON - CONFIDENTIAL

1
2     Q.   **Does it have any subsidiaries?**
3     A.   Again, I would direct you to Steve
4 Matejek.  The only one I can think of is the
5 Canadian entity, which, again, I believe was
6 called Trump Education, I believe it's ULC up
7 there, which I believe is a wholly owned
8 subsidiary of Trump University LLC.
9     Q.   **Does Trump University have any other**
10 **affiliates?**
11     A.   No, not that I'm aware of.
12     Q.   **Or has it throughout its history?**
13     A.   No.
14     Q.   **What is Prosper, Incorporated,**
15 **P-R-O-S-P-E-R?**
16     A.   Prosper -- it is a -- they're
17 kind of a sales and marketing partner that will
18 work with branded entities and provide -- kind of
19 partner to provide marketing and sales and --
20 marketing and sales support as well as execution
21 of specifically coaching.
22     Q.   **So getting a little more specific,**
23 **what did Prosper provide for Trump University?**
24     A.   So early, and I guess in 2005 it
25 would have been, they made a proposal to us, and

Page 167

SEXTON - CONFIDENTIAL

1
2 we agreed to pilot it to -- where they would
3 market a coaching program, a real estate coaching
4 program under the Trump University brand.  And
5 they would incur the costs to market it.  And
6 then they demonstrated to us they had expertise
7 in that area.  They would sell coaching programs
8 and they would deliver coaching programs
9 specifically in the area of real estate.
10     Q.   **And was it done under Prosper's name**
11 **or under Trump University's name?**
12     A.   Trump University's name.
13     Q.   **And were there any agreements,**
14 **written agreements, between Trump University and**
15 **Prosper which memorialized that relationship?**
16     A.   There was an agreement for a pilot.
17 I believe it was -- it covered kind of a test,
18 like a memo of understanding, that kind of thing.
19     Q.   **And who was primarily responsible**
20 **for negotiating that -- executing that?**
21     A.   I was.
22     Q.   **And did Trump University make a**
23 **portion of the revenues?**
24     A.   Correct.  So that was a revenue
25 share.

Page 168

42 (Pages 165 to 168)

Exhibit 14
- 269 -

SEXTON - CONFIDENTIAL

1   okay. And, if they're not okay, then we would
2   have a conversation and also give the instructor
3   coaching on what -- what was the appropriate
4   thing to say, if any, at the time.
5      Q.   Do you know what those reports were
6   called?
7      A.   We didn't call them anything. It
8   was kind of a process. They were just compliance
9   review. I guess compliance review.
10     Q.   Okay. You didn't just make that up,
11  did you?
12     A.   It sounded right, so I'm going with
13  it. I believe it was called compliance review.
14     Q.   Okay. Do you know -- do you know
15  which employees did those reviews?
16     A.   So outside counsel -- you're talking
17  about the initial review of either the transcript
18  and/or audio?
19     Q.   The initial --
20     A.   Outside counsel initially did them.
21  And then two outsourced partners did them that
22  weren't -- it wasn't a full-time job. It
23  was . . .
24     Q.   But the -- but the documents -- the

Page 189

SEXTON - CONFIDENTIAL

1   recordings would have been on the Trump
2   University system; right?
3      A.   Correct.
4      Q.   And the compliance reviews would
5   have been on the Trump University system?
6      A.   Yes. They would have been, yes.
7      Q.   Okay.
8      A.   And by "system," I mean they would
9   have been -- a lot of those would have ended up
10  on my hard drive. There wasn't any system.
11  There wasn't a like shared server anywhere. They
12  would have ended up on my hard drive if I was the
13  one giving feedback back to the instructor.
14     Q.   Okay. There was a server at Trump
15  University, correct, or were there only a series
16  of hard drives?
17     A.   I believe -- I only used my hard
18  drive. I believe there was a shared server
19  that -- Matejek I think set up a shared server
20  for his finance team. Honestly, I don't recall.
21  There may have been, actually. Now I'm sitting
22  here, I actually don't recall. I think there
23  was. It wasn't -- it wasn't resident there. It
24  was --

Page 190

SEXTON - CONFIDENTIAL

1      MR. SCHNEIDER: Don't speculate.
2   Just testify to what you know.
3      THE WITNESS: Okay. Got it.
4      (Discussion off the record.)
5   BY MS. JENSEN:
6      Q.   Did you -- you reviewed the
7   compliance reviews; correct?
8      A.   Most of them. David would have
9   reviewed some as well. Kind of divide and
10  conquer on that.
11     Q.   And based on your review, did you
12  generate any correspondence or documents?
13     A.   No. Those were important. We
14  picked up the phone immediately and had a
15  one-on-one with the instructor so they understood
16  exactly where we're coming from, our position.
17     MS. JENSEN: I see that we are out
18  of time on the tape. Why don't we go ahead
19  and change the tape.
20     THE VIDEOGRAPHER: The time is 3:32
21  and we're off the record.
22     (Recess from the record.)
23     THE VIDEOGRAPHER: The time is 4:07.
24  This begins Tape No. 4 of the videotaped

Page 191

SEXTON - CONFIDENTIAL

1   deposition of Michael Sexton.
2   BY MS. JENSEN:
3      Q.   Mr. Sexton, during the break, we
4   discussed there might be some ambiguity about the
5   relationship between Trump University LLC and
6   Trump University CA LLC. If there was something
7   you wanted to clarify from your testimony, I
8   invite you to do so.
9      A.   There may have been a misconception
10  that monies flowed from Trump University LLC into
11  the Canadian entity. And to the best of my
12  knowledge, other than some small monies to seed
13  that account, that wasn't the case. Monies
14  flowed from the other way.
15     So when we had events in Canada,
16  there's a bank account in Canada and we paid for
17  the cost of those events and taxes, obligations
18  for those events out of that account, and
19  whatever balance remained flowed back to the LLC.
20  So I just wanted to make that clear.
21     Q.   That is helpful. Thank you.
22     Before we broke, we went on break,
23  we discussed the compliance process. First I
24  wanted to establish a time frame for that

Page 192

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| | |
|---|---|
| 1     SEXTON - CONFIDENTIAL | 1     SEXTON - CONFIDENTIAL |
| 2 compliance process. | 2 board because of concerns about FTC regulations? |
| 3          When was that compliance process | 3     A.    No, no. He was -- he was -- he is a |
| 4 instituted? | 4 very well-recognized expert in this industry. |
| 5     A.    Very early in the -- in our | 5 He's been in the industry for 25, 30 years. So |
| 6 launching of the -- our live events, Trump | 6 we leapt at the chance to work with him when he |
| 7 University live events. I believe we recorded | 7 left his previous employer. Not that we employed |
| 8 them from the get-go. And the policy continued | 8 him. We used him as outside counsel, but when we |
| 9 to be refined over time, but the bulk was in | 9 had the opportunity, we wanted to do that. |
| 10 place very early in our live events -- our live | 10     Q.    Which firm was he with at the time |
| 11 events -- staging our live events. | 11 when you brought him on board? |
| 12     Q.    Was that in the 2007 time frame? | 12     A.    He actually formerly was the general |
| 13     A.    I would imagine. I don't recall the | 13 counsel for BSG and their other entities. |
| 14 exact date, but I would imagine. | 14     Q.    Then when you were working with him, |
| 15     Q.    And when did Peter Hoppenfeld come | 15 for what firm did he work? |
| 16 on board? | 16     A.    For his own firm. |
| 17     A.    As outside counsel? | 17     Q.    Did -- were the compliance |
| 18     Q.    Yes. | 18 procedures -- were they written down anywhere, |
| 19     A.    Again, I don't recall the exact | 19 the actual policies and procedures for |
| 20 date. I would say sometime in 2008. | 20 compliance? |
| 21     Q.    And so up until he came on board, | 21     A.    Yes, I believe they were. |
| 22 was somebody reviewing the recordings for | 22     Q.    Do you know what the name of the |
| 23 compliance? | 23 document was? |
| 24     A.    I don't recall. | 24     A.    I'm sorry, I do not. |
| 25     Q.    And was Peter Hoppenfeld brought on | 25     Q.    Did legal review -- did any legal |
| Page 193 | Page 194 |
| 1     SEXTON - CONFIDENTIAL | 1     SEXTON - CONFIDENTIAL |
| 2 counsel review Trump University's marketing | 2 have been? |
| 3 and/or advertisement materials? | 3     A.    I don't. I wouldn't know the name |
| 4     A.    Yes. | 4 of it. |
| 5     Q.    And which counsel did that? | 5     Q.    Do you know what time frame that |
| 6     A.    Peter Hoppenfeld certainly reviewed | 6 was? |
| 7 materials. | 7     A.    I know we got more sophisticated |
| 8     Q.    How about course materials? | 8 over time. And I imagine kind of our near final |
| 9     A.    I believe Peter Hoppenfeld reviewed | 9 version would have been sometime in early 2009, |
| 10 course materials as well. | 10 late 2008. |
| 11     Q.    How about the requirements for | 11     Q.    Did legal review any live |
| 12 instructors to the extent they were written down? | 12 presentation material? |
| 13     A.    Requirements in terms of? | 13     A.    The PowerPoint presentation? |
| 14     Q.    For the terms of employment or | 14     Q.    Yes. |
| 15 contracting. | 15     A.    Yes. |
| 16     A.    I see. Yes, Peter was -- Peter was | 16     Q.    Did all Trump University personnel |
| 17 very active in helping us script those as well. | 17 receive a copy of the playbook that we discussed |
| 18     Q.    How about any credentials for the | 18 earlier? |
| 19 instructors? | 19     A.    All of the entire field team did. |
| 20     A.    Yes. We worked with Peter to put in | 20 So anybody that was involved in any way in any |
| 21 a process to vet instructors. | 21 aspect of the field operation did. Somebody like |
| 22     Q.    Was that in writing? | 22 in finance did not. |
| 23     A.    I believe it was. Yes, I know it | 23     Q.    Did that include all the |
| 24 was. | 24 instructors? |
| 25     Q.    Do you know what document that would | 25     A.    Yes. |
| Page 195 | Page 196 |

www.aptusCR.com

Exhibit 14
- 271 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|
| 1   SEXTON - CONFIDENTIAL<br>2   Q.   And all the mentors?<br>3   A.   Yes.<br>4   Q.   And all the other speakers?<br>5   A.   Yes, yes.<br>6   Q.   And then also the sales reps that<br>7   accompanied --<br>8   A.   Yes.<br>9   Q.   -- them at the live events?<br>10   I presume along with the -- so if<br>11   they received a copy, they were also required to<br>12   review it; correct?<br>13   A.   Yes.  They were required to attend<br>14   the annual training which the purpose of which<br>15   was to lay out what our standard operating<br>16   procedures were, not really from a content<br>17   standpoint, but from a procedural standpoint.  So<br>18   we -- that's where we made sure everybody was on<br>19   the same page with regards to how we operated in<br>20   the field.<br>21   Q.   And was that with respect to all --<br>22   all aspects of being out in the field?<br>23   MR. SCHNEIDER:  Objection.  Vague.<br>24   You mean not content?<br>25   THE WITNESS:  The primary purpose<br>Page 197 | 1   SEXTON - CONFIDENTIAL<br>2   was focused on operational procedures, so<br>3   dos and don'ts, how we behave, whatever<br>4   innovations we were coming up with in the<br>5   process improvement standpoint.  You<br>6   can't -- it was a two-day meeting.  We<br>7   didn't have time to get into content, but<br>8   it was about making sure we had a<br>9   disciplined approach and a consistent<br>10   approach to how we operated.<br>11   BY MS. JENSEN:<br>12   Q.   Were there other retreats or other<br>13   mandatory meetings where content was discussed?<br>14   A.   The only time the -- the content was<br>15   discussed at the annual meeting.  Not everybody<br>16   had been to, for instance, a commercial advanced<br>17   training.  So the individual that was teaching<br>18   that gave a brief synopsis of what materials were<br>19   covered so individuals got a sense of what that<br>20   experience was like so they could share it with<br>21   prospective students.  Other than that, no.<br>22   Q.   What is the profit from real estate<br>23   orientation program?<br>24   A.   I don't know.<br>25   Q.   Would that be the same as the<br>Page 198 |
| 1   SEXTON - CONFIDENTIAL<br>2   preview that we discussed earlier?<br>3   A.   Over the period of time, we called<br>4   that preview event different things.  That name<br>5   doesn't ring a bell.  The word "orientation" is<br>6   throwing me.  I don't recall ever using that, but<br>7   profit from real estate was what at one point we<br>8   called our introductory three-day workshop.<br>9   Q.   So to be clear, let me step back for<br>10   a second.  And from our conversation of this<br>11   morning, I understand there is a 90-minute<br>12   preview --<br>13   A.   Correct.<br>14   Q.   -- correct?<br>15   And from there, there is a<br>16   fulfillment program; correct?<br>17   A.   There is a three-day workshop.<br>18   Q.   And is that the same as the profit<br>19   from real estate?<br>20   A.   I believe so.  Again, we called it<br>21   different things.  As kind of the market<br>22   conditions changed, moved into foreclosures, we<br>23   had a foreclosure-focused name.  But I believe<br>24   earlier on that's what we called it.<br>25   Q.   Does the term -- name the front end<br>Page 199 | 1   SEXTON - CONFIDENTIAL<br>2   mean anything to you?<br>3   A.   It does.  That was kind of<br>4   colloquial for the preview.<br>5   Q.   So were there any other terms used<br>6   for the preview, that you can recall?<br>7   A.   Typically it was preview or front<br>8   end.  Those are the only ones I can recall.<br>9   Q.   They were -- they were the same<br>10   thing; correct?<br>11   A.   Exact same thing, yes.<br>12   Q.   And they were the same thing<br>13   regardless of the location in which they took<br>14   place; correct?<br>15   MR. SCHNEIDER:  Well, objection.<br>16   Are you saying those two names or<br>17   are you saying that they're all the same<br>18   programs?  What do you mean when you say<br>19   "they're the same thing."<br>20   MS. JENSEN:  I'm saying they're the<br>21   same program; correct?<br>22   MR. SCHNEIDER:  These two names, the<br>23   90-minute versus the front end, or all<br>24   90-minute programs the same?<br>25   MS. JENSEN:  The front end and the<br>Page 200 |

50 (Pages 197 to 200)

Exhibit 14
- 272 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

**Page 201**

1   SEXTON - CONFIDENTIAL
2   preview.
3        MR. SCHNEIDER:  Were those two names
4   interchangeable?
5        THE WITNESS:  They words all
6   interchangeable.
7   BY MS. JENSEN:
8        Q.   Yes.  And they referred to the same
9   program; correct?
10       A.   They referred to the 90-minute free
11   introductory program.
12       Q.   Correct.  Okay.
13            And you weren't familiar with the
14   term "profit from real estate orientation," but
15   did you also hear it called orientation program
16   or anything else?
17       A.   It sounds clumsy.  It may have been
18   something early on that we used to describe that.
19   I don't recall it, though.  But I wouldn't be
20   surprised.
21            MR. SCHNEIDER:  I want to caution
22   you not to guess or speculate.  Just answer
23   what you know.
24            THE WITNESS:  I don't know.
25                                        Page 201

**Page 202**

1   SEXTON - CONFIDENTIAL
2   BY MS. JENSEN:
3        Q.   And was there a PowerPoint for the
4   front end or the preview?
5        A.   There were many over time.  Again,
6   that was a -- it was a very dynamic kind of
7   event.  It changed quite a bit, specifically in
8   relation to market conditions.  It changed in
9   relation to feedback we got from the market.  And
10   it changed just in cooperation working with
11   instructors on what we kind of collectively felt
12   was most effective at the time.
13       Q.   And at any given time, though, they
14   were all taught with a PowerPoint; correct?
15       A.   They were all taught with a
16   PowerPoint.  The PowerPoint wasn't necessarily
17   always the same.  Certainly early on, there was
18   far more variability than there was towards the
19   end in the actual PowerPoint presentation.  We
20   made attempts to standardize that, not as
21   successful as we probably would have liked.
22       Q.   I'm sorry, when you say "not as
23   successful as we probably would have liked," what
24   do you mean by that?
25       A.   Well, in an ideal world, you'd have
                                        Page 202

**Page 203**

1   SEXTON - CONFIDENTIAL
2   one presentation that everybody would use.  And
3   from my standpoint, you want to be able to
4   deliver something consistently.  The reality is
5   that that's impossible.  Every instructor has
6   their own style.  Every marketplace has its own
7   nuances.  And you need to make it local to make
8   it resonate and relevant to people.  The same --
9            Phoenix is a very different real
10   estate market than South Bend, Indiana.  And it
11   would be silly to give the same presentation in
12   both markets because it wouldn't make sense.  So
13   whereas from a management standpoint, I would
14   love to be able to say a widget is a widget is a
15   widget, the reality was that that just wasn't
16   possible and it wasn't the right thing.
17       Q.   Were all the PowerPoints -- let me
18   back up.
19            A PowerPoint was always used;
20   correct?
21       A.   Yes, 100 percent of the time.
22       Q.   And was that PowerPoint always
23   approved in advance?
24       A.   I'd like to say yes, but the reality
25   is not always.
                                        Page 203

**Page 204**

1   SEXTON - CONFIDENTIAL
2        Q.   And were there consequences for not
3   using the preapproved PowerPoint?
4        A.   Yes and no.  We -- when we started
5   out, like I said, from a -- theoretically you
6   wanted to be consistent.  And I was probably too
7   insistent on that and learned over time that it
8   was okay to have some variability.  And so as
9   long as -- as long as it was variability for the
10   right reasons and there was a strong -- there was
11   a logical rationale for why changes were made, I
12   learned to be fine with that.
13       Q.   And so when you say "variability,"
14   you're talking about specific issues related to
15   that local real estate market?
16       A.   So -- exactly.  So a good example
17   would be, we had an instructor, on their own,
18   they would fly in early and drive around and take
19   pictures of real properties for sale in that
20   geographic market.  And we didn't tell them to do
21   that.  It was their idea, their initiative.
22            And initially you'd say, that's
23   crazy, why are you changing the presentation?
24   And then you take a step back and you say, that's
25   brilliant.  You're not only showing real deals
                                        Page 204

51 (Pages 201 to 204)

Exhibit 14
- 273 -

CONFIDENTIAL

**Michael Sexton**                                    **Makaeff v. Trump University**

SEXTON - CONFIDENTIAL

1       THE WITNESS:  If you're asking
2   what -- if there's a document that shows
3   which instructors used specifically which
4   presentation at a specific preview event,
5   no, no.
6   BY MS. JENSEN:
7       Q.   Was there e-mail correspondence
8   concerning the schedule of events with the
9   instructor who was going to present?
10      A.   Yes, there was.
11      Q.   And who -- who was on that e-mail
12  correspondence?
13      A.   So we would send out, I believe on
14  weekly basis, kind of a master schedule looking
15  out maybe three or four weeks for every event
16  just so people could plan travel and such.  If
17  you're asking who's on the distribution of that?
18      Q.   Uh-huh.
19      A.   Everybody who would have been
20  affected.  So anybody that was on a field team,
21  every speaker that was -- whether they're working
22  or not that period of time, the staff at the
23  office who had to make sure materials flowed from
24  one place to another, certainly the marketing

Page 225

SEXTON - CONFIDENTIAL

1   folks who had to support those events, all the
2   instructors.  You know, really just about
3   everybody.
4       Q.   And who kept the master schedule?
5       A.   April Neumann.
6       Q.   Do you recall, sitting here, the
7   names of the presenters for the free program?
8       A.   I can certainly recall some of them.
9       Q.   Okay.  For those that you can name,
10  why don't you go ahead and list them.
11      A.   Steve Goff.  Gerald Martin.  Steven
12  Ligman.  James Harris.  I believe Gene Gorino.
13  There's the bulk of them.
14      Q.   How were these speakers selected to
15  provide these free presentations?
16      A.   So they were -- again, they were
17  referred to us.  We would interview with them.
18  We got fairly sophisticated over time where we
19  would have them give them the presentation, give
20  them whatever time they felt they needed to
21  prepare, fly them in and they would audition for
22  us live.
23      But initially we didn't do that.
24  Initially it was more give us a sense of what it

Page 226

SEXTON - CONFIDENTIAL

1   would be like.  And ultimately we found you can
2   weed out people fairly quickly that either don't
3   know what they're talking about, just don't have
4   any depth of content, they're not credible, or
5   people that just weren't gifted speakers.  I
6   mean, they couldn't -- nobody was going to listen
7   to them.
8       But after that, there's no real way
9   to simulate.  We can put them in a room and they
10  can talk to us all day long, but then we put them
11  on stage.
12      Q.   And by "we," do you mean yourself?
13      A.   No.
14      Q.   Or somebody else -- who auditioned
15  them?
16      A.   Oh, no.  So I would -- it would
17  typically be David and myself.  And we would fly
18  them into a market where we -- where we were
19  having an event, secure a spare room and
20  literally try to replicate the environment that
21  they would face in a preview.
22      Q.   Was their ability to sell the Trump
23  University programs an important component of
24  their -- of their qualifications?

Page 227

SEXTON - CONFIDENTIAL

1       A.   Certainly a component.  I think our
2   litmus test began with do they know what they're
3   talking about, do they have the content knowledge
4   to be credible; second, can they communicate
5   effectively, you know; and third, can they sell;
6   you know, and I guess fourth -- the fourth
7   probably is not in the right order, but certainly
8   there was an intangible there, are these people
9   that we feel good about doing business with.  And
10  can they embody our values.
11      And believe me, there are lots of
12  speakers that met the other three criteria and
13  didn't meet that fourth one that we didn't -- and
14  we didn't obviously move forward with them.
15      Q.   And in terms of the presentation,
16  the content was provided to them; correct?
17      A.   Yes.
18      Q.   Okay.
19      A.   Yes.  I'm sorry, the physical
20  presentation was provided to them.
21      Q.   Right.  Right.
22      A.   Yes.
23      Q.   Where were the free programs
24  advertised?

Page 228

57 (Pages 225 to 228)

Exhibit 14
- 274 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

SEXTON - CONFIDENTIAL

1   **SEXTON - CONFIDENTIAL**
2        MR. SCHNEIDER:  Just for
3   clarification, are you talking about the
4   PowerPoint slides?
5        THE WITNESS:  The PowerPoint slides.
6        MR. SCHNEIDER:  Not the actual
7   presentation.
8        THE WITNESS:  I guess, when I say
9   "presentation," there's no script -- when I
10  say "presentation," I mean the PowerPoint,
11  not the physical slides.
12  BY MS. JENSEN:
13     **Q.    Right.**
14     A.    Where were they marketed?  We tested
15  and used many channels.  Print media.  Online.
16  Both e-mail and display advertisements.  I
17  believe we tested paid search.  We tested radio.
18  We did direct mail.  And I believe we even tested
19  other forms of social media.
20     **Q.    Okay.  Taking them in turn, print**
21  **media.  Where did you advertise in print media?**
22     A.    It would -- it would -- it would
23  depend a lot on the market.  Some markets not at
24  all because it wasn't effective.  Some markets it
25  really depended on our past experience.  We would
                                            Page 229

1   SEXTON - CONFIDENTIAL
2   test -- certainly test it.  Some markets there
3   may be an alternative weekly.  Some maybe the
4   LA Times.  Sometimes we'd go to LA and do the
5   secondary paper chain out there.  I'm forgetting
6   what it's called.
7        Washington, D.C. -- we would never
8   do the Post.  It wasn't effective.  We would do
9   the Times and the Examiner.
10       New York, we tested the Post.  We
11  tested the Free Metro.  We tested -- you know,
12  the Westchester Journal -- we constantly tested
13  and tried to figure out which one worked.
14     **Q.    Were there any other print media**
15  **that you can remember that Trump University**
16  **advertised itself in?**
17     A.    Dozens and dozens of papers across
18  the country.
19     **Q.    Were they all mainstream newspapers**
20  **or were there any other -- any other types of**
21  **print ads that Trump University advertised itself**
22  **through?**
23     A.    I guess I wouldn't qualify --
24  majority were what I would call mainstream
25  newspaper.  The only exception -- I would call
                                            Page 230

1   SEXTON - CONFIDENTIAL
2   the Free Metro paper we have here that they hand
3   out in the subways, I wouldn't call that a
4   mainstream newspaper, but we tried that as well.
5   But in other markets, it was either the primary
6   or the secondary paper.
7        **Q.    Okay.  E-mail you mentioned -- I'm**
8   **sorry, let me back up.**
9             **Online, you said that there was**
10  **online advertising.  What were the channels for**
11  **online advertising?**
12     A.    I know we tested online display ads.
13  I don't believe it was effective.  It wasn't a
14  standard part of our mix, but we tested it.
15     **Q.    Display ads being?**
16     A.    Banners or skyscraper ads that you
17  typically see on a web page.  Everything
18  obviously was geo targeted to the local
19  marketplace.
20     **Q.    Were there particular -- particular**
21  **websites or were there Google searches or any --**
22  **what types of, I guess, medium or vehicles did**
23  **you use?**
24     A.    On the dismay, we tried to tar- --
25  we had a profile of our target demographic.  We
                                            Page 231

1   SEXTON - CONFIDENTIAL
2   wanted people that were -- in our audience was
3   75 percent male.  Typical age -- our target age
4   was 40 to 48, something like that, maybe 40 to
5   55, something like that.  We had an income
6   threshold.  We wanted them to be college
7   educated.
8        So effectively, you go to a media
9   buyer that -- with your profile, here's what I
10  want and here are the dates I want to run it and
11  here's the city I want to run it in, and I don't
12  want it to be on any objectionable sites at all.
13  And they come back and they say, okay, here's
14  what it will cost you and, you know, do you want
15  to place the insertion order.
16       So that's typically how it works.
17  You don't have -- for this kind of thing, it's
18  not like you're going to be on the front page of
19  Yahoo!
20     **Q.    And who was in charge of the media**
21  **channels?**
22     A.    Michael Bloom.
23     **Q.    For e-mail, where did you all --**
24  **where did you all get the list for e-mail**
25  **advertisements?**
                                            Page 232

58 (Pages 229 to 232)

Exhibit 14
- 275 -

C O N F I D E N T I A L

**Michael Sexton**                                          **Makaeff v. Trump University**

| | |
|---|---|
| 1      SEXTON - CONFIDENTIAL | 1      SEXTON - CONFIDENTIAL |

SEXTON - CONFIDENTIAL

1
2      A.   So we would work with specific media
3  companies, again to give them our -- to give them
4  our profile of who we're looking for. And they
5  had a proprietary e-mail list, and they would
6  send out our e-mail to their house list, their
7  database of members.
8      Q.   Which companies did you work with
9  for the e-mail leads?
10     A.   Probably our biggest relationship.
11  , most successful one, was a company called Beyond.com,
12  which -- it's a big operator of kind of secondary
13  employment-oriented website. I think they've got
14  3,000 websites around the country
15     Q.   And were there -- was there e-mail
16  correspondence with them about your target
17  market?
18     A.   Oh, yes. I would imagine, yes.
19     Q.   Would that e-mail come from you or
20  Michael Bloom or somebody else?
21     A.   It would have come from Michael.
22     Q.   And paid search?
23     A.   I know we tried it. It was not part
24  of our mix, so I'm going to assume it didn't
25  work.

Page 233

SEXTON - CONFIDENTIAL

1
2      Q.   Okay. I don't even know what that
3  term means.
4      A.   "Paid search"?
5      Q.   Yes.
6      A.   It's simply a Google ad word where
7  if somebody typed in "real estate investing
8  New York," it would appear.
9      Q.   Okay. Google. Got it. Got it.
10  Okay. I do know that term.
11         Radio, did you do -- place radio ads
12  on -- on specific radio stations?
13     A.   Again, we experimented with that.
14  It did not work at all. And we didn't test it
15  again.
16     Q.   Okay. Direct mail, where did you
17  get addresses for the direct mail?
18     A.   We worked with -- in direct mail,
19  you typically work with a list broker. Again,
20  you give them the profile, here's the kind of
21  people we want. And they've got 10,000 different
22  lists that -- magazines and newspaper. Everybody
23  rents their names and addresses of their
24  subscribers.
25         And we would test in any market, I

Page 234

SEXTON - CONFIDENTIAL

1
2  don't know, five, ten different lists. And you
3  can track back -- very specifically back to that
4  list, what your successful rate was. And the
5  ones that performed, the next time you're there,
6  you do more of.
7      Q.   Are there any companies that you can
8  think of that you worked with on the -- the list
9  brokers?
10     A.   Oh, it was a fairly well-known list
11  broker that lots of people work with.
12     Q.   So, again, there would be e-mails
13  between Michael Bloom and --
14     A.   Oh, sure, yes.
15     Q.   -- that company describing the
16  target market, et cetera?
17     A.   Yes, there would be.
18     Q.   Moving to the fulfillment, is
19  fulfillment the same -- the same thing as the
20  profit from real estate workshop?
21     A.   Yes, it is. But, again, we changed
22  that name over time. It was called the fast
23  track to foreclosure investing workshop. I
24  forget the last name we called it.
25     Q.   The back end --

Page 235

SEXTON - CONFIDENTIAL

1
2      A.   That's just a slang. That's -- the
3  front and back, those are kind of slang terms.
4  But we tried to brand that particular workshop
5  with a name, like fast track for foreclosure
6  investing or profit from real estate.
7      Q.   Were there any other names by which
8  that -- that workshop was called?
9      A.   Yes.
10     Q.   What are those other names?
11     A.   Those were two. I think it was only
12  called -- I think we only called it three other
13  things -- three things. Blueprint, real estate
14  blueprint. Anyway, I forget. I'm sure it's in
15  this material somewhere.
16     Q.   But they were all the 1495 three-day
17  training?
18     A.   We experimented with different price
19  points. So you should know we did some price
20  testing, but it was always the three-day
21  workshop, kind of our introductory --
22  introduction to real estate investing workshop,
23  regardless of what the brand was we put on top of
24  it.
25     Q.   Who created that program?

Page 236

59 (Pages 233 to 236)

Exhibit 14
- 276 -

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

      Plaintiffs,

                                    CASE NO.: 10 CV 0940 EIG (WVG)

  -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

      Defendants.

---------------------------------------------

VIDEOTAPED DEPOSITION of MICHAEL SEXTON

Volume II

August 23, 2012

New York, New York

Reported by:
Eileen Mulvenna
CSR/RMR/CRR
Job No. 10003487

Exhibit 14
- 277 -

CONFIDENTIAL

**Michael Sexton**                                                                                          **Makaeff v. Trump University**

---

** CONFIDENTIAL ** CONFIDENTIAL **
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
CASE NO.: 10 CV 0940 EIG (WVG)
----------------------------------------x
TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

                                   Plaintiffs,

                 -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

                                   Defendants.
----------------------------------------x
                    August 23, 2012
                    9:14 a.m.

        CONTINUED VIDEOTAPED DEPOSITION of
MICHAEL SEXTON, 30(b)(6) Witness in the
above-captioned matter, taken by Plaintiffs, held
at 725 Fifth Avenue, New York, New York, before
Eileen Mulvenna, CSR/RMR/CRR, Certified Shorthand
Reporter, Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the State
of New York.

Page 279

---

** CONFIDENTIAL ** CONFIDENTIAL **
1
2   A P P E A R A N C E S:
3
4
5       ZELDES & HAEGGQUIST, LLP
            Attorneys for Plaintiffs
6           625 Broadway
            Suite 906
            San Diego, California  92101
7   BY:  AMBER L. ECK, ESQ.
            ambere@zhlaw.com
8       AARON M. OLSEN, ESQ.
            aarono@zhlaw.com
9
10
11      YUNKER & SCHNEIDER
            Attorneys for Defendants
            655 West Broadway
12          Suite 1400
            San Diego, California  92101
13  BY:  DAVID K. SCHNEIDER, ESQ.
            dks@yslaw.com
14
15
16  A L S O   P R E S E N T:
17
        Richard Ramos, Videographer
18
19
20
21
22
23
24
25

Page 280

---

|   | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | SEXTON - CONFIDENTIAL |
| 2 | THE VIDEOGRAPHER:  Good morning. |
| 3 | This is the continuation of the |
| 4 | videotaped deposition of Michael Sexton in |
| 5 | the matter of Tarla Makaeff, et al., versus |
| 6 | Trump University LLC, et al., on 8/23/2012 |
| 7 | at approximately 9:14 a.m. |
| 8 | My name is Richard Ramos, the video |
| 9 | specialist.  The court reporter is Eileen |
| 10 | Mulvenna. |
| 11 | Will the court reporter please swear |
| 12 | in the witness, please. |
| 13 | MICHAEL SEXTON, |
| 14 | having been duly resworn by Eileen Mulvenna, |
| 15 | a Notary Public of the State of New York, |
| 16 | was examined and testified further as |
| 17 | follows: |
| 18 | EXAMINATION (Cont'd) |
| 19 | BY MS. ECK: |
| 20 | Q.    Good morning, Mr. Sexton. |
| 21 | A.    Good morning. |
| 22 | Q.    My name is Amber Eck.  I'm one of |
| 23 | the attorneys for the plaintiffs in this matter. |
| 24 | We're continuing your 30(b)(6) deposition from |
| 25 | yesterday. |

Page 281

---

1   SEXTON - CONFIDENTIAL
2       You mentioned yesterday that Trump
3   University entered into a licensing agreement
4   with BSG; is that correct?
5       A.    That's correct.
6       Q.    I'd like you to turn to page
7   TU129757 in the binders.
8       MR. SCHNEIDER:  129757?
9       MS. ECK:  Right.
10      I'd like to mark this as Exhibit
11  No. 7.  Actually, you know what, that was
12  his employment agreement we marked
13  yesterday.  Let's mark -- it's TU 1581
14  through TU 1602.  We'll mark that as
15  Exhibit 7.
16      (Plaintiffs' Exhibit 7, Bates Nos.
17  TU001581 through 1602, Licensing Agreement
18  between Trump University and Business
19  Strategies Group, marked for
20  identification.)
21  BY MS. ECK:
22      Q.    Do you recognize this document?
23      (Witness peruses the exhibit.)
24      A.    Yes, I do.
25      Q.    What is it?

Page 282

---

1 (Pages 279 to 282)

**www.aptusCR.com**

Exhibit 14
– 278 –

CONFIDENTIAL

**Michael Sexton**                                           **Makaeff v. Trump University**

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

1   SEXTON - CONFIDENTIAL
2   just show me where you are?  Are you on
3   page 22?
4       MS. ECK:  Yes.
5       MR. SCHNEIDER:  Under -- on the
6   left --
7       MS. ECK:  One hour twenty minutes
8   into event.
9       MR. SCHNEIDER:  Thank you.
10      THE WITNESS:  Yes.
11  BY MS. ECK:
12      Q.   Do you know what ad the reference
13  print ad refers to?
14      A.   If -- if there was a print
15  advertisement in that market, the print
16  advertisements typically would feature the
17  premium or the giveaway that they would have at
18  that event, if there was one.  So that's what
19  the -- that refers to.
20      Q.   So when it says "Display free
21  premium," the premium was the gift that you would
22  receive for attending the seminar?
23      A.   Correct.
24      Q.   And what kind of gifts did Trump
25  University give away?
                                        Page 311

1   SEXTON - CONFIDENTIAL
2       A.   They changed over time.  We tested
3   many different ones.  We would -- we certainly
4   used a number of CDs that we gave away that had
5   an audio course on them and workbooks and that
6   sort of thing.  We experimented with giving -- I
7   think at one point we gave out access codes on a
8   printed card that people could go home and access
9   password-protected e-learning courses online.
10  Those are the ones I recall.
11      Q.   If you could turn to page 33 of the
12  handbook, which is TU52966.  Under "Evening
13  prior," it indicates "Student profiles
14  distributed."  What were those student profiles?
15  What did they look like or what did they contain?
16      (Witness peruses the exhibit.)
17      A.   So I'm just reading this, but at
18  this point, the student profiles would be blank
19  profile sheets that contained the data fields
20  that we discussed yesterday; namely, a snapshot
21  of the -- of the individual's financial goals,
22  their, I believe, current assets and liabilities,
23  I believe their time frame for achieving their
24  stated goals.  I'm sure I'm missing some other
25  data fields on that.
                                        Page 312

1   SEXTON - CONFIDENTIAL
2       Q.   But at this point, they don't
3   contain substantive information from the
4   students?
5       A.   Well, again, I'm reading this as the
6   evening prior to the workshop, nobody's shown up
7   yet, so we wouldn't have any opportunity to talk
8   to students and distribute those.
9       MR. SCHNEIDER:  Amber, this is
10  saying the evening prior -- what they're
11  going to do the next day.  They're talking
12  about when they're going to do things.
13  They're saying the event team meets, they
14  walk the space and they discuss the plan of
15  action, registration, team introductions,
16  format and when the student profiles would
17  be distributed.
18      So in the meeting, for example, I'm
19  telling you, hey, tomorrow when we have our
20  presentation, after we do the whole
21  presentation or 15 minutes into it, that's
22  when we're going to distribute the student
23  profiles and ask them to give information.
24      So this is a pre -- a preprogram
25  discussion as to timing, as to when things
                                        Page 313

1   SEXTON - CONFIDENTIAL
2   are going to be distributed.
3       MS. ECK:  I guess since it says
4   "Evening prior to fulfillment," they've
5   already attended the free 90-minute
6   seminar, so Trump University may already
7   have certain information on them that might
8   be contained in a profile.
9       MR. SCHNEIDER:  Maybe you should ask
10  that.  I don't think they get any profile
11  information in the 90-minute program.
12      THE WITNESS:  No information is
13  collected prior to the -- I should say no
14  information on the student profile is
15  collected.  Obviously we have their name,
16  address.
17  BY MS. ECK:
18      Q.   During the fulfillment seminar, the
19  three-day $1500 seminar, are completed profiles
20  provided to the instructors?
21      A.   So student profiles are distributed
22  to attendees.  And the students, at their
23  discretion, can complete them and meet with any
24  team member to review it.  Typically those
25  meetings happened -- I shouldn't say typically --
                                        Page 314

9 (Pages 311 to 314)

Exhibit 14
- 279 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

SEXTON - CONFIDENTIAL
1   SEXTON - CONFIDENTIAL
2   I believe exclusively they happened after hours
3   or during breaks from the workshop itself.
4       Q.    When you say "any" team members, who
5   were the team members that would be at this
6   fulfillment seminar?
7       A.    So typically the instructor.  And
8   depending on -- we had certain ratios of
9   attendees to team members.  So -- I don't recall
10  what the exact ratio is, but depending on the
11  size of the audience, it would be anywhere from,
12  I imagine, one to three coordinators who would be
13  part of that team.
14      Q.    So there's instructors, and then who
15  were the other team members?
16      A.    We're listing them here as sales
17  coordinators and then program coordinators.
18      Q.    What type of people were these?
19  Were these instructors, mentors, what did you
20  call them?  Was this really their title, sales
21  coordinator and program coordinator?
22      A.    Those were their titles.
23      Q.    So these weren't people that provide
24  mentorship or do -- instruct on courses?
25      A.    No, these were not instructors.
Page 315

1   SEXTON - CONFIDENTIAL
2   These were --
3       Q.    They were salespeople?
4       A.    Well, they were individuals that had
5   some level of real estate experience, but they
6   were there to help manage the overall workshop.
7   And they had some sales experience as well.
8       Q.    On page 36 of the playbook, which is
9   52969, it again talks about profile sheets and
10  says, "Team works together to identify potential
11  buyers with student profile sheets."
12          And this is in the evening of day
13  one.  So now do they have information on the
14  profile sheets?
15      A.    Yes, for the individual attendees
16  that elected to provide information, they would
17  have that at that time.
18      Q.    And how did the individuals provide
19  information?  What form did they fill out or in
20  what form was it?
21      A.    It was a paper-based form.  There's
22  only one copy.  It was returned to the
23  individuals after the review.
24      Q.    What was it called?
25      A.    Student profile sheet.
Page 316

1   SEXTON - CONFIDENTIAL
2       Q.    What information was contained on
3   the student profile sheet?
4       A.    Again, as we've discussed, it was
5   information pertaining to the student's goals, I
6   believe both financial and otherwise; the time
7   frame they desired to achieve those goals in;
8   what -- a snapshot at a high level of what their
9   resources were, both assets and liabilities.  And
10  again, I'm forgetting on there -- I'm forgetting
11  other fields, but there were others, I imagine.
12      Q.    Did it ask them to list their credit
13  cards and the amount of credit limits?
14      A.    I don't recall that specifically.
15      Q.    Did it ask them to list their banks
16  and their bank account balances?
17      A.    I don't believe we ever asked for
18  specific banks.  That wasn't the intent.  But
19  certainly assets, yes.
20      Q.    If you could turn to page 40 of the
21  handbook, which is TU52973.  At the top, it
22  discusses survey distribution and says,
23  "Distributed surveys to all attendees and
24  collects, once completed, in exchange for
25  certificates."
Page 317

1   SEXTON - CONFIDENTIAL
2           Did that mean that the students
3   needed to turn in their evaluation form in order
4   to receive a certificate?
5       A.    I don't recall.  I don't recall that
6   being a policy.
7       Q.    And the forms that asked the
8   students to rate the instructors and the programs
9   on the scale from one to five, are those referred
10  to as surveys?
11      A.    Yes, those are.
12      Q.    If you could turn to page 71 of the
13  handbook, which is TU53004.  It states, about
14  halfway down, that "TU presentations must be
15  approved in advance and you may not change or
16  modify presentations/slides without prior
17  approval."
18          Was that Trump University's' policy?
19      A.    That was our policy.
20      Q.    It states a few lines down, "You may
21  not share a personal story or testimonial unless
22  and until appropriate documentation and support
23  has been provided to TU and the story/testimonial
24  has been approved in advance."
25          Was that Trump University's policy
Page 318

10 (Pages 315 to 318)

Exhibit 14
- 280 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

1        SEXTON - CONFIDENTIAL
2  during just some portion?
3        A.   Just during some portions of that
4  period, we experimented with a pricing plan that
5  gave a discount.  If you purchased education and
6  training at the event, you would get a discount.
7        Q.   Do you know what portions of that
8  time period --
9        A.   I do not.
10       Q.   The next bullet point states that
11 corporate should be notified if there is an
12 express or implied earnings claim given or a
13 guarantee.  Were you aware of instructors or
14 mentors providing an expressed or implied
15 earnings claim stating that the students would
16 make a certain amount of money or that they were
17 guaranteed something?
18       A.   No.
19       Q.   Were you aware of instructors
20 telling students that they were either guaranteed
21 or likely to make back the entire amount they
22 spent in their first deal or two?
23       A.   No.
24       Q.   If you knew that instructors were
25 saying that, would that be grounds for
                                        Page 355

1        SEXTON - CONFIDENTIAL
2  termination?
3        A.   I don't know.  You'd have to be back
4  in the situation and understand explicitly what
5  they said.  I can't make a judgment now, looking
6  backwards.
7        Q.   The next section states that all
8  Trump University events will be recorded.  When
9  did that policy go into effect?
10       A.   I couldn't tell you the exact date,
11 but I believe from the first time we had a
12 seminar or a workshop or a preview or any sort of
13 live event.
14       Q.   What was the purpose for that?
15       A.   It was for purposes of quality and
16 compliance.
17       Q.   Is there a list that Trump
18 University kept of all of the tapes or all of the
19 live events?
20       A.   Of all of the live events --
21       Q.   So, in other words, if there were
22 tapes of all of these different events and
23 they're all compiled, is there some kind of table
24 of contents or list of what all these tapes are,
25 all the events are?
                                        Page 356

1        SEXTON - CONFIDENTIAL
2        A.   Not that I'm aware of.
3        Q.   If you could please turn to Bates
4  No. TU96011 through 96034.
5        A.   I'm sorry, what is it?
6        Q.   96011 through 96034.
7             (Witness peruses the exhibit.)
8        Q.   Do you recognize this document?
9        A.   No.
10       Q.   Do you know whether it was a portion
11 of a playbook or an earlier version of a
12 playbook?
13       A.   I don't believe it was.
14       Q.   Do you know what it is?
15       A.   I suspect what it is.
16       Q.   What do you suspect?
17       A.   I suspect it's some sales tool that
18 somebody brought to us at some point, but this
19 was not part of our training.
20       Q.   Do you know whether Trump University
21 used this document?
22       A.   I do not believe we ever used this
23 document.
24       Q.   If you can please turn to TU9603 --
25            MR. SCHNEIDER:  Is this to be
                                        Page 357

1        SEXTON - CONFIDENTIAL
2  marked?
3            MS. ECK:  It's not.  Thank you.
4            THE WITNESS:  TU96 --
5  BY MS. ECK:
6        Q.   038 through 96053.
7             (Witness peruses document.)
8        Q.   Do you recognize this document?
9        A.   I mean, I don't recognize this
10 specific document.
11       Q.   Do you know whether this script was
12 used by Trump University?
13       A.   I'm positive it was not, no.
14       Q.   Why are you positive it was not used
15 by Trump University?
16       A.   Because everything that was
17 officially used by us had a certain level of
18 quality and a look and a feel and it was
19 grammatically correct.  And this is -- sales guys
20 brought us junk all the time that they used in
21 former -- this was an inside sales -- this
22 happened all the times.
23            Guys that worked at wherever,
24 selling whatever, would say, hey, I'm going to
25 search and replace "XYZ Company" for "Trump" and
                                        Page 358

20 (Pages 355 to 358)

Exhibit 14
- 281 -

CONFIDENTIAL

Michael Sexton                                         Makaeff v. Trump University

| | |
|---|---|
| 1         SEXTON - CONFIDENTIAL | 1         SEXTON - CONFIDENTIAL |

1        SEXTON - CONFIDENTIAL
2   present this to us like it was the holy grail and
3   this was going to be a fantastic sales tool.  And
4   we never used them because they were all crap.
5        Q.   Who is Steve Miller?
6        A.   Steve Miller was a mentor and
7   instructor.  May have even done some coaching for
8   us, but definitely a mentor and an instructor.
9   In addition to that, we also used him to vet
10  other mentors and instructors.
11       Q.   What time period did he work for
12  Trump University?
13       A.   I would guess fairly early in our
14  live event side.  So I would guess late 2007,
15  early 2008 through early 2010.
16       Q.   Do you know where he's working now?
17       A.   I don't.  I have no idea.
18       Q.   What did he do before he came to
19  Trump University?
20       A.   He was, I assume he still is, a real
21  estate investor.  That was his primary -- as I
22  understand it, that was his primary job.
23       Q.   If you could please turn to TU19457
24  [sic] through 129460.
25            MR. SCHNEIDER:  19457 to 129 --
                                              Page 359

1        SEXTON - CONFIDENTIAL
2        MS. ECK:  129457 through 129460.
3        MR. SCHNEIDER:  Thank you.
4        THE WITNESS:  I think it's in that
5   one (indicating).
6        MR. SCHNEIDER:  (Handing.)
7        (Witness peruses the exhibit.)
8        MS. ECK:  Let's mark this exhibit as
9   Exhibit 10.
10       (Plaintiffs' Exhibit 10, Bates Nos.
11  TU 129455 through 60, 10/1/08 Memorandum to
12  The Mentor Team from Brad Schneider, marked
13  for identification.)
14  BY MS. ECK:
15       Q.   At this point, in May of 2010, was
16  Steve Miller the person who was interviewing and
17  approving mentors?
18       A.   Yes, he would have been, I believe.
19       Q.   How long was he interviewing and
20  approving mentors?
21       A.   How long had he been by this point?
22       Q.   Yes.
23       A.   I believe we put that in place in
24  2009.
25       Q.   Do you know what month in 2009?
                                              Page 360

1        SEXTON - CONFIDENTIAL
2        A.   No.
3        Q.   Who was interviewing and approving
4   mentors before 2009?
5        A.   David Highbloom and myself.
6        Q.   The document also refers to
7   "Howard."  Who is Howard?
8        A.   I believe that would be Howard
9   Haller.
10       Q.   Who is he?
11       A.   He's a mentor.
12       Q.   Was he applying for a mentorship or
13  was he a person who interviewed mentors with
14  Steve Miller?
15       A.   I'm sorry, where is he referenced?
16       Q.   He's referenced in the second
17  paragraph on the first page.
18       A.   No, this was -- what was the
19  question?  I'm sorry.
20       Q.   Was he -- was he interviewing people
21  with Steve Miller, or what was his role?
22       A.   He was not interviewing people with
23  Steve Miller.  He was a mentor, but had
24  significant experience and a very strong process
25  orientation.  So what Gillian Birnie was
                                              Page 361

1        SEXTON - CONFIDENTIAL
2   attempting to do was to work with Howard and Troy
3   to set up a -- a more process-driven mentorship.
4        Q.   What do you mean by "process-driven
5   mentorship"?
6        A.   To create a more structured model
7   for a mentorship than what it had been in the
8   past.
9        Q.   Why did Trump University feel they
10  wanted to set up a more structured model?
11       A.   I'm not sure we're convinced it was
12  the right idea.  I mean, you have to strike the
13  right balance between hiring good people that are
14  good at their jobs and empowering them to do what
15  you hired them to do.  And, you know, look, the
16  very nature of mentorship, no two are alike.
17            And on one hand, it would be great
18  to structure it; but the other hand, you're doing
19  a disservice to the student if you -- if one
20  guy's in Santa Fe and is looking for commercial
21  properties, by its very nature, that's going to
22  be a dramatically different mentorship than
23  somebody who's looking for residential
24  foreclosures in Detroit, right.
25            You know, what we were trying to do
                                              Page 362

21 (Pages 359 to 362)

Exhibit 14
- 282 -

CONFIDENTIAL

**Michael Sexton**                                                    **Makaeff v. Trump University**

SEXTON - CONFIDENTIAL

1
2  was kind of an idea of freedom within framework.
3  So can we provide a framework for what a
4  mentorship is, but balance that against the --
5  indeed for the mentor to ultimately prescribe
6  what they felt was the right experience based on
7  the students' explicit stated goals.  And that
8  would be the freedom.
9         So, you know, can you balance --
10  structure a framework, but allow the mentor to
11  ultimately be the architect of what that
12  mentorship experience is, again driven by the
13  customer, the student, and let them -- let them
14  have freedom within the framework we set out for
15  them.
16         And this never came to fruition,
17  which should be noted.
18     **Q.    This idea to require a certain**
19  **structure in the mentorships?**
20     A.    Yes, the specific effort to create
21  those frameworks.
22     **Q.    There's also a reference at the top**
23  **of page 129458 of a new pay structure for the**
24  **mentors.  Did that take place?**
25     A.    I don't know.  I don't know what pay

Page 363

SEXTON - CONFIDENTIAL

1
2  structure they're referencing.  Obviously we did
3  change.  We continued to tweak the compensation
4  program for mentors.
5     **Q.    We discussed this a little bit**
6  **yesterday, but how did that change over time?**
7  **How were the mentors initially compensated and**
8  **how did that change?**
9     A.    Initially they were -- I believe
10  initially it was very straightforward.  We paid
11  them based on the successful completion -- a
12  fixed rate based on the successful completion of
13  a mentorship as measured by positive customer
14  feedback.  I know we proactively reached out to
15  the student, the mentee, as well to review their
16  experience.
17         Later on we -- I think we staggered
18  payments.  A portion -- I believe a portion was
19  paid up front and then a portion was -- I believe
20  another portion was paid upon successful
21  completion.  And then I believe there was portion
22  a portion held -- held back for some period of
23  time to -- just to ensure that everything was --
24  was still good.
25     **Q.    Do you know when that staggered**

Page 364

SEXTON - CONFIDENTIAL

1
2  **payment plan went into effect?**
3     A.    I know it wasn't binary.  We didn't
4  go from here's your money to -- there were
5  intermediates steps where we -- I believe at one
6  point -- so I'm kind of giving you both ends of
7  that.  At one point in the middle, we -- there
8  was nothing up front.  You got a portion based on
9  successful completion and then a portion was held
10  for some period of days, 30, 60 days, something
11  like that.
12         So that -- again, like many things,
13  it was pretty dynamic, and we were constantly
14  trying to tweak everything to -- to make the
15  delivery of our services better.
16     **Q.    When you talk about successful**
17  **completion, are you talking about that they would**
18  **get paid at the end of the three-day in-field**
19  **mentorship?**
20     A.    No.  It would be based on -- well,
21  at some point, that was one of the -- a portion
22  was triggered by the in-field, and then a portion
23  was triggered by the completion of -- you know,
24  whatever it was, 60 days later.
25         Again, I don't remember the --

Page 365

SEXTON - CONFIDENTIAL

1
2  recall the specific time frame, but we did tie --
3  we wanted everybody to understand their job
4  wasn't done after three days in the field.
5  Because there's a temptation obviously, as people
6  move on to the next mentorship, not to give
7  sufficient time to previous mentors -- mentees,
8  which is why we went to that compensation
9  structure, to make sure everybody understood the
10  mentorship really wasn't over until the mentee
11  said it was and they were happy.
12     **Q.    Where was the pay structure --**
13  **compensation structure set out?  Was it in a**
14  **general employee handbook, company guidelines, or**
15  **was it only in the individual agreements with the**
16  **mentors?**
17     A.    It would have -- it would have
18  been -- again, it was fairly dynamic and changed
19  when we wanted it to change if we thought that it
20  was an improvement.  So the binding -- the
21  binding document would have been the contract
22  with the -- the mentor had to agree to it,
23  obviously.  And some didn't and that was fine.
24  We didn't work with them.  But they had to sign
25  off physically on -- on their acceptance of those

Page 366

22 (Pages 363 to 366)

Exhibit 14
- 283 -

CONFIDENTIAL

Michael Sexton                                          Makaeff v. Trump University

SEXTON - CONFIDENTIAL

1      SEXTON - CONFIDENTIAL
2   seminars in a location where another entity had
3   already had a course in that market?
4      A.    I mean, it's -- it's all based on
5   time, right. We're going to come back to
6   New York, but if somebody was just in -- if Rich
7   Dad was just in New York, the last place I want
8   to be is in New York a week after Rich Dad came
9   through.
10      Because you're competing in many
11   ways for similar -- a similar audience, although
12   I know that we benchmarked our audience against
13   other companies and ours were -- you know, had a
14   higher education level, higher income level, it
15   was a more sophisticated group.
16      So I hope I answered your question.
17   The last thing we want to do is be in a market
18   anywhere near where a competitor was, but we're
19   going to come back to that same market.
20      Q.    What was your relationship like with
21   the other staff in the office or the folks at
22   40 Wall Street?
23      MR. SCHNEIDER:  Objection.
24   "Relationship."
25
Page 387

1      SEXTON - CONFIDENTIAL
2   BY MS. ECK:
3      Q.    Did you get along with them?
4      A.    Yes.
5      Q.    Was your office located at 40 Wall
6   Street also?
7      A.    Yes, it was.
8      Q.    What floor were you on?
9      A.    Thirty-second floor, I believe.
10      Q.    And were the other employees also on
11   the 32nd floor?
12      A.    Yes, they were.
13      Q.    Did you ever have employees on
14   different floors, or were you generally on the
15   same floor?
16      A.    Our initial office was on a
17   different floor, but when we moved, everybody
18   moved together.
19      Q.    Did you get along with the
20   instructors and mentors?
21      A.    Yes, by and large.
22      Q.    Are there some that you didn't get
23   along with?
24      A.    When you're the person that has to
25   discipline them, it's a -- it can be a complex
Page 388

1      SEXTON - CONFIDENTIAL
2   relationship. You know, I certainly didn't shy
3   away from disciplining them. And it wasn't
4   always welcome and . . .
5      Q.    Did you have to discipline anybody
6   other than James Harris?
7      A.    So I use "discipline" broadly, but
8   when you give negative feedback to people about
9   what they've done and are proud of and spend a
10   lot of energy doing, it's not always taken
11   particularly well. And that -- you know, that
12   was the nature of the relationship.
13      Q.    Who did you give negative feedback
14   to?
15      A.    I gave constructive criticism to
16   just about every speaker. There was never --
17   there was no perfect presentation. And there was
18   always something that could be improved upon.
19   And between David and myself, we gave them -- we
20   gave them feedback.
21      Q.    What was your relationship like with
22   Donald Trump?
23      A.    I think it was positive.
24      Q.    Did you enjoy working with him?
25      A.    I learned a lot from Donald Trump.
Page 389

1      SEXTON - CONFIDENTIAL
2      Q.    Did he like working with you?
3      A.    I couldn't answer that.
4      Q.    Have you spoken to him since you
5   left Trump University?
6      A.    I have not.
7      Q.    Have you communicated with him in
8   any way regarding this lawsuit?
9      A.    Since I left Trump University?
10      Q.    That's a good question.
11      I guess have you communicated --
12   first more generally, have you communicated with
13   him at all regarding this lawsuit?
14      A.    Yes.
15      Q.    Okay. When was that?
16      A.    While I was still at Trump
17   University.
18      Q.    What did you discuss?
19      MR. SCHNEIDER:  Was there counsel
20   present?
21      THE WITNESS:  Yes.
22      MR. SCHNEIDER:  That would all be
23   privileged.
24   BY MS. ECK:
25      Q.    Did you have any discussions with
Page 390

28 (Pages 387 to 390)

Exhibit 14
- 284 -

C O N F I D E N T I A L

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|
| 1      SEXTON - CONFIDENTIAL | 1      SEXTON - CONFIDENTIAL |

SEXTON - CONFIDENTIAL
1
2   Donald Trump outside the presence of counsel?
3       A.   About this lawsuit?
4       Q.   Yes.
5       A.   No.
6       Q.   Have you had any conversations with
7   Donald Trump since the filing of this lawsuit
8   without counsel present in regard to anything?
9       A.   In regard to anything.
10          What was the date of the lawsuit
11  again?
12      Q.   I think it was end of April 2010.
13      A.   I don't recall.
14      Q.   When you said before that counsel
15  was present in those conferences with Donald
16  Trump, which counsel was that?  Which attorneys?
17      A.   It would have been George Sorial
18  and/or Michael Cohen.
19      Q.   Was Donald Trump angry about the
20  lawsuit?
21          MR. SCHNEIDER:  He's not going to
22          talk about anything that occurred in the
23          meeting when there was counsel there.  So
24          what they discussed, what people's
25          demeanors were, the documents they

Page 391

SEXTON - CONFIDENTIAL
1
2   reviewed, that's all privileged.
3   BY MS. ECK:
4       Q.   Outside -- in any communications
5   outside the presence of counsel, did Donald Trump
6   reprimand you or have anything negative to say to
7   you?
8          MR. SCHNEIDER:  Assumes facts not in
9          evidence.  He just testified he can't
10         recall any meetings or discussions with
11         Donald Trump since --
12         MS. ECK:  I'm entitled to flush that
13         out.
14         (Discussion off the record.)
15  BY MS. ECK:
16      Q.   Do you recall any?
17      A.   Again, I don't recall any specific
18  meetings without counsel present between the
19  lawsuit being filed and my last day.
20      Q.   And who does George Sorial
21  represent?  Is he counsel for Donald Trump or for
22  Trump Organization or for Trump University?
23         MR. SCHNEIDER:  Objection.
24         Foundation.
25

Page 392

SEXTON - CONFIDENTIAL
1
2   BY MS. ECK:
3       Q.   Do you know who he represents?
4       A.   I don't.
5       Q.   Do you know who Michael Cohen
6   represents?
7       A.   I don't.
8       Q.   What's your experience in real
9   estate?
10      A.   Beyond buying my primary residence,
11  none.
12      Q.   Have you purchased or sold any other
13  real estate other than your primary residence?
14      A.   I have not.
15      Q.   Have you made any money investing in
16  real estate?
17      A.   I have not.
18      Q.   Did Trump University conduct any
19  surveys to determine the importance to students
20  of Donald Trump's involvement in Trump
21  University?
22      A.   No.
23      Q.   Did Trump University conduct surveys
24  of students other than the evaluation forms that
25  were filled out at the end of seminars and

Page 393

SEXTON - CONFIDENTIAL
1
2   mentorships?
3          MR. SCHNEIDER:  Hang on just a
4          second.  I just want to read the question.
5          (Pause from the record.)
6          MS. ECK:  I think the question
7          didn't come out -- or at least didn't get
8          transcribed as I meant it.
9   BY MS. ECK:
10      Q.   Did Trump University conduct surveys
11  of students other than the evaluation surveys
12  that were issued after seminars and after
13  mentorships?
14      A.   Yes.
15      Q.   What surveys were those?
16      A.   We conducted surveys to understand
17  what areas of study people were interested in.
18      Q.   Anything else?
19      A.   We conducted surveys on what -- the
20  modality of education individuals were interested
21  in --
22      Q.   What do you mean --
23      A.   -- such as e-learning, classroom,
24  coaching.
25      Q.   Did you conduct surveys regarding

Page 394

29 (Pages 391 to 394)

Exhibit 14
- 285 -

C O N F I D E N T I A L

Michael Sexton                                                    Makaeff v. Trump University

| | |
|---|---|
| 1          SEXTON - CONFIDENTIAL | 1          SEXTON - CONFIDENTIAL |
| 2   what representation students found important, so, | 2   surveys compiled? |
| 3   in other words, whether they felt it was | 3       A.   I don't recall specifically, but I |
| 4   important to work with an expert in real estate | 4   believe we used a third-party software, like |
| 5   or whether they felt it was important to work | 5   SurveyMonkey or the like. |
| 6   with someone who was going to work with them for | 6       Q.   Where were the results of the |
| 7   one year?  Did you explore certain statements | 7   surveys kept? |
| 8   that Trump University was making? | 8       A.   By our marketing group. |
| 9          MR. SCHNEIDER: Objection. Assumes | 9       Q.   Would that be Michael Bloom? |
| 10   facts not in evidence. | 10       A.   No, back then it would have been |
| 11          You can answer the question. | 11   Josef Katz. |
| 12          THE WITNESS:  Not that I recall. | 12       Q.   Did Trump University alter seminars |
| 13   BY MS. ECK: | 13   or courses based on the results of these surveys? |
| 14       Q.   And how often did Trump University | 14       A.   The surveys helped define the |
| 15   do these other surveys, surveys other than the | 15   education and training products that we |
| 16   ones after courses in mentorships? | 16   ultimately developed.  Your question about |
| 17       A.   We did quite a bit initially, early | 17   altering the seminars and training that we had |
| 18   on, in 2005, probably into 2006, but not | 18   launched, those -- the information that helped us |
| 19   regularly after that. | 19   fine-tune or evolve those really did come from |
| 20       Q.   Were these surveys issued to | 20   the -- primarily the attendee surveys where |
| 21   students who had taken courses, or were they | 21   attendees had open-ended questions and were |
| 22   issued more generally to people in Trump | 22   allowed to -- or were encouraged to tell us how |
| 23   University's database? | 23   we could improve and what else we could do |
| 24       A.   The latter. | 24   differently that they might be interested in. |
| 25       Q.   How were the results of those | 25       Q.   Did Donald Trump review all the |
| Page 395 | Page 396 |
| 1          SEXTON - CONFIDENTIAL | 1          SEXTON - CONFIDENTIAL |
| 2   print ads that Trump University distributed? | 2   the controller. |
| 3       A.   Yes, he did. | 3       Q.   Who was the controller? |
| 4       Q.   Did Donald Trump review all of his | 4       A.   For Trump University? |
| 5   blogs that were published on the Trump University | 5       Q.   Yes. |
| 6   website? | 6       A.   Steven Matejek. |
| 7       A.   Yes, I believe he did. | 7       Q.   Did you discuss advertisements with |
| 8       Q.   Did Donald Trump review Trump -- | 8   Donald Trump? |
| 9   Trump University financials? | 9       A.   Yes, I did. |
| 10       A.   I don't know. | 10       Q.   How frequently? |
| 11       Q.   Did you review Trump University | 11       A.   Any time we had a new ad, we would |
| 12   financials with Donald Trump? | 12   discuss it. |
| 13       A.   At times. | 13       Q.   How often were there new ads |
| 14       Q.   How frequently? | 14   created? |
| 15       A.   Infrequently. | 15       A.   Print ads, fairly frequently.  We |
| 16       Q.   How many times per year? | 16   would typically create a batch at one time and |
| 17       A.   I couldn't answer that. | 17   then have three or four approved -- present them |
| 18       Q.   Less than four? | 18   to Mr. Trump, get approval on three or four |
| 19       A.   Yes. | 19   different versions that we would then be able to |
| 20       Q.   Less than two? | 20   go out and test over a period of time. |
| 21       A.   I don't know. | 21       Q.   Why did he want to be involved in |
| 22       Q.   When you reviewed financials with | 22   reviewing and approving the advertisements? |
| 23   Donald Trump, what financial documents would you | 23          MR. SCHNEIDER:  Objection. |
| 24   review? | 24   Foundation. |
| 25       A.   Just a summary document prepared by | 25          THE WITNESS:  Mr. Trump |
| Page 397 | Page 398 |

30 (Pages 395 to 398)

Exhibit 14
- 286 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|
| 1        SEXTON - CONFIDENTIAL | 1        **SEXTON - CONFIDENTIAL** |

1          SEXTON - CONFIDENTIAL
2    understandably is protective of his brand
3    and very protective of his image and how
4    he's portrayed.  And he wanted to see how
5    his brand and image were portrayed in Trump
6    University marketing materials.  And he had
7    very good and substantive input as well.
8  BY MS. ECK:
9    Q.    Did -- for what other purposes would
10  you meet with -- or discuss things with Donald
11  Trump?
12    A.    Other than --
13    Q.    Other than advertising, the
14  financials.
15    A.    -- advertising and marketing.
16          State of the business.
17    Q.    How often would you meet on that?
18    A.    Periodically.
19    Q.    A few times a year?
20    A.    Maybe once a quarter.
21    Q.    Did you discuss students' or buyers'
22  complaints with Trump University with him?
23    A.    We did not, no.
24    Q.    Did you discuss with Donald Trump
25  students' dissatisfaction with Trump University?
                                        Page 399

1          **SEXTON - CONFIDENTIAL**
2    A.    I did not, no.
3    Q.    Why not?
4    A.    Because if 97 percent were
5  satisfied, I felt the story line was 97 percent
6  are satisfied, not 3 percent are dissatisfied.
7    Q.    Were there any other purposes that
8  you would talk with Donald Trump about other than
9  the ones you already mentioned?
10    A.    About new products.
11    Q.    Anything else?
12    A.    At times about other activities he
13  was engaged in that were adjacent to our industry
14  or maybe part of our industry.
15    Q.    Anything else?
16    A.    Not that I can recall.
17          MS. ECK: We're almost done with
18  this tape.  Let's go ahead and take a
19  break.
20          THE VIDEOGRAPHER:  The time is 12:31
21  and we're off the record.
22          (Luncheon recess from the record.)
23
24
25
                                        Page 400

1          SEXTON - CONFIDENTIAL
2          A F T E R N O O N   S E S S I O N
3          THE VIDEOGRAPHER:  The time is 1:46.
4    This begins Tape No. 8 of the videotaped
5    deposition of Michael Sexton.
6    MICHAEL SEXTON,
7          having been previously sworn, resumed the
8          stand and testified further as follows:
9    EXAMINATION (Cont'd.)
10  BY MS. ECK:
11    Q.    Are you aware of any lawsuits, other
12  than this present one, that have been filed
13  against Trump University?
14    A.    No.
15          MS. ECK: I'd like to mark as
16    Exhibit No. 11 a document, TU25203.
17          (Plaintiffs' Exhibit 11, Bates No.
18    TU 25203, List of Lawsuits, marked for
19    identification.)
20          MR. SCHNEIDER:  Can you say the
21    number again?  I'm sorry.
22          MS. ECK:  25203.
23          MR. SCHNEIDER:  Thank you.
24          (Witness peruses the exhibit.)
25
                                        Page 401

1          SEXTON - CONFIDENTIAL
2  BY MS. ECK:
3    Q.    Do you recognize this document?
4    A.    I don't, no.
5    Q.    Do you know who created it?
6    A.    I don't.
7    Q.    Are you familiar with any of these
8  lawsuits listed on this document?
9    A.    I guess the first one had to do with
10  the Utah -- the Draper, Utah office space.
11    Q.    Who was located in the Utah space?
12    A.    Customers -- for a period, customer
13  service, inside sales.  That was it.
14    Q.    How many people were located in
15  Utah?
16    A.    It varied, but at its peak, maybe a
17  dozen.
18    Q.    Did these people all service
19  seminars in Utah?
20    A.    No, no, no.  They would -- inside
21  sales had nothing told with the seminars really.
22  They were a separate entity.  Customer service
23  out there would support events anywhere by making
24  reminder calls, that sort of thing.
25    Q.    Why did you establish an office in
                                        Page 402

31 (Pages 399 to 402)

Exhibit 14
- 287 -

CONFIDENTIAL

Michael Sexton                                          Makaeff v. Trump University

| | |
|---|---|
| 1   SEXTON - CONFIDENTIAL | 1   SEXTON - CONFIDENTIAL |
| 2   a three full days, for a 90-minute preview. | 2   BY MS. ECK: |
| 3      And we gave her, I would guess, | 3   Q.   Yes, sure. |
| 4   three or four, probably more, four to six, | 4   A.   (Handing.) |
| 5   opportunities.  And it just didn't work out I | 5   Q.   This appears to be an e-mail from |
| 6   think from both of our standpoints. | 6   Michael Bloom to you regarding print ads with |
| 7   Q.   If you could look at document 102422 | 7   DJT's signature and title.  Are you familiar with |
| 8   through 102426. | 8   this document? |
| 9   A.   102422? | 9   A.   I believe so, yes. |
| 10   Q.   Yes. | 10   Q.   And it states that -- "Your updated |
| 11      (Witness peruses document.) | 11   versions incorporating your good idea to include |
| 12   A.   I'm sorry, just to amend my previous | 12   DJT's title as chairman, Trump University." |
| 13   comment, we did have a female instructor. | 13      Was that your idea to include Donald |
| 14   Q.   What was her name? | 14   Trump's title as chairman of Trump University? |
| 15   A.   Denise Devoe, D-E-V-O-E. | 15   A.   I assume so, reading the -- reading |
| 16   Q.   During what time period was she an | 16   the e-mail. |
| 17   instructor? | 17   Q.   Was he the chairman of Trump |
| 18   A.   2007. | 18   University? |
| 19   Q.   How many courses did she teach? | 19   A.   Yes, he was. |
| 20   A.   Maybe a dozen, maybe more. | 20   Q.   Had advertisements featured his |
| 21      MR. SCHNEIDER:  Are you marking | 21   position as chairman of Trump University before |
| 22   this? | 22   this date? |
| 23      MS. ECK:  Not yet. | 23   A.   I don't recall.  I don't recall |
| 24      THE WITNESS:  Would you care for | 24   specifically. |
| 25   this back? | 25   Q.   Did Trump University have various |
| Page 455 | Page 456 |
| 1   SEXTON - CONFIDENTIAL | 1   SEXTON - CONFIDENTIAL |
| 2   different campaigns to promote the university? | 2   whether it was direct mail versus print versus |
| 3      MR. SCHNEIDER:  Objection as to the | 3   e-mail and so on.  Then there was even geographic |
| 4   term "campaigns." | 4   differentiations based on the market we were |
| 5   BY MS. ECK: | 5   specifically targeting. |
| 6   Q.   Were there different themes of | 6   Q.   Was one of these themes Donald Trump |
| 7   advertising?  So, for example, an apprenticeship | 7   saying, I want you to be my apprentice? |
| 8   advertisement or campaign or a Trump the master | 8   A.   I believe we used that theme, yes. |
| 9   campaign? | 9   Q.   Was that called like an |
| 10   A.   So we really didn't do any what I | 10   apprenticeship theme, or did it have a title? |
| 11   would call brand advertising.  So when you say to | 11   A.   We didn't really title it that way. |
| 12   promote the company, everything we did was direct | 12   Q.   Was that apprenticeship theme |
| 13   response.  It was -- the vast, vast majority was | 13   successful or popular with potential students? |
| 14   designed with one goal in mind, which was to get | 14   A.   We were pretty consistently A, B |
| 15   people to become aware of our free previews and | 15   test design.  So test two different designs and |
| 16   to attend. | 16   measure which one performed better.  I think it |
| 17      Within that context, yes, we had | 17   was highly dependent upon seasonality.  So if The |
| 18   dozens and dozens of different -- I guess you'd | 18   Apprentice was running, I think our thinking was |
| 19   call them campaigns, but it was really -- there | 19   let's -- there's a millions of dollars in |
| 20   were thematic differences.  There was certainly | 20   advertisement for The Apprentice TV show.  If |
| 21   content differences that were meaningful | 21   we're in The Apprentice TV show season, it will |
| 22   differences in copy, body copy, meaningful | 22   be top of mind for people.  Let's take advantage |
| 23   differences in display and layout and design. | 23   of that momentum and use that in some of our |
| 24      And then, of course, there were | 24   marketing materials.  When it wasn't The |
| 25   differences based on the media that we used, | 25   Apprentice season, I recall it didn't perform as |
| Page 457 | Page 458 |

45 (Pages 455 to 458)

Exhibit 14
- 288 -

CONFIDENTIAL

**Michael Sexton**                                                              **Makaeff v. Trump University**

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

1         SEXTON - CONFIDENTIAL
2    well.
3        **Q.    Was learn from the master or Trump**
4    **the master another advertising theme?**
5        A.    For instance, I don't know whether
6    we used any or all of these in real ads.  The
7    idea that Donald Trump was an expert in real
8    estate certainly was a consistent theme.
9        **Q.    Was learn from the master a**
10   **consistent theme?**
11       A.    I would say that would be -- if we
12   thought about -- that would be part of this
13   overarching messaging of Donald Trump's an expert
14   in real estate.  If you're going to learn about
15   real estate, why wouldn't you learn from
16   somebody's who actually been out there and done
17   it before, as opposed to, you know, Robert Adder
18   [ph] or some of these other guys that haven't.
19       **Q.    Was learn from the master Donald**
20   **Trump a successful or popular advertising theme?**
21       A.    I couldn't tell that.  I don't know.
22       **Q.    Was it tested?**
23       A.    Again, I don't know whether -- this
24   looks like a mock-up to a PDF.  I don't know
25   whether this -- I don't know whether this ran
                                                    Page 459

1         SEXTON - CONFIDENTIAL
2    in -- I don't know whether this particular ad was
3    approved and ran in a market.
4        **Q.    Did other advertisements using that**
5    **same phrase, "learn from the master," actually**
6    **run?**
7        A.    I couldn't tell you.
8        **Q.    Was Donald Trump's signature a theme**
9    **from a Donald Trump signature campaign or theme**
10   **where there would be his signature and name of**
11   **chairman of the board?**
12       A.    No, it was what we think of as an
13   element in the design and layout of an ad like
14   this, much like the logo is an element, a free
15   giveaway is an element, the picture is an
16   element.
17           We felt it supported -- he's got a
18   fairly distinctive signature.  We felt it
19   supported the -- the overall messaging.
20       **Q.    Who came up with the idea to use his**
21   **signature in the advertising?**
22       A.    I don't know.
23       **Q.    Was it you?**
24       A.    I don't know.
25       **Q.    Was it Michael Bloom?**
                                                    Page 460

1         **SEXTON - CONFIDENTIAL**
2        A.    I don't know.
3        **Q.    Was using his -- Donald Trump's**
4    **signature a successful element of an**
5    **advertisement for Trump University?**
6        A.    I don't know if the signature added
7    anything to the ad.
8        **Q.    Can you think of other themes or**
9    **elements that Trump University used that were**
10   **successful in motivating students to attend the**
11   **courses?**
12       A.    I mean, we used dozens and dozens of
13   different headlines, body copy, layouts.  I
14   can't -- we measured all of this, so there's --
15   you know, there's an answer.  I don't have it for
16   you, which one was the, quote-unquote, winning
17   theme.
18           And even if it was, there's a --
19   what works today doesn't necessarily work
20   tomorrow.  What works in New York doesn't
21   necessarily work in LA.  It's a fairly -- it's a
22   very dynamic, messy process that's, by its very
23   nature, multi-variant when you've got 30
24   different variables on any ad that you're
25   tinkering with over time to -- to optimize.  And
                                                    Page 461

1         SEXTON - CONFIDENTIAL
2    I don't have that data handy.
3        **Q.    The last two attachments are "Learn**
4    **to invest like a billionaire."  Do you recall**
5    **whether you ever used this theme or an**
6    **advertisement similar to this?**
7        A.    I don't recall, but I know we kind
8    of backed off the whole notion of learn to invest
9    like a billionaire.
10       **Q.    Why was that?**
11       A.    It wasn't accessible to people.
12   People didn't necessarily walk around wanting to
13   be a billionaire.  They'd be very happy to be a
14   millionaire.  So it was almost -- I think our
15   feeling was it was almost overwhelming, daunting,
16   you know, that's not going to happen.
17       **Q.    Did you have a theme you are**
18   **encouraging people to invest like a millionaire**
19   **or to become a millionaire?**
20       A.    Not specifically, no.
21       **Q.    Did you have campaigns or themes or**
22   **elements using the word "millionaire"?**
23       A.    Not that I can recall.
24       **Q.    Were the two primary people involved**
25   **in Trump University advertising and marketing,**
                                                    Page 462

46 (Pages 459 to 462)

Exhibit 14
- 289 -

CONFIDENTIAL

Michael Sexton

Makaeff v. Trump University

```
 1        SEXTON - CONFIDENTIAL
 2  other than you, Michael Bloom and Josef Katz?
 3      A.    That's correct.
 4      Q.    And Josef Katz was there first and
 5  then Bloom came when he left; is that right?  Or
 6  were they there at the same time?
 7      A.    They overlapped briefly.
 8      Q.    Why did Josef Katz leave?
 9      A.    We terminated him.  We felt that
10  Michael had a better skill-set.
11      Q.    When did Michael Bloom leave?  Was
12  it after you left or before?
13      A.    Just before.  I would say a month or
14  two prior.
15      Q.    Was he terminated?
16      A.    Laid off.
17      MR. SCHNEIDER:  Off the record just
18  one moment.
19      THE VIDEOGRAPHER:  The time is 3:50.
20  We're off the record.
21      (Pause from the record.)
22      THE VIDEOGRAPHER:  The time is 3:53.
23  We're back on the record.
24  BY MS. ECK:
25      Q.    Who was David Early?
                              Page 463
```

```
 1        SEXTON - CONFIDENTIAL
 2      A.    He was -- he used to work at
 3  Dynatech for a good, long time, about 13 years, I
 4  believe, in a variety of roles.  And so when he
 5  left there, he started his own consulting firm.
 6  And we worked with him pretty extensively in a
 7  number of different areas.
 8      Q.    In what -- what did he do with Trump
 9  University or for Trump University?
10      A.    He did -- well, a lot of things.  He
11  helped with speaker and instructors, coaching
12  them.  He helped us at times get feedback on
13  presentations.  He helped at times with putting
14  together things like the video testimonials.  He
15  helped with print buying.  He helped with design
16  of some print ads, I believe.  I believe.
17      Q.    And what time period did he work
18  with Trump University?
19      A.    I'd say 2000 -- on and off in
20  different ways from 2007 through, I'd say, 2009.
21      Q.    Was his company Entrende?
22      A.    Entrende, yes.
23      Q.    How do you spell that?
24      A.    E-N-T-R-E-N-D-E.
25      Q.    Did he create any content for
                              Page 464
```

```
 1        SEXTON - CONFIDENTIAL
 2  courses for Trump University?
 3      A.    No, I don't believe so.
 4      Q.    Did he -- who's Phillip Ungricht,
 5  U-N-G-R-I-C-H-T?  Is he with EWI?
 6      A.    The name's vaguely familiar.  Do you
 7  have anything else on him?
 8      Q.    Who was Kos -- Kos Rovoni [ph]?
 9      A.    Character.
10      Kos was and is an Internet marketing
11  instructor.  He's based out of Los Angeles.  He's
12  got his own course on how to -- how to market
13  business on the Internet using a combination of,
14  as I recall, social media, like LinkedIn, Meet Up
15  and that sort of thing Facebook and paid search,
16  so Google AdWords.
17      And we worked with him.  We wanted
18  an Internet marketing product.  We thought it
19  would complement our -- we thought it would
20  complement our offerings for entrepreneurs that
21  wanted to not just launch a business, but then
22  marketed their business.  And we did partner with
23  him.  We liked -- we liked the focus of his
24  content, but it just didn't work out.
25      Q.    Did he create a video with Donald
                              Page 465
```

```
 1        SEXTON - CONFIDENTIAL
 2  Trump?
 3      A.    No, not that I'm aware of.
 4      Q.    Was he involved in any of the real
 5  estate courses or no?
 6      A.    No.  Purely -- purely Internet
 7  marketing.
 8      Q.    If you could please look at document
 9  TU102432 through 435.
10      (Witness peruses the exhibit.)
11      Q.    This is an e-mail from Josef Katz to
12  various people, including you, regarding
13  California ad for Trump.  It says, "See attached
14  for a few small tweaks from legal."
15      Do you recognize this document?
16      A.    I don't recall this specific
17  document, no.
18      Q.    Do you have any reason to believe
19  you would not have received this document?
20      A.    No.
21      Q.    Was it common to have advertisements
22  reviewed by the legal department?
23      A.    Yes.
24      Q.    Did they review every advertisement?
25      A.    I believe any ad, any newspaper ad
                              Page 466
```

47 (Pages 463 to 466)

Exhibit 14
- 290 -

# EXHIBIT 15
# [Filed Under Seal]

Exhibit 15
- 291 -

## CONTRACTOR AGREEMENT

THIS AGREEMENT is made and entered into this 14ᵗʰ day of April 2010 2009 between TRUMP UNIVERSITY ("TU") with offices at 40 Wall Street, New York, NY 10005, and Adam Ginsberg International whose principal address is ("Consultant"). 11693 San Vicente Blvd #518, Los Angeles, CA 9CC49

## WITNESSETH:

WHEREAS, TU seeks to engage Consultant to render such services as it determines from time-to-time and,

WHEREAS, Consultant represents that he/she is qualified to render these services;

NOW, THEREFORE, IT IS AGREED:

## I. ENGAGEMENT

1.01   Engagement:   Subject to the terms of this agreement TU has hereby retained the non-exclusive services of Consultant to render the services specified in Exhibit A, annexed hereto.

## II. OBLIGATIONS OF CONSULTANT

2.01   (a)   Consultant shall expend such time and effort as are necessary to carry out the assignment.

(b)   The results and proceeds of Consultant's services hereunder shall be deemed a "work-made-for-hire" specifically ordered by TU. Consultant acknowledges and agrees that all copyrightable material, including writings, software, drawings, and designs, and all ideas, inventions, improvements, developments and discoveries made, conceived or reduced to practice by Consultant, whether individually or in collaboration with others, during the course of performance under this Agreement, are the sole property of TU; and Consultant agrees to assign (or cause to be assigned) to TU all right, title and interest in and to all such intellectual property, including without limitation any

*TU CONSULTANT AGMT/0703*

1

CONFIDENTIAL

worldwide copyright(s), moral rights, patent(s) and any and all other such rights of whatever kind, and the right to obtain registrations, renewals, reissues and extensions of the same. In this regard, Consultant is executing the Assignment annexed hereto as Exhibit B.

Consultant agrees to execute such further documents and to do such further acts as may be necessary to perfect the foregoing assignments and to protect TU's rights. In the event Consultant fails or refuses to execute such documents, Consultant hereby appoints TU as Consultant's attorney-in-fact (this appointment to be irrevocable and a power coupled with an interest) to act on Consultant's behalf and to execute such documents. Consultant further agrees that TU shall have the right to use, copy, publish, reproduce, alter, or destroy the Intellectual Property and to take any other action consistent with TU's sole and exclusive ownership thereof, and Consultant waives any right to interfere with or to prevent the exercise of the forgoing rights by TU in its sole and absolute discretion.

(c)     Consultant Identification: While working on this Assignment, Consultant shall not directly or indirectly state or imply that she is an employee, officer or director of TU (or its affiliates) and shall not directly or indirectly state or imply that she is authorized to contractually obligate TU (or its affiliates).

2.02     Compliance with Laws, Rules and Regulations: Consultant shall perform in strict compliance with all applicable laws and all of TU's directives.

### III. COMPENSATION & EXPENSES

3.01     (a) Compensation Payable to Consultant: Consultant shall be paid in accordance with the provisions of Exhibit C, annexed hereto and made a part hereof.

(b)     TU shall also be responsible for all reasonable costs and expenses of Consultant that are pre-approved in writing by TU in order for Consultant to work on the assignment.

*TU CONSULTANT AGMT/0708*

2

CONFIDENTIAL

## IV.   CONFIDENTIAL INFORMATION, COMPETITION, ETC.

4.01   Restriction on Use of Confidential Information:

(a)   Consultant shall not, during the term of his/her affiliation with TU or at any time thereafter, communicate, divulge or use for the benefit of any other person, persons, partnership, association, corporation or entity any of TU's "confidential information,"(as defined below) knowledge or know-how.

(b)   Any and all information, knowledge or know-how concerning the operation, products, services, procedures, policies or customers of TU which by its nature is confidential, shall be deemed confidential for purposes of this Agreement; provided, however, the parties shall not be required to treat any information as confidential information under this Agreement if such information (i) was publicly known at the time it was disclosed or becomes publicly known after disclosure without breach by the receiving party; (ii) was known by the receiving party at the time of disclosure or becomes known to it from a party other than the disclosing party who has the apparent right to disclose such information to the receiving party's knowledge after due inquiry; (iii) is independently developed by the receiving party without reliance on the disclosed confidential information; or, (iv) is approved for disclosure by the disclosing party with the disclosing party's prior written consent.

(c)   It is expressly understood and agreed that the following shall be deemed "Confidential Information" for the purposes of this Agreement: all client lists, information regarding TU's business operations, methods and practices, training materials, audio/visual products, content, , electronic information, business plans, marketing materials, marketing strategies, product pricing, offers, cost data, profits, sales, income, salaries, wages, margins and all information regarding the financial affairs of TU;, and materials specifically designated as confidential

(d)   The furnishing of Confidential Information hereunder shall not constitute nor be construed as a grant of any express or implied ownership interest, license or other right by TU to Consultant under any of TU's trademarks, copyrights or other intellectual property rights. Consultant's right to use the Confidential Information is strictly limited to the furtherance of the said Purpose. Upon request, Consultant shall return all Confidential Information in his/her possession to TU.

*TU CONSULTANT AGMT/07/08*

3

CONFIDENTIAL

4.02    Enforcement of Covenants:  Consultant acknowledges that any violation of the covenants in this Agreement would result in immediate and irreparable injury to TU for which no adequate remedy at law would be available.  Accordingly, Consultant hereby consents to the entry of an injunction, without the need to post a bond, prohibiting any conduct by Consultant (its shareholders, directors, officers and employees) in violation of this Agreement.

## V. TERMINATION

5.01    Termination Upon Notice:  TU may, in its sole and exclusive discretion, terminate this Agreement and all rights granted hereunder upon written notice to the addresses set forth above.  Upon termination, Consultant's entitlement to compensation shall cease.

## VI. CONSTRUCTION AND INTERPRETATION:

6.01 Construction & Interpretation:

(a)  This Agreement is to be construed as to form, substance and procedure in accordance with the laws of New York.

(b)  Consultant & TU shall act in good faith and use their best efforts to comply with their obligations under this Agreement, and shall cooperate in accomplishing the purposes of this Agreement. Further, neither party shall directly or indirectly engage in any activities which would be detrimental to or interfere with the operation or reputation of the other party.

(c)  Independent Contractor:  This Agreement does not create a fiduciary relationship between Consultant and TU.  TU and Consultant shall be and remain independent contractors.  Nothing in this Agreement shall constitute either party, as the general or special agent, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose, nor shall anything in this Agreement cause the employees of either party to be employees of the other.  Consultant is responsible to pay her own income taxes on compensation paid hereunder and is not being provided with any health benefits of any kind.

*TU CONSULTANT AGMT/0708*

4

CONFIDENTIAL

(d)     This Agreement constitutes the entire agreement between the parties, and there are no other oral or written understandings or agreements between TU and Consultant. This Agreement may be amended only by a written instrument signed by the parties hereto.

(e)     Any notice required or permitted to be given hereunder shall be in writing and shall be served upon the other party personally, or by certified mail, return receipt requested, postage prepaid.

(f)     The signatories to this agreement possess all the necessary power and authority to enter into this agreement on behalf of their organizations, and to perform the obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by the entities by their signatories and constitutes a legal, valid and binding obligation of both TU and Consultant enforceable against each other in accordance with its terms.

WE HAVE READ THE FOREGOING AGREEMENT AND HEREBY AGREE TO AND ACCEPT EACH AND ALL OF THE PROVISIONS.

TRUMP UNIVERSITY

By: _____
Name: _____
Title: _____

CONSULTANT

By: _____
Name: _____
Title: _____

*TU CONSULTANT AGMT/0703*

5

CONFIDENTIAL

TU 48773

Exhibit 15
- 296 -

## EXHIBIT A

### SCOPE OF WORK

1.  2 live sessions on April 14th at 6:00 pm and 9:00 pm EDT

2.  Fulfillment of all packages (Speedlings Basic and Speedlings Unlimited) by Adam Ginsberg International within one week of student purchase

3.  Should any refunds be issued, Adam Ginsberg International will absorb the full expense of each refund

*TU CONSULTANT AGMT/0708*

6

CONFIDENTIAL

TU 48774

Exhibit 15
- 297 -

4. **EXHIBIT B**

## ASSIGNMENT

_____ for value received, hereby assigns all right, title and interest in and to any and all ownership rights to any and all materials it has developed, produced, created, edited, drafted or otherwise delivered and received or, may in the future, develop. Produce, create, edit, draft, or otherwise deliver as a result of, or incident to its work as a Consultant to and for TRUMP UNIVERSITY. (and its affiliates) (the "Work"). This Assignment includes all copyrights, and the right to secure copyright protection in the United States and all other countries of the world, and all present and future rights of every kind pertaining to such Work, whether or not such rights are now known, recognized, or contemplated. Contractor further assign all renewals of copyright and the right to renew and secure renewals of copyright, in all countries in such Work and in all versions made pursuant to this agreement.

Further, all of the concepts, ideas and materials that have been developed, produced, created and/or delivered are works for hire under all applicable laws, and no claim shall be made under this Agreement or otherwise to any right, title or interest to them.

Dated:

_____

_TU CONSULTANT AGMT/0708_

7

CONFIDENTIAL

TU 48775

Exhibit 15
- 298 -

## EXHIBIT C
## COMPENSATION

(a)     As full and complete compensation for all services provided, TU shall pay You compensation and/or commissions for payments made on sales consummated at TU events attended by You (less refunds granted in TU's sole and exclusive discretion) in accordance with the following Compensation Schedule.

(b)     Webinar speakers shall be paid a commission for payments received (net of shipping and taxes) on completed sales consummated as a direct result of the event on the following schedule:

Objecti commission of payments made on webinar sales.

(c)     This Compensation Schedule may be increased or decreased by TU, in its sole and exclusive discretion.

(d)     TU prices for products, services and programs are subject to change in TU's discretion and upon reasonable notice. You must strictly follow TU's pricing structure.

(e)     TU may retain 10% of commissions accrued by You for a period of ninety (90) days as a reserve for potential refunds, returns, bad debt, credits and/or charge backs.   Withheld funds shall be released, after appropriate adjustments, if any, on a quarterly basis.

*TU CONSULTANT AGMT/0709*

8

CONFIDENTIAL