1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  DAVID L. KIRMAN (S.B. #235175)
   dkirman@omm.com
3  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars
4  Los Angeles, California  90067-6035
   Telephone:  (310) 553-6700
5  Facsimile:   (310) 246-6779

6  JILL A. MARTIN (S.B. #245626)
   jmartin@trumpmational.com
7  TRUMP NATIONAL GOLF CLUB
   One Trump National Drive
8  Rancho Palos Verdes, CA 90275
   Telephone: (310) 202-3225
9  Facsimile: (310) 265-5522

10  Attorneys for Defendant

11  DONALD J. TRUMP

12              UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14

15  ART COHEN, Individually and          Case No.  13-CV-2519-GPC(WVG)
    on Behalf of All Others Similarly
16  Situated,                            **CLASS ACTION**

17                    Plaintiffs,        **DEFENDANT DONALD J.
                                         TRUMP'S MEMORANDUM OF
18       v.                              POINTS AND AUTHORITIES IN
                                         SUPPORT OF DEFENDANT'S
19  DONALD J. TRUMP,                     MOTION FOR SUMMARY
                                         JUDGMENT OR, IN THE
20                    Defendant.         ALTERNATIVE, PARTIAL
                                         SUMMARY JUDGMENT
21
                                         **[DECLARATION OF DAVID L.
22                                       KIRMAN FILED
                                         CONCURRENTLY HEREWITH]**
23

24                                       Hearing: July 8, 2016
25                                       Time:  1:30 p.m.
                                         Courtroom:  2d
26                                       Judge:  Hon. Gonzalo P. Curiel

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................... 1

II.   BACKGROUND ....................................................................................... 3

     A.    Donald J. Trump ............................................................................ 3

     B.    Concept for Trump University ..................................................... 3

     C.    Defendant's role in TU's operations was necessarily limited given his other responsibilities as the head of The Trump Organization ............................................................................... 3

     D.    Michael Sexton managed and operated Trump University through his well-qualified team ...................................... 4

     E.    TU significantly expanded its business operations in 2007 ................ 5

     F.    TU's marketing materials focused on conveying Defendant's "Secrets" to success ....................................................... 6

     G.    Relevant Procedure ....................................................................... 7

III.   LEGAL STANDARD .............................................................................. 7

IV.   ARGUMENT .......................................................................................... 8

     A.    Plaintiffs seek an unprecedented expansion of RICO law .................... 8

     B.    Defendant did not "conduct" the affairs of the alleged "Trump University Enterprise" ................................................ 10

     C.    Plaintiffs Failed to Establish Racketeering Activity ......................... 13

         1.    The Representations are not Actionable ................................. 14

         2.    The Representations Were Not False or Misleading ............... 19

     D.    Plaintiffs cannot show that Defendant "knowingly participated" in a scheme to defraud ........................................ 22

         1.    Defendant did not participate in the alleged scheme to defraud ............................................................................... 22

         2.    There is No Evidence Defendant Intended to Defraud Students ............................................................................... 22

V.    CONCLUSION ...................................................................................... 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Althof v. Hanlin*,
575 F. App'x 789 (9th Cir. 2014)..........................................................27

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ...........................................................12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................................9

*Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*,
660 F. Supp. 1362 (D. Conn. 1987) ...............................................13, 29

*Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
941 F.2d 561 (7th Cir. 1991)...............................................................26

*Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*,
685 F. Supp. 2d 1001 (N.D. Cal.)........................................................17

*Becks v. Emery-Richardson, Inc.*,
1990 WL 303548 (S.D. Fla. Dec. 21, 1990) .......................................14

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
818 F.2d 1466 (9th Cir. 1987)..............................................................27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .........................................................................9, 16

*CollegeNet, Inc. v. Embark.Com, Inc.*,
230 F. Supp. 2d 1167 (D. Or. 2001).....................................................17

*Conway v. Licata*,
62 F. Supp. 3d 169 (D. Mass. 2014).....................................................11

*Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*,
911 F.2d 242 (9th Cir. 1990).........................................................17, 18

*County of Marin v. Deloitte Consulting LLP*,
836 F. Supp. 2d 1030 (N.D. Cal. 2011)................................................18

DEF.'S MOT. FOR DECERTIFICATION
13-CV-2519-GPC (WVG)

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*F.T.C. v. Grant Connect*, LLC,
    763 F.3d 1094 (9th Cir. 2014) ................................................................... 14

*Gautt v. Lewis*,
    489 F.3d 993 (9th Cir. 2007) ..................................................................... 26

*Grimmett v. Brown*,
    75 F.3d 506 (9th Cir. 1996) ....................................................................... 11

*Haskell v. Time, Inc.*,
    857 F. Supp. 1392 (E.D. Cal. 1994) .......................................................... 17

*In re Toyota Motor Corp. Unintended Acceleration Mktg.*,
    826 F. Supp. 2d 1180 (C.D. Cal. 2011) ..................................................... 13

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) ....................................................................... 24

*James v. Borg*,
    24 F.3d 20 (9th Cir. 1994) ......................................................................... 26

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
    940 F.2d 397 (9th Cir. 1991) ..................................................................... 26

*Makaeff v. Trump University LLC*,
    No. 10-cv-00940 GPC ........................................................................ passim

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..................................................................................... 9

*Midwest Grinding Co. v. Spitz*,
    976 F.2d 1016 (7th Cir. 1992) ................................................................... 10

*Miranda v. Ponce Fed. Bank*,
    948 F.2d 41 (1st Cir. 1991) ....................................................................... 11

*Peviani v. Nat. Balance, Inc.*,
    774 F. Supp. 2d 1066 (S.D. Cal. 2011) ..................................................... 17

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ............................................................................. 12, 15

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Schmidt v. Fleet Bank*,
   16 F. Supp. 2d 340 (S.D.N.Y. 1998) ...................................................................11

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) .........................................................................................11

*Shade v. Anderson*,
   2013 WL 3014140 (N.D. Cal. June 17, 2013) ....................................................16

*Smith-Victor Corp. v. Sylvania Elec. Products, Inc.*,
   242 F. Supp. 302 (N.D. Ill. 1965) .....................................................................17

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ...........................................................................17

*Turner v. New York Rosbruch/Harnik, Inc.*,
   84 F. Supp. 3d 161 (E.D.N.Y. 2015) .........................................................10, 12

*United States Fire Ins. Co. v. United Limousine Serv., Inc.*,
   303 F. Supp. 2d 432 (S.D.N.Y. 2004) ...............................................................13

*United States v. Harkonen*,
   510 F. App'x 633 (9th Cir. 2013) ...............................................................23, 27

*United States v. Manion*,
   339 F.3d 1153 (9th Cir. 2003) .....................................................................27, 28

*United States v. Stapleton*,
   293 F.3d 1111 (9th Cir. 2002) ...........................................................................14

*United States v. Woods*,
   335 F.3d 993 (9th Cir. 2003) .............................................................................16

*Van Schaick v. Church of Scientology of Cal.*, Inc.,
   535 F. Supp. 1125 (D. Mass. 1982) ..................................................................11

**Statutes**

18 U.S.C. § 1341 ......................................................................................................15

18 U.S.C. § 1343 ......................................................................................................15

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

1

2

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

3

18 U.S.C. § 1962(c) ............................................................................. 11, 12

4

18 U.S.C. § 1964(c) ................................................................................. 11

5

**Other Authorities**

6

FSA, *Security Clearances*, definition of "Top Secret,"
   available at http://www.fas.org/sgp/library/quist2/chap_7.html ........................ 18

7

8

*Troubled Tees University of Farmers commercial*,
   YouTube, https://www.youtube.com/watch?v=EhKfjKiS454 (last
   visited February 24, 2016) ....................................................................... 21

9

10

**Rules**

11

Fed. R. Civ. P. 56 ....................................................................................... 9

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

This case epitomizes the pervasive abuse of civil RICO.  Although there are longstanding and well-established consumer laws that provide full redress for legitimate grievances, Plaintiff Art Cohen and his nationwide class have elected to sue Defendant Donald J. Trump under the civil RICO statute in an effort to extract punitive money awards and exert undue leverage for settlement.  Courts steadfastly and rightly refuse such unwarranted, overreaching access to RICO laws.  This case is no exception.  Indeed, if this case is allowed to proceed, it would represent an unprecedented and unprincipled expansion of civil RICO and transform virtually every alleged violation of consumer protection laws into a civil RICO claim and subject owners, officers, directors, and others to personal liability for treble damages.

RICO was never intended to provide a "federal cause of action and treble damages" for every plaintiff,[1] and courts "should strive to flush out frivolous RICO allegations at an early stage of the litigation" to protect defendants from improper use of RICO "as a club to bludgeon settlement or surrender."[2]  RICO offers incentives to plead "every commercial disappointment in terms of victimization by racketeers," "[b]ut epithets in the pleadings, when tested by a motion for summary judgment, are no substitute for facts."[3]

Plaintiff Art Cohen's class-action complaint is just that.  There are no genuine issues of material fact on at least three essential issues, each of which is independently dispositive and requires the Court to dismiss this case:

---

[1] *Oscar v. Univ. Students Co-Operative Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005).
[2] *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 407 (S.D.N.Y. 2013) (citations and internal quotation marks omitted).
[3] *River City Markets, Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1465 (9th Cir. 1992).

First, while Defendant was personally involved in the development of the concept and curriculum for Trump University ("TU") from 2004-2005, no genuine issue of fact exists as to Defendant's control of the alleged RICO enterprise during the period alleged in the complaint.  Once TU was established in 2005—as with many of his scores of businesses—Defendant relied on well-qualified executives, including a president, chief marketing officer, chief operating officer, compliance officer, and others, to ensure that TU provided quality programs and followed applicable laws.

Second, there are no genuine issues of fact that TU's marketing materials were fraudulent.  References to "secrets," "hand-picked" instructors, and "university" are classic  examples of sales puffery common to advertising everywhere.  Depositions of TU students have confirmed that these terms are subject to varying subjective meanings and are not actionable as statements of fact.  Plaintiffs also cannot establish that these representations are false.  Defendant selected some key instructors himself and provided guidance and criteria to TU's management to select other instructors, his secrets were taught, and "university" is a term that has been widely used (including by former President Clinton) to describe not only academic degree-granting institutions, but also as a descriptor for a place of learning.

Third, plaintiffs have no evidence that Defendant harbored a "specific intent to defraud."  The undisputed facts establish that Defendant believed students were receiving a high-quality education in real estate and were satisfied with TU's instruction.  TU's 97% approval rating provided ample reason for Defendant's belief that TU was providing valuable instruction.

In short, this is not a RICO case.  We respectfully submit  summary judgment must be granted and this case dismissed.

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

## II.   BACKGROUND

### A.   Donald J. Trump

Defendant is a renowned entrepreneur and business leader.  He is Chairman of the Board of Directors, President, and Chief Executive Officer of The Trump Organization.  SOF 1.  The Trump Organization is affiliated with over 500 businesses worldwide, which include real estate holdings, hotels, golf courses, interests in entertainment and talent management, among others.  SOF 2–3.  At any given time Defendant is involved in any number of business ventures around the globe.  SOF 4.  Because of his expansive business portfolio, Defendant necessarily relies on his management teams to operate the affairs of his many business ventures.  SOF 5–7.

### B.   Concept for Trump University

Prior to joining TU, Michael Sexton received a BA from Tufts University, an MBA from Dartmouth College, worked as Senior Consultant for Accenture (formerly Anderson Consulting), was the Vice President of Strategic Initiatives for a technology company, and started his own business where he developed insight into the potential of e-learning.  Ex. 2 at 74:19-75:11, 76:8-79:24.  In 2004, Sexton met with Defendant to present a business idea to create an e-learning company that would merge cutting-edge instructional design and delivery with content created by leading subject matter experts in real estate and finance.  SOF 8.  Defendant liked the idea and agreed to invest in what would later become TU.  SOF 9.

### C.   Defendant's role in TU's operations was necessarily limited given his other responsibilities as the head of The Trump Organization

TU launched business operations in or around 2004.  SOF 12.  TU began as an e-learning platform that provided real estate training and education through webinars and other online content.  SOF 13.  TU sought to distinguish itself from competitors by providing an educational product focused on real estate fundamentals and lessons to teach students how to analyze and solve real-world

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

1   problems.  SOF 10–11.

2          During this time, Defendant met with Sexton to discuss overall methods and

3   goals, approve the TU business plan, and select the original instructors.  SOF 16–

4   19.  Defendant met with various real estate and finance experts responsible for

5   developing TU course materials, including Columbia Business School professor

6   Don Sexton; former Stanford University, University of Virginia, and University of

7   Illinois business professor Gary W. Eldred, PhD; Babson Professor Michael

8   Gordon; and Columbia Business School Adjunct Profession Jack Kaplan.  SOF 18–

9   19.

10          Defendant delegated management and operational control of TU to Michael

11   Sexton.  SOF 21.  Defendant provided Sexton with guidance and criteria for

12   selecting instructors and mentors.  SOF 22.  Defendant told Sexton instructors

13   should be entrepreneurial, motivational, great communicators and, importantly,

14   "people that had practical, hands-on experience versus people from an ivory tower

15   that only had theoretical experience."  Ex. 2, at 141:15-142:17.[4]

16          In early 2005, Defendant filmed an interview about TU, conducted by Jon

17   Ward.  By the time this video was created, Defendant had selected the instructors

18   who would create and teach TU's online courses.  SOF 43.  The Launch Video was

19   included in a DVD and audio CD compilation that TU sold as the "Wealth

20   Builder's Blueprint."  SOF 41–42; Ex. 45.  TU's marketing department later

21   created shorter promotional videos excerpted from the Launch Video.  SOF 44.

22   Plaintiffs refer to these shorter promotional videos as the "Main Promotional

23   Video."  Dkt. 1, at 6.

24          **D.   Michael Sexton managed and operated Trump University
          through his well-qualified team**

25

26   TU President Michael Sexton was in charge of TU's operations.  SOF 14–15.

27

28   ――――――――――――――――――
[4] Unless otherwise indicated, all references to "Ex." refer to Exhibits attached to the
Kirman Declaration. All page numbers refer to the paginated page number.

                                        - 4 -          DEF.'S MOT. FOR SUMMARY JUDGMENT
                                                        13-CV-2519-GPC (WVG)

He reported to Defendant, SOF 23, and gave status reports to defendant about once a quarter, Ex. 2, at 119:9-:20.  Defendant believed Sexton and his staff were fully capable of running TU, SOF 21, and that the management team required little, if any, oversight.  Ex. 1, at 69:22-70:6.

Sexton hired a talented team of individuals to help run TU.  SOF 29.  The team included April Neumann as Director of Operations, who managed the review of TU live event recordings to ensure instructors complied with TU's operational guidelines.  Ex. 2, at  95:8-20, 96:10-97:15.  It also included attorney Peter Hoppenfeld, who served as independent, outside counsel to provide legal advice to TU.  SOF 30–31.  Hoppenfeld had significant expertise advising companies in the business seminar industry on advertising, marketing, and compliance procedures.  *Id.*  Hoppenfeld reviewed TU's advertising and marketing materials.  SOF 32.  Hoppenfeld also assisted TU develop compliance policies for TU live events.  SOF 33.  Sexton also hired David Highbloom, the Chief Operating Officer for TU, and Michael Bloom, the Chief Marketing Officer.  Exs. 2, at 97:16-98:7;  4 at 184:22-24, 187:11-21, 189:17-25, 192:18-234:10.  They too, were responsible for making sure TU's operations complied with the law.  Ex. 2, at 94:25–97:15; SOF 26, 29.

Defendant relied on this management team to carry out the business plan for TU, to protect the Trump "Brand," and to comply with the law.  SOF 47.  Based on the positive feedback of many students, Defendant had no reason to doubt TU's management team was successfully carrying out these objectives.[5]  SOF 46–47.

### E.      TU significantly expanded its business operations in 2007

In 2007, TU began conducting live seminars to supplement and expand its existing e-learning platform.  Ex. 2, at 88:16-22, 147:12-18.  TU conducted these live events in hotels across the country, attracting a diverse—and often highly

---

[5] Plaintiffs challenge the veracity of the student surveys and TU's 97% approval rating.  *See, e.g.*, *Makaeff* Dkt. 195 at 17.  However, there is no evidence in the record that Defendant had any reason to question the accuracy of this information.

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

educated—group of people, including entrepreneurs.  This expansion of TU's business operations required the management team to hire additional employees and contractors, including instructors and mentors.

**F.     TU's marketing materials focused on conveying Defendant's "Secrets" to success**

TU's materials, online content, and live instruction focused on teaching people practical real estate investing techniques to enable them to perform different types of real estate transactions. Ex. 5 at TU 52936.  These teachings were drawn from Defendant's own case studies, experiences, and secrets to success:

> People often ask me the secret to my success, and the answer is simple: focus, hard work, and tenacity. I've had some lucky breaks, but luck will only get you so far.  You also need business savvy—not necessarily a degree from Wharton, but you do need the desire and discipline to educate yourself.  I created Trump University to give motivated business people the skills required to achieve lasting success.

Ex. 23 at ix (Foreword to *Trump University: Real Estate 101*).  This message was repeated throughout TU course materials and publications. *See, e.g.*, Exs. 24, at 425; 25 at 445–47; 26 at 450–56.

TU's marketing materials sought to convey these lessons.  The advertisements usually included Defendant's picture and inspirational quotes about his business philosophies or trending real estate topics.  For example, during the economic downturn, TU's advertising focused on foreclosure investing (<u>e.g.</u>, "learn foreclosure investing from the inside out"; "historically low interest rates and record high inventories [make] 2009 . . . the 'perfect storm' for real estate investors of every income and experience level"). Ex. 28.[6]  The advertising also contained catchy phrases about the timely investing techniques the participants would learn: "Buy real estate from banks"; "Finance your deals creatively in today's tight credit market"; "Find pre-foreclosures in your area," and others.  Ex. 28.

---

[6] Exhibit 28 is an advertisement demonstrative of TU's advertising materials.

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

### G.   Relevant Procedure

Three years after commencement of the class action case in *Makaeff v. Trump University LLC*, Plaintiff filed this class action against Defendant for violation of civil RICO.  Dkt. 1.  The complaint alleged that Defendant "uniformly misled . . . the Class that they would learn Donald Trump's real estate secrets through him and his handpicked professors at his elite 'University.'"  Dkt. 1 at 1.

On October 27, 2014, the Court certified a class consisting of all individuals who purchased a TU live event from January 1, 2007 to present.  Dkt. 53.  In doing so, the Court distilled plaintiffs' alleged misrepresentations as follows: TU "programs would give access to Donald Trump's real estate investing secrets"; "that Donald Trump had a meaningful role in selecting the instructors for Trump University programs"; and that TU was a "university."  Dkt. 53 at 3.  The Court certified two issues for class-wide determination: Plaintiffs' allegations that Defendant misrepresented that he "was integrally involved in Trump University[;] and that Trump University was an 'actual university.'"  *Id.* at 7.

### III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56.  The Court must grant summary judgment if the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  A fact is material when it affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party demonstrates an absence of any genuine issues of material fact, the nonmoving party must set forth specific evidence showing that there remains a genuine issue for trial.  *Id.*  To do so, the nonmoving party cannot rest on the mere allegations or denials of her pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In addition, if the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 325.

## IV.   ARGUMENT

### A.   Plaintiffs seek an unprecedented expansion of RICO law

Plaintiffs' case bears no resemblance to the reasons Congress enacted the RICO statute:

> [T]he eradication of organized crime in the United States by . . . providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

H.R. Rep. No. 1549, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Admin. News 1073; *see* Gerard E. Lynch, RICO: The Crime of Being a Criminal, Parts I & II, 87 Colum. L. Rev. 661, 677 (1987) ("The [RICO] bill proposed to remove the 'cancer' of organized crime penetration from the economy 'by direct attack, by forcible removal and prevention of return.'" (quoting 115 Cong. Rec. 9567 (1969)).  Courts throughout the country have denounced the use of RICO for more generalized disputes:

> [C]ivil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions. While it is clear that the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, it is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour. . . . The widespread abuse of civil RICO stems from the fact that all modern business transactions entail use of the mails or wires—giving plaintiffs a jurisdictional hook—and the fact that RICO offers a far more generous compensation scheme than typically available in state court.

*Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992).

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

The Ninth Circuit and courts within it have echoed this view and "overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *See Gomez v. Guthy-Renker*, LLC, 2015 WL 4270042, at *8–11 (C.D. Cal. July 13, 2015)("Courts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises."); *Oscar*, 965 F.2d at 786 ("RICO was intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff."); *River City Markets, Inc.*, 960 F.2d at 1465 (granting summary judgment and rejecting plaintiffs' attempt to manufacture a RICO case out of "a month's worth of broken promises by defendants"); *Vega v. Ocwen Fin. Corp.*, 2015 WL 1383241, at *5 (C.D. Cal. Mar. 24, 2015) (rejecting plaintiff's attempt to "artfully plead [a] contract dispute as a fraud case").

This condemnation of RICO abuse is uniform. *See Turner v. N.Y. Rosbruch/Harnik, Inc.*, 84 F. Supp. 3d 161, 168 (E.D.N.Y. 2015) ("The Court will not permit a civil RICO suit to go forward when, in fact, it is merely 'an effort to construct a treble damage suit from what, at best, is a civil wrong[.]'" (citation omitted)); *Conway v. Licata*, 62 F. Supp. 3d 169, 175 (D. Mass. 2014) ("[A] RICO suit . . . is not merely another garden-variety theory of vicarious liability."); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) ("[C]ourts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." (internal citation omitted)); *Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125, 1136 (D. Mass. 1982) (Courts "have consistently concluded that [section] 1964(c) must be interpreted with careful attention to the provision's purpose and have avoided a slavish literalism that would escort into federal court through RICO what traditionally have been civil actions pursued in state courts."). Courts' reluctance to expand the reach of civil RICO is warranted: the statute is "an unusually potent weapon" that provides treble damages as a remedy. In short, civil RICO is "the

1  litigation equivalent of a thermonuclear device." *Miranda v. Ponce Fed. Bank*, 948

2  F.2d 41, 44 (1st Cir. 1991).

3       To substantiate a RICO claim, Plaintiffs must establish that Defendant

4  engaged in each of the following elements: "(1) conduct (2) of an enterprise (3)

5  through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing

6  injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506,

7  510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c)); *accord Am. Dental

8  Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("[T]he RICO statutes

9  require that a plaintiff prove that a defendant participated in an illegal enterprise

10 through a pattern of racketeering activity.").  "Racketeering activity" includes

11 plaintiffs' alleged predicate acts of mail and wire fraud. *Turner v. Cook*, 362 F.3d

12 1219, 1229 (9th Cir. 2004).

13
14
### B. Defendant did not "conduct" the affairs of the alleged "Trump University Enterprise"

15      Initially, Plaintiffs' RICO claim rests on an incurable conflict.  On the one

16 hand, plaintiffs attempt to show wire and mail fraud by alleging Defendant was

17 "completely absent" from TU.  *E.g.*, Dkt. 1 at 14.  On the other hand, to prove that

18 Defendant "conducted" the affairs of a RICO enterprise, plaintiffs allege Defendant

19 "exercised substantial control" over TU and its allegedly fraudulent marketing

20 scheme.  Dkt. 1. at 25.  Both things cannot be true, and the contradiction exposes

21 and underscores the inappropriateness of RICO in this case.

22      Beyond this fatal conflict, Plaintiff has no credible evidence that Defendant

23 exercised control within the meaning of RICO.  The Supreme Court's decision in

24 *Reves v. Ernst & Young*, 507 U.S. 170 (1993), is illustrative—and controlling.

25 There, the Court first analyzed Congress's intent when it enacted the statute,

26 finding "it was clear that Congress did not intend to extend RICO liability under

27 § 1962(c) beyond those who *participate* in the operation or management of an

28 enterprise *through* a pattern of racketeering activity."  *Id.* at 184, 185-86 (emphasis

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

added).  "Conduct," the Court determined, "require[s] some degree of direction" in which the RICO defendant must personally take part.  *Id.* at 179.  Critically, "[t]here is a 'substantial difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves* because the 'test is not involvement but control.'"  *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451 (S.D.N.Y. 2004).

Here, Defendant did not direct the operations or management of TU, much less any alleged "racketeering activity" of what plaintiffs pejoratively call the "Trump University Enterprise."  As the principal shareholder and highest official of the Trump Organization, Defendant heads an enormously large and successful global business.  In this capacity, he makes innumerable decisions that may ultimately affect the Trump Organization's many business, but this in no way equates to personally conducting the affairs of a given affiliate company for purposes of civil RICO.  *See Taylor v. Bob O'Connor Ford, Inc.*, 1999 U.S. Dist. LEXIS 4028, at *8 n.4 (N.D. Ill. Mar. 25, 1999) (*Reves* test not satisfied by allegation that defendant was president and principal shareholder; there must be some allegations as to how defendant operated or managed the enterprise); *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F. Supp. 1362, 1370 (D. Conn. 1987) (RICO defendant "must have conducted the enterprise conducting the pattern of racketeering, or participated in it."); *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011) (plaintiffs "allege[] no more than that Defendants' primary business activity . . . was conducted fraudulently. This overarching allegation is incompatible with the types of conduct RICO was enacted to prevent.").

Nor can plaintiffs establish RICO control by citing to Defendant's activities in planning and launching TU, which dates back to 2004.  The Plaintiffs' class consists of all persons who purchased Live Events from TU *starting January 1,*

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

*2007*.  Critically, in determining whether a defendant directed the management and operations of a RICO enterprise, the defendant must direct the enterprise during its existence.  Conduct that occurred *before* the alleged RICO scheme is wholly immaterial to determining whether Defendant directed the affairs of the alleged TU Enterprise, much less participated in the alleged scheme to defraud.  *See United States v. Stapleton*, 293 F.3d 1111, 1118 (9th Cir. 2002) (defendant can be "convicted for acts that occurred only during his active participation in the . . . scheme").

Plaintiff's reliance on facts showing no more than ordinary business activity is entirely unavailing.  Because Defendant invested his own money, or controls a majority ownership stake in TU, proves only that he is an investor and shareholder in TU, not that he managed or directed a RICO enterprise.  Similarly, Defendant approved the names "Trump University, LLC" and "Trump Entrepreneurial Initiative, LLC" because he is the majority owner of TU and TU's LLC Agreement *required* his approval for the name change.  Ex. 29 at 2.2, 4.4, and 11.4.

Defendant's review of financial documents and his status meetings with Sexton also show only ordinary business conduct by a principal investor and top executive.[7]  Likewise, Defendant reviewed advertisements "very quickly" to see how his Brand and image were portrayed in the marketing materials.  SOF 40.  He played no part in evaluating whether marketing materials were legally compliant.  SOF 27.  Nor is there reason why he would—Defendant is not a lawyer, and TU had compliance *and* marketing review procedures to ensure compliance.  SOF 26– 33, 35.

Evidence such as this does not and cannot establish a RICO violation.  *See*

---

[7]  Notably, Defendant and Sexton met more frequently during the first two years of TU's operations.  Once TU was operational, Defendant entrusted Mr. Sexton to run TU.  *See* Ex. 30 (Defendant's day planner showing that Defendant and Sexton met 19 times between 2005 and 2006, while the two met only 8 times over the following four years).

DEF.'S MOT. FOR SUMMARY JUDGMENT
                                                    13-CV-2519-GPC (WVG)

*Becks v. Emery-Richardson, Inc.*, 1990 WL 303548, at *38 (S.D. Fla. Dec. 21, 1990) (failure to present evidence that "defendants' role . . . was anything other than in the ordinary course of business . . . resulted in no intentional participation on their part in any RICO enterprise sufficient to establish the primary RICO liability of these defendants").  Under plaintiffs' impermissible stretch of RICO, the CEO of any global business conglomerate could be held personally liable whenever the executive's actions implicated "management" or "operational" functioning of an affiliated company alleged to be a RICO "enterprise."  Such an outcome would directly conflict with and undermine the most fundamental principles of corporate structure and governance, the business judgment rule, and many other essential state-law protections afforded to shareholders, corporate officers, directors, and other business actors.  *Cf. Reves*, 507 U.S. at 172; *Guthy-Renker*, LLC, 2015 WL 4270042, at *8–11 (C.D. Cal. July 13, 2015); *Vega*, 2015 WL 1383241, at *5 (C.D. Cal. Mar. 24, 2015) (rejecting plaintiffs' attempt to manufacture a RICO claim through artfully pleading facts).

### C.    Plaintiffs Failed to Establish Racketeering Activity

Plaintiffs cannot establish a genuine issue of material fact that Defendant engaged in any "predicate act," required to establish RICO.  *See Shade v. Anderson*, 2013 WL 3014140, at *2 (N.D. Cal. June 17, 2013)(racketeering activity requires showing of specified predicate acts).  In this case, plaintiffs alleged federal mail and wire fraud as the predicate acts.  18 U.S.C. §§ 1341 (Mail Fraud), 1343 (Wire Fraud).  As it relates to the fraud allegations, the Court certified the class based on the alleged "scheme" to defraud consumers through two representations: Defendant was "integrally involved in Trump University" and TU was an "actual university."  Dkt. 52 at 7.  Consequently, plaintiffs must prove each of the following elements: "(1) that the defendant knowingly devised or knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) that the statements

1    made or the facts omitted as part of the scheme were material; (3) that the defendant

2    acted with the intent to defraud; and (4) that in advancing or furthering or carrying

3    out the scheme, the defendant used the mails/wires or caused the mails/wires to be

4    used." *United States v. Woods*, 335 F.3d 993, 997 (9th Cir. 2003). Failure to

5    demonstrate a genuine issue of material fact as to any one of these elements

6    mandates summary judgment on this issue. *See Celotex*, 477 U.S. at 325.

7         The Court must grant summary judgment on both of the certified questions

8    because (1) they are not actionable; (2) they were not misleading; (3) Defendant's

9    involvement in the alleged scheme is wholly insufficient to establish he

10   "participated in a scheme to defraud"; and (4) there is no evidence—*none*—that

11   defendant intended to defraud TU students.

### 1.    The Representations are not Actionable

13        The factual record has now confirmed that neither of the certified issues

14   constitutes actionable misrepresentations, because they are no more than mere sales

15   puffery. As noted by the Court in denying defendant's motion to dismiss, puffery is

16   appropriately decided on motions for summary judgment. *Peviani v. Nat. Balance,*

17   *Inc.*, 774 F. Supp. 2d 1066, 1072 n.1 (S.D. Cal. 2011). "The distinguishing

18   characteristics of puffery are vague, highly subjective claims as opposed to specific,

19   detailed factual assertions." *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1399 (E.D.

20   Cal. 1994). The following are examples of claims that are not puffery:

21
22   - defendant's grass required 50% less mowing, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997);

23
24   - defendant's website was used by more than 1.7 million individuals each month and is growing 300% to 400% annually, *CollegeNet, Inc. v. Embark.Com, Inc.*, 230 F. Supp. 2d 1167, 1178 (D. Or. 2001);
25

26   - defendant's bulb had 35,000 candle power and 10-hour life, *Smith-Victor*
27   *Corp. v. Sylvania Elec. Prods., Inc.*, 242 F. Supp. 302, 308–09 (N.D. Ill. 1965);

28

- program would work with *any version* of another program, *Autodesk, Inc. v. Dassault Systèmes SolidWorks Corp.*, 685 F. Supp. 2d 1001, 1018 (N.D. Cal. 2009).

In contrast, representations that are subject to interpretation are not actionable. *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990), is illustrative. In *Cook*, the Ninth Circuit held that a collection agency's statement that "we're the low cost commercial collection experts" and any implication that it had "comparable services to attorneys at lower rates" were general assertions and could not be fairly characterized as factual misstatements. *Id.*

*County of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1040 (N.D. Cal. 2011) is another example. There, the County alleged that Deloitte engaged in mail fraud by inducing it to enter into an agreement and identified a number of representations it believed were fraudulent: that Deloitte was "uniquely qualified," had "deep experience," assembled "a highly skilled and experienced team," has a "breadth" of capability and "unmatched" understanding of the County's needs, that it was committed to "dedicating [its] best resources to the project," and that it had a "winning solution" to the County's needs. *Id.* at 1038-39. The Court held that these statements were "highly subjective, generalized statements of . . . superiority." *Id.* at 1039. Because they are "puffery" and "not quantifiable," they were not actionable misstatements that could form the basis of a mail fraud claim. *Id.*

Here, the two certified misrepresentations are rooted in terms that are inherently subjective and susceptible to varying interpretations. Like *Cook, Perkiss & Liehe, Inc.* and *County of Marin*, the definition of "secrets" is highly subjective as evidence by students' interpretation of the term in this case. *See* Exs. 47 at 578:23–579:1 (references to Defendant's "secrets" was "marketing BS" "[b]ecause nobody's secrets are truly secrets. This information is out"); 12 at 282:6–13,

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

282:20-23 (testifying that he knew he would not be "learning Donald Trump's personal approaches to real estate investment," but rather strategies that would lead to success in real estate investing); 13 at 292:8–293:6, 296:21–297:24 (testifying that she knew the techniques being taught were not "Donald Trump's secrets"), 8 at 228:12–15 (equating Defendant's "secrets" to "his knowledge"); 14 at 305:19–306:4 (testifying that "secrets" means "what Donald Trump does" and "how Donald Trump does" it); 20 372:19–373:6 (secrets means "how to invest like Donald Trump").  Books frequently use the term "secrets" as a catchy way to describe information.  *See, e.g.*, Exs. 31, 32, 33.  Some books use a superlative to describe the kind of "secret" information available to a willing consumer.



Ex. 34.  But no reasonable consumer believes a book referencing "top secret" contains information in which the "unauthorized disclosure . . . could be expected to cause exceptionally grave damage to national security."  FSA, *Security Clearances*, definition of "Top Secret," available at http://www.fas.org/sgp/library/quist2/chap_7.html.

Like these books, use of the term "secrets" in context makes clear that it cannot be interpreted literally.  Literally, "secrets" means "not known or seen or not meant to be known or seen by others."  Just as the authors of the books above have not engaged in racketeering activity by using the title "secrets" in their books, TU's use of the term cannot be a RICO violation.  *See Corley v. Rosewood Care Ctr.,*

1   *Inc. of Peoria*, 388 F.3d 990, 1009 (7th Cir. 2004) (A "generic promise" cannot

2   form "the basis of a mail fraud claim").

3       The word "handpicked" is another catchy and popular word in advertising:



10   https://www.smore.com/0shwh-you-ve-been-hand-picked.  While it literally

11   translates to pick by hand, it also means "chosen very carefully for a particular

12   purpose."  http://www.oxforddictionaries.com/us/definition/english/hand-pick.  It is

13   synonymous with words like favored, favorite, first-line, select, picked, preferred,

14   selected.  http://www.merriam-webster.com/thesaurus/handpicked.  Student

15   testimony in this case again shows the subjective variability of the term "hand-

16   picked."  *See* Exs. 8 at 222:14–22 ("[S]omebody handpicked using whatever

17   criteria that Donald J. Trump and Trump University used in selecting these

18   mentors"); 10 at 264:24–265:9 ("['Handpicked'] means to me that . . . Donald

19   Trump. . . went to those people and personally knew them and had them teach the

20   class."); 9 at 240:15–18 ("hand-picked" meant "they were very knowledgeable in

21   real estate and in the programs they were presenting"); 19 at 362:11–364:17 ("I

22   think if Mr. Trump looked at the resume and said this person looks good, I would

23   think that that would be considered handpicked, yes.").

24       The use of "university" also has varying meanings.  Students who testified

25   could not agree on what it means.  *See* Exs. 10 at 264:14–17; 8 at 228:9–24; 9 at

26   243:13–19, 250:11–254:10; 19 at 347:4–15, 350:23–351:11, 354:6–23, 357:22–

27   358:12; 12 at 285:4–8.  Nor can Plaintiffs' lawyers.  *See* Dkt. 1 ¶ 1 ("elite

28   university"); *id.* ¶ 19, ("actual university"); *id.* ¶ 21(j) ("real university"); Dkt. 39-1

1    at 18 ("accredited university").

2         In all but a handful of states there are no limitations on the use of the word

3    university in a business name.  Indeed, as one university recently described in a

4    press release, "there is no nationally standardized definition of the term 'university'

5    in the United States, although the term is primarily used to designate research

6    institutions and is often reserved for doctorate-granting institutions."

7    http://www.samuelmerritt.edu/president/news_room/jan_2009/oakland-nursing-

8    college-now-university.  As a result, educational companies and business

9    organizations of all types frequently use the word "university" to market their

10    products or services despite having no affiliation with a degree-granting university.

11    For example, "FedEx University" offers online courses geared toward "professional

12    development."  Ex. 37.

13         The Clinton Global Initiative launched "CGI University," which is a

14    "network of global young leaders" that holds an annual meeting with the goal "to

15    create innovative solutions to some of the world's most pressing challenges."

16

17

18 

19

20

21    Ex. 38.  The "Florida Real Estate University" offers live and online courses on the

22    basics of real estate in Florida.  Ex. 39.  Even Farmers Insurance runs a well-known

23    series of commercials starring actor J.K. Simmons as "Professor Nathaniel Burke"

24    at University of Farmers, where they aim to "make you smarter" about insurance

25    coverage.  *See Troubled Tees University of Farmers commercial*, YouTube,

26    https://www.youtube.com/watch?v=EhKfjKiS454 (last visited April 22, 2016).

27    Other large corporations label their training programs as a "university" even though

28    they do not provide four years of university education to the employees they are

1  training, including Disney University (Disney), Hamburger University

2  (McDonalds), and Motorola University.  Exs. 40, 41; *see also* Ex. 42 at ¶ 63 ("TU's

3  use of the University moniker is . . . not extraordinary in today's world of

4  marketing."); Ex. 43 at ¶ 25.[8]



13  Ex. 40.  These examples show that "university" is commonplace in marketing to

14  advertise a learning environment; nobody thinks that students who attend

15  Hamburger University will earn degrees in hamburgers.

16  **2.  The Representations Were Not False or Misleading**

17  Even if the certified representations were not puffery, plaintiffs cannot raise a

18  genuine dispute that the representations were false.

19  **a.  <u>Defendant shared his secrets with students.</u>**

20  In his own words, Defendant's secrets to success were—"focus, hard work,

21  and tenacity" along with some business knowledge.  Ex. 23.  Indeed, these values

22  were central to TU's teachings.  *See* Exs. 44; 24 (*Trump 101: The Way to Success*)

23  at DT0009090; 25 at 3–4 (*Fortune Without Fear, Real Estate Riches in an*

24  *Uncertain Market*); 26 at TU 102032–37 (*Trump University Wealth Building 101*

25  
_____

26  [8] Notably, TU's former director of operations in charge of collecting student

27  feedback, April Neumann, testified that she never encountered a single complaint
    from a student who thought that TU was an four-year university or an institution

28  that otherwise offered degrees.  Ex. 15 at 312:19–313:20.

DEF.'S MOT. FOR SUMMARY JUDGMENT
                                      13-CV-2519-GPC (WVG)

1  *Coaching Manual*); 27 at TU 101372 (*Trump University: Real Estate*

2  *Breakthrough*).  Plaintiffs cannot show that these values were not taught at TU.

3       **b.**   <u>Defendant was also integrally involved in the instructor</u>

4       <u>and mentor selection process.</u>

5       Plaintiffs claim Defendant represented in TU's "Main Promotional Video"

6  that he personally hand selected instructors.  Plaintiffs say this video is the

7  "cornerstone" of the scheme to defraud.  Dkt. 1 at 6.  However, the "Main

8  Promotional Video" to which plaintiffs refer is an excerpted version of the early

9  Launch Video that Defendant recorded in 2005.  SOF 44.  The "Main Promotional

10  Video" was not separately or independently prepared by Defendant.  Nor is any

11  evidence that Defendant made any statements that he believed were untrue.  *See In*

12  *re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993) ("The fact that the

13  prediction proves to be wrong in hindsight does not render the statement untrue

14  when made.").

15       The remaining promotional materials cited by plaintiffs also do not show

16  fraud.  When Trump University began operations, Defendant was personally

17  involved in hiring decisions.  That changed as and when TU's business operations

18  expanded.  Defendant relied on Sexton, Highbloom, and other TU employees, to

19  hire instructors based on the qualities Defendant identified.  Defendant did not

20  personally select these individuals, and nothing in the advertising materials cited by

21  plaintiffs indicates Defendant represented his *personal* involvement in hiring

22  decisions.

23       **c.**   <u>Trump University was marketed as a high value real</u>

24       <u>estate business seminar company.</u>

25       Defendant also never represented that Trump University was a "university"

26  equivalent to a four-year, degree-granting institution.  This unfounded allegation

27  was concocted by plaintiffs.  In an attempt give it a patina of legitimacy, Plaintiffs

28  hired an expert to conduct an absurd comparison between TU's curriculum and the

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

top 14 undergraduate real estate programs in the United States.  Ex. 18 at 341:12-15.  Plaintiffs' own allegations reveal their claim is vacuous: they cannot even define the misrepresentation, much less explain how it is false.  For example, throughout their pleadings and other filings in this case, Plaintiff has accused Defendant of promoting TU as an "elite university," Dkt. 1 ¶ 1, an "actual university," id. ¶ 19, a "real university," id. ¶ 21(j), and an "accredited university," Dkt. 39-1 at 18.  Whether a university is "real" is a different question than whether it is "accredited," which is different from whether it is an "actual university," which is different from whether a university is "elite."  Plaintiffs' inability even to articulate this alleged misrepresentation highlights that it cannot serve as a predicate act for a RICO claim.  *See Gautt v. Lewis*, 489 F.3d 993, 1002-03 (9th Cir. 2007) ("The Sixth Amendment guarantees a . . . defendant the fundamental right to be informed of the nature and cause of the charges made against him so as to permit adequate preparation of a defense."); *James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994) (same).

Indeed, this allegation has been a moving target precisely because Plaintiffs have no evidence that Defendant made false representations regarding TU's status as a "university."  This is especially true when considering the use of the word "university" in context, which is an essential component of any fraud analysis.  *See, e.g.*, *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1128 (E.D. Wash. 2013) ("In several instances, it is also clear that Plaintiff either misconstrues or ignores the context in which Defendants' allegedly false statements were made."); *see also Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 571 (7th Cir. 1991) (affirming summary judgment on RICO claims for failure to establish predicate acts because "no jury could find that a reasonable investor would be misled by the statements Schwarz related, when the truth was under his nose in black and white (many times over)").  The alleged "university" misrepresentations are limited to TU's use of the word in its moniker,

"Trump University."  TU disclosed it granted no degrees or academic credits.  And the context of this alleged misrepresentation is further illuminated by what TU did not do.  TU never asked students to submit an application, take an admissions test, conduct an interview for the program, or register for a semester of courses.  Nor did TU teach academic subjects or conduct its live event in a classroom or on a university campus.  Rather, TU's programs occurred at hotels across the country, usually on weekends and for three-day workshops, where it taught practical real estate investing techniques to individuals from a wide variety of backgrounds.  Given this, it is not surprising that many students testified that they knew at the time they attended TU that it was not a degree-granting university.  There is no genuine issue of material fact about whether TU's use of the word "university" was deceptive.

### D.  Plaintiffs cannot show that Defendant "knowingly participated" in a scheme to defraud

Under binding Ninth Circuit precedent, plaintiffs must establish that defendant "willful[ly] participat[ed] in a scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved."  *United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003) (citation omitted).  Plaintiffs cannot establish a genuine issue of material fact that Defendant knowingly participated in fraud or had *any* culpable intent to defraud.

### 1.  Defendant did not participate in the alleged scheme to defraud

As described in Section IV.B, Defendant did not manage the operations of TU.  He relied on others to do so.  He therefore did not and could not have knowingly participated in a scheme to defraud.

### 2.  There is No Evidence Defendant Intended to Defraud Students

Plaintiffs have no evidence demonstrating Defendant had the "specific intent

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

to deceive or defraud." "[T]he term 'to defraud' has its commonplace definition and includes any sort of 'dishonest method or scheme,' and any 'trick, deceit, chicane or overreaching.'" *United States v. Harkonen*, 510 F. App'x 633, 637 (9th Cir. 2013) (modifications omitted). Summary judgment is warranted when plaintiffs fail to present evidence of a defendant's intent. *See Althof v. Hanlin*, 575 F. App'x 789, 790 (9th Cir. 2014).

After TU became operational, Defendant entrusted Sexton with the operation and management of the company. Defendant believed that TU students were satisfied with their education. He reviewed student reviews (almost all good) and received positive reports about TU's success from Sexton and others. SOF 46.

The evidence in the record overwhelmingly proves Defendant had no intent to deceive TU students:

- **Defendant invested in TU because he "loved the educational aspect" of the business.** SOF 45.

- **TU was not a large investment for Defendant.** Ex. 1 at 66:13-15.

- **Defendant intended to provide high-quality education to TU's students.** *Id.* at 66:13–19.

- **Defendant vigilantly protected the reputation of the Trump "Brand."** SOF 36–39.
- **Defendant believed TU was providing a good program because he was informed about the many positive student reviews.** SOF 46.

- **Defendant knew and relied on TU's hired counsel and compliance team to review marketing materials for legal compliance.** SOF 26, 28, 47.

This evidence shows Defendant did not have the intent or the motivation to tarnish his Brand by defrauding TU students. In *Makaeff*, the Court held that plaintiffs raised facts showing that Defendant may have been negligent when he reviewed TU's marketing. *Makaeff* Dkt. 423, at 33. But that is insufficient to

DEF.'S MOT. FOR SUMMARY JUDGMENT
13-CV-2519-GPC (WVG)

establish civil RICO liability.  *See Andreo*, 660 F. Supp. at 1370 ("Friedlander
Gaines conducted or participated in the enterprise conducting a pattern of
racketeering only if it assisted with knowledge of the illegal activities. Mere
reckless disregard of the truth when drafting documents does not justify a finding of
RICO civil liability on the basis that the party participated in the illegal
enterprise.").

## V.    CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court
grant his motion for summary judgment in its entirety and dismiss this case.


Dated:  April 22, 2016                          O'MELVENY & MYERS LLP
                                                DANIEL M. PETROCELLI
                                                DAVID L. KIRMAN


                                                By:    /s/Daniel M. Petrocelli

                                                Attorneys for Defendant
                                                DONALD J. TRUMP