DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
DAVID L. KIRMAN (S.B. #235175)
dkirman@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

JILL A. MARTIN (S.B. #245626)
jmartin@trumpnational.com
c/o TRUMP NATIONAL GOLF CLUB
One Trump National Drive
Rancho Palos Verdes, CA 90275
Telephone:  (310) 202-3225
Facsimile:   (323) 282-3629

MATTHEW R. MARON
(admitted *pro hac vice*)
mmaron@trumporg.com
c/o THE TRUMP ORGANIZATION
725 Fifth Avenue
New York, NY 10022
Telephone:  (212) 715-7200
Facsimile:   (212) 989-3821

Attorneys for Defendant
*DONALD J. TRUMP*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ART COHEN, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP<br><br>        Defendant. | Case No. 13-CV-2519-GPC(WVG)<br><br>**DEFENDANT DONALD J. TRUMP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF MICHAEL A. KAMINS**<br><br>Hearing:     July 8, 2016<br>Time:         1:30 p.m.<br>Courtroom:  2d<br>JUDGE: Hon. Gonzalo P. Curiel |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...........................................................................................1

II. RELEVANT BACKGROUND.....................................................................1

III. MICHAEL KAMINS ...................................................................................2

IV. LEGAL STANDARD ...................................................................................3

V. ANALYSIS ....................................................................................................4

    A. The Kamins Survey Is Fundamentally Flawed and Unreliable ............4

        1. The Kamins Survey Used an Incorrect Target Universe............5

        2. The Kamins Survey Did Not Conduct a Control Group ............7

        3. The Kamins Survey Took Statements Out of Context ...............9

        4. Kamins Did Not Provide the Underlying Data to His Survey ...........................................................................................11

        5. Kamins Lacked Control over His Survey..................................13

        6. The Kamins Survey Created a Demand Effect..........................14

    B. Kamins Ignored Evidence Contradicting His Opinions ......................16

    C. Kamins's Criticisms of TU Student Surveys Are Incorrect ................20

    D. Kamins's Opinions About TU's Marketing Are Unreliable, Irrelevant, and Overly Prejudicial..........................................................22

    E. Kamins Did Not Disclose the Foundation for His Opinions ...............24

VI. CONCLUSION ...........................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*Apple v. Samsung*,
No. 5:11-cv-01846-LHK (N.D. Cal. June 30, 2012)..........................9

*Avery Dennison Corp. v. Sumpton*,
189 F.3d 868 (9th Cir. 1999) .........................................7

*Cottonwood Fin. v. Cash Store Fin. Servs.*,
No. 3:10-cv-01650-N (N.D. Tex. Oct. 16, 2012).....................7, 8, 13

*Cumberland Packing Corp. v. Monsanto Co.*,
32 F. Supp. 2d 561 (E.D.N.Y. 1999).....................................8

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ..........................................4

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .............................................3, 4, 24

*Dreyfus Fund, Inc. v. Royal Bank of Can.*,
525 F. Supp. 1108 (S.D.N.Y. 1981) .....................................7

*Eastwood v. Nat'l Enquirer*,
123 F.3d 1249 (9th Cir. 1997) .........................................11

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ...................................................4

*Gibson v. Cnty. of Riverside*,
181 F. Supp. 2d 1057 (C.D. Cal. 2002)............................5, 6, 9

*Guidroz-Brault v. Mo. Pac. R. Co.*,
254 F.2d 825 (9th Cir. 2001) .......................................4, 17

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007)...........................16, 20

*Jinro Am., Inc. v. Secure Invs., Inc.*,
266 F.3d 993 (9th Cir. 2001) .........................................24

*JJI Int'l, Inc. v. Bazar Grp., Inc.*,
2013 U.S. Dist. LEXIS 88478 (D.R.I. Apr. 8, 2013) ....................12

*Keith v. Volpe*,
858 F.3d 467 (9th Cir. 1988) ..........................................4

*Kournikova v. Gen. Media Commc'ns, Inc.*,
278 F. Supp. 2d 1111 (C.D. Cal. 2003).............................6, 10

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...............................................................................4

4

5

*M2 Software, Inc. v. Madacy Entm't*,
    421 F.3d 1073 (9th Cir. 2005) ..............................................................4

6

*Munchkin, Inc. v. Playtex Products, LLC*,
    No. CV11-503-AHM(RZx) (C.D. Cal. May 1, 2012)....................9, 14

7

8

*Reeves v. Commonwealth Edison Co.*,
    2008 WL 239030 (N.D. Ill. Jan. 28, 2008) ........................................16

9

*Reinsdorf v. Skechers U.S.A.*,
    922 F. Supp. 866 (C.D. Cal. 2013)...................................................4, 5

10

*Rinehart Racing, Inc. v. S&S Cycle, Inc.*,
    2014 U.S. Dist. LEXIS 7196 (W.D.N.C. Jan. 17, 2014).....................12

11

12

*Sears, Roebuck & Co. v. Menard, Inc.*,
    2003 WL 168642 (N.D. Ill. Jan. 24, 2003) .............................10, 14, 16

13

*Simon Prop. Grp. L.P. v. MySimon, Inc.*,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ...............................................14

14

15

*Watec Co. v. Liu*,
    2002 WL 34373489 (C.D. Cal. May 21, 2002)....................................5

16

*Weisgram v. Marley*,
    528 U.S. 440 (2000) ..............................................................................4

17

18

*Wells Fargo & Co. v. WhenU.com, Inc.*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003) ...........................................7, 8

19

**OTHER AUTHORITIES**

20

http://thelawdictionary.org/inter-alia/........................................................18

21

22

Shari S. Diamond, *Reference Guide on Survey Research*, *in* Reference
    Manual on Scientific Evidence 359 (Fed. J. Ctr. 3d ed. 2011) .........5, 7

23

**RULES**

24

Fed. R. Civ. P. 26(a)(2).................................................................................2

25

Fed. R. Evid. 702 .....................................................................................1, 3

26

27

28

DEF.'S MOT. TO EXCLUDE KAMINS
13-CV-2519-GPC(WVG)

## I.    INTRODUCTION

Plaintiff Art Cohen's proffered expert Dr. Michael Kamins has submitted a report advancing four opinions that are unreliable, irrelevant, and inadmissible.  His first three opinions are little more than unsupported assertions reiterating Plaintiff's allegations in the Complaint (which Kamins admittedly assumed were true), and his "survey" is fundamentally and irreversibly flawed in numerous ways.  The Court should exclude Kamins's opinions and testimony under Rule 702 because:

- Kamins's survey suffers from substantial and fundamental flaws that render it entirely unreliable, including (1) use of an incorrect target universe, (2) failure to use a control group, (3) taking statements out of context, (4) failure to disclose the underlying survey data, (5) a lack of administrative control over his own survey, and (6) a demand effect;

- Kamins reviewed but consciously ignored significant evidence contradicting his opinions and "survey";

- Kamins's first two opinions are irrelevant to any material issues in the case and are overly prejudicial; and

- Kamins failed to disclose the foundation for his opinions.

These flaws and deficiencies are evident from the Kamins report and were confirmed during Kamins's deposition.  Similar deficiencies in his opinions in other cases have resulted in Kamins's exclusion as an expert, and the same result is warranted here.  Kamins's study and his testimony and opinions in this case should be excluded.

## II.    RELEVANT BACKGROUND

TU is a for-profit real estate seminar company that started in 2005 as an online program and added live events to its programming in 2007.  Ex. 1 at 81:8–13, 193:16–18.[1]  TU comprised one of over 500 business ventures launched under the umbrella of the Trump Organization.  Many of these businesses bear the name "Trump" in their title, including the Trump Hotel Collection, Trump golf courses,

---

[1] All references to "Ex." refer to Exhibits attached to the Kirman Declaration, unless otherwise indicated.

and the Trump Winery.  Through the success of these business ventures, Trump has become a popular brand known for, among other things, "luxury," *see* Ex. 2 at 181:2–4, "excellence," Ex. 3 at 135:18–24, and "quality," Ex. 4 at 24:14–23.

TU operated under the Trump brand name, teaching students practical real estate investing techniques to enable anyone—beginners or commercial real estate experts—to learn and apply valuable investing lessons. Ex. 5 at TU 52936.  To attract people likely to have an interest in a real estate investment and entrepreneurship seminar, TU sent direct mail advertisements to lists of individuals who had already participated in or signed up for similar real estate investment programs like Armando Montelongo.  Ex. 6 at 149:3–152:10.

Anyone interested was invited to attend a free 90-minute Preview seminar. At the end of the Preview, attendees would be able to enroll in a three-day seminar course, known as the Fulfillment, on how to profit from real estate investing.  These seminars typically took place approximately seven to ten days following the Preview that the students attended, Ex. 7 at TU 130464, and students were eligible to receive a full refund up until the end of the first day of the Fulfillment, *see* Ex. 8 at 114:24–115:13; Ex. 9 at 300:7–12; Ex. 10 at 146:1–25.  Following the Fulfillment, some attendees, including Plaintiff Art Cohen, chose to purchase TU's yearlong Elite training packages, which offered additional support and resources such as a three-day, in-field mentorship, more seminars, and various online resources.  Ex. 11.

## III.   MICHAEL KAMINS

Dr. Kamins is a professor at Stony Brook University-SUNY.  Ex. 12 ¶ 10. He pays various services to advertise his services for hire as an expert witness, *see* Ex. 13, and he frequently testifies in trademark cases, *see* Ex. 12 at Ex. 2.  He has never testified in a case involving real estate or business seminars like TU.  Ex. 2 at 126:22–127:2; Ex. 12 at Ex. 2.  Plaintiff retained him in this matter to opine on the issue of materiality.  Ex. 2 at 94:4–12.

Pursuant to Rule 26(a)(2), Kamins submitted a report detailing the opinions to which he intends to testify in this matter on January 29, 2016.  Ex. 12.  The Kamins report asserts four conclusions: (1) "TU's Advertising and Promotional Campaign Focused Almost Exclusively on Trump and Targeted His Biggest Fans"; (2) "TU's Marketing and Sales Strategies Were Designed to Force Prospective Consumers to Make Decisions Using System 1 Processing"; (3) "The 98% Approval Rating Is Not the Product of Reliable Questions or Methodology"; and (4) an "Empirical Study of Consumers Demonstrates the Importance of the Offers to Learn Trump's Strategies from His Hand-Picked Instructors."  *Id.*  In forming these opinions, Kamins made various assumptions, including that "the allegations alleged in the Complaint are true and will be proven by Plaintiff at trial."  *Id.* ¶ 21.

Kamins did not conduct any research to support his first three opinions.  For his fourth opinion, Kamins conducted an "empirical study" that purported to determine the effect of a TU advertisement on surveyed individuals' interest in attending a live event sponsored by TU.  *Id.* ¶¶ 119–35.  The only two aspects of the advertisement he questioned respondents about were "(1) The opportunity to learn Trump's strategies; and (2) The opportunity to be taught by Trump's hand-picked professors."  *Id.* ¶ 119.  He did not ask about interest in real estate, entrepreneurship, or continuing education.  He did not ask open-ended questions.  He did not ask any follow-up questions.  He did not use a control group.  His report states that "[a] total of 126 individuals were surveyed," but a later note in the report clarifies that this number comprises only 35% of the respondents surveyed.  *Id.* ¶ 123.  Kamins does not disclose the total number of respondents, the distribution of answers by the other respondents, or any other underlying data to the survey.  *Id.*

## IV.   LEGAL STANDARD

Testimony by expert witnesses has the potential to "be both powerful and quite misleading."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).  Federal Rule of Evidence 702 therefore "imposes a special obligation upon

a trial judge to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). Under *Daubert*'s "exacting standards of reliability," *Weisgram v. Marley*, 528 U.S. 440, 455 (2000), an "expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science," which requires an "objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir. 1995). Testing is the fundamental feature of the scientific method required by *Daubert*, which recognizes that valid scientific methodology involves "generating hypotheses and testing them to see if they can be falsified." *Daubert*, 509 U.S. at 593.

An opinion that is based only on speculative assumptions or is not supported by the record is inadmissible. *Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.2d 825, 829 (9th Cir. 2001) (expert cannot rely on "unsupported speculation and subjective beliefs"). In particular, this Court, not the jury, must closely inspect how the expert arrives at his conclusions, including whether "there is simply too great an analytical gap between the data [the expert relies on] and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court must exclude "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

## V.   ANALYSIS

### A.   The Kamins Survey Is Fundamentally Flawed and Unreliable

Whether a survey is admissible is a threshold question for the court. *See M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005). The proponent of a survey bears the burden of establishing its admissibility. *Keith v. Volpe*, 858 F.3d 467, 480 (9th Cir. 1988). "The first step in the court's analysis of any survey . . . is to determine whether the survey is admissible, relevant, and conducted according to accepted principles." *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013). "Unless survey evidence is conducted

1   according to accepted principles, it is not admissible in the first instance." *Id.*

2   "[S]ubstantial deficiencies in the design or execution of a survey . . . is grounds for

3   its complete exclusion." *Gibson v. Cnty. of Riverside*, 181 F. Supp. 2d 1057, 1067

4   (C.D. Cal. 2002). Kamins's survey is unreliable for numerous reasons, several of

5   which have formed the basis for Kamins's exclusion as an expert in other cases.

6   **1.     The Kamins Survey Used an Incorrect Target Universe**

7   Certain elements are so fundamental to a properly conducted empirical

8   survey that their omission may disqualify a survey entirely. *Id.* at 1069. Among

9   these essential aspects of a properly conducted study is the requirement that "[a]

10   proper universe must be examined and a representative sample must be chosen."

11   *Id.* at 1067;[2] *see generally* Shari S. Diamond, *Reference Guide on Survey Research*,

12   *in* Reference Manual on Scientific Evidence 359, 362 (Fed. J. Ctr. 3d ed. 2011).[3]

13   The target universe consists of "all elements (i.e., individuals or other units) whose

14   characteristics or perceptions the survey is intended to represent." Diamond,

15   *Reference Guide*, at 376. The need for a proper universe is obvious—even a survey

16   that asks the right questions will be unreliable if it asks the wrong individuals.

17   Nowhere in his report does Kamins identify a target universe of respondents

18   to his survey. Rather, he describes his sample as having the following features:

19-23   > Demographic/respondent background characteristic qualifying questions to ensure survey respondents: (a) were 21+ years of age; (b) had no one in the household who worked for a marketing research firm, advertising agency, or public relations firm; (c) had no one in the household who worked for a company that offers seminars on financial or real estate investing; and (d) had not participated or enrolled in a live seminar or mentorship program sponsored by TU in the past 10 years.

24   Ex. 12 ¶ 124. These criteria appear to provide a sample of the general population of

25   adults over 21 years in age who do not have any specialized knowledge of the case

26   ────────────

[2] All internal citations, modifications, and quotation marks omitted.

27   [3] District courts have cited and relied on the *Reference Guide*'s principles in

28   assessing whether proffered surveys meet the requirements of Rule 702 and *Daubert*. *See, e.g.*, *Reinsdorf*, 922 F. Supp. at 878–79.

1    at hand.  This is not, however, a "representative sample" of the class, *Gibson*, 181

2    F. Supp. 2d at 1067, which is comprised of "[a]ll persons who purchased Live

3    Events from Trump University throughout the United States from January 1, 2007

4    to the present," Dkt. 53 at 22.

5          Based on the certified class, a proper target universe must encompass

6    potential customers of TU.  And the generic person off the street does not fall

7    within this category.  To the contrary, potential TU customers must have some

8    basic interest in entrepreneurship, continuing education, real estate, or business

9    generally.  Indeed, TU's Chief Marketing Officer, Michael Bloom, testified that TU

10   actively targeted individuals with a prior interest in business seminars by sending

11   direct mail advertisements to lists of people who had purchased similar programs in

12   the past.  Ex. 6 at 54:17–25, 280:14–281:9.  Yet by his own admission, Kamins did

13   not seek to exclude respondents without any such interests from his initial

14   respondent population.  *See* Ex. 2 at 302:7–303:14.

15         As a result, Kamins's survey almost certainly included respondents without

16   any prior interest in subjects such as entrepreneurship or real estate, and these

17   respondents would necessarily approach the survey with a different frame of mind.

18   To illustrate, an individual with a prior interest in real estate investing may have

19   researched—or at least considered—real estate investment courses prior to taking

20   the study.  By contrast, the generic person off the street comes to the survey with a

21   blank slate.  How different elements of the survey advertisement affected these

22   individuals varies significantly depending on their backgrounds.  And there is no

23   reason why Kamins could not have screened for a more accurate target universe.

24         This "substantial and fundamental" deficiency in Kamins's survey is

25   sufficient to exclude it entirely.  *Gibson*, 181 F. Supp. 2d at 1069; *accord*

26   *Kournikova v. Gen. Media Commc'ns, Inc.*, 278 F. Supp. 2d 1111, 1125 (C.D. Cal.

27   2003) (discarding an expert's survey on the basis that it was "fundamentally

28   flawed" because while its "sample may have reflected opinions of the general

DEF.'S MOT. TO EXCLUDE KAMINS
13-CV-2519-GPC(WVG)

1   public, it d[id] not represent the appropriate target group – the average Penthouse

2   customer"); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 879 (9th Cir. 1999)

3   (rejecting reliance on survey where survey failed to address the appropriate sample

4   of the population); *Dreyfus Fund, Inc. v. Royal Bank of Can.*, 525 F. Supp. 1108,

5   1116 (S.D.N.Y. 1981) ("To be probative and meaningful . . . surveys . . . must rely

6   upon responses by potential customers of the products in question."); *Cottonwood*

7   *Fin. v. Cash Store Fin. Servs.*, No. 3:10-cv-01650-N (N.D. Tex. Oct. 16, 2012)

8   (Dkt. 76 at 5) (discrediting expert in case involving Kamins because the survey

9   "failed to actually approximate the marketplace of CSFS's potential investors").[4]

10          **2.      The Kamins Survey Did Not Conduct a Control Group**

11          Another fundamental error in Kamins's survey is that it did not include a

12   control group.  A properly designed survey testing for causal inference presents its

13   stimulus to two groups of respondents—a "test" group and a "control" group.  *See*

14   Diamond, *Reference Guide*, at 398.  The survey will present the survey stimulus

15   *with* the hypothesized causal variable to the test group and an otherwise identical

16   stimulus *without* the causal variable to the control group.  Observing the difference

17   in results between these groups enables the surveyor to isolate the causal variable

18   and account for possible alternative explanations for the survey's results and for

19   random "noise."  Indeed, "[c]ourts have widely recognized the need for consumer

20   surveys to adjust for so-called 'background noise,' i.e., extrinsic factors, pre-

21   existing beliefs, general confusion or other factors, other than the stimulus at issue,

22   that contribute to a survey's results."  *Wells Fargo & Co. v. WhenU.com, Inc.*, 293

23   F. Supp. 2d 734, 768 (E.D. Mich. 2003) (citing cases across federal jurisdictions).[5]

24   ─────────────
     [4] *See* Req. for Judicial Not. Ex. A.

25   [5] As the court in *Wells Fargo* explained, "The control group functions as a baseline
     and provides a measure of the degree to which respondents are likely to give an

26   answer not as a result of the thing at issue, but because of other factors, such as the
     survey's questions, the survey's procedures or some other potential influence on a

27   respondent's answer such as pre-existing beliefs.  By adding an appropriate control
     group, the survey expert can test exactly the influence of the stimulus."  293 F.

28   Supp. 2d at 768–69.

1    Kamins states that the purpose of his survey was to determine if TU students

2 were "influenced in their enrollment decision" by "(1) The opportunity to learn

3 from Trump's strategies; and (2) The opportunity to be taught by Trump's hand-

4 picked professors." Ex. 12 ¶ 119.  He thus sought to determine if there was a causal

5 inference between exposure to these representations about Mr. Trump and a

6 decision by consumers to enroll in TU.  Accordingly, he devised an ad that

7 purported to present both of these representations about Mr. Trump and showed it

8 to a test group of 126 respondents.  *Id.* ¶¶ 119–35.  Yet he *never* showed a separate

9 group of respondents a stimulus that did *not* contain these representations.  For

10 example, he did not ask another group of respondents whether they would be

11 positively influenced by the chance to learn sound real estate strategies (without

12 them being Mr. Trump's).  Nor did he ask a group whether they would be

13 influenced by the chance to be taught by expert real estate professors (without them

14 being "handpicked" by Mr. Trump).  In fact, he used no control group whatsoever.

15    During his deposition, Kamins conceded that he did not use a control group,

16 claiming that "[i]t was not needed."  Ex. 2 at 84:16–85:17, 87:2–4.  Yet Kamins

17 never explains how it was possible to accurately test a causal inference without use

18 of a control group.  Nor is such an explanation evident.  Courts have universally

19 emphasized the importance of using a control group in surveys designed to test for

20 causal inference, and the failure to include one is a frequent basis for exclusion.

21 *See, e.g.*, *Wells Fargo*, 293 F. Supp. 2d at 769 (excluding expert's surveys because

22 they did not "employ an experimental design that established causation," noting

23 that had he "used a control group, he might have been able to make a 'causal

24 inference' that was 'clear and unambiguous'"); *Cottonwood Fin.*, No. 3:10-cv-

25 01650-N (Dkt. 76 at 5) (discrediting expert in case involving Kamins because the

26 surveys "failed to provide a control"); *see also Cumberland Packing Corp. v.*

27 *Monsanto Co.*, 32 F. Supp. 2d 561, 574 (E.D.N.Y. 1999) ("In a test of a causal

28 proposition the appropriate use of controls is crucial.").

In fact, the Central District of California excluded a survey Kamins conducted for precisely this reason.  In *Munchkin, Inc. v. Playtex Products, LLC*, the court excluded Kamins's survey because, among other reasons, "[h]e didn't include a control group that really would have been necessary in any appropriate comparative test to determine what meaning was attached either to 'Best diaper pail' or 'Best diaper pail on the market.'"  No. CV11-503-AHM(RZx) (C.D. Cal. May 1, 2012) (Dkt. 285 at 30).[6]  In another case, Kamins was challenged for using an *improper* control group (although he did use one).  *See Apple v. Samsung*, No. 5:11-cv-01846-LHK (N.D. Cal. June 30, 2012) (Dkt. 1157).[7]  And although the court found that Kamins's use of a control group was "not so unreasonable as to render the survey excludable," the court noted that "relying on a wholly inappropriate control group may render a survey so flawed as to be inadmissible." *Id.* at 8.  Here, there is no dispute about whether Kamins used a "wholly inappropriate" control group because he did not use one at all.

### 3.    The Kamins Survey Took Statements Out of Context

Another fundamental characteristic of any properly conducted survey is the complete and proper context.  *See Gibson*, 181 F. Supp. 2d at 1067 ("the sample design, the questionnaires and the manner of interviewing [must] meet the standards of objective surveying and statistical techniques").  Here, Kamins distorted the context of the alleged misrepresentations at issue by exposing survey respondents only to "one print ad and . . . a television advertisement -- a video actually." Ex. 2 at 31:13–16.  In presenting such a limited selection, Kamins failed to account for many other factors that contribute to consumers' understanding of the alleged misrepresentations.  For example:

- Kamins did not show students a video, audio file, or transcript of a free 90-minute preview course, even though he concedes that these seminars impacted students' decision to enroll in TU.  *Id.* at 46:5–47:6.

---

[6] *See* Req. for Judicial Not. Ex. B.
[7] *See* Req. for Judicial Not. Ex. C.

DEF.'S MOT. TO EXCLUDE KAMINS
13-CV-2519-GPC(WVG)

- Kamins did not factor in the content and quality on three-day seminar programs that students attended and their impact on students' decision to purchase more TU programs. *Id.* at 47:23–48:12.

- Kamins acknowledged that his survey did not consider the possibility that "students could decide to purchase TU classes because they liked the instructor." *Id.* at 48:14–20.

- Kamins did not provide any of the handout materials that were provided to students at the preview seminars free of charge prior to students having to purchase a TU event. *Id.* at 47:7–22.

- Kamins did not account for the state of the economy or opportunities in real estate at the time that TU was in operation. *Id.* at 48:22–49:1.

As Kamins acknowledged in his deposition, these factors could have had an impact on class members' decision to enroll in TU. And by failing to provide respondents with the full picture, Kamins distorted the context of the survey.

This is not the first time that Kamins has manipulated the context of a survey. In *Sears, Roebuck & Co. v. Menard, Inc.*, 2003 WL 168642, at *2 (N.D. Ill. Jan. 24, 2003), the court excluded Kamins as an expert witness precisely because Kamins conducted his survey in the wrong context:

> We agree with Menard that the survey distorted marketplace conditions by taking the advertisements out of context. We are primarily concerned with the fact that respondents were presented with mere clips rather than the entire commercials. 'While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey mirrors the real world setting which can create an instance of actual confusion.' . . . In other words, important cues regarding affiliation or lack of affiliation between the parties were removed from the commercials.

Similarly here, Kamins omitted many "important cues" that TU students likely relied on in deciding to enroll in TU. His omissions caused a "distort[ion of] marketplace conditions" and require exclusion of his survey. *Id.*; *accord Kournikova*, 278 F. Supp. 2d at 1125 (excluding expert survey in part because it "did not permit those sampled to view all of the relevant evidence bearing on the relevant issue," noting: "Survey respondents were not allowed to examine the

1   photos or the magazine article.  This seriousness of this deficiency becomes more

2   apparent when one considers Plaintiff's FAC, which alleges that the magazine as a

3   whole—the cover *and* its contents—gave potential customers the impression of

4   Plaintiffs endorsement"); *see also Eastwood v. Nat'l Enquirer*, 123 F.3d 1249, 1256

5   (9th Cir. 1997) ("[W]e look to the totality of the Enquirer's presentation of the

6   interview and find that the editors falsely suggested to the ordinary reader of their

7   publication—as well as those who merely glance at the headlines while waiting at

8   the supermarket checkout counter—that Eastwood had willingly chatted with

9   someone from the Enquirer.").  Kamins cannot be permitted to distort the context in

10   which he conducts his survey to arrive at the results Plaintiff desires.

11          **4.**     **Kamins Did Not Provide the Underlying Data to His Survey**

12         Kamins admitted during his deposition that he failed to provide—or even

13   disclose the existence of—the underlying data to his survey in his expert report.

14   Kamins stated in his report that there were 126 respondents to his survey.  Ex. 12

15   ¶ 126.  In reality, however, Kamins questioned far more respondents in the course

16   of his survey, but he did not disclose (and has not to this day disclosed) the number

17   of or results from those other respondents.

18         In his report, Kamins explains the methodology of his survey, which asked

19   respondents two questions.  First, the survey asked respondents whether, after

20   viewing the print and video advertisements, they "would be likely to enroll in a live

21   class from TU if it was held at a convenient site and offered the potential to pay for

22   itself quickly."  *Id.* ¶ 124.  Respondents indicated their answers from a scale of 1 to

23   9, with 1 through 4 indicating an unlikeliness to enroll, 5 indicating "no opinion /

24   don't know," and 6 through 9 indicating a likeliness to enroll.  *Id.*  Respondents

25   who answered 6, 7, 8, or 9 (those who were likely to enroll) were then asked a

26   second question about the impact of the alleged conduct on that decision.  *Id.*  It is

27   *these respondents*—the ones who answered the first question with a 6 through 9—

28   who comprise the 126 people Kamins identified as the total universe of his survey

1    population.  Ex. 2 at 56:12–16.  Kamins never discloses how many students

2    answered the initial qualifying question.  In fact, the *only* reference to the existence

3    of additional respondents beyond the 126 he identified is a "Note" at the end of a

4    long list of bullet points detailing his "Data Collection," where he states:

5    "Terminating panel members who did not meet all of the study qualifiers.  (Note:

6    35% of those initiating the study qualified for the study.)."  Ex. 12 ¶ 123.  During

7    deposition, Kamins confirmed that "[t]he 126 represent the 35 percent" indicated in

8    this parenthetical "Note."  Ex. 2 at 67:18–22.  He also confirmed that there were

9    "many more [surveys that were received and responded to] inclusive of the one,

10   two, three, four, fives."  *Id.* at 67:24–68:3.

11         Nowhere in his report does Kamins disclose this information, nor does he

12   provide the underlying survey data.  Under Federal Rule of Civil Procedure 26,

13   Kamins was clearly required to disclose and produce the survey data with his expert

14   report.  *See Rinehart Racing, Inc. v. S&S Cycle, Inc.*, 2014 U.S. Dist. LEXIS 7196,

15   at *4 (W.D.N.C. Jan. 17, 2014) ("Based on the plain language of [Rule 26(a)(2)(b)],

16   Defendant should have produced the underlying survey data as part of its expert

17   report, but failed to do so."); *JJI Int'l, Inc. v. Bazar Grp., Inc.*, 2013 U.S. Dist.

18   LEXIS 88478, at *2 (D.R.I. Apr. 8, 2013) ("Defendant is right that raw survey data

19   should be included as part of the expert disclosure of an opinion based on survey

20   results because they are 'facts or data considered by' the expert who designed the

21   survey, even if the specific data were not relied on in forming the opinion.").  In

22   spite of this clear requirement, Kamins testified that he does not know where these

23   data are, nor has he ever even reviewed these data:

24              Q. But within the one through five and the don't know answers, you
             don't know how those questions were answered, do you?
25              A. As I sit here, I would need to ask for the distribution of the one
             through five.
26              Q. Where is that data?
27              A. I suspect it would be at Spectrum Associates or Toluna.
28              Q. Have you seen that data?

DEF.'S MOT. TO EXCLUDE KAMINS
                                                     13-CV-2519-GPC(WVG)

A. Have I seen it, no.

Ex. 2 at 72:18–73:2.

These data are particularly relevant because Kamins has previously been excluded for his survey containing too large a number of "Don't Know" responses, indicating unreliability in the survey design. *See Cottonwood Fin.*, No. 3:10-cv-01650-N (Dkt. 76 at 5) ("The Court declines to credit Cottonwood's survey evidence from Dr. Kamins. The Court finds Dr. Kamin's survey unreliable because of its extremely large number of 'don't know' responses to its question about whether the respondents believed 'a foreign financial services company can be listed on the New York Stock Exchange (NYSE) when its name contains an existing US financial service company's trademark.'"). Here too, a large number of "Don't Know" answers to the first question indicates a poorly designed survey construct and, consequently, unreliability. But there is no way of knowing how many respondents answered 5 to the first question because Kamins himself does not know. There is also inconsistency in the Kamins report as to the number of respondents who qualified for the survey. According to the text and Tables 1 and 2, 126 respondents participated in the study. According to Figure 5's analysis of the "learn Trump's Strategies" question, 125 participated. According to Figure 5's analysis of the "professors hand-picked by Trump" question, 124 participated. These inconsistencies, coupled with Kamins's lack of knowledge or production of the data underlying the first question of his survey, warrant exclusion of the survey.

## 5. Kamins Lacked Control over His Survey

Kamins's lack of knowledge regarding the underlying data to his survey is illustrative of the hands-off approach he took in conducting his survey. In fact, Kamins has a history of taking this approach. As the court in *Munchkin* reasoned in excluding his survey:

> The bottom line is that the strongest points that Playtex has made is that Kamins didn't know how the omnibus survey that he was relying on to shoot down the Simonson questionnaire and survey -- he didn't know how it

was administered.  There was some survey.  It was done.  He relied on it.  He didn't know how the panel was selected.  He didn't know what the statistical technique was that was used to weigh the survey and provide weight to it.
. . . .
For the reasons that Playtex has set forth, I think that the conclusions that Kamins drew were unreliable and I grant the motion to exclude his testimony.

No. CV11-503-AHM(RZx) (Dkt. 285 at 29–30).  Kamins has demonstrated a similar lack of control over his survey in this case.  He does not know how many respondents were questioned; he does not know the distribution of respondents' answers to the first (of only two) questions in his survey; and he never even *looked* at the underlying data.

### 6.     The Kamins Survey Created a Demand Effect

Kamins introduced another of his common research flaws into his study: a demand effect.  As the court in *Sears* explained in excluding Kamins's survey, "'demand effects' bias a survey 'by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items.'"  2003 WL 168642, at *2 (quoting *Simon Prop. Grp. L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000)).  Or, as Kamins himself explained, demand effects occur when the survey questions "give clues that people would hook on to to answer in a certain -- in a certain biased way."  Ex. 2 at 52:6–9.

In *Sears*, the court found that Kamins's survey was unreliable because one of the survey questions "suggested the similarity to respondents rather than testing whether respondents perceived it themselves."  2003 WL 168642, at *2.  The same is true here.  Kamins showed people who may have had no interest in real estate, entrepreneurship, or business seminars an advertisement for a free preview seminar depicting Mr. Trump; he then asked *only* those who responded that they would be *likely* to attend whether the reason for their interest was Mr. Trump.  Having

1 already answered that they were interested in the seminar, and presented in question

2 two with no alternative response other than Mr. Trump to justify their interest,

3 respondents naturally concluded that they were supposed to say they were likely to

4 enroll because of Mr. Trump.  That is a demand effect.  In fact, it closely resembles

5 the example of a demand effect that Kamins provided during deposition:

6 > For instance, questions that suggest an answer, that suggest -- I will
> give an example.  So suppose I asked the question, "Would you agree with
7 > the American Medical Association's conclusion that taking a shot for
> measles doesn't affect your kids"?  There could be a demand effect there
8 > because who's not to going to agree with the American Medical Association?
9 > So I try to avoid questions that would lead consumers down a primrose
> path to really feel that they have to answer in a certain way.
10

11 Ex. 2 at 52:13–22.  In his survey, however, Kamins asked a very similar question:

12 he showed respondents an advertisement for a real estate investment seminar that

13 was endorsed by perhaps the most famous and successful real estate investor in the

14 world, and then he asked them whether that endorsement had an "impact" on their

15 decision to enroll.  Ex. 12 ¶ 123.  By limiting his questions to whether Mr. Trump's

16 role had an "impact" on their decision to enroll in a real estate seminar, he led

17 respondents "down a primrose path to really feel that they [had] to answer in a

18 certain way."

19 > Kamins could likely have avoided this effect had he given respondents the

20 opportunity to explain their answers.  For example, had he asked open-ended

21 follow-up questions about why they were impacted by Mr. Trump's endorsement or

22 what else they were impacted by, Kamins could have negated the bias he

23 introduced into the survey through his improper questions.  Of course, he did not do

24 so.  *See* Ex. 2 at 60:7–10 ("Q. You didn't include any follow-up questions in the

25 survey you conducted in this case, did you?  A. No, I did not.").  Kamins's failure

26 to ask open-ended follow-up questions was "[a]nother major flaw" warranting

27 exclusion of his survey in *Sears*, where the court explained: "The Kamins Survey

28 failed to determine the reason(s) why those respondents answering question 14 in

the affirmative believed that Sears and Menard were affiliated.  This follow-up

question is critical . . . ."  *Sears*, 2003 WL 168642, at *2–3.  Here, too, Kamins's

failure to ask *why* respondents answered his second question in the affirmative

renders the survey results unreliable.

### B.    Kamins Ignored Evidence Contradicting His Opinions

Where a designated expert ignores substantial evidence that contradicts the

allegations asserted, it renders his conclusions inherently unreliable.  *See, e.g.*, *In re*

*Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d

1166, 1181, 1184 (N.D. Cal. 2007) (finding an expert opinion unreliable and

inadmissible because the expert ignored evidence contradicting her conclusions);

*Reeves v. Commonwealth Edison Co.*, 2008 WL 239030, at *5–7 (N.D. Ill. Jan. 28,

2008) (precluding expert's opinions because he ignored key facts).  Kamins should

be excluded because he blatantly ignored any evidence that was contrary to his

opinions and blindly adopted all allegations in the Complaint as true.

In paragraph 20 of his report, under the heading "Methodological Approach

Applied to this Matter," Kamins explained: "I have assumed that the allegations

alleged in the Complaint are true and will be proven by Plaintiff at trial."  Ex. 12

¶ 20.  During deposition, he confirmed that he assumed Plaintiff's allegations in

forming the opinions in his report, Ex. 2 at 135:20–23, 137:20–22, 138:1–3 ("Q.

You assumed that everything in the complaint is true; right?  A. Correct."),

including allegations regarding marketing and materiality that were the very issues

on which he was retained to opine, *see, e.g.*, Compl. ¶ 13 (alleging that Plaintiff

attended a TU event because of "Defendant's misrepresentations and material

omissions" in a TU advertisement).  At times in his report, Kamins even cites the

Complaint as the *sole* evidence supporting his conclusion.  *See* Ex. 12 ¶ 115.  He

also made various other assumptions concerning key issues in the case, such as the

notion that the TU class "scripts" were read to students in TU courses, *see* Ex. 2 at

264:18–20, despite the sworn testimony of TU's Director of Operations (which he

ignored) who attended hundreds of TU events but did not observe instructors
following scripts, Ex. 14 at 21:17–19, 62:11–13.  These speculative assumptions
render his entire report unreliable.  *See Guidroz-Brault*, 254 F.2d at 829.

In fact, Kamins's report appears to have been little more than a conduit for
Plaintiff's allegations in the complaint.  Several of Kamins's conclusions are
presented in substantially the same language as they are asserted in the Complaint:

| Plaintiff's Complaint | Kamins Report |
| --- | --- |
| ¶ 1:  Defendant ***ensnared*** Plaintiff and thousands of other student-victims . . . . in a fraudulent scheme nationwide to sell real estate seminars and mentorships ("Live Events") by trading on the Trump moniker. | ¶ 25:  Using advertising which focused almost exclusively on Trump and his expertise as a real estate mogul, TU's marketing campaign ***ensnared*** fans of Trump who revered his business and real-estate success. |
| ¶ 1:  [T]hough Defendant promised "Trump University," ***he delivered neither Donald Trump nor a University***. | ¶ 24:  TU made these sales without ***delivering either Trump or a university***. |
| ¶ 2:  Defendant expressly set out to leverage Donald Trump's fame and expertise as a ***real estate mogul*** by creating "Trump University" . . . . | ¶ 5:  Focusing TU's advertising campaign and promotion almost exclusively on Defendant Donald J. Trump and his expertise and reputation as a ***real estate "mogul,"*** TU Live Events targeted Trump's biggest fans, who revered his real-estate success and desired to emulate it. |
| ¶ 2:  Defendant marketed Trump University as ***the next best thing*** to being Trump's ***"Apprentice,"*** referencing Trump's hit reality television series. | ¶ 31:  TU piggybacked on the "***Apprentice***" theme by pitching its Live Events as the ***"next best thing"*** to being Trump's Apprentice . . . . |

Kamins even used "legalese" terms in his report such as "*inter alia*," which he said
during his deposition translates to "that is."  Ex. 2 at 169:12–13, 172:3–16.  *Inter*

1   *alia*, of course, means "among other things," not "that is." *See Inter alia*,

2   http://thelawdictionary.org/inter-alia/.  In addition to calling into question whether

3   Kamins actually drafted his report, his (incorrect) speculation under oath about a

4   term with which he was clearly unfamiliar undermines his credibility as a witness.

5   In addition to assuming Plaintiff's allegations in authoring his report, Kamins

6   also ignored substantial evidence contradicting his opinions.  For example, Kamins

7   did not review the deposition testimony of even a single former TU student.  Ex. 2

8   at 177:21–23.  When asked why he did not review this testimony, he replied that

9   such testimony would not be relevant.  Ex. 2 at 178:1–18.  Had he actually

10  considered any student deposition testimony, he would have discovered substantial

11  evidence contradicting the assumptions underlying his report.

12  To illustrate, Kamins testified that he believed students who saw TU's

13  advertisements actually expected Mr. Trump to be teaching the classes.  Ex. 2 at

14  217:17–20.  Yet even the testimony of *Plaintiff Art Cohen* contradicts that

15  assumption.  *See* Ex. 15 at 28:1–5 ("I did not have the expectation that Donald

16  Trump was going to be teaching directly.  That's -- that would not be reasonable to

17  expect at that time.").  Other TU students similarly testified that they did not hold

18  this expectation.  *See, e.g.*, Ex. 16 at 110:11–18, 68:17–69:15, 162:16–163:13; Ex.

19  4 at 33:16–19, 43:2–12, 99:5–21, 100:8–22; Ex. 17 at 61:13–19; Ex. 3 at 132:19–

20  133:5.  Kamins also testified that he believed students thought TU was an actual

21  university, Ex. 2 at 297:25–298:2, but nearly every student deposed testified to the

22  opposite belief, *see, e.g.*, Ex. 3 at 106:9–12 ("You have to be pretty thick-skulled to

23  think it was a university. For goodness sales [sic]. I mean, a university is a four-

24  year degree. I knew it was a business seminar.").

25  During his deposition, it became apparent that Kamins consciously ignored

26  important evidence contradicting key issues in his report.  For example, Kamins

27  admits that he reviewed an email from TU president Michael Sexton in 2006

28  regarding TU advertising in which Sexton wrote:

DEF.'S MOT. TO EXCLUDE KAMINS
13-CV-2519-GPC(WVG)

> Our surveys clearly show that people don't expect DJT to be teaching them anything…and they don't care, as long as the professors are experts in their fields.
>
> *The TrumpU logo should be featured prominently at the TOP of the page. Again, we're selling TrumpU, not DJT. His picture needn't be so large.

Ex. 18.[8]  Despite reviewing this document, however, Kamins does not cite it in his report or consider the implications it has on his first opinion that "TU's Advertising and Promotional Campaign Focused Almost Exclusively on Trump and Targeted His Biggest Fans."

Similarly, Kamins listed the deposition of Michael Bloom—TU's Chief Marketing Officer—in his list of materials reviewed, but he ignored Mr. Bloom's testimony that TU's direct mail advertising was targeted to people who "attended an event related to entrepreneurship or business or starting a business or growing a business or, you know, an entrepreneurial activity."  Ex. 6 at 280:14–281:9.  He also admitted that there were themes in TU's advertising other than Mr. Trump, such as real estate and foreclosure investing.  Ex. 2 at 184:5–17.

Finally, Kamins cites a 2006 TU survey that asked TU students:  "What advantages do you think Trump University has over other programs."  Ex. 12 ¶ 47 (citing Ex. 19 at DT-KATZ-0000647).[9]  Kamins cites this survey for the proposition that "[r]eference to Trump [w]as the number one answer by 20% of the consumers indicated that consumers believed they were being taught information they could attribute directly to the 'Master' (Trump), and that they would learn the process of how Trump thinks when making real-estate deals."  *Id.*  In fact, however, the page Kamins was relying on only listed common words used by students in

---

[8] This email is not listed in Exhibit 3 to the Kamins report, where he listed all the documents he reviewed in arriving at his opinions, even though he testified that he reviewed this document before authoring his report.  *See* Ex. 2 at 187:17–193:17.

[9] Kamins cites this document as DT-KATZ 0002510 in his report, but there is no document with that bates number.  During deposition, Kamins confirmed that he was referring to Exhibit 19 to the Kirman Declaration.  *See* Ex. 2 at 309:16–310:13.

responding to the survey. Ex. 19 at DT-KATZ-0000647. The actual results of the survey were on the several pages immediately preceding this page, and they showed that "reference to Trump" was actually the *fourth* most common answer:



Ex. 19 at DT-KATZ-0000641–46. Kamins's decision to ignore contradictory evidence *that he reviewed* is grounds for complete exclusion of his testimony. *See Bextra*, 524 F. Supp. 2d at 1181, 1184.

### C.   Kamins's Criticisms of TU Student Surveys Are Incorrect

Kamins provides eight criticisms of TU's surveys. Each of them is incorrect. First, Kamins opines that the 98% approval rating is unreliable because TU had a 25% refund rate. Ex. 12 ¶ 111. But it is undisputed that TU students could seek refunds up to the end of the first day of three-day seminars,[10] and surveys were handed out on the third day,[11] so a student who received a refund would not have filled out a survey. And it is entirely possible that 98% of the students who stayed for all three days gave TU positive reviews.

Second, Kamins states that the surveys were unreliable because they were not anonymous and that, consequently, students felt compelled to give positive reviews. Ex. 12 ¶ 112. But the surveys included the parenthetical "(Optional)" next to the line for the student's name, *see* Ex. 20, and the deposition of former *Makaeff* class

---

[10] *See* Ex. 8 at 114:24–115:13; Ex. 9 at 300:7–12; ex. 10 at 146:1–25.
[11] Ex. 14 at 21:22–22:9.

representative Tarla Makaeff completely undermines Kamins's theory.  Makaeff gave TU very positive reviews *except* in one instance where she wished to give a negative review, and she omitted her name on that occasion.  Ex. 21 at 496:2–5.

Third, Kamins questions the surveys because "TU maintains that there are over 10,000 completed questionnaires, yet only 7,611 individuals were paid customers."  Ex. 12 ¶ 113.  Again, there is a simple answer to that: purchasing a three-day TU program entitled the buyer to bring a guest, *see* Ex. 14 at 109:12–22, and the surveys were passed out to everyone attending the TU course, not just the paying customers, *see* Ex. 14 at 21:22–22:9, 63:17–19.

Fourth, Kamins criticizes the surveys because they were given before "students had an opportunity to attempt to apply the so-called teachings."  Ex. 12 ¶ 114.  Yet, unsurprisingly, Kamins conceded during his deposition that no school has ever conducted a survey of his students years after they have had a chance to apply what they learned in his classes.  Ex. 2 at 296:2–8.

Fifth, Kamins states that the surveys are unreliable because "at no point before the surveys were administered did TU personnel inform the students of the truth"—the "truth" being the fraud alleged by Plaintiff in this case.  Ex. 12 ¶ 115.  This is, of course, the entire factual basis of Plaintiff's unproven case, and the sole support that Kamins cites for this conclusion is: "(*See* Complaint)."  *Id.*

Sixth, Kamins accuses the survey questions as creating a positivity bias because of the way they are framed, *id.* ¶ 116, but the majority of the surveys' questions simply ask students to "rate the training/seminar" from 1 to 5 on various criteria, such as "quality of the presentation," "relevance of the topics covered," "usefulness of the information," and "quality of the instructor," *see, e.g.*, Ex. 20.

Seventh, Kamins opines that the surveys have a "confirmatory bias" because students who "have spent a significant amount of money on TU offerings . . . have a strong need to confirm to themselves that the money spent was for a good cause."  Ex. 12 ¶ 117.  Yet the same reasoning would apply to college students everywhere

1  who incur substantial student loans.  Kamins's reasoning would mean that
2  university student surveys everywhere were unreliable as well.

3      Eighth, Kamins provides anecdotal evidence by instructors for the
4  proposition that TU students were "prompted by the instructors themselves to give
5  high scores." *Id.* ¶ 118.  Yet TU's Director of Operations, who attended hundreds
6  of TU seminars, testified that instructors were typically outside the room while
7  surveys were being filled out.  Ex. 14 at 22:4–6.  And when asked whether she ever
8  "observe[d] anyone coercing the attendees to give positive comments on the
9  surveys," she answered "No."  *Id.* at 24:4–6.  Many students similarly testified that
10  they were not pressured to give high ratings on their evaluations.  *See, e.g.*, Ex. 3 at
11  33:19–25; Ex. 10 at 164:8–13; Ex. 22 at 76:2–78:5.

12      Because all eight of the reasons that Kamins provides to support his third
13  opinion are incorrect, this opinion must be excluded.  Moreover, the surveys that he
14  criticizes were collected not for public consumption—for example, they were never
15  used in TU advertising—but for internal review to enable TU "to provide the best
16  level of customer service that [it] possibly could."  Ex. 14 at 23:4–10.

17  **D.  <u>Kamins's Opinions About TU's Marketing Are Unreliable,</u>**
18  **<u>Irrelevant, and Overly Prejudicial</u>**

19      Kamins spends the bulk of his report on his first two opinions, which concern
20  the allegedly prominent role that Mr. Trump plays in TU's advertising and the
21  extent of extent to which TU's "hard sell techniques" prompted potential consumers
22  to make gut-laden, emotional decisions (what he calls "System 1 Processing").[12]
23  Although he includes numerous citations to academic literature about what System
24  1 Processing is and the use of celebrity endorsement, he provides no empirical
25  research or any other scientific evidence to show that the principles he discusses
26  apply here.  Underlying these opinions is the assumption that TU's advertising was

27

28  [12] By contrast, Kamins says "System 2 Processing" is "slow, deliberate, analytical and consciously effortful mode of reasoning about the world."  Ex. 12 ¶ 53.

DEF.'S MOT. TO EXCLUDE KAMINS
13-CV-2519-GPC(WVG)

1  "false and deceptive" and designed to "manipulate" the target population.  Ex. 12

2  ¶ 49.  These conclusions are therefore based on notions that have not been proven

3  in litigation and that he personally did *no research whatsoever* to establish.

4       Moreover, Kamins's conclusion that TU invoked System 1 processing is

5  undermined by the undisputed facts in this case.  TU live events marketing

6  generally consisted of three stages: (1) The Preview (free 90-minute seminar open

7  to the public); (2) The Fulfillment (three-day seminar open only to registrants upon

8  payment of $1495); and (3) Elite Training Packages (yearlong training packages

9  ranging in price from $9995 to $34,995).  While there was not a set amount of time

10  between the Preview and the Fulfillment, it was generally seven to ten days, *see* Ex.

11  7 at TU 130464, giving students plenty of time to deliberate over their choice to

12  purchase the TU product (and the potential choice to purchase any future products).

13  Moreover, refunds for the Fulfillment were fully available up to and including

14  immediately after the first day of the event.  *See* Ex. 8 at 114:24–115:13; Ex. 9 at

15  300:7–12; Ex. 10 at 146:1–25.  As a result, students had a ninety-minute Preview

16  seminar, seven to ten days' time, and a full day of the Fulfillment to deliberate over

17  their choice to purchase a TU program; if they decided they did not want it, they

18  could receive a full refund.  In fact, the sales data make clear that the vast majority

19  of consumers who attended a preview seminar either did *not* purchase a TU

20  program or received a refund, which undercuts Kamins's conclusion that consumers

21  were somehow tricked into enrolling.  Specifically, of the 80,308 people who

22  attended a TU Preview seminar, only 7803 people actually made a purchase of

23  additional training at that seminar, resulting in a conversion rate of less than 10%.

24  And of those 7803 people, 2114 returned their purchase, leaving only 5689 fulfilled

25  purchases, or a total of approximately 7%.  Ex. 23 at TU 137461.

26       Kamins's first two opinions are also irrelevant, since it is not disputed that

27  Mr. Trump's name and likeness were included in TU's advertisements, and, by

28  Kamins's own admission, there is nothing wrong with System 1 Processing:

DEF.'S MOT. TO EXCLUDE KAMINS
13-CV-2519-GPC(WVG)

Q. [N]ow, there's nothing wrong with sales strategies designed to invoke System 1 processing, is there?

. . . .

A. Okay. In general, there's nothing wrong with it, no.

Q. In fact, it's a common practice for companies to use strategies that try to get consumers to make quick, gut-laden decisions; correct?

A. Correct. Yes.

Ex. 2 at 238:17–239:6. It is also not disputed that TU—a for-profit business seminar program—employed common sales practices to boost the sales of its products. Nowhere—either in his report or during deposition—does Kamins explain how the use or combination of legitimate and common sales practices somehow transforms this case into fraud. And because of the lengths to which Kamins goes to demonize TU in his report for using these techniques (which he admits are common and appropriate), it is clear that his testimony on these points will be used for no purpose other than to prejudice the jury against TU. Federal Rule of Evidence 403 "permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir. 2001). Because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it, . . . the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than lay witnesses." *Id.* (quoting *Daubert*, 509 U.S. at 595). Here, Kamins's first two opinions are both irrelevant and highly prejudicial, and they should be excluded on this basis as well.

### E.   Kamins Did Not Disclose the Foundation for His Opinions

Finally, Kamins should be excluded because he based a large part of his opinion on evidence that he did not disclose and that has not been produced in this litigation. Rule 26(a)(2)(B) requires an expert to disclose in his report all "facts or data considered by the witness in forming" his opinions. "Failure to comply with Rule 26(a)(2)'s requirements results in sanction: the offending party is not allowed

1  to introduce the expert witness's testimony as 'evidence on a motion, at a hearing,

2  or at a trial.'"  *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008)

3  (quoting Fed. R. Civ. P. 37(c)(1)).  "This sanction is 'automatic and mandatory'

4  unless the offending party can establish 'that its violation of Rule 26(a)(2) was

5  either justified or harmless.'"  *Id.*

6  During his deposition, Kamins testified that he reviewed over *one thousand*

7  TU student evaluations, even though the exhibit listing the documents he reviewed

8  spanned only a few pages.  Ex. 2 at 113:9–17.  Kamins accessed these evaluations

9  through an external website titled 98PercentApproval.com, which he did not

10  disclose in his report.  *Id.* at 110:13–119:16.  Even more significantly, the

11  evaluations available on that website have not been bates-stamped, so it was not—

12  and it *still* is not—possible for Kamins to identify for Defendant *which* evaluations

13  he reviewed.  Kamins can provide no justification for this omission from his report,

14  and the omission (which cannot be cured) certainly cannot be deemed "harmless"

15  given the significance of these data to Kamins's opinions.  Indeed, if Kamins really

16  reviewed one thousand evaluations, these materials would significantly eclipse the

17  other evidence he reviewed and disclosed in his report.  Because Kamins based a

18  large portion of his report on these evaluations—including the entirety of his third

19  conclusion, *see* Ex. 12 ¶¶ 110–18—his failure to provide the basis for his opinions

20  warrants his complete exclusion.

21  **VI.    CONCLUSION**

22  For all the foregoing reasons, the Report of Dr. Michael A. Kamins and

23  related testimony should be excluded from this action in its entirety.

24  Dated:  April 22, 2016          O'MELVENY & MYERS LLP
                                    DANIEL PETROCELLI
25                                  DAVID L. KIRMAN

26                                  By:   /s/ Daniel Petrocelli
                                          Daniel Petrocelli
27                                  Attorneys for Defendant
                                    DONALD J. TRUMP
28

DEF.'S MOT. TO EXCLUDE KAMINS
13-CV-2519-GPC(WVG)