EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

        Plaintiffs,

                                CASE NO.: 10 CV 0940 EIG (WVG)

-against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

        Defendants.

---------------------------------------------

VIDEOTAPED DEPOSITION of MICHAEL SEXTON

August 22, 2012

New York, New York

Reported by:
Eileen Mulvenna
CSR/RMR/CRR
Job No. 10003486

Exhibit 14
- 256 -

CONFIDENTIAL

Michael Sexton                                                      Makaeff v. Trump University

** CONFIDENTIAL ** CONFIDENTIAL **
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
CASE NO.: 10 CV 0940 EIG (WVG)
-------------------------------------x
TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

            Plaintiffs,
    -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

            Defendants.
-------------------------------------x
            August 22, 2012
            9:57 a.m.

    VIDEOTAPED DEPOSITION of MICHAEL SEXTON,
30(b)(6) Witness in the above-captioned matter,
taken by Plaintiffs, held at 725 Fifth Avenue,
New York, New York, before Eileen Mulvenna,
CSR/RMR/CRR, Certified Shorthand Reporter,
Registered Merit Reporter, Certified Realtime
Reporter and Notary Public of the State of
New York.

                                            Page 1

1    ** CONFIDENTIAL ** CONFIDENTIAL **
2    APPEARANCES:
3
4
5    ROBBINS GELLER RUDMAN & DOWD, LLP
     Attorneys for Plaintiffs
6        655 West Broadway
         Suite 1900
7        San Diego, California 92101
     BY:  RACHEL L. JENSEN, ESQ.
8        racheljj@rgrdlaw.com
9        -and-
10
11   ZELDES & HAEGGQUIST, LLP
         625 Broadway
12       Suite 906
         San Diego, California 92101
13   BY:  AMBER L. ECK, ESQ.
         ambere@zhlaw.com
14       AARON M. OLSEN, ESQ.
15       aarono@zhlaw.com
16
17   YUNKER & SCHNEIDER
     Attorneys for Defendants
18       655 West Broadway
         Suite 1400
19       San Diego, California 92101
     BY:  DAVID K. SCHNEIDER, ESQ.
20       dks@yslaw.com
21
22   ALSO PRESENT:
23
24       Richard Ramos, Videographer
25
                                            Page 2

1    ** CONFIDENTIAL ** CONFIDENTIAL **
2            STIPULATIONS
3
4        IT IS HEREBY STIPULATED AND AGREED,
5    by and between the attorneys for the respective
6    parties herein, that filing and sealing be and
7    the same are hereby waived.
8
9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form of the
11   question, shall be reserved to the time
12   of the trial.
13
14       IT IS FURTHER STIPULATED AND AGREED
15   that the within deposition may be signed and
16   sworn to before any officer authorized to
17   administer an oath, with the same force and
18   effect as if signed and sworn to before the
19   officer before whom the within deposition was
20   taken.
21
22
23
24
25
                                            Page 3

1            SEXTON - CONFIDENTIAL
2            THE VIDEOGRAPHER:  Good morning.
3    This is Tape No. 1 of the videotaped
4    deposition of Michael Sexton in the matter
5    of Tarla Makaeff, et al., versus Trump
6    University LLC, et al., in the United
7    States District Court for the Southern
8    District of California.
9        This deposition is being held at The
10   Trump Organization located at
11   725 5th Avenue, New York, New York 10022 on
12   August 22, 2012, at approximately 9:57 a.m.
13       My name is Richard Ramos and I'm the
14   legal video specialist.  The court reporter
15   is Eileen Mulvenna.
16       Will counsel please introduce
17   themselves beginning with the party
18   noticing this proceeding.
19       MS. JENSEN:  Yes.  Good morning.  My
20   name is Rachel Jensen from Robbins Geller
21   Rudman & Dowd, and I'm here representing
22   the plaintiffs.
23       MS. ECK:  Amber Eck of Zeldes &
24   Haeggquist representing the plaintiffs.
25       MR. OLSEN:  Aaron Olsen, Zeldes &
                                            Page 4

1 (Pages 1 to 4)

Exhibit 14
- 257 -

CONFIDENTIAL

Michael Sexton                                                                          Makaeff v. Trump University

| | |
|---|---|
| 1      SEXTON - CONFIDENTIAL<br>2 psychographics.<br>3    A.  It is.<br>4    Q.  What were your years of employment<br>5 there?<br>6    A.  I want to say 2000 to 2002.<br>7    Q.  And for all of these positions,<br>8 Accenture and then Digital Discovery and then<br>9 Install, did you leave these positions<br>10 voluntarily to pursue the next position?<br>11    A.  Yes, I did.<br>12    Q.  Then after Install, for what<br>13 companies did you work?<br>14    A.  I worked for -- I started a company<br>15 called Katon Direct.<br>16    Q.  Can you spell that?<br>17    A.  K-A-T-O-N.<br>18      It was called Katon Partners when we<br>19 launched it. And that's a -- that was a<br>20 technology-driven health care recruitment<br>21 company.<br>22    Q.  Can you explain that?<br>23    A.  Yes. So traditionally if you need<br>24 to hire a nurse, put an ad out on Monster or the<br>25 newspaper and you hope people see your ad and<br>                          Page 61 | 1      SEXTON - CONFIDENTIAL<br>2 apply for the job. Or you hire -- for a higher<br>3 level job, you may hire a headhunter to go out<br>4 and find somebody.<br>5      So for licensed professionals, you<br>6 can literally get everybody that legally can fill<br>7 that job. And what we did is we got the universe<br>8 of people that had the required licensure to fill<br>9 a specific job. And then rather than hope people<br>10 saw the ad, employers would come to us and say, I<br>11 want four registered nurses at this location.<br>12      We had all the licensed<br>13 professionals that can legally fill that role, so<br>14 we could very effectively and efficiently contact<br>15 everybody in a drive range around that location,<br>16 because commute time is a key indicator of job<br>17 satisfaction, and reach out to them and say, hey,<br>18 there's this job, are you interested?<br>19      So it's a much more proactive way to<br>20 make what people always refer to as that passive<br>21 job candidate -- make them aware that there's an<br>22 opening close to them.<br>23    Q.  And when did you start the company?<br>24    A.  Probably 2003 or late 2002,<br>25 somewhere in there.<br>                          Page 62 |
| 1      SEXTON - CONFIDENTIAL<br>2    Q.  And what was your position there?<br>3    A.  I was partner.<br>4    Q.  How many partners did you have?<br>5    A.  Three at the time.<br>6    Q.  And how many employees did you have?<br>7    A.  When I left, maybe a dozen.<br>8    Q.  When did you leave?<br>9    A.  It would have been the winter of<br>10 2004, so sometime before the new year.<br>11    Q.  And why did you leave?<br>12    A.  I left to start Trump University.<br>13    Q.  And do you still have an interest in<br>14 Katon?<br>15    A.  I do not.<br>16    Q.  Is this Katon -- is Katon still in<br>17 business?<br>18    A.  It is.<br>19    Q.  So do you -- strike that.<br>20      Did you sever all ties when you left<br>21 Katon in terms of equity interest and so forth?<br>22    A.  Yes, I did.<br>23    Q.  Accenture is still in business,<br>24 isn't it?<br>25    A.  Yes.<br>                          Page 63 | 1      SEXTON - CONFIDENTIAL<br>2    Q.  Digital Discovery?<br>3    A.  I don't know.<br>4    Q.  Install?<br>5    A.  No.<br>6    Q.  When did that company go out of<br>7 business?<br>8    A.  Shortly after 9/11.<br>9    Q.  Was it related to 9/11?<br>10    A.  Yes, it was.<br>11    Q.  Was it in one of the towers or --<br>12    A.  No, it was a funding issue. And<br>13 scheduled to close to allow us to expand. And<br>14 that environment -- post 9/11, nobody was lending<br>15 money -- or investing money.<br>16    Q.  Is that why you left and started<br>17 another company?<br>18    A.  Yes, it is.<br>19    Q.  Could you take me through and -- the<br>20 process of starting Trump University, whose idea<br>21 was Trump University?<br>22    A.  It was my idea.<br>23    Q.  And did you present that directly to<br>24 Mr. Trump?<br>25    A.  I did.<br>                          Page 64 |

16 (Pages 61 to 64)

Exhibit 14
- 258 -

CONFIDENTIAL

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

1   SEXTON - CONFIDENTIAL
2   Q.   How did you come to meet Mr. Trump?
3   A.   One of my former partner's
4   brother-in-law was a golfing friend of
5   Mr. Trump's.
6   Q.   Former partner's brother-in-law?
7   A.   Yes.
8   Q.   Was a golfing buddy?
9   A.   Yes.
10   Q.   And who was that?
11   A.   His name a Jonathan Spitalny.
12   Q.   Could you spell his last name.
13   A.   S-P-I-T-A-L-N-Y.
14   Q.   And was Jonathan involved in the
15   starting of Trump University as well?
16   A.   He was involved in the -- not in the
17   operational portion of starting the company, but
18   in the negotiations to start the company.
19   Q.   And when you say "negotiations," do
20   you mean negotiations with Mr. Trump?
21   A.   Yes, I do.
22   Q.   And how was he involved?
23   A.   He was present at the early
24   meetings, obviously he arranged for the early
25   meetings, and continued to be involved through --
Page 65

1   SEXTON - CONFIDENTIAL
2   through the negotiation of the contract.
3   Q.   And did he have an interest in Trump
4   University?
5   A.   Yes, he did.
6   Q.   Do you know what his interest was?
7   A.   I believe it's 3.5 percent.
8   Q.   Does he still have an interest in
9   Trump University?
10   A.   I don't know.
11   Q.   How did you have the idea to start
12   Trump University?
13   A.   The business was going well, and we
14   were looking for additional services that we
15   could provide to our target market health care
16   professionals.
17   Q.   I'm sorry, when you say "business,"
18   you mean Katon?
19   A.   Katon, yes.
20        And I started looking at
21   specifically the requirements for health care
22   professionals to get continuing education credits
23   to maintain a licensure and was exploring
24   offering those educational training products
25   through the Internet, an e-learning platform.
Page 66

1   SEXTON - CONFIDENTIAL
2   And that's where -- the genesis.
3        The idea was that -- running the
4   numbers found that the acquisition cost to get a
5   new customer in a pretty commoditized environment
6   was too high.  And so started thinking about what
7   other -- if there's a brand in that -- in that
8   industry you could license to differentiate
9   yourself from the other continuing education
10   providers.
11        And that's where -- that's what kind
12   of got the thinking if you can do it in that
13   area, why limit yourself just to health care?
14   Why not -- other small business owners that have
15   a need for business education that aren't
16   adequately being served today, if we could
17   license a brand that could cut through the
18   clutter and connect with small/midsize
19   businesses, that would be a compelling business.
20   Q.   What do you mean by "cut through the
21   clutter"?
22   A.   So if you're -- anybody that's tried
23   to market to small business owners or even
24   executives at midsize businesses, middle market
25   companies know that it's very -- it's difficult
Page 67

1   SEXTON - CONFIDENTIAL
2   to reach them because, you know, they're busy
3   people.  And if you had a brand, it would make --
4   it would make it much more compelling from a
5   marketing standpoint to be able to connect with
6   them and effectively communicate what you were
7   offering.
8   Q.   And the idea of brand, did that make
9   you think of Donald Trump?
10   A.   It did.  It was -- if I recall, it
11   was during the first season of The Apprentice.
12   And it seemed like a long time ago, but they
13   were -- made quite a splash then because there
14   were a number of courses being taught at
15   traditional four-year colleges, lessons learned
16   about the -- from The Apprentice, management
17   lessons from The Apprentice.
18        And it kind of caught my attention
19   that the brand had transcended real estate to be
20   something much bigger, more of an entrepreneurial
21   brand in many people's mind.  And I thought it
22   was -- from a brand equity standpoint, I thought
23   it would be a very effective -- very, very
24   effective way to connect with people.
25   Q.   I was just thinking who says that TV
Page 68

17 (Pages 65 to 68)

Exhibit 14
- 259 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | watching isn't productive. |
| 3 | A.   That's right. |
| 4 | Q.   So this came to you in a flash |
| 5 | thinking about The Apprentice? |
| 6 | A.   It did. |
| 7 | Q.   And -- and then -- and then Jonathan |
| 8 | put you in touch with Mr. Trump? |
| 9 | A.   He did. |
| 10 | Q.   And when was the first time you met |
| 11 | with Donald Trump? |
| 12 | A.   It would have been in 2004. I |
| 13 | imagine the summer of 2004. |
| 14 | Q.   And not to belabor the point, but in |
| 15 | that conversation, the first meeting, as it were, |
| 16 | was it you and Jonathan and Mr. Trump? |
| 17 | A.   And a partner of mine, Richard |
| 18 | Kaskel. |
| 19 | Q.   Who is Richard Kaskel? |
| 20 | A.   He was my partner at Katon Partners. |
| 21 | Q.   And did he also have an equity |
| 22 | interest in Trump University? |
| 23 | A.   No. |
| 24 | Q.   Did he have any role in Trump |
| 25 | University? |

Page 69

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | A.   Originally our strategy was to |
| 3 | license the brand. And he would have had a role |
| 4 | if we had gone down that path. We didn't, so he |
| 5 | didn't. |
| 6 | Q.   And what would -- I'm sorry. Is he |
| 7 | an attorney or -- |
| 8 | A.   No, no. He was just a business |
| 9 | person. |
| 10 | Q.   Okay. Okay. Why did you decide not |
| 11 | to go down -- I think you said that path? |
| 12 | A.   That path. |
| 13 | During the course of multiple |
| 14 | meetings with Mr. Trump and other members of the |
| 15 | Trump organization, Mr. Trump kind of -- it |
| 16 | changed at his direction from a licensing |
| 17 | agreement to an equity ownership. |
| 18 | Q.   And you mean, by "equity ownership," |
| 19 | his equity ownership? |
| 20 | A.   Correct. Rather than us raising |
| 21 | money in the financial markets and licensing his |
| 22 | brand to build the business, he wanted to put his |
| 23 | own money in. He thought it was a compelling |
| 24 | concept. And rather than an arm's length |
| 25 | license, he would, in fact, be equity partner. |

Page 70

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | Q.   And was he -- was his equity |
| 3 | interest about roughly 93 percent? |
| 4 | A.   92 1/2, I believe. No, you're |
| 5 | right, 93. No, I'm sorry, I don't remember. 92 |
| 6 | or 93. |
| 7 | Q.   Sure. |
| 8 | And do you recall how much of his |
| 9 | own money he invested? |
| 10 | MR. SCHNEIDER: I'm going to object. |
| 11 | The court's already ruled it's not |
| 12 | appropriate for the case. |
| 13 | I instruct you not to answer. |
| 14 | The court's already ruled on this, |
| 15 | Rachel. |
| 16 | MS. JENSEN: The court did not rule |
| 17 | as to the amount of money that he invested |
| 18 | in the company. |
| 19 | MR. SCHNEIDER: He did. You -- |
| 20 | you've asked in documents. You've asked |
| 21 | him redacted documents for his capital |
| 22 | contribution, how much money has been paid |
| 23 | to Mr. Trump, how much money was put into |
| 24 | the company. And every time the judge has |
| 25 | ruled, now twice, that monies to or from |

Page 71

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | Donald Trump are not relevant to your case. |
| 3 | MS. ECK: My recollection is that |
| 4 | the question was in regard to money paid to |
| 5 | Donald Trump and not in regard to money |
| 6 | that Donald Trump paid. |
| 7 | MR. SCHNEIDER: That's not accurate. |
| 8 | MS. JENSEN: That's correct. |
| 9 | MR. SCHNEIDER: You all brought a |
| 10 | motion seeking to get the capital |
| 11 | contributions on the limited liability |
| 12 | operating agreement. And you lost. That |
| 13 | included the capital contributions in the |
| 14 | limited -- in the operating agreement that |
| 15 | were redacted. And you asked the court to |
| 16 | remove the redaction so you could see the |
| 17 | contributions made by the partners, and the |
| 18 | court said no. |
| 19 | MS. JENSEN: My recollection is that |
| 20 | it was the monies that were paid to. But |
| 21 | again, you know, I want to keep moving, so |
| 22 | we'll reserve on that. And we might come |
| 23 | back to that. |
| 24 | BY MS. JENSEN: |
| 25 | Q.   So in your initial meetings, besides |

Page 72

18 (Pages 69 to 72)

Exhibit 14
- 260 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|

1     SEXTON - CONFIDENTIAL
2  asked for it this week, we produced it this
3  morning and --
4     (Discussion off the record.)
5  BY MS. JENSEN:
6     Q.   In case I didn't ask this question
7  on the record.
8     Again, I'm -- how much of a pay
9  reduction did you take in terms of dollar
10 amounts?
11    A.   10 percent.
12    (Discussion off the record.)
13    Q.   How were you compensated -- how were
14 you compensated by Trump University?
15    MR. SCHNEIDER: Are you asking for a
16 dollar amount? Are you trying to invoke
17 the objection? I'll make it. I'm not sure
18 if you're asking if he received a paycheck
19 every two weeks, or are you asking for the
20 dollar amount.
21 BY MS. JENSEN:
22    Q.   I'm asking -- I'll say were you paid
23 by a flat salary?
24    A.   I was paid a management fee.
25    Q.   Was that management fee set
                                        Page 101

1     SEXTON - CONFIDENTIAL
2  annually?
3     A.   It actually never changed from the
4  original agreement.
5     Q.   Was it an annual amount?
6     A.   Yes, it was. Paid out every two
7  weeks.
8     Q.   And was it contingent on revenues?
9     A.   No, it was not.
10    Q.   Was it contingent on profits?
11    A.   No, it was not.
12    Q.   Just to clarify, by "original
13 agreement," do you mean your employment
14 agreement?
15    A.   I do.
16    Q.   And I take it that your employment
17 agreement was part of the negotiations for Trump
18 University --
19    A.   Yes, it was.
20    Q.   -- we were talking about previously?
21    And I don't want to ask you
22 questions that I think I know the answers to, so
23 you were originally the president; correct?
24    A.   Correct.
25    Q.   And did your title ever change?
                                        Page 102

1     SEXTON - CONFIDENTIAL
2     A.   It did not.
3     Q.   Did your responsibilities or job
4  duties ever change?
5     A.   No, they did not.
6     MS. JENSEN: David, do you have
7  additional copies of the employment
8  agreement?
9     MR. SCHNEIDER: I think I did make a
10 couple of copies.
11    MS. JENSEN: Okay. That's a
12 document I do not have in the binders for
13 you because I just received it.
14    MR. SCHNEIDER: (Handing document to
15 the witness.)
16    MS. JENSEN: But I would like to
17 introduce this document as Exhibit No. 2.
18 It is entitled the "Employment Agreement,"
19 it is Bates ranges TU129757 to 71, which I
20 will ask the court reporter to mark as
21 Exhibit No. 2.
22    (Plaintiffs' Exhibit 2, Bates Nos.
23 TU129757 through 72, Employment Agreement,
24 marked for identification.)
25    (Discussion off the record.)
                                        Page 103

1     SEXTON - CONFIDENTIAL
2     MR. OLSEN: Can I have the Bates
3  numbers again?
4     MS. JENSEN: It's TU129757.
5  BY MS. JENSEN:
6     Q.   Mr. Sexton, is this the employment
7  agreement for your employment with Trump
8  University?
9     A.   Yes, it is.
10    Q.   If you can turn to the last page of
11 the document, which is -- I don't know -- do you
12 see the heading, "Schedule A"?
13    A.   Yes, I do.
14    Q.   And there is a list from number 1 to
15 10 for employees' duties and responsibilities?
16    A.   Uh-huh.
17    Q.   Does that fairly portray what your
18 duties and responsibilities were while at Trump
19 University?
20    (Witness peruses the exhibit.)
21    A.   Yes, it was -- yes, it does.
22    Q.   And were you the person primarily
23 responsible for each one of these duties and
24 responsibilities?
25    A.   Yes, I was.
                                        Page 104

26 (Pages 101 to 104)

www.aptusCR.com

Exhibit 14
- 261 -

1      SEXTON - CONFIDENTIAL
2      Q.   Looking at Schedule A, is there
3  anybody else who had primary responsibility for
4  these duties and responsibilities?
5      A.   Well, number 6, certainly Steven
6  Matejek, our controller.
7           Number 9, certainly our chief
8  marketing officer.
9      Q.   I'm sorry, that's Michael Bloom?
10     A.   Correct.
11          But other than that, yes. And,
12 look, number 3 was kind of a collaborative
13 effort.
14     Q.   Collaborative effort?
15     A.   With -- it's pretty high level
16 talking about business processes. If there was a
17 customer service business process, it would be
18 David Highbloom. If it was a marketing business
19 process, it would be Michael Bloom. But
20 certainly I worked in collaboration with them.
21     Q.   Thank you.
22          Where did you report location-wise?
23 Where did you show up every morning?
24     A.   Well, initially we didn't have
25 offices, so it was kind of pre -- pre venture.
                                            Page 105

1      SEXTON - CONFIDENTIAL
2  We worked out of here, this building, at times.
3  We -- again, I don't recall the exact date, but
4  we got offices at 40 Wall Street relatively
5  quickly. And that's where -- that's where we
6  remained in a different -- two different office
7  spaces there for the remainder of the term.
8      Q.   I'm sorry, so you had two different
9  office spaces at 40 Wall --
10     A.   We started in a very small space and
11 then, as we grew a bit, we got a slightly bigger
12 space.
13     Q.   Did you have an office at Trump
14 Organization -- you said in the beginning?
15     A.   No, we were never given an office.
16 If we needed to use a conference room, we'd use a
17 conference room.
18     Q.   Okay. Fair enough.
19          Did you report to anyone?
20     A.   You know, technically, I don't know.
21 I mean, technically, Mr. Trump is the managing
22 member. Practically speaking, Allen Weisselberg
23 is the CFO.
24     Q.   CFO of Trump Organization?
25     A.   Correct.
                                            Page 106

1      SEXTON - CONFIDENTIAL
2           Again, reporting is a little --
3  there's kind of the reporting from a -- the
4  operating agreement standpoint. You know, I
5  didn't report to anybody in Trump Organization
6  from an organizational hierarchy standpoint.
7      Q.   I'm sorry, I just want to make sure
8  I understand your question -- your answer.
9      A.   Sure.
10     Q.   So from an operating agreement
11 standpoint. So, again, are you referring to the
12 members?
13     A.   Correct. The LLC. So I reported --
14 inasmuch as I had to report the managing in
15 Schedule A to the managing member financial
16 results, I'm using report in one way. If you're
17 asking who -- from an organizational development
18 standpoint or hierarchy standpoint who I reported
19 to here, I didn't report to anybody.
20     Q.   So you did have a responsibility to
21 report the financials to the managing member?
22     A.   The overall performance of the
23 business.
24     Q.   Correct.
25          And then also I see, on number 10,
                                            Page 107

1      SEXTON - CONFIDENTIAL
2  there's a parenthetical next to "Negotiating
3  significant contracts."
4      A.   Uh-huh.
5      Q.   It says, "With approval of a
6  managing member or another person authorized by
7  Donald Trump."
8           What types of contracts would be
9  significant enough to warrant preapproval?
10     A.   The BSG contract would be a good
11 example. We certainly didn't have many, but
12 that's the one that sticks in my mind as --
13     Q.   Any others?
14     A.   Maybe the rent, the office lease
15 at -- yes, I'm sure the office lease at 40 Wall.
16 Other than that, I can't recall.
17     Q.   And then in terms of people who
18 reported to you, is it fair to say that everybody
19 else at Trump University ultimately reported to
20 you?
21     A.   Yes, it is.
22     Q.   Did you have anybody directly report
23 to you?
24     A.   Yes.
25     Q.   And who was that?
                                            Page 108

27 (Pages 105 to 108)

Exhibit 14
- 262 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | A.    David Highbloom, who is the chief |
| 3 | operating officer. I mean, it evolved over time, |
| 4 | right. So if you want a snapshot, towards the |
| 5 | end, it was Michael Bloom as the chief marketing |
| 6 | officer, Steven Matejek as the controller. I |
| 7 | guess April Neumann as the director of |
| 8 | operations. |
| 9 | (Discussion off the record.) |
| 10 | **Q.    Trump University was registered to** |
| 11 | **do business in New York; correct?** |
| 12 | A.    Yes. |
| 13 | **Q.    Was it registered to do business in** |
| 14 | **any other state?** |
| 15 | A.    Yes. |
| 16 | **Q.    What other states?** |
| 17 | A.    It's A long list. We had operations |
| 18 | in Illinois, where we had a -- our Greg Saunders, |
| 19 | who we spoke of earlier, was effectively our CTO, |
| 20 | lived and worked out of his home. |
| 21 | And Ben Mueller from Florida. |
| 22 | Chief learning officer by the name |
| 23 | of Roger Schank. |
| 24 | **Q.    Sorry, what was his title, chief** |
| 25 | **learning officer?** |

Page 109

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | A.    Learning officer, uh-huh. |
| 3 | **Q.    And could you spell Roger's last** |
| 4 | **name for the record?** |
| 5 | A.    I believe it's S-C-H-A-N-K. |
| 6 | We had a fulfillment, logistics kind |
| 7 | of pick, pack and ship fulfillment warehouse that |
| 8 | we contracted with out in Arizona. And then we |
| 9 | filed to do businesses in states where we were |
| 10 | going to appear in the course of business. |
| 11 | **Q.    Do you recall what states -- what** |
| 12 | **states you were registered with?** |
| 13 | A.    I would just be guessing, but |
| 14 | California, Florida, New York, New Jersey, |
| 15 | Maryland, Virginia. Every state where we would |
| 16 | routinely conduct business. |
| 17 | **Q.    And do you mean by "routinely** |
| 18 | **conduct business" the live events or --** |
| 19 | A.    Correct. Correct. And/or have a |
| 20 | presence. I think they call it nexus, where -- |
| 21 | where we had an employee or some kind of ongoing |
| 22 | operation like the logistics facility -- |
| 23 | **Q.    Sure.** |
| 24 | A.    -- in Phoenix. |
| 25 | **Q.    Did you have any employees in** |

Page 110

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | California? |
| 3 | A.    No, we did not. |
| 4 | **Q.    Did you have any other nexus in** |
| 5 | **California?** |
| 6 | A.    No, we did not. |
| 7 | **Q.    Is there an entity called Trump U** |
| 8 | **CA?** |
| 9 | A.    I believe there is, yes. |
| 10 | **Q.    And what was its relationship to** |
| 11 | **Trump University LLC?** |
| 12 | A.    I didn't deal with the specific |
| 13 | corporations, but I believe it was a company that |
| 14 | we set up to ensure we paid the proper taxes in |
| 15 | Canada. I know -- again, I wasn't directly |
| 16 | involved with that, but I know we had to go |
| 17 | through a fair amount of paperwork, |
| 18 | administrative to do business in Canada. That |
| 19 | was part of it. |
| 20 | **Q.    So the "CA" stands for Canada?** |
| 21 | A.    Yes, it does. |
| 22 | **Q.    Besides the offices at 40 Wall** |
| 23 | **Street, did Trump University also have an office** |
| 24 | **at 399 Pine Road, Briarcliff Manor, New York?** |
| 25 | A.    No. |

Page 111

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | **Q.    Do you know -- does that address** |
| 3 | **ring a bell?** |
| 4 | A.    It doesn't to me. I know Mr. Trump |
| 5 | has I think a golf course in Briarcliff Manor, |
| 6 | but I don't know the address of it. |
| 7 | **Q.    Moving to the Trump University** |
| 8 | **operating agreement, did Trump University** |
| 9 | **entered -- enter into a license with Donald Trump** |
| 10 | **to use the name Trump?** |
| 11 | A.    I don't recall if that was a |
| 12 | specific part of the operating agreement. |
| 13 | **Q.    I'm going to direct your** |
| 14 | **attention --** |
| 15 | A.    Should I do something with this? |
| 16 | **Q.    You can put it actually back into** |
| 17 | **the binder -- I'm sorry, that one wasn't in the** |
| 18 | **binder before. Could you put it in the left-hand** |
| 19 | **pocket right there.** |
| 20 | (Witness complies.) |
| 21 | **Q.    That would be great. Thanks.** |
| 22 | I'd like to direct your attention to |
| 23 | a document labeled TU62027 through 56. Perhaps |
| 24 | your counsel can help you -- |
| 25 | MR. SCHNEIDER: Which binder? |

Page 112

28 (Pages 109 to 112)

Exhibit 14
- 263 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

1      SEXTON - CONFIDENTIAL
2          MS. JENSEN: These are all labeled
3      numerically, and it says on the binder what
4      the Bates ranges are.
5          THE WITNESS: This goes up to 56
6      or --
7          MR. SCHNEIDER: So what is the
8      number?
9          MS. JENSEN: It should be the one
10     after that.
11     62027.
12         We'll ask that it be marked as
13     Exhibit No. 3.
14         (Plaintiffs' Exhibit 3, Bates Nos.
15     TU62027 through 56, Operating Agreement,
16     marked for identification.)
17     BY MS. JENSEN:
18     Q.   Could you please turn to page No. 6.
19         I'm sorry, before we get there, do
20     you recognize that this is the operating
21     agreement of Trump University?
22     A.   It appears to be, yes.
23     Q.   Turning to page No. 6, do you see
24     the heading for "Name"?
25     A.   Yes, I do.

Page 113

1      SEXTON - CONFIDENTIAL
2      Q.   It says that the company will enter
3      into a license agreement with Trump, which
4      states, among other things, the rights of the
5      company for the use of the name "Trump" as part
6      of the name of the company in the form and on the
7      terms satisfactory to the manager?
8      A.   Yes, I do.
9      Q.   Does that refresh your recollection
10     as to whether there was a license agreement?
11     A.   Yes, appears to be.
12     Q.   Whose idea was it to use the name
13     Trump in the name of the organization?
14     A.   It was mine. We wouldn't have
15     approached the Trump Organization and Donald
16     Trump specifically unless we intended to use that
17     name as part of the branding.
18     Q.   So that was always part of the plan?
19     A.   Right.
20     Q.   To which -- it sounds like Mr. Trump
21     agreed?
22     A.   Yes, he agreed.
23     Q.   Why did you want to use the name
24     Trump? I understand that it's -- from your prior
25     testimony, I'm not trying to misstate anything,

Page 114

1      SEXTON - CONFIDENTIAL
2      it was for brand purposes. Can you explain that
3      a little bit more?
4      A.   We thought it was a very
5      aspirational and inspirational brand that could
6      motivate people. And going back to the earlier
7      testimony, at this point in time, the Trump brand
8      really transcended real estate.
9          And there was actually a survey --
10     we'd done a fair amount of research into what
11     brands really do represent the best of
12     entrepreneurship in America. And there was a
13     survey done by a recognized company, I forget,
14     maybe it was Microsoft, and Trump was the number
15     two recognized brand for entrepreneurship very
16     specifically in America.
17         And we felt it was the most
18     compelling brand out there that would -- that
19     would be accessible to a broad range of people
20     who would understand kind of instantly when you
21     put that name what it stood for.
22     Q.   Did you keep that survey in your
23     records?
24     A.   I don't recall. I'm sure it was
25     referenced in -- you know, in early documents.

Page 115

1      SEXTON - CONFIDENTIAL
2      Q.   Do you remember the name of the
3      survey?
4      A.   You know, I believe it was Intuit,
5      actually. I believe it was Intuit who conducted
6      the survey.
7      Q.   You don't recall the name of the
8      survey, sitting here?
9      A.   No. That was seven years ago.
10     Q.   Was the survey released in 2004?
11     A.   I believe it's 2004.
12     Q.   Just curious, what was the number
13     one?
14     A.   I believe it was Bill Gates.
15     Q.   Would have made sense, if it was a
16     Microsoft survey.
17     A.   That's why I was thinking Microsoft.
18     Q.   Right.
19     A.   But, again, it wasn't lost on us
20     that colleges -- four-year colleges and some
21     community colleges were actually teaching courses
22     based on lessons learned from the program. So it
23     clearly -- clearly people were motivated by it,
24     so we thought it was a very, very good brand.
25     Q.   And by "motivated," do you mean

Page 116

29 (Pages 113 to 116)

Exhibit 14
- 264 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

1   SEXTON - CONFIDENTIAL
2   motivated to buy?
3       A.    Motivated to do -- to act. We did a
4   fair amount of research on small business owner
5   market. And historically, it's been a very, very
6   difficult market to crack because small business
7   owners are typically more worried about making
8   payroll and the day-to-day operations of the
9   business as opposed to investing in building
10  their education and training to grow the
11  business.
12      And so many companies had kind of
13  gone down that path and been frustrated by --
14  even though everybody agrees -- surveys will show
15  they know they need to do specific things to
16  improve their financial performance and grow the
17  business, but they don't have time to do it.
18      So we were looking for something
19  that was aspirational that would get people to
20  get up and act.
21      Q.    And, I'm sorry, by "act," do you
22  mean sign up for the program?
23      A.    To engage in the training and
24  education, right.
25      Q.    Okay.  So -- I mean, the end result
                                          Page 117

1   SEXTON - CONFIDENTIAL
2   will.
3       MS. JENSEN: I'm not harassing.  I'm
4   absolutely not harassing.  So let me ask my
5   questions and let him give me the answers.
6   And right now you're -- you're coaching
7   him, so --
8       MR. SCHNEIDER: No, he's answered
9   it -- I let him answer twice, and then on
10  the third time, you're trying to
11  recharacterize it.  That's improper.
12      MS. JENSEN: No, I'm not trying to
13  recharacterize it at all.  I'll trying to
14  flush it out.
15      I think the question is still
16  pending.
17      (Record read.)
18      THE WITNESS: Again, we were kind of
19  thinking about it.  When you build a
20  business, you have to understand who your
21  market is and what their need is.  And if
22  their need's not currently being met by
23  other products or services on the market,
24  then there's an opportunity.
25      So the opportunity for us was to get
                                          Page 119

1   SEXTON - CONFIDENTIAL
2   would be to buy the product; right?
3       MR. SCHNEIDER: Well, he's answered
4   this two or three times now, Rachel.  You
5   keep asking.  He said it's to do
6   something --
7       MS. JENSEN: I know.  I understand.
8   I'm trying to flush it out, David.
9       MR. SCHNEIDER: What you want is the
10  answer that -- what you want is the answer
11  to buy, but he's twice now told you that's
12  not what it was.  He said it's to do
13  something, to get businesses to move
14  into --
15      MS. JENSEN: No, I understand.  I'm
16  trying to flush it out further.  So that's
17  what --
18      MR. SCHNEIDER: That's not what your
19  question was.  You said, it's this; right?
20  And he said, no, it's X.  And you go, okay,
21  but really it's this; right?  And he said,
22  no.  And you said, okay, but it's to buy --
23      MS. JENSEN: Are you instructing
24  your client not to answer?
25      MR. SCHNEIDER: If you harass him, I
                                          Page 118

1   SEXTON - CONFIDENTIAL
2   people engaged in training and education
3   with a specific purpose of building their
4   business.  So when we talk about acting and
5   motivating, we were trying to act -- get
6   small business owners to act on their own
7   behalf to build their skill base so that
8   they could grow their business and achieve
9   their goals.
10  BY MS. JENSEN:
11      Q.    And they -- they would do so how?  I
12  guess I'm not understanding the end --
13      A.    Sure.
14      Q.    -- the end result here.
15      A.    So the end result is, if I can give
16  a store owner in Idaho an opportunity to take a
17  marketing class from Don Sexton, a tenured
18  professor at Columbia Business School, for $300,
19  I want to do everything I can to get him to take
20  that class because that class is fundamentally
21  going to change the way he approaches his
22  business.
23      And that's not -- that was never
24  available anywhere at that time.  And to the best
25  of my knowledge, you start seeing a little bit of
                                          Page 120

30 (Pages 117 to 120)

Exhibit 14
- 265 -

SEXTON - CONFIDENTIAL

1  SEXTON - CONFIDENTIAL
2  it being available now, but that was a very
3  compelling value proposition from my standpoint.
4  Q.   And so for purposes of this
5  hypothetical, did Don Sexton offer these courses
6  through Trump University?
7  A.   Yes, he did.
8  Q.   Online? They're online courses?
9  A.   Yes.
10 Q.   Did he ever teach at a live event?
11 A.   No. We specifically wanted him as a
12 subject matter expert for the e-learning courses.
13 Q.   Besides the equity that you
14 discussed earlier as to Donald Trump, did he --
15 was there consideration given on behalf of Trump
16 University to obtain the license agreement?
17      MR. SCHNEIDER: Objection. Vague.
18      THE WITNESS: No. Everything was
19 included in this operating agreement.
20 BY MS. SEXTON:
21 Q.   Okay. Was -- the operating
22 agreement, was that written up by Trump
23 Organization?
24 A.   Yes, it was.
25 Q.   Jason Greenblatt?
                                          Page 121

1  SEXTON - CONFIDENTIAL
2  A.   Yes.
3  Q.   Do you have an understanding at that
4  time as to why Trump Organization was providing
5  legal services for Trump University's operating
6  agreement? Was there an agreement that Trump
7  Organization would provide legal services for
8  Trump University?
9  A.   I can't talk to what happened before
10 the formation of the company, how Greenblatt was
11 acting on behalf of the managing member. I don't
12 know. I will say subsequent to that, we had --
13 you know, we used one of the few things we used
14 the Trump Organization for as a shared service
15 was the legal department, if that's your
16 question.
17 Q.   Yes. Thank you.
18 A.   For part of our agreements.
19 Q.   Was that in a side agreement or in
20 writing anywhere?
21 A.   No, it wasn't. No.
22 Q.   I understand that you left the
23 company, according to your testimony today,
24 July 31, 2010. At that time, were there
25 discussions about filing for bankruptcy?
                                          Page 122

1  SEXTON - CONFIDENTIAL
2  A.   Just to clarify, that's my last
3  formal day. I helped with transition. Obviously
4  no compensation, but helped manage a transition
5  for, you know, I don't know a month and a half
6  after that, something like that, as-needed.
7      Were there discussions about
8  bankruptcy?
9      MR. SCHNEIDER: Those would be
10 discussions outside of the presence of any
11 counsel.
12     THE WITNESS: I can't think of any
13 time we discussed that outside of the
14 presence of counsel.
15 BY MS. JENSEN:
16 Q.   Do you know whether there's an
17 ongoing discussion about whether to file for
18 bankruptcy on behalf of Trump University?
19     MR. SCHNEIDER: Objection.
20 Foundation.
21     And, first, I doubt there's a
22 foundation, but -- about what's currently
23 going on, but any information that you
24 personally have unrelated to counsel --
25     THE WITNESS: I have no information.
                                          Page 123

1  SEXTON - CONFIDENTIAL
2      MS. JENSEN: Just for the future,
3  David, if you could please finish -- I
4  mean, wait to start talking until after I
5  finish my question. I was still asking my
6  question. So I want to make sure we have a
7  clean record for this deposition.
8      MR. SCHNEIDER: Well, the question
9  said, "Do you know whether there's any
10 ongoing discussion about whether to file
11 for bankruptcy on behalf of Trump
12 University?"
13     And then I made my objection on
14 foundation. So were you not finished with
15 that question?
16     MS. JENSEN: You were starting to
17 talk before I had finished that question.
18 So apparently we have a very proficient
19 court reporter who can still clean it up.
20 But I'm saying for a clean record --
21     MR. SCHNEIDER: Sure.
22     MS. JENSEN: -- and also for
23 courtesy, if you could just please wait
24 until I've finished, I'd appreciate it.
25 That's all I'm asking.
                                          Page 124

31 (Pages 121 to 124)

Exhibit 14
- 266 -

CONFIDENTIAL

1      SEXTON - CONFIDENTIAL
2 to do. We were the exact opposite.
3      And that was our position, was it's
4 not about ivy tower. It's about practical, at
5 the time very cost-effective, very, very
6 high-quality education delivered tactically and
7 quickly to your computer. You know, so, no, I
8 don't -- we went to great pains to make it clear
9 this wasn't my intent, it wasn't traditional
10 education.
11     **Q.  It was for e-learning?**
12     A.  Correct. Not only e-learning, this
13 is continuing ed for working adults. And this is
14 very practically focused education to help build
15 specific skills that could help business people
16 achieve their goals.
17     **Q.  And you've used the term "continuing**
18 **education" a couple of times. To be clear, did**
19 **Trump University offer any credits for continuing**
20 **legal requirements -- I mean, continuing**
21 **education requirements?**
22     A.  "Continuing education" is a very
23 broad term. It doesn't -- a portion of it infer
24 continuing ed credits; but continuing ed is --
25 you can go to a learning annex and you can take
                                Page 157

1      SEXTON - CONFIDENTIAL
2 continuing ed course; right?
3      We -- we were certified by the -- by
4 IACAT to offer continuing ed credits. It's
5 I-A-C-A-T. I forget what the acronym stands for,
6 but we went through that certification process
7 and received -- received approval grant
8 continuing ed credits for -- for our courses.
9     **Q.  Did Trump University ever seek**
10 **accreditation to become a university?**
11     A.  No, never.
12     **Q.  And besides the names Trump**
13 **University LLC, Trump University CA LLC, and**
14 **Trump Entrepreneur Initiative LLC, did Trump**
15 **University ever operate under another name?**
16     A.  I believe there's another name in
17 Canada. Again, I believe that Delaware Corp. --
18 there was a Canadian -- they don't call them LLCs
19 out there, they call them something else.
20 Something else. But I believe that fed into the
21 Delaware Corp. And I believe we called it Trump
22 Education in Canada. So that would be the only
23 other name that would appear, that I can recall.
24     **Q.  Was it Trump Education, perhaps?**
25     A.  Trump Education, but it's Trump
                                Page 158

1      SEXTON - CONFIDENTIAL
2 Education like U -- ULC or something.
3     **Q.  Was the brand name Trump U used in**
4 **Maryland and the D.C. area?**
5     A.  We did use Trump U in certain
6 states.
7     **Q.  Why was that term used in certain**
8 **states?**
9     A.  I believe the states that used that
10 were additional states that regulated the word
11 "university."
12     **Q.  When you say "additional states," do**
13 **you mean besides New York?**
14     A.  Yes.
15     **Q.  Why did you feel the need to use**
16 **Trump U instead of Trump University in those**
17 **states?**
18     A.  I think in Maryland, we may have
19 gotten a call from the education department,
20 something like that. I guess Massachusetts,
21 probably something similar. And we just agreed
22 to change, and the -- and the state was happy
23 with that.
24     **Q.  So to be clear, did you start off**
25 **using the term "Trump University" in those states**
                                Page 159

1      **SEXTON - CONFIDENTIAL**
2 and then you changed that --
3     A.  Yes, we did.
4     **Q.  -- after you got that phone call?**
5     A.  Yes.
6     **Q.  And in -- in New York, it's my**
7 **presumption you didn't get a call until May of**
8 **2010, or did you get a call before then from --**
9     A.  No, we got a call -- if it's --
10 spring of 2010, sometime in that time frame.
11     **Q.  Right.**
12     A.  Yes. And it was brought to our
13 attention that there was an issue with the name
14 and we quickly changed it.
15     **Q.  Do you have an understanding of**
16 **why -- why they waited until spring of 2010?**
17     MR. SCHNEIDER: Objection. Calls
18 for speculation.
19     THE WITNESS: When was this -- when
20 was this lawsuit filed?
21     MR. SCHNEIDER: April or May of
22 2010.
23     THE WITNESS: I would suspect that
24 was the cause for . . .
25                                  Page 160

40 (Pages 157 to 160)

Exhibit 14
- 267 -

CONFIDENTIAL

Michael Sexton                                          Makaeff v. Trump University

| | |
|---|---|
| 1   SEXTON - CONFIDENTIAL | 1   SEXTON - CONFIDENTIAL |
| 2   BY MS. JENSEN: | 2   Q.   Who created that document? |
| 3   Q.   That's fine. Anyway, it doesn't | 3   A.   David Highbloom did, with assistance |
| 4   matter what I think. | 4   from April Neumann. |
| 5   A.   I would suspect. I don't know. | 5   Q.   Do you know when -- |
| 6   Q.   Okay. Okay. Sure. | 6   A.   Probably others within that team. |
| 7   How was the name Trump Entrepreneur | 7   Q.   Do you know when it was created? |
| 8   Initiative chosen? | 8   A.   I believe the first one was created |
| 9   A.   We brainstormed a number of | 9   prior to an annual meeting in Atlanta, Georgia in |
| 10   different names, shared them with Mr. Trump. And | 10   I believe December of 2008. |
| 11   I think we all agreed that Trump Entrepreneur | 11   Q.   Was it updated over time? |
| 12   Initiative captured -- was kind of a very | 12   A.   It was. It was -- it was treated as |
| 13   mission-oriented name that captured what we were | 13   kind of a living document that evolved as we |
| 14   trying to do, to create a creative generation of | 14   added regulations, rules. I know the big updates |
| 15   entrepreneurs out there. | 15   came -- in addition to updates over time, the big |
| 16   Q.   So that decision was made in | 16   updates came prior to annual training. So that |
| 17   conjunction with Donald Trump? | 17   would have been December of '09 and December of |
| 18   A.   Yes, it was. | 18   '10 as well, in New Orleans and Las Vegas, |
| 19   Q.   And who else contributed to that | 19   respectively. |
| 20   decision? | 20   Q.   I'm sorry, were there annual |
| 21   A.   Michael Bloom. I know Mr. Trump | 21   meetings after you left in July 2010? |
| 22   asked other people's opinions as well internally. | 22   A.   No. Did I mess up the dates again? |
| 23   Q.   Are you familiar with a document | 23   Q.   That's okay. |
| 24   called the playbook? | 24   A.   Move all those back again. |
| 25   A.   Yes, I am. | 25   Q.   So Atlanta 2007? |
| Page 161 | Page 162 |

| | |
|---|---|
| 1   SEXTON - CONFIDENTIAL | 1   SEXTON - CONFIDENTIAL |
| 2   A.   Yes. | 2   amount of sense; but at the end of the day, the |
| 3   Q.   New Orleans in 2008? | 3   brand was critical to the business. |
| 4   A.   Yes. | 4   Q.   When the New York Department of |
| 5   Q.   And Las Vegas in 2009? | 5   Education contacted Trump University, do you know |
| 6   A.   Thank you, yes. That also solves | 6   whether it did so by letter? |
| 7   the mystery. | 7   A.   It did so by letter, yes. |
| 8   Q.   You threw me off there. | 8   Q.   And to whom was it addressed? Do |
| 9   A.   Those dates are killing me. | 9   you know? Was it addressed to you? |
| 10   Q.   Okay. And what was the purpose of | 10   A.   I believe it was. I believe it was. |
| 11   the playbook? | 11   Q.   What did Trump University do in |
| 12   A.   It was -- it was an aggregation of | 12   response to the letter? |
| 13   all the standard operating procedures, rules, | 13   A.   We spoke to Joseph Frey at the |
| 14   regulations that governed how we as an | 14   Department of Education. |
| 15   organization behaved and acted out in the field. | 15   Q.   Can you spell Joseph's name for the |
| 16   Q.   Going back to the name, when you | 16   record? |
| 17   were changing the name to Trump Entrepreneur | 17   A.   Last name F-R-E-Y. |
| 18   Initiative, did you consider any names that did | 18   We obviously referred it immediately |
| 19   not have Trump in them? | 19   to counsel as well. |
| 20   A.   No, we did not. | 20   Q.   By "counsel," who do you mean? |
| 21   Q.   And why was it important to retain | 21   A.   George Sorial. |
| 22   the name Trump? | 22   Q.   George Sorial, for the record, is |
| 23   A.   We believed it had brand equity. | 23   with? |
| 24   There was value to it. Certainly from a | 24   A.   Trump Organization. |
| 25   continuity standpoint, it made a tremendous | 25   Q.   And did you -- did you -- did you |
| Page 163 | Page 164 |

41 (Pages 161 to 164)

Exhibit 14
- 268 -

CONFIDENTIAL

Michael Sexton                                      Makaeff v. Trump University

| | SEXTON - CONFIDENTIAL | | SEXTON - CONFIDENTIAL |
|---|---|---|---|
| 1 | SEXTON - CONFIDENTIAL | 1 | SEXTON - CONFIDENTIAL |
| 2 | ever respond by letter or in writing? | 2 | A.   Yes. |
| 3 | A.   I didn't. | 3 | Q.   So to tie this up, in -- the upshot |
| 4 | Q.   Do you know whether Trump University | 4 | of this investigation, as I understand it, was |
| 5 | did? | 5 | that Trump University changed its name; correct? |
| 6 | A.   I don't know. I imagine we did. I | 6 | A.   (Witness nods head in the |
| 7 | don't know. | 7 | affirmative.) |
| 8 | Q.   Do you know whether any documents | 8 | Q.   Were there any other consequences or |
| 9 | were produced to the New York Department of | 9 | actions taken as a result of that investigation? |
| 10 | Education? | 10 | A.   No. |
| 11 | A.   I don't believe so, but I don't know | 11 | Q.   Were there any fines imposed? |
| 12 | for sure. | 12 | A.   No. |
| 13 | Q.   Do you know who would know? | 13 | Q.   Penalties? |
| 14 | A.   George Sorial. | 14 | A.   No. |
| 15 | Q.   Would -- George Sorial would also | 15 | Q.   Anything else? |
| 16 | know if there was any letter of response to the | 16 | A.   No. |
| 17 | New York Department of Education? | 17 | Q.   Besides the companies that we've |
| 18 | A.   Yes. | 18 | discussed, does Trump University have any parent |
| 19 | Q.   And to your understanding, did the | 19 | company? |
| 20 | New York Department of Education notify Trump | 20 | A.   No. |
| 21 | University that the use of the term "university" | 21 | Q.   Actually, let me take that |
| 22 | violated the rules of the board of regents? | 22 | disclaimer out of there. |
| 23 | A.   Yes. | 23 | Does Trump University have a parent |
| 24 | Q.   And, again, that was by a letter as | 24 | company? |
| 25 | well, that same letter that you received? | 25 | A.   No. |
| | Page 165 | | Page 166 |

| | SEXTON - CONFIDENTIAL | | SEXTON - CONFIDENTIAL |
|---|---|---|---|
| 1 | SEXTON - CONFIDENTIAL | 1 | SEXTON - CONFIDENTIAL |
| 2 | Q.   Does it have any subsidiaries? | 2 | we agreed to pilot it to -- where they would |
| 3 | A.   Again, I would direct you to Steve | 3 | market a coaching program, a real estate coaching |
| 4 | Matejek. The only one I can think of is the | 4 | program under the Trump University brand. And |
| 5 | Canadian entity, which, again, I believe was | 5 | they would incur the costs to market it. And |
| 6 | called Trump Education, I believe it's ULC up | 6 | then they demonstrated to us they had expertise |
| 7 | there, which I believe is a wholly owned | 7 | in that area. They would sell coaching programs |
| 8 | subsidiary of Trump University LLC. | 8 | and they would deliver coaching programs |
| 9 | Q.   Does Trump University have any other | 9 | specifically in the area of real estate. |
| 10 | affiliates? | 10 | Q.   And was it done under Prosper's name |
| 11 | A.   No, not that I'm aware of. | 11 | or under Trump University's name? |
| 12 | Q.   Or has it throughout its history? | 12 | A.   Trump University's name. |
| 13 | A.   No. | 13 | Q.   And were there any agreements, |
| 14 | Q.   What is Prosper, Incorporated, | 14 | written agreements, between Trump University and |
| 15 | P-R-O-S-P-E-R? | 15 | Prosper which memorialized that relationship? |
| 16 | A.   Prosper was -- it is a -- they're | 16 | A.   There was an agreement for a pilot. |
| 17 | kind of a sales and marketing partner that will | 17 | I believe it was -- it covered kind of a test, |
| 18 | work with branded entities and provide -- kind of | 18 | like a memo of understanding, that kind of thing. |
| 19 | partner to provide marketing and sales and -- | 19 | Q.   And who was primarily responsible |
| 20 | marketing and sales support as well as execution | 20 | for negotiating that -- executing that? |
| 21 | of specifically coaching. | 21 | A.   I was. |
| 22 | Q.   So getting a little more specific, | 22 | Q.   And did Trump University make a |
| 23 | what did Prosper provide for Trump University? | 23 | portion of the revenues? |
| 24 | A.   So early, and I guess in 2005 it | 24 | A.   Correct. So that was a revenue |
| 25 | would have been, they made a proposal to us, and | 25 | share. |
| | Page 167 | | Page 168 |

42 (Pages 165 to 168)

Exhibit 14
- 269 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| | |
|---|---|
| 1   SEXTON - CONFIDENTIAL | 1   SEXTON - CONFIDENTIAL |

1    SEXTON - CONFIDENTIAL
2    okay. And, if they're not okay, then we would
3    have a conversation and also give the instructor
4    coaching on what -- what was the appropriate
5    thing to say, if any, at the time.
6       Q.   Do you know what those reports were
7    called?
8       A.   We didn't call them anything. It
9    was kind of a process. They were just compliance
10   review. I guess compliance review.
11      Q.   Okay. You didn't just make that up,
12   did you?
13      A.   It sounded right, so I'm going with
14   it. I believe it was called compliance review.
15      Q.   Okay. Do you know -- do you know
16   which employees did those reviews?
17      A.   So outside counsel -- you're talking
18   about the initial review of either the transcript
19   and/or audio?
20      Q.   The initial --
21      A.   Outside counsel initially did them.
22   And then two outsourced partners did them that
23   weren't -- it wasn't a full-time job. It
24   was . . .
25      Q.   But the -- but the documents -- the
                                                Page 189

1    SEXTON - CONFIDENTIAL
2    recordings would have been on the Trump
3    University system; right?
4       A.   Correct.
5       Q.   And the compliance reviews would
6    have been on the Trump University system?
7       A.   Yes. They would have been, yes.
8       Q.   Okay.
9       A.   And by "system," I mean they would
10   have been -- a lot of those would have ended up
11   on my hard drive. There wasn't any system.
12   There wasn't a like shared server anywhere. They
13   would have ended up on my hard drive if I was the
14   one giving feedback back to the instructor.
15      Q.   Okay. There was a server at Trump
16   University, correct, or were there only a series
17   of hard drives?
18      A.   I believe -- I only used my hard
19   drive. I believe there was a shared server
20   that -- Matejek I think set up a shared server
21   for his finance team. Honestly, I don't recall.
22   There may have been, actually. Now I'm sitting
23   here, I actually don't recall. I think there
24   was. It wasn't -- it wasn't resident there. It
25   was --
                                                Page 190

1    SEXTON - CONFIDENTIAL
2       MR. SCHNEIDER: Don't speculate.
3    Just testify to what you know.
4       THE WITNESS: Okay. Got it.
5       (Discussion off the record.)
6    BY MS. JENSEN:
7       Q.   Did you -- you reviewed the
8    compliance reviews; correct?
9       A.   Most of them. David would have
10   reviewed some as well. Kind of divide and
11   conquer on that.
12      Q.   And based on your review, did you
13   generate any correspondence or documents?
14      A.   No. Those were important. We
15   picked up the phone immediately and had a
16   one-on-one with the instructor so they understood
17   exactly where we're coming from, our position.
18      MS. JENSEN: I see that we are out
19   of time on the tape. Why don't we go ahead
20   and change the tape.
21      THE VIDEOGRAPHER: The time is 3:32
22   and we're off the record.
23      (Recess from the record.)
24      THE VIDEOGRAPHER: The time is 4:07.
25   This begins Tape No. 4 of the videotaped
                                                Page 191

1    SEXTON - CONFIDENTIAL
2    deposition of Michael Sexton.
3    BY MS. JENSEN:
4       Q.   Mr. Sexton, during the break, we
5    discussed there might be some ambiguity about the
6    relationship between Trump University LLC and
7    Trump University CA LLC. If there was something
8    you wanted to clarify from your testimony, I
9    invite you to do so.
10      A.   There may have been a misconception
11   that monies flowed from Trump University LLC into
12   the Canadian entity. And to the best of my
13   knowledge, other than some small monies to seed
14   that account, that wasn't the case. Monies
15   flowed from the other way.
16          So when we had events in Canada,
17   there's a bank account in Canada and we paid for
18   the cost of those events and taxes, obligations
19   for those events out of that account, and
20   whatever balance remained flowed back to the LLC.
21   So I just wanted to make that clear.
22      Q.   That is helpful. Thank you.
23          Before we broke, we went on break,
24   we discussed the compliance process. First I
25   wanted to establish a time frame for that
                                                Page 192

48 (Pages 189 to 192)

www.aptusCR.com

Exhibit 14
- 270 -

CONFIDENTIAL

Michael Sexton                                           Makaeff v. Trump University

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | **SEXTON - CONFIDENTIAL** |
| 2 | compliance process. |
| 3 | When was that compliance process |
| 4 | instituted? |
| 5 | A.   Very early in the -- in our |
| 6 | launching of the -- our live events, Trump |
| 7 | University live events. I believe we recorded |
| 8 | them from the get-go. And the policy continued |
| 9 | to be refined over time, but the bulk was in |
| 10 | place very early in our live events -- our live |
| 11 | events -- staging our live events. |
| 12 | **Q.   Was that in the 2007 time frame?** |
| 13 | A.   I would imagine. I don't recall the |
| 14 | exact date, but I would imagine. |
| 15 | **Q.   And when did Peter Hoppenfeld come** |
| 16 | on board? |
| 17 | A.   As outside counsel? |
| 18 | **Q.   Yes.** |
| 19 | A.   Again, I don't recall the exact |
| 20 | date. I would say sometime in 2008. |
| 21 | **Q.   And so up until he came on board,** |
| 22 | was somebody reviewing the recordings for |
| 23 | compliance? |
| 24 | A.   I don't recall. |
| 25 | **Q.   And was Peter Hoppenfeld brought on** |

Page 193

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | **SEXTON - CONFIDENTIAL** |
| 2 | board because of concerns about FTC regulations? |
| 3 | A.   No, no. He was -- he was -- he is a |
| 4 | very well-recognized expert in this industry. |
| 5 | He's been in the industry for 25, 30 years. So |
| 6 | we leapt at the chance to work with him when he |
| 7 | left his previous employer. Not that we employed |
| 8 | him. We used him as outside counsel, but when we |
| 9 | had the opportunity, we wanted to do that. |
| 10 | **Q.   Which firm was he with at the time** |
| 11 | when you brought him on board? |
| 12 | A.   He actually formerly was the general |
| 13 | counsel for BSG and their other entities. |
| 14 | **Q.   Then when you were working with him,** |
| 15 | for what firm did he work? |
| 16 | A.   For his own firm. |
| 17 | **Q.   Did -- were the compliance** |
| 18 | procedures -- were they written down anywhere, |
| 19 | the actual policies and procedures for |
| 20 | compliance? |
| 21 | A.   Yes, I believe they were. |
| 22 | **Q.   Do you know what the name of the** |
| 23 | document was? |
| 24 | A.   I'm sorry, I do not. |
| 25 | **Q.   Did legal review -- did any legal** |

Page 194

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | **SEXTON - CONFIDENTIAL** |
| 2 | counsel review Trump University's marketing |
| 3 | and/or advertisement materials? |
| 4 | A.   Yes. |
| 5 | **Q.   And which counsel did that?** |
| 6 | A.   Peter Hoppenfeld certainly reviewed |
| 7 | materials. |
| 8 | **Q.   How about course materials?** |
| 9 | A.   I believe Peter Hoppenfeld reviewed |
| 10 | course materials as well. |
| 11 | **Q.   How about the requirements for** |
| 12 | instructors to the extent they were written down? |
| 13 | A.   Requirements in terms of? |
| 14 | **Q.   For the terms of employment or** |
| 15 | contracting. |
| 16 | A.   I see. Yes, Peter was -- Peter was |
| 17 | very active in helping us script those as well. |
| 18 | **Q.   How about any credentials for the** |
| 19 | instructors? |
| 20 | A.   Yes. We worked with Peter to put in |
| 21 | a process to vet instructors. |
| 22 | **Q.   Was that in writing?** |
| 23 | A.   I believe it was. Yes, I know it |
| 24 | was. |
| 25 | **Q.   Do you know what document that would** |

Page 195

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | **SEXTON - CONFIDENTIAL** |
| 2 | have been? |
| 3 | A.   I don't. I wouldn't know the name |
| 4 | of it. |
| 5 | **Q.   Do you know what time frame that** |
| 6 | was? |
| 7 | A.   I know we got more sophisticated |
| 8 | over time. And I imagine kind of our near final |
| 9 | version would have been sometime in early 2009, |
| 10 | late 2008. |
| 11 | **Q.   Did legal review any live** |
| 12 | presentation material? |
| 13 | A.   The PowerPoint presentation? |
| 14 | **Q.   Yes.** |
| 15 | A.   Yes. |
| 16 | **Q.   Did all Trump University personnel** |
| 17 | receive a copy of the playbook that we discussed |
| 18 | earlier? |
| 19 | A.   All of the entire field team did. |
| 20 | So anybody that was involved in any way in any |
| 21 | aspect of the field operation did. Somebody like |
| 22 | in finance did not. |
| 23 | **Q.   Did that include all the** |
| 24 | instructors? |
| 25 | A.   Yes. |

Page 196

49 (Pages 193 to 196)

www.aptusCR.com

Exhibit 14
- 271 -

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | Q. And all the mentors? |
| 3 | A. Yes. |
| 4 | Q. And all the other speakers? |
| 5 | A. Yes, yes. |
| 6 | Q. And then also the sales reps that |
| 7 | accompanied -- |
| 8 | A. Yes. |
| 9 | Q. -- them at the live events? |
| 10 | I presume along with the -- so if |
| 11 | they received a copy, they were also required to |
| 12 | review it; correct? |
| 13 | A. Yes. They were required to attend |
| 14 | the annual training which the purpose of which |
| 15 | was to lay out what our standard operating |
| 16 | procedures were, not really from a content |
| 17 | standpoint, but from a procedural standpoint. So |
| 18 | we -- that's where we made sure everybody was on |
| 19 | the same page with regards to how we operated in |
| 20 | the field. |
| 21 | Q. And was that with respect to all -- |
| 22 | all aspects of being out in the field? |
| 23 | MR. SCHNEIDER: Objection. Vague. |
| 24 | You mean not content? |
| 25 | THE WITNESS: The primary purpose |

Page 197

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | was focused on operational procedures, so |
| 3 | dos and don'ts, how we behave, whatever |
| 4 | innovations we were coming up with in the |
| 5 | process improvement standpoint. You |
| 6 | can't -- it was a two-day meeting. We |
| 7 | didn't have time to get into content, but |
| 8 | it was about making sure we had a |
| 9 | disciplined approach and a consistent |
| 10 | approach to how we operated. |
| 11 | BY MS. JENSEN: |
| 12 | Q. Were there other retreats or other |
| 13 | mandatory meetings where content was discussed? |
| 14 | A. The only time the -- the content was |
| 15 | discussed at the annual meeting. Not everybody |
| 16 | had been to, for instance, a commercial advanced |
| 17 | training. So the individual that was teaching |
| 18 | that gave a brief synopsis of what materials were |
| 19 | covered so individuals got a sense of what that |
| 20 | experience was like so they could share it with |
| 21 | prospective students. Other than that, no. |
| 22 | Q. What is the profit from real estate |
| 23 | orientation program? |
| 24 | A. I don't know. |
| 25 | Q. Would that be the same as the |

Page 198

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | preview that we discussed earlier? |
| 3 | A. Over the period of time, we called |
| 4 | that preview event different things. That name |
| 5 | doesn't ring a bell. The word "orientation" is |
| 6 | throwing me. I don't recall ever using that, but |
| 7 | profit from real estate was what at one point we |
| 8 | called our introductory three-day workshop. |
| 9 | Q. So to be clear, let me step back for |
| 10 | a second. And from our conversation of this |
| 11 | morning, I understand there is a 90-minute |
| 12 | preview -- |
| 13 | A. Correct. |
| 14 | Q. -- correct? |
| 15 | And from there, there is a |
| 16 | fulfillment program; correct? |
| 17 | A. There is a three-day workshop. |
| 18 | Q. And is that the same as the profit |
| 19 | from real estate? |
| 20 | A. I believe so. Again, we called it |
| 21 | different things. As kind of the market |
| 22 | conditions changed, moved into foreclosures, we |
| 23 | had a foreclosure-focused name. But I believe |
| 24 | earlier on that's what we called it. |
| 25 | Q. Does the term -- name the front end |

Page 199

| 1 | SEXTON - CONFIDENTIAL |
|---|---|
| 2 | mean anything to you? |
| 3 | A. It does. That was kind of |
| 4 | colloquial for the preview. |
| 5 | Q. So were there any other terms used |
| 6 | for the preview, that you can recall? |
| 7 | A. Typically it was preview or front |
| 8 | end. Those are the only ones I can recall. |
| 9 | Q. They were -- they were the same |
| 10 | thing; correct? |
| 11 | A. Exact same thing, yes. |
| 12 | Q. And they were the same thing |
| 13 | regardless of the location in which they took |
| 14 | place; correct? |
| 15 | MR. SCHNEIDER: Well, objection. |
| 16 | Are you saying those two names or |
| 17 | are you saying that they're all the same |
| 18 | programs? What do you mean when you say |
| 19 | "they're the same thing." |
| 20 | MS. JENSEN: I'm saying they're the |
| 21 | same program; correct? |
| 22 | MR. SCHNEIDER: These two names, the |
| 23 | 90-minute versus the front end, or all |
| 24 | 90-minute programs the same? |
| 25 | MS. JENSEN: The front end and the |

Page 200

50 (Pages 197 to 200)

Exhibit 14
- 272 -

CONFIDENTIAL

1        SEXTON - CONFIDENTIAL
2     preview.
3         MR. SCHNEIDER: Were those two names
4     interchangeable?
5         THE WITNESS: They words all
6     interchangeable.
7     BY MS. JENSEN:
8     Q.   Yes. And they referred to the same
9     program; correct?
10    A.   They referred to the 90-minute free
11    introductory program.
12    Q.   Correct. Okay.
13        And you weren't familiar with the
14    term "profit from real estate orientation," but
15    did you also hear it called orientation program
16    or anything else?
17    A.   It sounds clumsy. It may have been
18    something early on that we used to describe that.
19    I don't recall it, though. But I wouldn't be
20    surprised.
21        MR. SCHNEIDER: I want to caution
22    you not to guess or speculate. Just answer
23    what you know.
24        THE WITNESS: I don't know.
25
                                          Page 201

1        SEXTON - CONFIDENTIAL
2     BY MS. JENSEN:
3     Q.   And was there a PowerPoint for the
4     front end or the preview?
5     A.   There were many over time. Again,
6     that was a -- it was a very dynamic kind of
7     event. It changed quite a bit, specifically in
8     relation to market conditions. It changed in
9     relation to feedback we got from the market. And
10    it changed just in cooperation working with
11    instructors on what we kind of collectively felt
12    was most effective at the time.
13    Q.   And at any given time, though, they
14    were all taught with a PowerPoint; correct?
15    A.   They were all taught with a
16    PowerPoint. The PowerPoint wasn't necessarily
17    always the same. Certainly early on, there was
18    far more variability than there was towards the
19    end in the actual PowerPoint presentation. We
20    made attempts to standardize that, not as
21    successful as we probably would have liked.
22    Q.   I'm sorry, when you say "not as
23    successful as we probably would have liked," what
24    do you mean by that?
25    A.   Well, in an ideal world, you'd have
                                          Page 202

1        SEXTON - CONFIDENTIAL
2     one presentation that everybody would use. And
3     from my standpoint, you want to be able to
4     deliver something consistently. The reality is
5     that that's impossible. Every instructor has
6     their own style. Every marketplace has its own
7     nuances. And you need to make it local to make
8     it resonate and relevant to people. The same --
9         Phoenix is a very different real
10    estate market than South Bend, Indiana. And it
11    would be silly to give the same presentation in
12    both markets because it wouldn't make sense. So
13    whereas from a management standpoint, I would
14    love to be able to say a widget is a widget is a
15    widget, the reality was that that just wasn't
16    possible and it wasn't the right thing.
17    Q.   Were all the PowerPoints -- let me
18    back up.
19        A PowerPoint was always used;
20    correct?
21    A.   Yes, 100 percent of the time.
22    Q.   And was that PowerPoint always
23    approved in advance?
24    A.   I'd like to say yes, but the reality
25    is not always.
                                          Page 203

1        SEXTON - CONFIDENTIAL
2     Q.   And were there consequences for not
3     using the preapproved PowerPoint?
4     A.   Yes and no. We -- when we started
5     out, like I said, from a -- theoretically you
6     wanted to be consistent. And I was probably too
7     insistent on that and learned over time that it
8     was okay to have some variability. And so as
9     long as -- as long as it was variability for the
10    right reasons and there was a strong -- there was
11    a logical rationale for why changes were made, I
12    learned to be fine with that.
13    Q.   And so when you say "variability,"
14    you're talking about specific issues related to
15    that local real estate market?
16    A.   So -- exactly. So a good example
17    would be, we had an instructor, on their own,
18    they would fly in early and drive around and take
19    pictures of real properties for sale in that
20    geographic market. And we didn't tell them to do
21    that. It was their idea, their initiative.
22        And initially you'd say, that's
23    crazy, why are you changing the presentation?
24    And then you take a step back and you say, that's
25    brilliant. You're not only showing real deals
                                          Page 204

51 (Pages 201 to 204)

www.aptusCR.com

Exhibit 14
- 273 -

SEXTON - CONFIDENTIAL

1  THE WITNESS: If you're asking
2  what -- if there's a document that shows
3  which instructors used specifically which
4  presentation at a specific preview event,
5  no, no.
6  BY MS. JENSEN:
7  **Q.** Was there e-mail correspondence
8  **concerning the schedule of events with the**
9  **instructor who was going to present?**
10 A. Yes, there was.
11 **Q.** And who -- who was on that e-mail
12 **correspondence?**
13 A. So we would send out, I believe on
14 weekly basis, kind of a master schedule looking
15 out maybe three or four weeks for every event
16 just so people could plan travel and such. If
17 you're asking who's on the distribution of that?
18 **Q.** Uh-huh.
19 A. Everybody who would have been
20 affected. So anybody that was on a field team,
21 every speaker that was -- whether they're working
22 or not that period of time, the staff at the
23 office who had to make sure materials flowed from
24 one place to another, certainly the marketing

Page 225

1  SEXTON - CONFIDENTIAL
2  folks who had to support those events, all the
3  instructors. You know, really just about
4  everybody.
5  **Q.** And who kept the master schedule?
6  A. April Neumann.
7  **Q.** Do you recall, sitting here, the
8  **names of the presenters for the free program?**
9  A. I can certainly recall some of them.
10 **Q.** Okay. For those that you can name,
11 **why don't you go ahead and list them.**
12 A. Steve Goff. Gerald Martin. Steven
13 Ligman. James Harris. I believe Gene Gorino.
14 There's the bulk of them.
15 **Q.** How were these speakers selected to
16 **provide these free presentations?**
17 A. So they were -- again, they were
18 referred to us. We would interview with them.
19 We got fairly sophisticated over time where we
20 would have them give them the presentation, give
21 them whatever time they felt they needed to
22 prepare, fly them in and they would audition for
23 us live.
24      But initially we didn't do that.
25 Initially it was more give us a sense of what it

Page 226

SEXTON - CONFIDENTIAL

1  would be like. And ultimately we found you can
2  weed out people fairly quickly that either don't
3  know what they're talking about, just don't have
4  any depth of content, they're not credible, or
5  people that just weren't gifted speakers. I
6  mean, they couldn't -- nobody was going to listen
7  to them.
8      But after that, there's no real way
9  to simulate. We can put them in a room and they
10 can talk to us all day long, but then we put them
11 on stage.
12 **Q.** And by "we," do you mean yourself?
13 A. No.
14 **Q.** Or somebody else -- who auditioned
15 **them?**
16 A. Oh, no. So I would -- it would
17 typically be David and myself. And we would fly
18 them into a market where we -- where we were
19 having an event, secure a spare room and
20 literally try to replicate the environment that
21 they would face in a preview.
22 **Q.** Was their ability to sell the Trump
23 **University programs an important component of**
24 **their -- of their qualifications?**

Page 227

SEXTON - CONFIDENTIAL

1  A. Certainly a component. I think our
2  litmus test began with do they know what they're
3  talking about, do they have the content knowledge
4  to be credible; second, can they communicate
5  effectively, you know; and third, can they sell;
6  you know, and I guess fourth -- the fourth
7  probably is not in the right order, but certainly
8  there was an intangible there, are these people
9  that we feel good about doing business with. And
10 can they embody our values.
11      And believe me, there are lots of
12 speakers that met the other three criteria and
13 didn't meet that fourth one that we didn't -- and
14 we didn't obviously move forward with them.
15 **Q.** And in terms of the presentation,
16 **the content was provided to them; correct?**
17 A. Yes.
18 **Q.** Okay.
19 A. Yes. I'm sorry, the physical
20 presentation was provided to them.
21 **Q.** Right. Right.
22 A. Yes.
23 **Q.** Where were the free programs
24 **advertised?**

Page 228

www.aptusCR.com

Exhibit 14
- 274 -

CONFIDENTIAL

Michael Sexton                                        Makaeff v. Trump University

| | |
|---|---|
| 1  SEXTON - CONFIDENTIAL | 1  SEXTON - CONFIDENTIAL |
| 2  MR. SCHNEIDER: Just for | 2  test -- certainly test it. Some markets there |
| 3  clarification, are you talking about the | 3  may be an alternative weekly. Some maybe the |
| 4  PowerPoint slides? | 4  LA Times. Sometimes we'd go to LA and do the |
| 5  THE WITNESS: The PowerPoint slides. | 5  secondary paper chain out there. I'm forgetting |
| 6  MR. SCHNEIDER: Not the actual | 6  what it's called. |
| 7  presentation. | 7  Washington, D.C. -- we would never |
| 8  THE WITNESS: I guess, when I say | 8  do the Post. It wasn't effective. We would do |
| 9  "presentation," there's no script -- when I | 9  the Times and the Examiner. |
| 10  say "presentation," I mean the PowerPoint, | 10  New York, we tested the Post. We |
| 11  not the physical slides. | 11  tested the Free Metro. We tested -- you know, |
| 12  BY MS. JENSEN: | 12  the Westchester Journal -- we constantly tested |
| 13  Q.  Right. | 13  and tried to figure out which one worked. |
| 14  A.  Where were they marketed?  We tested | 14  Q.  Were there any other print media |
| 15  and used many channels.  Print media.  Online. | 15  that you can remember that Trump University |
| 16  Both e-mail and display advertisements.  I | 16  advertised itself in? |
| 17  believe we tested paid search.  We tested radio. | 17  A.  Dozens and dozens of papers across |
| 18  We did direct mail.  And I believe we even tested | 18  the country. |
| 19  other forms of social media. | 19  Q.  Were they all mainstream newspapers |
| 20  Q.  Okay.  Taking them in turn, print | 20  or were there any other -- any other types of |
| 21  media.  Where did you advertise in print media? | 21  print ads that Trump University advertised itself |
| 22  A.  It would -- it would -- it would | 22  through? |
| 23  depend a lot on the market.  Some markets not at | 23  A.  I guess I wouldn't qualify -- |
| 24  all because it wasn't effective.  Some markets it | 24  majority were what I would call mainstream |
| 25  really depended on our past experience.  We would | 25  newspaper.  The only exception -- I would call |
| Page 229 | Page 230 |
| 1  SEXTON - CONFIDENTIAL | 1  SEXTON - CONFIDENTIAL |
| 2  the Free Metro paper we have here that they hand | 2  wanted people that were -- in our audience was |
| 3  out in the subways, I wouldn't call that a | 3  75 percent male.  Typical age -- our target age |
| 4  mainstream newspaper, but we tried that as well. | 4  was 40 to 48, something like that, maybe 40 to |
| 5  But in other markets, it was either the primary | 5  55, something like that.  We had an income |
| 6  or the secondary paper. | 6  threshold.  We wanted them to be college |
| 7  Q.  Okay.  E-mail you mentioned -- I'm | 7  educated. |
| 8  sorry, let me back up. | 8  So effectively, you go to a media |
| 9  Online, you said that there was | 9  buyer that -- with your profile, here's what I |
| 10  online advertising.  What were the channels for | 10  want and here are the dates I want to run it and |
| 11  online advertising? | 11  here's the city I want to run it in, and I don't |
| 12  A.  I know we tested online display ads. | 12  want it to be on any objectionable sites at all. |
| 13  I don't believe it was effective.  It wasn't a | 13  And they come back and they say, okay, here's |
| 14  standard part of our mix, but we tested it. | 14  what it will cost you and, you know, do you want |
| 15  Q.  Display ads being? | 15  to place the insertion order. |
| 16  A.  Banners or skyscraper ads that you | 16  So that's typically how it works. |
| 17  typically see on a web page.  Everything | 17  You don't have -- for this kind of thing, it's |
| 18  obviously was geo targeted to the local | 18  not like you're going to be on the front page of |
| 19  marketplace. | 19  Yahoo! |
| 20  Q.  Were there particular -- particular | 20  Q.  And who was in charge of the media |
| 21  websites or were there Google searches or any -- | 21  channels? |
| 22  what types of, I guess, medium or vehicles did | 22  A.  Michael Bloom. |
| 23  you use? | 23  Q.  For e-mail, where did you all -- |
| 24  A.  On the dismay, we tried to tar- -- | 24  where did you all get the list for e-mail |
| 25  we had a profile of our target demographic.  We | 25  advertisements? |
| Page 231 | Page 232 |

58 (Pages 229 to 232)

www.aptusCR.com

Exhibit 14
- 275 -

CONFIDENTIAL

1       SEXTON - CONFIDENTIAL
2           A.   So we would work with specific media
3    companies, again to give them our -- to give them
4    our profile of who we're looking for.  And they
5    had a proprietary e-mail list, and they would
6    send out our e-mail to their house list, their
7    database of members.
8           Q.   Which companies did you work with
9    for the e-mail leads?
10          A.   Probably our biggest relationship.
11   , most successful one, was a company called Beyond.com,
12   which -- it's a big operator of kind of secondary
13   employment-oriented website.  I think they've got
14   3,000 websites around the country
15          Q.   And were there -- was there e-mail
16   correspondence with them about your target
17   market?
18          A.   Oh, yes.  I would imagine, yes.
19          Q.   Would that e-mail come from you or
20   Michael Bloom or somebody else?
21          A.   It would have come from Michael.
22          Q.   And paid search?
23          A.   I know we tried it.  It was not part
24   of our mix, so I'm going to assume it didn't
25   work.

Page 233

1       SEXTON - CONFIDENTIAL
2           Q.   Okay.  I don't even know what that
3    term means.
4           A.   "Paid search"?
5           Q.   Yes.
6           A.   It's simply a Google ad word where
7    if somebody typed in "real estate investing
8    New York," it would appear.
9           Q.   Okay.  Google.  Got it.  Got it.
10   Okay.  I do know that term.
11          Radio, did you do -- place radio ads
12   on -- on specific radio stations?
13          A.   Again, we experimented with that.
14   It did not work at all.  And we didn't test it
15   again.
16          Q.   Okay.  Direct mail, where did you
17   get addresses for the direct mail?
18          A.   We worked with -- in direct mail,
19   you typically work with a list broker.  Again,
20   you give them the profile, here's the kind of
21   people we want.  And they've got 10,000 different
22   lists that -- magazines and newspaper.  Everybody
23   rents their names and addresses of their
24   subscribers.
25          And we would test in any market, I

Page 234

1       SEXTON - CONFIDENTIAL
2    don't know, five, ten different lists.  And you
3    can track back -- very specifically back to that
4    list, what your successful rate was.  And the
5    ones that performed, the next time you're there,
6    you do more of.
7           Q.   Are there any companies that you can
8    think of that you worked with on the -- the list
9    brokers?
10          A.   Oh, it was a fairly well-known list
11   broker that lots of people work with.
12          Q.   So, again, there would be e-mails
13   between Michael Bloom and --
14          A.   Oh, sure, yes.
15          Q.   -- that company describing the
16   target market, et cetera?
17          A.   Yes, there would be.
18          Q.   Moving to the fulfillment, is
19   fulfillment the same -- the same thing as the
20   profit from real estate workshop?
21          A.   Yes, it is.  But, again, we changed
22   that name over time.  It was called the fast
23   track to foreclosure investing workshop.  I
24   forget the last name we called it.
25          Q.   The back end --

Page 235

1       SEXTON - CONFIDENTIAL
2           A.   That's just a slang.  That's -- the
3    front and back, those are kind of slang terms.
4    But we tried to brand that particular workshop
5    with a name, like fast track for foreclosure
6    investing or profit from real estate.
7           Q.   Were there any other names by which
8    that -- that workshop was called?
9           A.   Yes.
10          Q.   What are those other names?
11          A.   Those were two.  I think it was only
12   called -- I think we only called it three other
13   things -- three things.  Blueprint, real estate
14   blueprint.  Anyway, I forget.  I'm sure it's in
15   this material somewhere.
16          Q.   But they were all the 1495 three-day
17   training?
18          A.   We experimented with different price
19   points.  So you should know we did some price
20   testing, but it was always the three-day
21   workshop, kind of our introductory --
22   introduction to real estate investing workshop,
23   regardless of what the brand was we put on top of
24   it.
25          Q.   Who created that program?

Page 236

59 (Pages 233 to 236)

Exhibit 14
- 276 -

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

        Plaintiffs,

                                 CASE NO.: 10 CV 0940 EIG (WVG)

  -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

        Defendants.

-------------------------------------------

VIDEOTAPED DEPOSITION of MICHAEL SEXTON

Volume II

August 23, 2012

New York, New York

Reported by:
Eileen Mulvenna
CSR/RMR/CRR
Job No. 10003487

Exhibit 14
- 277 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

---

** CONFIDENTIAL ** CONFIDENTIAL **
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
CASE NO.: 10 CV 0940 EIG (WVG)
-------------------------------x
TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

                Plaintiffs,

        -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

                Defendants.
-------------------------------x
                August 23, 2012
                9:14 a.m.

        CONTINUED VIDEOTAPED DEPOSITION of
MICHAEL SEXTON, 30(b)(6) Witness in the
above-captioned matter, taken by Plaintiffs, held
at 725 Fifth Avenue, New York, New York, before
Eileen Mulvenna, CSR/RMR/CRR, Certified Shorthand
Reporter, Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the State
of New York.

                                            Page 279

---

1       ** CONFIDENTIAL ** CONFIDENTIAL **
2   A P P E A R A N C E S:
3
4
        ZELDES & HAEGGQUIST, LLP
5           Attorneys for Plaintiffs
            625 Broadway
6           Suite 906
            San Diego, California 92101
7       BY:  AMBER L. ECK, ESQ.
            amberc@zhlaw.com
8           AARON M. OLSEN, ESQ.
            aarono@zhlaw.com
9
10
        YUNKER & SCHNEIDER
11          Attorneys for Defendants
            655 West Broadway
12          Suite 1400
            San Diego, California 92101
13      BY:  DAVID K. SCHNEIDER, ESQ.
            dks@yslaw.com
14
15
        A L S O  P R E S E N T:
16
17          Richard Ramos, Videographer
18
19
20
21
22
23
24
25
                                            Page 280

---

1           SEXTON - CONFIDENTIAL
2           THE VIDEOGRAPHER:  Good morning.
3       This is the continuation of the
4   videotaped deposition of Michael Sexton in
5   the matter of Tarla Makaeff, et al., versus
6   Trump University LLC, et al., on 8/23/2012
7   at approximately 9:14 a.m.
8           My name is Richard Ramos, the video
9   specialist.  The court reporter is Eileen
10  Mulvenna.
11          Will the court reporter please swear
12  in the witness, please.
13  MICHAEL SEXTON,
14          having been duly resworn by Eileen Mulvenna,
15          a Notary Public of the State of New York,
16          was examined and testified further as
17          follows:
18  EXAMINATION (Cont'd)
19  BY MS. ECK:
20      Q.   Good morning, Mr. Sexton.
21      A.   Good morning.
22      Q.   My name is Amber Eck.  I'm one of
23  the attorneys for the plaintiffs in this matter.
24  We're continuing your 30(b)(6) deposition from
25  yesterday.
                                            Page 281

---

1           SEXTON - CONFIDENTIAL
2           You mentioned yesterday that Trump
3   University entered into a licensing agreement
4   with BSG; is that correct?
5       A.   That's correct.
6       Q.   I'd like you to turn to page
7   TU129757 in the binders.
8           MR. SCHNEIDER:  129757?
9           MS. ECK:  Right.
10          I'd like to mark this as Exhibit
11  No. 7.  Actually, you know what, that was
12  his employment agreement we marked
13  yesterday.  Let's mark -- it's TU 1581
14  through TU 1602.  We'll mark that as
15  Exhibit 7.
16          (Plaintiffs' Exhibit 7, Bates Nos.
17  TU001581 through 1602, Licensing Agreement
18  between Trump University and Business
19  Strategies Group, marked for
20  identification.)
21  BY MS. ECK:
22      Q.   Do you recognize this document?
23          (Witness peruses the exhibit.)
24      A.   Yes, I do.
25      Q.   What is it?
                                            Page 282

---

1 (Pages 279 to 282)

Exhibit 14
- 278 -

CONFIDENTIAL

Michael Sexton                                                                Makaeff v. Trump University

1        SEXTON - CONFIDENTIAL
2    just show me where you are? Are you on
3    page 22?
4        MS. ECK: Yes.
5        MR. SCHNEIDER: Under -- on the
6    left --
7        MS. ECK: One hour twenty minutes
8    into event.
9        MR. SCHNEIDER: Thank you.
10        THE WITNESS: Yes.
11   BY MS. ECK:
12       Q.   Do you know what ad the reference
13   print ad refers to?
14       A.   If -- if there was a print
15   advertisement in that market, the print
16   advertisements typically would feature the
17   premium or the giveaway that they would have at
18   that event, if there was one. So that's what
19   the -- that refers to.
20       Q.   So when it says "Display free
21   premium," the premium was the gift that you would
22   receive for attending the seminar?
23       A.   Correct.
24       Q.   And what kind of gifts did Trump
25   University give away?

Page 311

1        SEXTON - CONFIDENTIAL
2        A.   They changed over time. We tested
3    many different ones. We would -- we certainly
4    used a number of CDs that we gave away that had
5    an audio course on them and workbooks and that
6    sort of thing. We experimented with giving -- I
7    think at one point we gave out access codes on a
8    printed card that people could go home and access
9    password-protected e-learning courses online.
10   Those are the ones I recall.
11       Q.   If you could turn to page 33 of the
12   handbook, which is TU52966. Under "Evening
13   prior," it indicates "Student profiles
14   distributed." What were those student profiles?
15   What did they look like or what did they contain?
16        (Witness peruses the exhibit.)
17       A.   So I'm just reading this, but at
18   this point, the student profiles would be blank
19   profile sheets that contained the data fields
20   that we discussed yesterday; namely, a snapshot
21   of the -- of the individual's financial goals,
22   their, I believe, current assets and liabilities,
23   I believe their time frame for achieving their
24   stated goals. I'm sure I'm missing some other
25   data fields on that.

Page 312

1        SEXTON - CONFIDENTIAL
2        Q.   But at this point, they don't
3    contain substantive information from the
4    students?
5        A.   Well, again, I'm reading this as the
6    evening prior to the workshop, nobody's shown up
7    yet, so we wouldn't have any opportunity to talk
8    to students and distribute those.
9        MR. SCHNEIDER: Amber, this is
10   saying the evening prior -- what they're
11   going to do the next day. They're talking
12   about when they're going to do things.
13   They're saying the event team meets, they
14   walk the space and they discuss the plan of
15   action, registration, team introductions,
16   format and when the student profiles would
17   be distributed.
18       So in the meeting, for example, I'm
19   telling you, hey, tomorrow when we have our
20   presentation, after we do the whole
21   presentation or 15 minutes into it, that's
22   when we're going to distribute the student
23   profiles and ask them to give information.
24       So this is a pre -- a preprogram
25   discussion as to timing, as to when things

Page 313

1        SEXTON - CONFIDENTIAL
2    are going to be distributed.
3        MS. ECK: I guess since it says
4    "Evening prior to fulfillment," they've
5    already attended the free 90-minute
6    seminar, so Trump University may already
7    have certain information on them that might
8    be contained in a profile.
9        MR. SCHNEIDER: Maybe you should ask
10   that. I don't think they get any profile
11   information in the 90-minute program.
12       THE WITNESS: No information is
13   collected prior to the -- I should say no
14   information on the student profile is
15   collected. Obviously we have their name,
16   address.
17   BY MS. ECK:
18       Q.   During the fulfillment seminar, the
19   three-day $1500 seminar, are completed profiles
20   provided to the instructors?
21       A.   So student profiles are distributed
22   to attendees. And the students, at their
23   discretion, can complete them and meet with any
24   team member to review it. Typically those
25   meetings happened -- I shouldn't say typically --

Page 314

9 (Pages 311 to 314)

Exhibit 14
- 279 -

CONFIDENTIAL

SEXTON - CONFIDENTIAL

1  I believe exclusively they happened after hours
2  or during breaks from the workshop itself.
3
4      Q.   When you say "any" team members, who
5  were the team members that would be at this
6  fulfillment seminar?
7      A.   So typically the instructor. And
8  depending on -- we had certain ratios of
9  attendees to team members. So -- I don't recall
10 what the exact ratio is, but depending on the
11 size of the audience, it would be anywhere from,
12 I imagine, one to three coordinators who would be
13 part of that team.
14     Q.   So there's instructors, and then who
15 were the other team members?
16     A.   We're listing them here as sales
17 coordinators and then program coordinators.
18     Q.   What type of people were these?
19 Were these instructors, mentors, or what did you
20 call them?  Was this really their title, sales
21 coordinator and program coordinator?
22     A.   Those were their titles.
23     Q.   So these weren't people that provide
24 mentorship or do -- instruct on courses?
25     A.   No, these were not instructors.

Page 315

SEXTON - CONFIDENTIAL

1  These were --
2
3      Q.   They were salespeople?
4      A.   Well, they were individuals that had
5  some level of real estate experience, but they
6  were there to help manage the overall workshop.
7  And they had some sales experience as well.
8      Q.   On page 36 of the playbook, which is
9  52969, it again talks about profile sheets and
10 says, "Team works together to identify potential
11 buyers with student profile sheets."
12         And this is in the evening of day
13 one. So now do they have information on the
14 profile sheets?
15     A.   Yes, for the individual attendees
16 that elected to provide information, they would
17 have that at that time.
18     Q.   And how did the individuals provide
19 information? What form did they fill out or in
20 what form was it?
21     A.   It was a paper-based form. There's
22 only one copy. It was returned to the
23 individuals after the review.
24     Q.   What was it called?
25     A.   Student profile sheet.

Page 316

SEXTON - CONFIDENTIAL

1      Q.   What information was contained on
2  the student profile sheet?
3      A.   Again, as we've discussed, it was
4  information pertaining to the student's goals, I
5  believe both financial and otherwise; the time
6  frame they desired to achieve those goals in;
7  what -- a snapshot at a high level of what their
8  resources were, both assets and liabilities. And
9  again, I'm forgetting on there -- I'm forgetting
10 other fields, but there were others, I imagine.
11     Q.   Did it ask them to list their credit
12 cards and the amount of credit limits?
13     A.   I don't recall that specifically.
14     Q.   Did it ask them to list their banks
15 and their bank account balances?
16     A.   I don't believe we ever asked for
17 specific banks. That wasn't the intent. But
18 certainly assets, yes.
19     Q.   If you could turn to page 40 of the
20 handbook, which is TU52973. At the top, it
21 discusses survey distribution and says,
22 "Distributed surveys to all attendees and
23 collects, once completed, in exchange for
24 certificates."

Page 317

SEXTON - CONFIDENTIAL

1      Did that mean that the students
2  needed to turn in their evaluation form in order
3  to receive a certificate?
4      A.   I don't recall. I don't recall that
5  being a policy.
6      Q.   And the forms that asked the
7  students to rate the instructors and the programs
8  on the scale from one to five, are those referred
9  to as surveys?
10     A.   Yes, those are.
11     Q.   If you could turn to page 71 of the
12 handbook, which is TU53004. It states, about
13 halfway down, that "TU presentations must be
14 approved in advance and you may not change or
15 modify presentations/slides without prior
16 approval."
17     Was that Trump University's' policy?
18     A.   That was our policy.
19     Q.   It states a few lines down, "You may
20 not share a personal story or testimonial unless
21 and until appropriate documentation and support
22 has been provided to TU and the story/testimonial
23 has been approved in advance."
24     Was that Trump University's policy

Page 318

10 (Pages 315 to 318)

Exhibit 14
- 280 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| 1 | SEXTON - CONFIDENTIAL |
|---|---|

1   SEXTON - CONFIDENTIAL
2   during just some portion?
3       A.    Just during some portions of that
4   period, we experimented with a pricing plan that
5   gave a discount. If you purchased education and
6   training at the event, you would get a discount.
7       Q.    Do you know what portions of that
8   time period --
9       A.    I do not.
10      Q.    The next bullet point states that
11  corporate should be notified if there is an
12  express or implied earnings claim given or a
13  guarantee. Were you aware of instructors or
14  mentors providing an expressed or implied
15  earnings claim stating that the students would
16  make a certain amount of money or that they were
17  guaranteed something?
18      A.    No.
19      Q.    Were you aware of instructors
20  telling students that they were either guaranteed
21  or likely to make back the entire amount they
22  spent in their first deal or two?
23      A.    No.
24      Q.    If you knew that instructors were
25  saying that, would that be grounds for
                                              Page 355

1   SEXTON - CONFIDENTIAL
2   termination?
3       A.    I don't know. You'd have to be back
4   in the situation and understand explicitly what
5   they said. I can't make a judgment now, looking
6   backwards.
7       Q.    The next section states that all
8   Trump University events will be recorded. When
9   did that policy go into effect?
10      A.    I couldn't tell you the exact date,
11  but I believe from the first time we had a
12  seminar or a workshop or a preview or any sort of
13  live event.
14      Q.    What was the purpose for that?
15      A.    It was for purposes of quality and
16  compliance.
17      Q.    Is there a list that Trump
18  University kept of all of the tapes or all of the
19  live events?
20      A.    Of all of the live events --
21      Q.    So, in other words, if there were
22  tapes of all of these different events and
23  they're all compiled, is there some kind of table
24  of contents or list of what all these tapes are,
25  all the events are?
                                              Page 356

1   SEXTON - CONFIDENTIAL
2       A.    Not that I'm aware of.
3       Q.    If you could please turn to Bates
4   No. TU96011 through 96034.
5       A.    I'm sorry, what is it?
6       Q.    96011 through 96034.
7           (Witness peruses the exhibit.)
8       Q.    Do you recognize this document?
9       A.    No.
10      Q.    Do you know whether it was a portion
11  of a playbook or an earlier version of a
12  playbook?
13      A.    I don't believe it was.
14      Q.    Do you know what it is?
15      A.    I suspect what it is.
16      Q.    What do you suspect?
17      A.    I suspect it's some sales tool that
18  somebody brought to us at some point, but this
19  was not part of our training.
20      Q.    Do you know whether Trump University
21  used this document?
22      A.    I do not believe we ever used this
23  document.
24      Q.    If you can please turn to TU9603 --
25           MR. SCHNEIDER: Is this to be
                                              Page 357

1   SEXTON - CONFIDENTIAL
2   marked?
3           MS. ECK: It's not. Thank you.
4           THE WITNESS: TU96 --
5   BY MS. ECK:
6       Q.    038 through 96053.
7           (Witness peruses document.)
8       Q.    Do you recognize this document?
9       A.    I mean, I don't recognize this
10  specific document.
11      Q.    Do you know whether this script was
12  used by Trump University?
13      A.    I'm positive it was not, no.
14      Q.    Why are you positive it was not used
15  by Trump University?
16      A.    Because everything that was
17  officially used by us had a certain level of
18  quality and a look and a feel and it was
19  grammatically correct. And this is -- sales guys
20  brought us junk all the time that they used in
21  former -- this was an inside sales -- this
22  happened all the times.
23           Guys that worked at wherever,
24  selling whatever, would say, hey, I'm going to
25  search and replace "XYZ Company" for "Trump" and
                                              Page 358

20 (Pages 355 to 358)

www.aptusCR.com

Exhibit 14
- 281 -

CONFIDENTIAL

Michael Sexton                                          Makaeff v. Trump University

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

1  SEXTON - CONFIDENTIAL
2  present this to us like it was the holy grail and
3  this was going to be a fantastic sales tool. And
4  we never used them because they were all crap.
5      Q.   Who is Steve Miller?
6      A.   Steve Miller was a mentor and
7  instructor. May have even done some coaching for
8  us, but definitely a mentor and an instructor.
9  In addition to that, we also used him to vet
10 other mentors and instructors.
11     Q.   What time period did he work for
12 Trump University?
13     A.   I would guess fairly early in our
14 live event side. So I would guess late 2007,
15 early 2008 through early 2010.
16     Q.   Do you know where he's working now?
17     A.   I don't. I have no idea.
18     Q.   What did he do before he came to
19 Trump University?
20     A.   He was, I assume he still is, a real
21 estate investor. That was his primary -- as I
22 understand it, that was his primary job.
23     Q.   If you could please turn to TU19457
24 [sic] through 129460.
25         MR. SCHNEIDER: 19457 to 129 --
                                          Page 359

1  SEXTON - CONFIDENTIAL
2      MS. ECK: 129457 through 129460.
3      MR. SCHNEIDER: Thank you.
4      THE WITNESS: I think it's in that
5  one (indicating).
6      MR. SCHNEIDER: (Handing.)
7      (Witness peruses the exhibit.)
8      MS. ECK: Let's mark this exhibit as
9  Exhibit 10.
10     (Plaintiffs' Exhibit 10, Bates Nos.
11 TU 129455 through 60, 10/1/08 Memorandum to
12 The Mentor Team from Brad Schneider, marked
13 for identification.)
14 BY MS. ECK:
15     Q.   At this point, in May of 2010, was
16 Steve Miller the person who was interviewing and
17 approving mentors?
18     A.   Yes, he would have been, I believe.
19     Q.   How long was he interviewing and
20 approving mentors?
21     A.   How long had he been by this point?
22     Q.   Yes.
23     A.   I believe we put that in place in
24 2009.
25     Q.   Do you know what month in 2009?
                                          Page 360

1  SEXTON - CONFIDENTIAL
2      A.   No.
3      Q.   Who was interviewing and approving
4  mentors before 2009?
5      A.   David Highbloom and myself.
6      Q.   The document also refers to
7  "Howard." Who is Howard?
8      A.   I believe that would be Howard
9  Haller.
10     Q.   Who is he?
11     A.   He's a mentor.
12     Q.   Was he applying for a mentorship or
13 was he a person who interviewed mentors with
14 Steve Miller?
15     A.   I'm sorry, where is he referenced?
16     Q.   He's referenced in the second
17 paragraph on the first page.
18     A.   No, this was -- what was the
19 question? I'm sorry.
20     Q.   Was he -- was he interviewing people
21 with Steve Miller, or what was his role?
22     A.   He was not interviewing people with
23 Steve Miller. He was a mentor, but had
24 significant experience and a very strong process
25 orientation. So what Gillian Birnie was
                                          Page 361

1  SEXTON - CONFIDENTIAL
2  attempting to do was to work with Howard and Troy
3  to set up a -- a more process-driven mentorship.
4      Q.   What do you mean by "process-driven
5  mentorship"?
6      A.   To create a more structured model
7  for a mentorship than what it had been in the
8  past.
9      Q.   Why did Trump University feel they
10 wanted to set up a more structured model?
11     A.   I'm not sure we're convinced it was
12 the right idea. I mean, you have to strike the
13 right balance between hiring good people that are
14 good at their jobs and empowering them to do what
15 you hired them to do. And, you know, look, the
16 very nature of mentorship, no two are alike.
17         And on one hand, it would be great
18 to structure it; but the other hand, you're doing
19 a disservice to the student if you -- if one
20 guy's in Santa Fe and is looking for commercial
21 properties, by its very nature, that's going to
22 be a dramatically different mentorship than
23 somebody who's looking for residential
24 foreclosures in Detroit, right.
25         You know, what we were trying to do
                                          Page 362

21 (Pages 359 to 362)

Exhibit 14
- 282 -

CONFIDENTIAL

1          SEXTON - CONFIDENTIAL
2   was kind of an idea of freedom within framework.
3   So can we provide a framework for what a
4   mentorship is, but balance that against the --
5   indeed for the mentor to ultimately prescribe
6   what they felt was the right experience based on
7   the students' explicit stated goals. And that
8   would be the freedom.
9       So, you know, can you balance --
10  structure a framework, but allow the mentor to
11  ultimately be the architect of what that
12  mentorship experience is, again driven by the
13  customer, the student, and let them -- let them
14  have freedom within the framework we set out for
15  them.
16       And this never came to fruition,
17  which should be noted.
18    Q.  This idea to require a certain
19  structure in the mentorships?
20    A.  Yes, the specific effort to create
21  those frameworks.
22    Q.  There's also a reference at the top
23  of page 129458 of a new pay structure for the
24  mentors. Did that take place?
25    A.  I don't know. I don't know what pay
                                Page 363

1          SEXTON - CONFIDENTIAL
2   structure they're referencing. Obviously we did
3   change. We continued to tweak the compensation
4   program for mentors.
5    Q.  We discussed this a little bit
6   yesterday, but how did that change over time?
7   How were the mentors initially compensated and
8   how did that change?
9    A.  Initially they were -- I believe
10  initially it was very straightforward. We paid
11  them based on the successful completion -- a
12  fixed rate based on the successful completion of
13  a mentorship as measured by positive customer
14  feedback. I know we proactively reached out to
15  the student, the mentee, as well to review their
16  experience.
17       Later on we -- I think we staggered
18  payments. A portion -- I believe a portion was
19  paid up front and then a portion was -- I believe
20  another portion was paid upon successful
21  completion. And then I believe there was portion
22  a portion held -- held back for some period of
23  time to -- just to ensure that everything was --
24  was still good.
25    Q.  Do you know when that staggered
                                Page 364

1          SEXTON - CONFIDENTIAL
2   payment plan went into effect?
3    A.  I know it wasn't binary. We didn't
4   go from here's your money to -- there were
5   intermediates steps where we -- I believe at one
6   point -- so I'm kind of giving you both ends of
7   that. At one point in the middle, we -- there
8   was nothing up front. You got a portion based on
9   successful completion and then a portion was held
10  for some period of days, 30, 60 days, something
11  like that.
12       So that -- again, like many things,
13  it was pretty dynamic, and we were constantly
14  trying to tweak everything to -- to make the
15  delivery of our services better.
16    Q.  When you talk about successful
17  completion, are you talking about that they would
18  get paid at the end of the three-day in-field
19  mentorship?
20    A.  No. It would be based on -- well,
21  at some point, that was one of the -- a portion
22  was triggered by the in-field, and then a portion
23  was triggered by the completion of -- you know,
24  whatever it was, 60 days later.
25       Again, I don't remember the --
                                Page 365

1          SEXTON - CONFIDENTIAL
2   recall the specific time frame, but we did tie --
3   we wanted everybody to understand their job
4   wasn't done after three days in the field.
5   Because there's a temptation obviously, as people
6   move on to the next mentorship, not to give
7   sufficient time to previous mentors -- mentees,
8   which is why we went to that compensation
9   structure, to make sure everybody understood the
10  mentorship really wasn't over until the mentee
11  said it was and they were happy.
12    Q.  Where was the pay structure --
13  compensation structure set out? Was it in a
14  general employee handbook, company guidelines, or
15  was it only in the individual agreements with the
16  mentors?
17    A.  It would have -- it would have
18  been -- again, it was fairly dynamic and changed
19  when we wanted it to change if we thought that it
20  was an improvement. So the binding -- the
21  binding document would have been the contract
22  with the -- the mentor had to agree to it,
23  obviously. And some didn't and that was fine.
24  We didn't work with them. But they had to sign
25  off physically on -- on their acceptance of those
                                Page 366

22 (Pages 363 to 366)

Exhibit 14
- 283 -

CONFIDENTIAL

Michael Sexton                                        Makaeff v. Trump University

| | |
|---|---|
| 1     **SEXTON - CONFIDENTIAL** | 1     SEXTON - CONFIDENTIAL |

1     **SEXTON - CONFIDENTIAL**
2   seminars in a location where another entity had
3   already had a course in that market?
4     A.   I mean, it's -- it's all based on
5   time, right. We're going to come back to
6   New York, but if somebody was just in -- if Rich
7   Dad was just in New York, the last place I want
8   to be is in New York a week after Rich Dad came
9   through.
10     Because you're competing in many
11   ways for similar -- a similar audience, although
12   I know that we benchmarked our audience against
13   other companies and ours were -- you know, had a
14   higher education level, higher income level, it
15   was a more sophisticated group.
16     So I hope I answered your question.
17   The last thing we want to do is be in a market
18   anywhere near where a competitor was, but we're
19   going to come back to that same market.
20     **Q.   What was your relationship like with**
21   **the other staff in the office or the folks at**
22   **40 Wall Street?**
23     MR. SCHNEIDER: Objection.
24   "Relationship."
25             Page 387

1     SEXTON - CONFIDENTIAL
2   BY MS. ECK:
3     **Q.   Did you get along with them?**
4     A.   Yes.
5     **Q.   Was your office located at 40 Wall**
6   **Street also?**
7     A.   Yes, it was.
8     **Q.   What floor were you on?**
9     A.   Thirty-second floor, I believe.
10     **Q.   And were the other employees also on**
11   **the 32nd floor?**
12     A.   Yes, they were.
13     **Q.   Did you ever have employees on**
14   **different floors, or were you generally on the**
15   **same floor?**
16     A.   Our initial office was on a
17   different floor, but when we moved, everybody
18   moved together.
19     **Q.   Did you get along with the**
20   **instructors and mentors?**
21     A.   Yes, by and large.
22     **Q.   Are there some that you didn't get**
23   **along with?**
24     A.   When you're the person that has to
25   discipline them, it's a -- it can be a complex
            Page 388

1     SEXTON - CONFIDENTIAL
2   relationship. You know, I certainly didn't shy
3   away from disciplining them. And it wasn't
4   always welcome and . . .
5     **Q.   Did you have to discipline anybody**
6   **other than James Harris?**
7     A.   So I use "discipline" broadly, but
8   when you give negative feedback to people about
9   what they've done and are proud of and spend a
10   lot of energy doing, it's not always taken
11   particularly well. And that -- you know, that
12   was the nature of the relationship.
13     **Q.   Who did you give negative feedback**
14   **to?**
15     A.   I gave constructive criticism to
16   just about every speaker. There was never --
17   there was no perfect presentation. And there was
18   always something that could be improved upon.
19   And between David and myself, we gave them -- we
20   gave them feedback.
21     **Q.   What was your relationship like with**
22   **Donald Trump?**
23     A.   I think it was positive.
24     **Q.   Did you enjoy working with him?**
25     A.   I learned a lot from Donald Trump.
            Page 389

1     SEXTON - CONFIDENTIAL
2     **Q.   Did he like working with you?**
3     A.   I couldn't answer that.
4     **Q.   Have you spoken to him since you**
5   **left Trump University?**
6     A.   I have not.
7     **Q.   Have you communicated with him in**
8   **any way regarding this lawsuit?**
9     A.   Since I left Trump University?
10     **Q.   That's a good question.**
11     **I guess have you communicated --**
12   **first more generally, have you communicated with**
13   **him at all regarding this lawsuit?**
14     A.   Yes.
15     **Q.   Okay. When was that?**
16     A.   While I was still at Trump
17   University.
18     **Q.   What did you discuss?**
19     MR. SCHNEIDER: Was there counsel
20   present?
21     THE WITNESS: Yes.
22     MR. SCHNEIDER: That would all be
23   privileged.
24   BY MS. ECK:
25     **Q.   Did you have any discussions with**
            Page 390

28 (Pages 387 to 390)

Exhibit 14
- 284 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

| | |
|---|---|
| 1      SEXTON - CONFIDENTIAL<br>2  Donald Trump outside the presence of counsel?<br>3     A.  About this lawsuit?<br>4     Q.  Yes.<br>5     A.  No.<br>6     Q.  Have you had any conversations with<br>7  Donald Trump since the filing of this lawsuit<br>8  without counsel present in regard to anything?<br>9     A.  In regard to anything.<br>10     What was the date of the lawsuit<br>11  again?<br>12     Q.  I think it was end of April 2010.<br>13     A.  I don't recall.<br>14     Q.  When you said before that counsel<br>15  was present in those conferences with Donald<br>16  Trump, which counsel was that? Which attorneys?<br>17     A.  It would have been George Sorial<br>18  and/or Michael Cohen.<br>19     Q.  Was Donald Trump angry about the<br>20  lawsuit?<br>21     MR. SCHNEIDER: He's not going to<br>22  talk about anything that occurred in the<br>23  meeting where there was counsel there. So<br>24  what they discussed, what people's<br>25  demeanors were, the documents they<br>                            Page 391 | 1      SEXTON - CONFIDENTIAL<br>2  reviewed, that's all privileged.<br>3  BY MS. ECK:<br>4     Q.  Outside -- in any communications<br>5  outside the presence of counsel, did Donald Trump<br>6  reprimand you or have anything negative to say to<br>7  you?<br>8     MR. SCHNEIDER: Assumes facts not in<br>9  evidence. He just testified he can't<br>10  recall any meetings or discussions with<br>11  Donald Trump since --<br>12     MS. ECK: I'm entitled to flush that<br>13  out.<br>14     (Discussion off the record.)<br>15  BY MS. ECK:<br>16     Q.  Do you recall any?<br>17     A.  Again, I don't recall any specific<br>18  meetings without counsel present between the<br>19  lawsuit being filed and my last day.<br>20     Q.  And who does George Sorial<br>21  represent? Is he counsel for Donald Trump or for<br>22  Trump Organization or for Trump University?<br>23     MR. SCHNEIDER: Objection.<br>24  Foundation.<br>25<br>                            Page 392 |
| 1      SEXTON - CONFIDENTIAL<br>2  BY MS. ECK:<br>3     Q.  Do you know who he represents?<br>4     A.  I don't.<br>5     Q.  Do you know who Michael Cohen<br>6  represents?<br>7     A.  I don't.<br>8     Q.  What's your experience in real<br>9  estate?<br>10     A.  Beyond buying my primary residence,<br>11  none.<br>12     Q.  Have you purchased or sold any other<br>13  real estate other than your primary residence?<br>14     A.  I have not.<br>15     Q.  Have you made any money investing in<br>16  real estate?<br>17     A.  I have not.<br>18     Q.  Did Trump University conduct any<br>19  surveys to determine the importance to students<br>20  of Donald Trump's involvement in Trump<br>21  University?<br>22     A.  No.<br>23     Q.  Did Trump University conduct surveys<br>24  of students other than the evaluation forms that<br>25  were filled out at the end of seminars and<br>                            Page 393 | 1      SEXTON - CONFIDENTIAL<br>2  mentorships?<br>3     MR. SCHNEIDER: Hang on just a<br>4  second. I just want to read the question.<br>5     (Pause from the record.)<br>6     MS. ECK: I think the question<br>7  didn't come out -- or at least didn't get<br>8  transcribed as I meant it.<br>9  BY MS. ECK:<br>10     Q.  Did Trump University conduct surveys<br>11  of students other than the evaluation surveys<br>12  that were issued after seminars and after<br>13  mentorships?<br>14     A.  Yes.<br>15     Q.  What surveys were those?<br>16     A.  We conducted surveys to understand<br>17  what areas of study people were interested in.<br>18     Q.  Anything else?<br>19     A.  We conducted surveys on what -- the<br>20  modality of education individuals were interested<br>21  in --<br>22     Q.  What do you mean --<br>23     A.  -- such as e-learning, classroom,<br>24  coaching.<br>25     Q.  Did you conduct surveys regarding<br>                            Page 394 |

29 (Pages 391 to 394)

www.aptusCR.com

Exhibit 14<br>- 285 -

CONFIDENTIAL

Michael Sexton                                                      Makaeff v. Trump University

| | |
|---|---|
| **SEXTON - CONFIDENTIAL** | **SEXTON - CONFIDENTIAL** |
| 1 | 1 |

1    SEXTON - CONFIDENTIAL
2  what representation students found important, so,
3  in other words, whether they felt it was
4  important to work with an expert in real estate
5  or whether they felt it was important to work
6  with someone who was going to work with them for
7  one year? Did you explore certain statements
8  that Trump University was making?
9        MR. SCHNEIDER: Objection. Assumes
10  facts not in evidence.
11        You can answer the question.
12        THE WITNESS: Not that I recall.
13  BY MS. ECK:
14    Q.   And how often did Trump University
15  do these other surveys, surveys other than the
16  ones after courses in mentorships?
17    A.   We did quite a bit initially, early
18  on, in 2005, probably into 2006, but not
19  regularly after that.
20    Q.   Were these surveys issued to
21  students who had taken courses, or were they
22  issued more generally to people in Trump
23  University's database?
24    A.   The latter.
25    Q.   How were the results of those
                                                    Page 395

1    SEXTON - CONFIDENTIAL
2  surveys compiled?
3    A.   I don't recall specifically, but I
4  believe we used a third-party software, like
5  SurveyMonkey or the like.
6    Q.   Where were the results of the
7  surveys kept?
8    A.   By our marketing group.
9    Q.   Would that be Michael Bloom?
10    A.   No, back then it would have been
11  Josef Katz.
12    Q.   Did Trump University alter seminars
13  or courses based on the results of these surveys?
14    A.   The surveys helped define the
15  education and training products that we
16  ultimately developed. Your question about
17  altering the seminars and training that we had
18  launched, those -- the information that helped us
19  fine-tune or evolve those really did come from
20  the -- primarily the attendee surveys where
21  attendees had open-ended questions and were
22  allowed to -- or were encouraged to tell us how
23  we could improve and what else we could do
24  differently that they might be interested in.
25    Q.   Did Donald Trump review all the
                                                    Page 396

1    SEXTON - CONFIDENTIAL
2  print ads that Trump University distributed?
3    A.   Yes, he did.
4    Q.   Did Donald Trump review all of his
5  blogs that were published on the Trump University
6  website?
7    A.   Yes, I believe he did.
8    Q.   Did Donald Trump review Trump --
9  Trump University financials?
10    A.   I don't know.
11    Q.   Did you review Trump University
12  financials with Donald Trump?
13    A.   At times.
14    Q.   How frequently?
15    A.   Infrequently.
16    Q.   How many times per year?
17    A.   I couldn't answer that.
18    Q.   Less than four?
19    A.   Yes.
20    Q.   Less than two?
21    A.   I don't know.
22    Q.   When you reviewed financials with
23  Donald Trump, what financial documents would you
24  review?
25    A.   Just a summary document prepared by
                                                    Page 397

1    SEXTON - CONFIDENTIAL
2  the controller.
3    Q.   Who was the controller?
4    A.   For Trump University?
5    Q.   Yes.
6    A.   Steven Matejek.
7    Q.   Did you discuss advertisements with
8  Donald Trump?
9    A.   Yes, I did.
10    Q.   How frequently?
11    A.   Any time we had a new ad, we would
12  discuss it.
13    Q.   How often were there new ads
14  created?
15    A.   Print ads, fairly frequently. We
16  would typically create a batch at one time and
17  then have three or four approved -- present them
18  to Mr. Trump, get approval on three or four
19  different versions that we would then be able to
20  go out and test over a period of time.
21    Q.   Why did he want to be involved in
22  reviewing and approving the advertisements?
23        MR. SCHNEIDER: Objection.
24  Foundation.
25        THE WITNESS: Mr. Trump
                                                    Page 398

30 (Pages 395 to 398)

www.aptusCR.com

Exhibit 14
- 286 -

CONFIDENTIAL

| | |
|---|---|
| 1         SEXTON - CONFIDENTIAL<br>2    understandably is protective of his brand<br>3    and very protective of his image and how<br>4    he's portrayed. And he wanted to see how<br>5    his brand and image were portrayed in Trump<br>6    University marketing materials. And he had<br>7    very good and substantive input as well.<br>8    BY MS. ECK:<br>9      **Q.**   **Did -- for what other purposes would**<br>10   **you meet with -- or discuss things with Donald**<br>11   **Trump?**<br>12      A.   Other than --<br>13      **Q.**   **Other than advertising, the**<br>14   **financials.**<br>15      A.   -- advertising and marketing.<br>16        State of the business.<br>17      **Q.**   **How often would you meet on that?**<br>18      A.   Periodically.<br>19      **Q.**   **A few times a year?**<br>20      A.   Maybe once a quarter.<br>21      **Q.**   **Did you discuss students' or buyers'**<br>22   **complaints with Trump University with him?**<br>23      A.   We did not, no.<br>24      **Q.**   **Did you discuss with Donald Trump**<br>25   **students' dissatisfaction with Trump University?**<br>                               Page 399 | 1         SEXTON - CONFIDENTIAL<br>2      A.   I did not, no.<br>3      **Q.**   **Why not?**<br>4      A.   Because if 97 percent were<br>5   satisfied, I felt the story line was 97 percent<br>6   are satisfied, not 3 percent are dissatisfied.<br>7      **Q.**   **Were there any other purposes that**<br>8   **you would talk with Donald Trump about other than**<br>9   **the ones you already mentioned?**<br>10      A.   About new products.<br>11      **Q.**   **Anything else?**<br>12      A.   At times about other activities he<br>13   was engaged in that were adjacent to our industry<br>14   or maybe part of our industry.<br>15      **Q.**   **Anything else?**<br>16      A.   Not that I can recall.<br>17        MS. ECK: We're almost done with<br>18   this tape. Let's go ahead and take a<br>19   break.<br>20        THE VIDEOGRAPHER: The time is 12:31<br>21   and we're off the record.<br>22        (Luncheon recess from the record.)<br>23<br>24<br>25<br>                               Page 400 |
| 1         SEXTON - CONFIDENTIAL<br>2       AFTERNOON SESSION<br>3        THE VIDEOGRAPHER: The time is 1:46.<br>4   This begins Tape No. 8 of the videotaped<br>5   deposition of Michael Sexton.<br>6   MICHAEL SEXTON,<br>7    having been previously sworn, resumed the<br>8    stand and testified further as follows:<br>9   EXAMINATION (Cont'd.)<br>10   BY MS. ECK:<br>11      **Q.**   **Are you aware of any lawsuits, other**<br>12   **than this present one, that have been filed**<br>13   **against Trump University?**<br>14      A.   No.<br>15        MS. ECK: I'd like to mark as<br>16   Exhibit No. 11 a document, TU25203.<br>17        (Plaintiffs' Exhibit 11, Bates No.<br>18   TU 25203, List of Lawsuits, marked for<br>19   identification.)<br>20        MR. SCHNEIDER: Can you say the<br>21   number again? I'm sorry.<br>22        MS. ECK: 25203.<br>23        MR. SCHNEIDER: Thank you.<br>24        (Witness peruses the exhibit.)<br>25<br>                               Page 401 | 1         SEXTON - CONFIDENTIAL<br>2   BY MS. ECK:<br>3      **Q.**   **Do you recognize this document?**<br>4      A.   I don't, no.<br>5      **Q.**   **Do you know who created it?**<br>6      A.   I don't.<br>7      **Q.**   **Are you familiar with any of these**<br>8   **lawsuits listed on this document?**<br>9      A.   I guess the first one had to do with<br>10   the Utah -- the Draper, Utah office space.<br>11      **Q.**   **Who was located in the Utah space?**<br>12      A.   Customers -- for a period, customer<br>13   service, inside sales. That was it.<br>14      **Q.**   **How many people were located in**<br>15   **Utah?**<br>16      A.   It varied, but at its peak, maybe a<br>17   dozen.<br>18      **Q.**   **Did these people all service**<br>19   **seminars in Utah?**<br>20      A.   No, no, no. They would -- inside<br>21   sales had nothing told with the seminars really.<br>22   They were a separate entity. Customer service<br>23   out there would support events anywhere by making<br>24   reminder calls, that sort of thing.<br>25      **Q.**   **Why did you establish an office in**<br>                               Page 402 |

31 (Pages 399 to 402)

Exhibit 14<br>- 287 -

CONFIDENTIAL

Michael Sexton                                    Makaeff v. Trump University

SEXTON - CONFIDENTIAL

1  a three full days, for a 90-minute preview.
2  And we gave her, I would guess,
3  three or four, probably more, four to six,
4  opportunities. And it just didn't work out I
5  think from both of our standpoints.
6  Q.  If you could look at document 102422
7  through 102426.
8  A.  102422?
9  Q.  Yes.
10  (Witness peruses document.)
11  A.  I'm sorry, just to amend my previous
12  comment, we did have a female instructor.
13  Q.  What was her name?
14  A.  Denise Devoe, D-E-V-O-E.
15  Q.  During what time period was she an
16  instructor?
17  A.  2007.
18  Q.  How many courses did she teach?
19  A.  Maybe a dozen, maybe more.
20  MR. SCHNEIDER: Are you marking
21  this?
22  MS. ECK: Not yet.
23  THE WITNESS: Would you care for
24  this back?

Page 455

SEXTON - CONFIDENTIAL

1  BY MS. ECK:
2  Q.  Yes, sure.
3  A.  (Handing.)
4  Q.  This appears to be an e-mail from
5  Michael Bloom to you regarding print ads with
6  DJT's signature and title. Are you familiar with
7  this document?
8  A.  I believe so, yes.
9  Q.  And it states that -- "Your updated
10  versions incorporating your good idea to include
11  DJT's title as chairman, Trump University."
12  Was that your idea to include Donald
13  Trump's title as chairman of Trump University?
14  A.  I assume so, reading the -- reading
15  the e-mail.
16  Q.  Was he the chairman of Trump
17  University?
18  A.  Yes, he was.
19  Q.  Had advertisements featured his
20  position as chairman of Trump University before
21  this date?
22  A.  I don't recall. I don't recall
23  specifically.
24  Q.  Did Trump University have various

Page 456

SEXTON - CONFIDENTIAL

1  different campaigns to promote the university?
2  MR. SCHNEIDER: Objection as to the
3  term "campaigns."
4  BY MS. ECK:
5  Q.  Were there different themes of
6  advertising? So, for example, an apprenticeship
7  advertisement or campaign or a Trump master
8  campaign?
9  A.  So we really didn't do any what I
10  would call brand advertising. So when you say to
11  promote the company, everything we did was direct
12  response. It was -- the vast, vast majority was
13  designed with one goal in mind, which was to get
14  people to become aware of our free previews and
15  to attend.
16  Within that context, yes, we had
17  dozens and dozens of different -- I guess you'd
18  call them campaigns, but it was really -- there
19  were thematic differences. There was certainly
20  content differences that were meaningful
21  differences in copy, body copy, meaningful
22  differences in display and layout and design.
23  And then, of course, there were
24  differences based on the media that we used,

Page 457

SEXTON - CONFIDENTIAL

1  whether it was direct mail versus print versus
2  e-mail and so on. Then there was even geographic
3  differentiations based on the market we were
4  specifically targeting.
5  Q.  Was one of these themes Donald Trump
6  saying, I want you to be my apprentice?
7  A.  I believe we used that theme, yes.
8  Q.  Was that called like an
9  apprenticeship theme, or did it have a title?
10  A.  We didn't really title it that way.
11  Q.  Was that apprenticeship theme
12  successful or popular with potential students?
13  A.  We were pretty consistently A, B
14  test design. So test two different designs and
15  measure which one performed better. I think it
16  was highly dependent upon seasonality. So if The
17  Apprentice was running, I think our thinking was
18  let's -- there's a millions of dollars in
19  advertisement for The Apprentice TV show. If
20  we're in The Apprentice TV show season, it will
21  be top of mind for people. Let's take advantage
22  of that momentum and use that in some of our
23  marketing materials. When it wasn't The
24  Apprentice season, I recall it didn't perform as

Page 458

45 (Pages 455 to 458)

Exhibit 14
- 288 -

CONFIDENTIAL

SEXTON - CONFIDENTIAL

1 well.
2
3    Q.    Was learn from the master or Trump
4 the master another advertising theme?
5    A.    For instance, I don't know whether
6 we used any or all of these in real ads. The
7 idea that Donald Trump was an expert in real
8 estate certainly was a consistent theme.
9    Q.    Was learn from the master a
10 consistent theme?
11    A.    I would say that would be -- if we
12 thought about -- that would be part of this
13 overarching messaging of Donald Trump's an expert
14 in real estate. If you're going to learn about
15 real estate, why wouldn't you learn from
16 somebody's who actually been out there and done
17 it before, as opposed to, you know, Robert Adder
18 [ph] or some of these other guys that haven't.
19    Q.    Was learn from the master Donald
20 Trump a successful or popular advertising theme?
21    A.    I couldn't tell that. I don't know.
22    Q.    Was it tested?
23    A.    Again, I don't know whether -- this
24 looks like a mock-up to a PDF. I don't know
25 whether this -- I don't know whether this ran

Page 459

SEXTON - CONFIDENTIAL

1 in -- I don't know whether this particular ad was
2 approved and ran in a market.
3
4    Q.    Did other advertisements using that
5 same phrase, "learn from the master," actually
6 run?
7    A.    I couldn't tell you.
8    Q.    Was Donald Trump's signature a theme
9 from a Donald Trump signature campaign or theme
10 where there would be his signature and name of
11 chairman of the board?
12    A.    No, it was what we think of as an
13 element in the design and layout of an ad like
14 this, much like the logo is an element, a free
15 giveaway is an element, the picture is an
16 element.
17       We felt it supported -- he's got a
18 fairly distinctive signature. We felt it
19 supported the -- the overall messaging.
20    Q.    Who came up with the idea to use his
21 signature in the advertising?
22    A.    I don't know.
23    Q.    Was it you?
24    A.    I don't know.
25    Q.    Was it Michael Bloom?

Page 460

SEXTON - CONFIDENTIAL

1
2    A.    I don't know.
3    Q.    Was using his -- Donald Trump's
4 signature a successful element of an
5 advertisement for Trump University?
6    A.    I don't know if the signature added
7 anything to the ad.
8    Q.    Can you think of other themes or
9 elements that Trump University used that were
10 successful in motivating students to attend the
11 courses?
12    A.    I mean, we used dozens and dozens of
13 different headlines, body copy, layouts. I
14 can't -- we measured all of this, so there's --
15 you know, there's an answer. I don't have it for
16 you, which one was the, quote-unquote, winning
17 theme.
18       And even if it was, there's a --
19 what works today doesn't necessarily work
20 tomorrow. What works in New York doesn't
21 necessarily work in LA. It's a fairly -- it's a
22 very dynamic, messy process that's, by its very
23 nature, multi-variant when you've got 30
24 different variables on any ad that you're
25 tinkering with over time to -- to optimize. And

Page 461

SEXTON - CONFIDENTIAL

1 I don't have that data handy.
2
3    Q.    The last two attachments are "Learn
4 to invest like a billionaire." Do you recall
5 whether you ever used this theme or an
6 advertisement similar to this?
7    A.    I don't recall, but I know we kind
8 of backed off the whole notion of learn to invest
9 like a billionaire.
10    Q.    Why was that?
11    A.    It wasn't accessible to people.
12 People didn't necessarily walk around wanting to
13 be a billionaire. They'd be very happy to be a
14 millionaire. So it was almost -- I think our
15 feeling was it was almost overwhelming, daunting,
16 you know, that's not going to happen.
17    Q.    Did you have a theme you are
18 encouraging people to invest like a millionaire
19 or to become a millionaire?
20    A.    Not specifically, no.
21    Q.    Did you have campaigns or themes or
22 elements using the word "millionaire"?
23    A.    Not that I can recall.
24    Q.    Were the two primary people involved
25 in Trump University advertising and marketing,

Page 462

46 (Pages 459 to 462)

Exhibit 14
- 289 -

C O N F I D E N T I A L

**Michael Sexton**                                                                  **Makaeff v. Trump University**

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | SEXTON - CONFIDENTIAL |
| 2 | other than you, Michael Bloom and Josef Katz? |
| 3 | A.   That's correct. |
| 4 | Q.   And Josef Katz was there first and |
| 5 | then Bloom came when he left; is that right?  Or |
| 6 | were they there at the same time? |
| 7 | A.   They overlapped briefly. |
| 8 | Q.   Why did Josef Katz leave? |
| 9 | |
| 10 | |
| 11 | Q.   When did Michael Bloom leave?  Was |
| 12 | it after you left or before? |
| 13 | A.   Just before.  I would say a month or |
| 14 | two prior. |
| 15 | Q.   Was he terminated? |
| 16 | |
| 17 | MR. SCHNEIDER:  Off the record just |
| 18 | one moment. |
| 19 | THE VIDEOGRAPHER:  The time is 3:50. |
| 20 | We're off the record. |
| 21 | (Pause from the record.) |
| 22 | THE VIDEOGRAPHER:  The time is 3:53. |
| 23 | We're back on the record. |
| 24 | BY MS. ECK: |
| 25 | Q.   Who was David Early? |

Page 463

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | SEXTON - CONFIDENTIAL |
| 2 | A.   He was -- he used to work at |
| 3 | Dynatech for a good, long time, about 13 years, I |
| 4 | believe, in a variety of roles.  And so when he |
| 5 | left there, he started his own consulting firm. |
| 6 | And we worked with him pretty extensively in a |
| 7 | number of different areas. |
| 8 | Q.   In what -- what did he do with Trump |
| 9 | University or for Trump University? |
| 10 | A.   He did -- well, a lot of things.  He |
| 11 | helped with speaker and instructors, coaching |
| 12 | them.  He helped us at times get feedback on |
| 13 | presentations.  He helped at times with putting |
| 14 | together things like the video testimonials.  He |
| 15 | helped with print buying.  He helped with design |
| 16 | of some print ads, I believe.  I believe. |
| 17 | Q.   And what time period did he work |
| 18 | with Trump University? |
| 19 | A.   I'd say 2000 -- on and off in |
| 20 | different ways from 2007 through, I'd say, 2009. |
| 21 | Q.   Was his company Entrende? |
| 22 | A.   Entrende, yes. |
| 23 | Q.   How do you spell that? |
| 24 | A.   E-N-T-R-E-N-D-E. |
| 25 | Q.   Did he create any content for |

Page 464

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | SEXTON - CONFIDENTIAL |
| 2 | courses for Trump University? |
| 3 | A.   No, I don't believe so. |
| 4 | Q.   Did he -- who's Phillip Ungricht, |
| 5 | U-N-G-R-I-C-H-T?  Is he with EWI? |
| 6 | A.   The name's vaguely familiar.  Do you |
| 7 | have anything else on him? |
| 8 | Q.   Who was Kos -- Kos Rovoni [ph]? |
| 9 | A.   Character. |
| 10 | Kos was and is an Internet marketing |
| 11 | instructor.  He's based out of Los Angeles.  He's |
| 12 | got his own course on how to -- how to market |
| 13 | business on the Internet using a combination of, |
| 14 | as I recall, social media, like LinkedIn, Meet Up |
| 15 | and that sort of thing Facebook and paid search, |
| 16 | so Google AdWords. |
| 17 | And we worked with him.  We wanted |
| 18 | an Internet marketing product.  We thought it |
| 19 | would complement our -- we thought it would |
| 20 | complement our offerings for entrepreneurs that |
| 21 | wanted to not just launch a business, but then |
| 22 | marketed their business.  And we did partner with |
| 23 | him.  We liked -- we liked the focus of his |
| 24 | content, but it just didn't work out. |
| 25 | Q.   Did he create a video with Donald |

Page 465

| | SEXTON - CONFIDENTIAL |
|---|---|
| 1 | SEXTON - CONFIDENTIAL |
| 2 | Trump? |
| 3 | A.   No, not that I'm aware of. |
| 4 | Q.   Was he involved in any of the real |
| 5 | estate courses or no? |
| 6 | A.   No.  Purely -- purely Internet |
| 7 | marketing. |
| 8 | Q.   If you could please look at document |
| 9 | TU102432 through 435. |
| 10 | (Witness peruses the exhibit.) |
| 11 | Q.   This is an e-mail from Josef Katz to |
| 12 | various people, including you, regarding |
| 13 | California ad for Trump.  It says, "See attached |
| 14 | for a few small tweaks from legal." |
| 15 | Do you recognize this document? |
| 16 | A.   I don't recall this specific |
| 17 | document, no. |
| 18 | Q.   Do you have any reason to believe |
| 19 | you would not have received this document? |
| 20 | A.   No. |
| 21 | Q.   Was it common to have advertisements |
| 22 | reviewed by the legal department? |
| 23 | A.   Yes. |
| 24 | Q.   Did they review every advertisement? |
| 25 | A.   I believe any ad, any newspaper ad |

Page 466

47 (Pages 463 to 466)

Exhibit 14
- 290 -