1                  UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    SONNY LOW, ET AL.,              .
                                     . Docket
5              Plaintiffs,           . No. 10-cv-0940-GPC(WVG)
                        v.           .
6    TRUMP UNIVERSITY, LLC,          .
     ET AL.,                         .
7              Defendants.           .
     . . . . . . . . . . . . . . . . .
8    ART COHEN, Individually and     .
     on Behalf of All Others         .
9    Similarly Situated,             .
                                     . Docket
10             Plaintiff,            . No. 13-cv-2519-GPC(WVG)
                        v.           .
11   DONALD J. TRUMP,                . July 13, 2016
               Defendant.            . 1:30 p.m.
12   . . . . . . . . . . . . . . . . . San Diego, California

13                  TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE GONZALO P. CURIEL
14                  UNITED STATES DISTRICT JUDGE

15

16                  A-P-P-E-A-R-A-N-C-E-S

17   For the Plaintiffs:    Robbins Geller Rudman & Dowd LLP
                            655 West Broadway, Suite 1900
18                          San Diego, California 92101
                            By:  JASON A. FORGE, ESQ.
19                               RACHEL L. JENSEN, ESQ.
                            - and -
20                          Zeldes Haeggquist & Eck, LLP
                            225 Broadway, Suite 2050
21                          San Diego, California 92101
                            By:  AMBER LEE ECK, ESQ.
22
     For the Defendants:    O'Melveny & Myers LLP
23                          1999 Avenue of the Stars, Suite 700
                            Los Angeles, California 90067
24                          By:  DAVID L. KIRMAN, ESQ.
                                 DANIEL M. PETROCELLI, ESQ.
25   ///

```
1                    A-P-P-E-A-R-A-N-C-E-S (CONTINUED)

2    For the Media Intervenor:
                            Davis Wright Tremaine LLP
3                           865 South Figueroa Street, Suite 2400
                            Los Angeles, California 90017
4                           By:  DAN LAIDMAN, ESQ.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:        Chari L. Possell, RPR, CRR
                            333 West Broadway, Suite 420
22                          San Diego, California 92101
                            chari_possell@casd.uscourts.gov
23
     Reported by Stenotype, Transcribed by Computer
24

25
```

1              SAN DIEGO, CALIFORNIA; JULY 13, 2016; 1:30 P.M.

2                              -o0o-

3              THE CLERK:  Number 2 on calendar, Case 10-cv-0940,

4    Low v. Trump University, for a motion hearing, and Number 3 on

5    calendar, case 13-cv-2519, Cohen v. Trump, for a motion

6    hearing.

7              THE COURT:  Appearances, please.

8              MR. FORGE:  Good afternoon, Your Honor.  Jason Forge,

9    Rachel Jensen, and Amber Eck for the plaintiffs in both cases.

10             THE COURT:  Good afternoon.

11             MS. JENSEN:  Good afternoon, Your Honor.

12             MR. PETROCELLI:  Good afternoon, Your Honor.  Daniel

13   Petrocelli and David Kirman for the defendant.

14             MR. LAIDMAN:  Good afternoon, Your Honor.  Dan

15   Laidman for the media intervenors.

16             THE COURT:  Good afternoon to you all.

17        We are here on a number of motions.  There's a motion to

18   intervene by media intervenors and seeking an order modifying

19   the stipulated protective order that was filed in the Cohen

20   case, at ECF 233.  There are motions to amend and correct the

21   protective order that have been filed by Donald J. Trump in

22   both the Low case, ECF 485-1, and in the Cohen case, and that's

23   at ECF 238.  There's also pending a motion that was filed by

24   plaintiffs under local rule or administrative Rule 2(k),

25   regarding the filing of certain video clips along with the

1    plaintiffs' pleadings relating to that motion for summary

2    judgment.

3        What I would like to do is to focus on the motions filed

4    by the media and the defense regarding the protective order.  I

5    think they overlap with respect to the issues, the law, and the

6    ultimate requests that are made.  And so at this point, I have

7    reviewed the pleadings that have been filed relating to these

8    motions, and I would like to begin with the defense.

9        And specifically, at this time, I am looking at this as a

10   Rule 26 motion, and I am focusing on the good cause to continue

11   the protection of the discovery material.  The Ninth Circuit

12   has offered a two-step process for determining whether there is

13   good cause to continue the protection of disputed discovery

14   material.  And first, the Court is directed to determine

15   whether or not particularized harm will result from disclosure

16   of information to the public.

17       And Mr. Petrocelli, I would like you to address that

18   particular component, that aspect, with respect to the

19   particularized harm that would befall the defendant in the

20   event the video depositions were produced.

21            MR. PETROCELLI:  Thank you, Your Honor.  And to be

22   clear, I think, as our filings outlined, we do not object to

23   de-designating the prior portions -- the portions of

24   Mr. Trump's deposition that have been previously designated

25   confidential in transcript form.

1          THE COURT:  The transcripts?

2          MR. PETROCELLI:  Right.  And the transcripts are --

3   to my knowledge, have no further confidentiality designations

4   with respect to that.

5       The particularized harm, Your Honor, is the threat to the

6   integrity and fairness of the trial proceedings in the Low case

7   and in the Cohen case.

8       This is a -- as I walk through the cases in this area,

9   Your Honor, as Your Honor well knows, they are very

10  circumstance- and fact-specific.

11         THE COURT:  Exactly.

12         MR. PETROCELLI:  But what you can do is you can glean

13  various guiding principles that influence the decision one way

14  or the other.  And the first principle that I glean from the

15  cases, Your Honor, is the Court's paramount duty to protect the

16  integrity of the proceedings, as was discussed in the *Stern*

17  case, the *Poindexter* case, and the *Paisley Park* case.  And that

18  is the touchstone.  And to that end, the courts look at certain

19  circumstances, such as what is the level of public interest and

20  media interest.  Is there a frenzy of interest, or has the

21  initial interest dissipated, as was the case in the *Condit*

22  case, the *Gary Condit* case?

23         THE COURT:  Let me back up for one second.  You said

24  that one of the touchstones of a number of the cases has been

25  protecting the integrity of the proceedings.  Walk me through

1    how it would be that the production or the disclosure of these

2    videotapes would adversely affect the integrity of the

3    proceedings.

4          MR. PETROCELLI:  Because, Your Honor, they would be

5    subjected to massive and perhaps unprecedented public

6    dissemination.  They would be -- Your Honor can see from the

7    papers all the extraordinary references outside of this

8    courtroom to this case, and these depositions are going to find

9    themselves all over the news, the cable news stations, the

10   streaming of digital video, and YouTube, and -- far beyond my

11   comprehension.  But I think nobody disagrees that there's going

12   to be widespread use and dissemination of these videos.  And

13   people sitting in San Diego, who may sit on our jury, are going

14   to be exposed to it, and it is going to make the job of picking

15   a fair and impartial jury much more difficult.

16         THE COURT:  Let me ask you --

17         MR. PETROCELLI:  And not only the videos, Your Honor,

18   but there will be massive commentary and discussion and pundits

19   and talking heads about these videos.

20         THE COURT:  Let me ask you how these videos differ in

21   weight and the significance of the videos compared to the

22   universe that currently exists with respect to information

23   about this case, and by that I mean the public comments that

24   have been made by candidates for president, by your client, the

25   stories that have been presented in the media.  I don't think

1    anyone would disagree that the universe is massive.  And given

2    that universe of information that already exists, how would

3    this particular videotape affect the current state of affairs?

4           MR. PETROCELLI:  Because it's qualitatively

5    different, Your Honor.  It is potentially evidence that the

6    jury will receive, as opposed to all of this noise and talking

7    that is filling the airwaves.  We are talking about not some

8    voluntary interview that a candidate or a person gave about

9    this case or expressed a view about this case.  We are talking

10   about someone who was summoned by law to appear and give

11   testimony in answering questions by just one side, as Your

12   Honor knows, because a deposition is taken by the opponent.

13   There's no questioning by both lawyers in the deposition

14   process.  And we are now parading evidence in a very graphic

15   way, that jurors, potential veniremen, in this community will

16   almost certainly be exposed to, which is very different from

17   turning on the news and hearing somebody make a comment about

18   the case that probably never will see the light of day inside

19   of the courtroom.

20       Not only that, the depositions themselves are filled with

21   questions and answers that won't see the light of day inside of

22   a courtroom, at least in my view, because they are filled with

23   all kinds of broad discovery excursions that are not relevant

24   to the issues in the case under the trial standards of

25   relevance and admissibility.

1      And indeed, in this particular set of depositions, I

2  objected and instructed the witness not to answer questions

3  about his views of other candidates and things like that, and

4  the Magistrate overruled my objections and said that this is a

5  discovery deposition and you can't instruct on anything other

6  than privilege.  And so we had to go back, and questions that,

7  in my view, were utterly improper and utterly irrelevant were

8  asked, and they were answered.

9      So you have all kinds of potentially -- "potentially"

10  because I am not the trial judge and I am not going to rule on

11  the admissibility of this evidence -- but you have potentially

12  inflammatory and prejudicial material in a deposition.  And

13  people will see it and understand it to be very different than

14  some interview.  They will understand it to be, "Hey, this is a

15  serious proceeding in the lawsuit.  It's evidence in the

16  lawsuit."  And they will be making judgments and opinions based

17  on witnessing this video examination, for no reason, Your

18  Honor.

19          THE COURT:  Let me ask you about that, as far as "no

20  reason."  The reasons that are offered by the media is that

21  this under-oath testimony is indicative or relates to serious

22  allegations that have been made against Mr. Trump that figure

23  in the evaluation of Mr. Trump as a candidate for president and

24  would fairly be information that would be relied upon in

25  determining whether to make Mr. Trump the leader of the free

world.

MR. PETROCELLI:  But this lawsuit, Your Honor, is not a vehicle to litigate the presidential campaign.  The media may have an abiding interest and the public may have an abiding interest in this case, but not to the extent where they can use this case to extract information to put into the public arena for the purpose of assessing his candidacy for president of the United States.  I mean, the cases are quite clear on that, that the Court's duty is not to facilitate the public election; the Court's duty is to facilitate a fair trial in this process.

THE COURT:  But doesn't this reflect on the strength of the public interest and the analysis and the balancing between whether or not any risk that this disclosure would create would be offset by the significant public interest?

MR. PETROCELLI:  I mean, we have an almost identical situation that just came up in the Hillary Clinton e-mail case, which we cited to Your Honor, where Cheryl Mills' deposition was taken in connection with the affairs of a then-sitting public official.

THE COURT:  But she is not a candidate for president.

MR. PETROCELLI:  I understand.  But the conduct involved in that case was about not only a person who is running for president but, more to the point I am trying to make, the conduct was about a public official and the discharge of her duties while in office.

1    And an area where I suggest the courts have balanced in

2    favor of public access, the cases where the courts -- and

3    there's only a couple of them, that are reported, at least --

4    have made these videos available is, for example, in the *Gary*

5    *Condit* case, where his conduct as a sitting Congressman was at

6    issue in the case.  And secondly, there's a case involving a

7    mayor, that's cited by the defense, where his conduct as a

8    sitting mayor was involved in the case.

9    In the case of Cheryl Mills' deposition, where the court

10   said -- the transcript was fully available -- but "I am not

11   releasing the video," the same arguments were made in the

12   briefing there.  The Court said, "I am not releasing the video

13   because the transcript is available."  What I am suggesting to

14   you is that case involved allegations of misconduct by a

15   sitting Secretary of State.

16   This case involves no such allegation of misconduct by a

17   sitting official.  This case involves purely private conduct by

18   a company and people who bought a ticket to attend these events

19   and signed up for these courses.  This has nothing to do with

20   the discharge of any public official's conduct.  And that is

21   one of the key principles that run through these cases.

22   And the other principle that runs through these cases that

23   is relevant to Your Honor's question is what is going to be the

24   use of these videos.  We know for sure that these videos are

25   going to be used for reasons completely unconnected to the

1   merits of this lawsuit or to any legitimate issue involving

2   this lawsuit.  They will be used for political ads, to be sure.

3   Indeed, I am sure that's one of the reasons that prompted Judge

4   Sullivan, sua sponte, I believe, to -- I think there was a

5   motion, but he didn't even wait for complete briefing.  He

6   blocked release of Cheryl Mills' video just two months ago and

7   said, "You don't need it because the transcript is fully

8   available"; in other words, what is the video going to add to

9   the public's need to evaluate any interest or issue relative to

10  this lawsuit?  What is it going to add?  The transcript is

11  available, to the extent there's public interest in the case,

12  and the videotape doesn't add anything.  And video may not

13  be --

14          THE COURT:  Didn't you say earlier this evidence

15  presents, in a graphic way, testimony of Mr. Trump?

16          MR. PETROCELLI:  Correct.

17          THE COURT:  So I think you recognize that the graphic

18  presentation adds an additional layer which, in your case, as

19  you are arguing to keep it confidential, you are saying that

20  this graphic presentation is potentially more dangerous or more

21  prejudicial; but on the other hand, at this time you are

22  saying, "What is it going to add?"  It seems like those

23  arguments are at odds with each other.

24          MR. PETROCELLI:  What is it going to add of

25  legitimate interest and value to honoring any public interest

1    in the case, was what I meant to say.  That's what I meant.

2         In other words, the public has some interest in the case,

3    to be sure.  They have available Mr. Trump's deposition

4    transcript in its entirety so they can see what he said.

5         When I used the word "graphic," I meant visual rather than

6    written.  But, you know, in today's day and age, everything is

7    about the visual.  It is about what you see, not what you

8    listen to or what you read.  So the exposure which his

9    deposition testimony will receive will be monumentally greater

10   than what it might be with just the transcript out there.

11        THE COURT:  Let me ask you another question,

12   Mr. Petrocelli.  With respect to these videos and the harm that

13   they potentially could pose, is there any reason to believe

14   that any such harm could be identified and addressed during

15   jury voir dire?

16        MR. PETROCELLI:  Well, if Your Honor releases these

17   videos, to be sure, I am going to be asking Your Honor for lots

18   of leeway on that issue.  But yeah, we would need to address it

19   in jury voir dire, which would just make that process more

20   fraught with risk.  And I don't believe that, when you are

21   balancing all of this out, Your Honor, that there's a need to

22   take that risk when the transcript is fully available.

23        I mean, if you look at all the cases, there are only a

24   couple -- only a couple -- and they involve official conduct

25   where the videos have been released.  They are overwhelmingly

1  in favor, decisively in favor of maintaining protection over

2  video depositions where the full transcript is available.  And

3  the cases are cited throughout the brief, and they go through

4  the factors that I have been discussing with Your Honor:

5  ulterior use, public official conduct, media frenzy,

6  availability of the transcript, need to protect the integrity

7  of the proceedings.

8        THE COURT:  You don't question that, as a starting

9  point, the media has a legitimate purpose in seeking these

10  tapes?

11     Do you dispute that the media has a legitimate purpose?

12        MR. PETROCELLI:  I do.  I do.

13     That -- we are not disputing their ability to or their

14  interest in seeing Mr. Trump's testimony via his written

15  transcript -- not that I think it's appropriate to just hand

16  transcripts out, and we have certainly not done that.  But if a

17  transcript is filed and it is a court record and the media

18  wants to get access to it, yeah, we have no issue with that.

19     But I don't believe that there's a compelling need to

20  obtain video deposition.  And typically, these depositions are

21  not made available until trial.  Even after trial, they are

22  only made available if and when they are used in the courtroom,

23  and even then, sometimes they are not made available.

24     You know, deposition materials are not part of an exchange

25  of free-market information.  These are unique to the powers

1    that a court has in adjudicating a case, and the interest

2    becomes when matters are filed as a matter of public record and

3    it becomes a matter of public record.

4        These depositions need not be filed as a matter of public

5    record, to begin with.  The Court does not require to see the

6    videos to rule on a summary judgment motion, and I doubt if

7    there are very many instances in which this Court has actually

8    had to watch a video deposition to rule on a summary judgment

9    motion when the transcript is fully available or when

10   credibility issues doom a summary judgment motion in any event.

11          THE COURT:  All right.  Mr. Petrocelli, thank you.

12       Let me pose some questions to counsel for the media, and

13   let me begin by asking why the Court shouldn't do in this case

14   what has been suggested by Mr. Petrocelli and what Judge Emmet

15   Sullivan did in the case pending before him relating to Cheryl

16   Mills' video deposition.

17          MR. LAIDMAN:  Thank you, Your Honor.

18       I would say that -- starting with that particular case the

19   Court has asked about, I would say that that decision in the

20   *Judicial Watch* case is of limited precedential value given the

21   posture and the nature of the proceedings and the ruling.  It

22   is a very brief minute order that doesn't go through the

23   complete analysis that's required under the Ninth Circuit

24   standard, under either the compelling reasons test or the good

25   cause standard, to go through the full two-step process the

1   Court mentioned of identifying a concrete harm backed up with a

2   particularized showing and then balancing the public and

3   private interest.  This was a very abbreviated proceeding at a

4   different stage of the case.  It was in advance of the

5   deposition of, as the Court noted, a nonparty, a third party.

6   It was not the public official at the center of the case, as

7   here.  Again, it was in advance of the deposition at an early,

8   pretrial stage of the case.  It wasn't like what we are dealing

9   with here, where records have been submitted for adjudication

10  in connection with a summary judgment motion.  And so I think

11  both the public interest and the procedure and the standard

12  applicable here under the Ninth Circuit law are all different.

13          THE COURT:  And let me ask you to further articulate

14  what the public interest is in disclosing these videos.

15          MR. LAIDMAN:  Thank you.

16      I guess I would say just that, first, as the Court

17  mentioned, it is a two-step test, and that before you even get

18  to the balancing of public and private interests,

19  particularized harm has to be shown.  And this -- same thing,

20  obviously, under the compelling reasons test, as the Court

21  asked us to address the good cause standard.  I think the case

22  law is very clear that if you don't make that threshold showing

23  of a specific concrete harm backed up by evidence or concrete

24  example, then you don't have to get to the balancing at all,

25  and the burden is on the party that's moving for closure to

1    make that threshold showing of harm.

2         So here, based on the assertions of harm that have been

3    made, I don't think Court even necessarily needs to get there.

4    I am happy to talk about the harm, but since the Court asked

5    about the public interest --

6              THE COURT:  Let's talk about the harm.

7         Mr. Petrocelli points to the likely exposure of these

8    videos to our prospective jurors.  He asserts that there may be

9    editing, which then presents the testimony of Mr. Trump in a

10   manner that isn't fair, isn't balanced, isn't complete, and

11   ultimately will have the effect of leading prospective jurors

12   to prejudge the case.

13        What is your response to that position?

14             MR. LAIDMAN:  I think my response, first and

15   foremost, is that all of the harms that have been asserted are

16   entirely abstract.  They are not based on specific content of

17   these depositions, and they are not really based on the

18   specific circumstances of the case.  They are abstract

19   interests in the integrity of the court and tainting a jury

20   pool that could really apply to any case, and there hasn't been

21   the required direct link drawn to the circumstances here that

22   the case law really requires.  And to hold, on this record and

23   these arguments, that that's sufficient would really

24   essentially be recognizing a new categorical exemption for

25   deposition videos.

1    In the *CBS* case, in the Second Circuit, which we discuss

2    in our brief, the court specifically said there is no

3    categorical exemption from the public right of access for

4    deposition videos.

5    Another case that I think is instructive on this point is

6    the Ninth Circuit *Archbishop of Portland* case that elaborates

7    on the good cause standard that's at issue here.  And there, a

8    couple of nonparties had asked for a -- basically a categorical

9    rule, an exemption, that said that nonparties who might have a

10   privacy interest in records shouldn't have the burden of

11   showing good cause.  And the court said that, while there's

12   some appeal to that, it is not supported by the law; it is not

13   supported by Rule 26.  Rule 26 says that the party moving for

14   closure always has to make that specific, particularized

15   showing of harm, and that Congress knows how to make exceptions

16   when it wants, and it's made some for certain particularly

17   sensitive personal identifying information, and it hasn't done

18   that for deposition videos.

19   And I think that's really on point here because to say

20   that the general overall integrity of the court, the general

21   overall effect of publicity, the general overall threat of

22   tainting a jury pool can justify restricting access here is

23   recognizing a categorical exemption for videos.

24   With respect to the publicity and jury issues

25   specifically, there's a really long line of controlling Ninth

1    Circuit authority that wasn't really countered in the briefing

2    that we had discussed from the *AP* case, the *CBS* case, the

3    *Seattle Times* case, that say the history of high-profile cases

4    shows that it's still possible to impanel a fair jury even

5    where there's been extensive continuing publicity in some of

6    the most high-profile cases of the century: Watergate, Manson

7    Family, ABSCAM, John Delorean.

8         So I think under that standard, under the tools that the

9    Supreme Court talked about in the *Press Enterprise* case, about

10   voir dire, jury instructions -- it's something that can be

11   addressed.

12        THE COURT:  Let me ask you about some of the content

13   of the deposition.  Certainly, there's a public interest in

14   obtaining details regarding the allegations made by the

15   plaintiffs against Mr. Trump.  Would you agree?

16        MR. LAIDMAN:  Yes.

17        THE COURT:  Now, to the extent that the questioning

18   goes beyond and starts asking Mr. Trump regarding his opinions

19   relating to certain politicians, such as Jeb Bush, and Rick

20   Perry, George Pataki, Hillary Clinton, do you believe that the

21   public also has a right to know about those matters?

22        MR. LAIDMAN:  Well, I guess I'd make two points in

23   response to that, Your Honor.

24        THE COURT:  As it relates to this case.

25        MR. LAIDMAN:  Yes.

1    That -- first of all, that that information is already

2  public.  The transcripts have been released in their entirety,

3  so that information is already out there.  What would be added

4  by the video?  There's a question of what is it going to add to

5  have the video.  It's going to add accuracy.  The *CBS* case,

6  from the Second Circuit, makes that very clear, that releasing

7  video of a deposition -- even where the content, the written

8  content, is already known -- can enhance the accuracy of

9  reporting by giving a full picture of the proceedings.  A lot

10  of the authority in this area recognizes that the cold

11  transcript is one thing, but in-person proceedings, being able

12  to view and hear the proceedings, adds another layer that's

13  important for the public.  And here, it would increase the

14  accuracy of the reporting.

15    And you know, the standards for what is admissible or

16  relevant before a jury or at the summary judgment stage is not

17  the test for public access.  The test for public access is if

18  something was submitted for the Court's consideration in

19  connection with a substantive motion that's related to the

20  merits because the Court's consideration of that, even what it

21  decides not to rely on, is important for the public to know

22  about, to evaluate the proceedings, and it's especially true in

23  a case like this, where the proceedings themselves have become

24  at issue in the public debate.

25         THE COURT:  All right.  Thank you.

1        Mr. Petrocelli, would you like to respond to any of those

2   arguments?

3            MR. PETROCELLI:  Yes, Your Honor.

4        On this particularized harm issue, this is why I think

5   it's instructive to go through the cases, Your Honor, because

6   this is more of an issue in cases that don't have any notoriety

7   or anything.  Here, nobody disputes the almost unprecedented

8   publicity and public attention that this case has received and

9   will continue to receive, and that makes it all the more risky

10  and dangerous that the video deposition can be prejudicial,

11  particularly when we are not really talking about depriving the

12  public of access.  The public has access to the testimony.

13  There is no question about the accuracy of the testimony.

14  Nobody has challenged the accuracy of the testimony.

15       This is unlike the *Condit* case, that's prominently relied

16  on by my opponents, where the defendant in the case, Dominick

17  Dunne, complained that his testimony was the result of

18  bullying, questioning, fatigue, and called into question the

19  deposition process itself.  No such factor or circumstance

20  exists in this case.  There's been no discussion about the

21  deposition process, no attack on the accuracy of what was said.

22  All of that public access has been fully afforded.

23       The protection that we are seeking here is extremely

24  narrow, Your Honor.  It is simply the public, having already

25  been given access to the transcript -- they don't have a

1    legitimate need, or a need that at least overcomes the

2    potential for harm, to also have a video when the video is rife

3    and ripe to be misused.

4        And the cases rely prominently on these kinds of factors.

5    No video was released in the Clinton case, none in the Steve

6    Jobs case, none in the Anna Nicole Smith case, none in the

7    Bobby Knight case, none in the Prince case, none in the Paula

8    Jones-Bill Clinton case, none in the other Bill Clinton case

9    involving McDougal, and none in the *Poindexter* case, involving

10   president Reagan.

11           THE COURT:  Although, those cases were different,

12   weren't they?

13           MR. PETROCELLI:  Almost all the cases have some

14   difference to them, yes.  For example, Jobs and Reagan involve

15   the --

16           THE COURT:  The Rule 15 depositions that are offered

17   in lieu of testimony at trial?

18           MR. PETROCELLI:  Exactly.  But even then -- for

19   example, in the *Poindexter* case -- obviously Reagan had been a

20   former president by then, but they didn't allow the press to

21   get a copy of the deposition, either before or even after the

22   trial; they could just come in and view it in a room.  But they

23   had the transcript.

24        And so the courts are particularly cautious and vigilant

25   in exercising their paramount duty to not worry about the

1    presidential election but to ensure the fairness and integrity

2    of the proceedings, especially when there's a proximate trial.

3    In the *Condit* case, for example, there was no trial date set.

4    It was in the beginning of the case.

5        We have a trial in one of the cases not too far down the

6    road.  I think the Court has scheduled it in end of November,

7    and here we are in July.  We have this convention next week, in

8    Cleveland, and there's all kinds of potential for mischief.

9    And the courts specifically call out the potential for misusing

10   the video for purposes unrelated to the litigation.

11       So I suggest to you, Your Honor, that the legitimate

12   public interest in the case -- which I do not dispute -- has

13   been more than honored by the availability of the transcript.

14   There is no need, and certainly no compelling need, to overcome

15   the risks and dangers associated by also making available the

16   video.  And I would ask that Your Honor keep the video

17   protected.  It can be used at trial, if it's subject to the

18   rules of evidence, and at that point, a determination can be

19   made whether it would then be made available to the press.

20            THE COURT:  Thank you.

21       Mr. Forge, would you like to provide any views?

22            MR. FORGE:  Thank you, Your Honor.  Just briefly.

23   And then I assume that we will take up the issue concerning the

24   specific 48 excerpts that we have submitted?  I can address

25   that now or --

1          THE COURT:  I will take that under submission.

2          MR. FORGE:  Okay.  Your Honor, I wanted to address

3    specifically the point you raised regarding the questions and

4    answers concerning Mr. Trump's opinions of other politicians,

5    and because this is one area -- a line of questions that has

6    been misunderstood in the press, quite frankly, and

7    misconstrued by the defense and unfairly maligned.  That is not

8    even remotely tangential to the case.

9          That line of questioning and Mr. Trump's answers go to the

10   heart of, really, the only thing even resembling a defense that

11   Mr. Trump has ever raised in this case, and that is that they

12   had this 98 percent approval rate.  And so, taking that

13   premise -- which is a false premise, initially, because it

14   doesn't account for the 25 percent of the students who

15   requested refunds.  But even taking that false premise at its

16   word, what that line of questioning revealed was that Mr. Trump

17   himself understands -- because this was his explanation for

18   previously praising politicians and then reversing course on

19   his opinions.

20         His explanation was, "I have a perfectly reasonable

21   explanation for that.  I was a businessman at the time.  And

22   because I had a potential need for these individuals'

23   assistance, I wanted to say nice things about them."

24         His second explanation was, "I didn't really give it much

25   thought at the time.  I hadn't really studied them that much.

1    Once I learned more about these people, my opinion changed."

2         So these two explanations, that Mr. Trump has given

3    repeatedly, both within this case and without, explain

4    completely why this 98 percent myth is just that; it is a myth.

5    Because, number one, the students were asked to fill out

6    non-anonymous evaluations at a time when they had paid for

7    it -- they weren't just expecting, but they had paid for

8    ongoing assistance from the Trump University

9    salesmen/instructors.  So just like Mr. Trump, they had an

10   expectation of needing help from the people who they were

11   evaluating.

12        And, just like Mr. Trump's explanation, they did not know

13   at the time that none of these salesmen had been handpicked by

14   Mr. Trump, that he had not met them or done anything to vet

15   them; so they also learned more at a later date and, therefore,

16   their earlier, uninformed opinions were not reliable.

17        What this -- this comes back to the issue before Your

18   Honor because it really highlights the lack of particularized

19   harm and, frankly, the lack of any effort to show

20   particularized harm.  We heard from Mr. Petrocelli about

21   threats and potential.  That's not particularized harm.  He has

22   not identified a single portion of either deposition -- either

23   the December or January or the earlier one, from 2012, any of

24   these three depositions -- that is particularly damaging

25   because Mr. Trump had worked up into an emotional frenzy, or it

1    was a moment of weakness or confusion, anything that could

2    particularly be used to present a false picture of what he

3    actually said and what he actually meant to say.

4         And I agree with Mr. Laidman entirely.  With that complete

5    failure to show any particularized harm -- and it's about as

6    complete a failure as we could imagine; they haven't identified

7    a single instance -- with that complete failure, we don't even

8    get to the balancing test.

9         And so the portion about the questioning and public

10   opinion -- his opinion of these public officials, it really

11   does highlight the fact that they haven't made any effort

12   whatsoever to show a particularized harm.  And we know from the

13   Ninth Circuit's case and the *CBS v. District Court* opinion that

14   these broad, conclusory, speculative harms don't cut it in this

15   context.  They do not amount to good cause.

16        And again, I have a different -- I have a different dog in

17   a somewhat different fight, but they are overlapping.  My

18   interest is not so much the press's being able to use it.  My

19   interest is being able to use it for this case and being able

20   to use it to, frankly, combat, for class members, the extensive

21   campaign Mr. Trump has waged to taint the jury pool.  And

22   that's really the elephant in the room here.  There's not a

23   single case Mr. Petrocelli has cited where any of the moving

24   parties engaged in anything in the universe of what Mr. Trump

25   has done in this case.  Mr. Petrocelli said himself -- and on

1   this front I agree with him -- we are living in a visual world,

2   and no one knows that better than Mr. Petrocelli's client.  No

3   one exploits that more than Mr. Petrocelli's client.

4        And so for him to say, after all that he has done, that

5   somehow the truth about his testimony will unfairly prejudice

6   him or taint this jury pool -- it just doesn't ring true, Your

7   Honor.  And that's, again, why we don't have even an attempt to

8   show a particularized harm here, because there's nothing that

9   they could offer up specifically that would withstand any

10  scrutiny because nothing they could say, nothing they could

11  identify in those video clips, would even approach even

12  Mr. Trump's mildest statements about this case.  Nothing.  And

13  that's why -- that's why we have the complete absence of an

14  attempt to meet that requirement.

15       And so, Your Honor, I really -- Ms. Jensen and I were

16  talking about this before we came over here.  I almost feel as

17  if even arguing this matter elevates their motion to a level

18  that it doesn't deserve because they haven't come forward with

19  anything to even discuss on that very first prong of the good

20  cause showing.

21          THE COURT:  Thank you.

22       Mr. Petrocelli, I will allow you to have the last word,

23  and I would ask you, in the course of that, to address the

24  argument that has been made now by plaintiffs and media counsel

25  that you have failed to demonstrate any particularized harm,

1    that you failed to provide any specifics which would allow the

2    Court to conclude there's this likelihood of harm.

3           MR. PETROCELLI:  Yes, Your Honor.

4       First of all, I indicated at the very outset, in response

5    to the first question, what the particularized harm is.  It is

6    the risk that our fair trial will be impaired.

7           THE COURT:  And the specifics?

8           MR. PETROCELLI:  That's the specifics, Your Honor,

9    the fact that jurors will be subjected to -- and you heard by

10   opposing counsel's own admission.  Apparently, they intend to

11   try to even the playing field by making these video excerpts or

12   the video deposition available.

13      In Footnote 5 of our reply brief, we cited cases that

14   stand for the proposition that a trial court need not have,

15   quote, "Positive proof of the impossibility of assuring

16   defendant a fair trial before access may be denied, because a

17   forecast of future difficulty is, by definition, uncertain."

18   And then there's another citation to the same effect in the

19   brief, Your Honor.

20      And this particularized showing is a bit of a red herring

21   in the sense that this comes up in cases largely, Your Honor,

22   where somebody is trying to keep the transcript itself

23   confidential and not available for public scrutiny.

24      The transcript is fully available.  So we are now only

25   focused on -- we are now focused on not the evidence, not every

1    single statement, not the accuracy of all the statements, none

2    of that.  All of that is out there.  We are now talking about

3    what additional incremental benefit there is by providing the

4    video of that.

5        And we heard the argument that they would like to counter

6    prior statements by Mr. Trump in interviews and questions put

7    to him, including in national debates by his opponents, with

8    video excerpts of his deposition, thereby almost ensuring that

9    a jury pool would be subjected to this material.

10       This is a false burden to which we are being put, is what

11   I am suggesting, Your Honor.

12       The Court can take judicial notice -- just look at the

13   papers that have been filed, at pages 4, 5, and 6 of the

14   plaintiffs' brief, docket 254; page 4, Exhibits B through E, of

15   the media parties' brief, docket 233.  All of that evidence is

16   before the Court.  It's all identifying the massive amount of

17   public discourse there has been about this case, assuring the

18   Court that that public discourse is not suddenly going to end.

19       And the Court has all of this evidence in front of it.  We

20   need not submit any more evidence.  I can't prove to you that

21   there will be a bad jury in this case, and I am not required to

22   prove that to you.  But based on the evidence that you have in

23   front of you, I think the Court can readily infer that if this

24   material is made available in video form, when it's already out

25   there in transcript form, the risk to assuring a fair trial

1  will be heightened.

2          THE COURT:  Thank you.

3          MR. PETROCELLI:  Thank you.

4          THE COURT:  The matter will be taken under

5  submission.

6          MR. PETROCELLI:  Thank you, Your Honor.

7      (End of proceedings at 2:16 p.m.)

8                      -o0o-

9              C-E-R-T-I-F-I-C-A-T-I-O-N

10

11          I hereby certify that I am a duly appointed,

12  qualified and acting official Court Reporter for the United

13  States District Court; that the foregoing is a true and correct

14  transcript of the proceedings had in the aforementioned cause;

15  that said transcript is a true and correct transcription of my

16  stenographic notes; and that the format used herein complies

17  with rules and requirements of the United States Judicial

18  Conference.

19          DATED:  July 13, 2016, at San Diego, California.

20

21                      /s/  Chari L. Possell

22                      _____
                        Chari L. Possell
23                      CSR No. 9944, RPR, CRR

24

25