UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ART COHEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP,<br><br>Defendant. | Case No.: 3:13-cv-2519-GPC-WVG<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>**[ECF No. 180]** |

Before the Court is Defendant Donald J. Trump's ("Defendant") motion for summary judgment. Defendant's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("Def. Mot."), ECF No. 180. The motion has been fully briefed. *See* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("Pl. Resp."), ECF No. 220; Defendant's Reply in Support of Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Def. Reply"), ECF No. 248. A hearing on the motion was conducted on July 22, 2016. ECF No. 263.

Upon consideration of the moving papers, oral argument, and the applicable law, and for the following reasons, the Court **DENIES** Defendant's motion.

//

# FACTUAL BACKGROUND

### A. Defendant Donald J. Trump

Defendant is a real estate magnate, television personality, and author. In 2004, Defendant helped found Trump University ("TU"), a private, for-profit entity offering real estate seminars and purporting to teach Defendant's "master strategies" for real estate success. Pl. Resp., Ex. E, at 242, 244–50; *see also id.* at 191–241. TU began with web-only content in 2005, and shifted to live events in 2007. Plaintiff's Response to Defendant's Separate Statement of Undisputed Facts ¶ 13 ("Pl. SSUF"), ECF No. 220-10; Trump Dep. 193:12–18, Def. Mot., Ex. 2.[1]

For TU's live events, consumers were first invited to a ninety-minute Free Preview, which was preceded by an orchestrated marketing campaign using mailed invitations and TU website, radio, and newspaper advertising. *See* Pl. Resp., Exs. E–F. For example, consumers were sent "Special Invitation[s] from Donald J. Trump" which included a letter signed by Defendant that stated "[m]y hand-picked instructors and mentors will show you how to use real estate strategies." Pl. Resp., Ex. F. Newspaper advertisements displayed a large photograph of Mr. Trump, stating "[l]earn from Donald Trump's handpicked expert," and quoted Mr. Trump as saying: "I can turn anyone into a successful real estate investor, including you." Pl. Resp., Ex. E, at 191–207. Similarly, other advertisements displayed large photographs of Mr. Trump and included statements such as "Learn from the Master," "The next best thing to being his Apprentice," and "Nobody on the planet can teach you how to make money in real estate better than I can." Pl. Resp., Ex. E, at 242, 244–50; Ex. T, at 321–22. Further, TU advertisements utilized various forms of recognizable signs associated with accredited academic institutions, such as a "school crest" used on TU letterhead, presentations, promotional materials and advertisements, *see* Pl. Resp., Exs. E,

---

[1] In 2005, the New York State Education Department directed TU to remove the word "University" from its title. Pl. Resp., Ex. Q. However, although TU officially changed its name to Trump Entrepreneur Initiative, LLC, marketing and promotional materials continued to refer to "Trump University."

F, I, L, P, as well as language comparing TU with such institutions, *see* Main Promotion Video, Pl. Resp., Ex. L ("We're going to teach you better than the business schools are going to teach you and I went to the best business school."); TU Marketing Guidelines, Pl. Resp., Ex. P, TU-DONNELLY0000016–17 (describing the "Trump University Community" as including "Staff," "Faculty," "Instructors," and "Program Directors (Trump University's Admissions Department)"; including under "Catch Phrases/Buzz Words" "Ivy League Quality," and under "Tone" "Thinking of Trump University as a real University, with a real Admissions process—i.e., not everyone who applies, is accepted"; and encouraging TU employees to "[u]se terminology such as" "Enroll," "Register," and "Apply").

Plaintiffs have provided evidence that Defendant reviewed and approved all advertisements. Trump Dep. 279:18–280:16, Pl. Resp., Ex. D; Bloom Dep. 73:3–74:2, Pl. Resp., Ex. H.

At the beginning of each Free Preview, a promotional video was played in which Defendant stated:

> We're going to have professors and adjunct professors that are absolutely terrific. Terrific people, terrific brains, successful. . . . The best. We are going to have the best of the best and honestly if you don't learn from them, if you don't learn from me, if you don't learn from the people that we're going to be putting forward—and these are all people that are handpicked by me—then you're just not going to make in terms of the world of success. . . . we're going to teach you better than the business schools are going to teach you and I went to the best business school.

Main Promotion Video, Pl. Resp., Ex. L.

Individuals were then invited to attend a $1,495 Fulfillment Seminar. Compl. 15, ECF No. 1. Those who paid for the Fulfillment Seminar were allegedly promised a three-day seminar and one year of expert interactive support. *Id.* at 20.

After the Fulfillment Seminar, individuals were invited to sign up for the Trump Elite Program for up to $34,995. *Id.* Elite Program participants were allegedly promised unlimited mentoring for an entire year. *Id.* at 21.

### B. Plaintiff Art Cohen

Plaintiff Art Cohen ("Plaintiff") is a businessman and resident of the state of California. Compl. 4. Plaintiff alleges learning about Trump University from a 2009 San Jose Mercury News advertisement. *Id.* Plaintiff alleges receiving a "special invitation" by mail to attend a Trump University seminar. *Id.* Drawn in by Defendant's name and reputation as a real estate expert, Plaintiff attended a free preview event. *Id.* Plaintiff then paid $1,495 to Trump University to attend a three-day real estate retreat, where he subsequently purchased a "Gold Elite" program for $34,995. *Id.* at 5.

Plaintiff avers that he would not have paid for any of the TU programs had he known that Defendant had not handpicked the TU instructors, and/or that TU was not a "university." *Id.*; *see also* Cohen Dep., 150:9–151:17, 151:20–152:9, Def. Mot., Ex. 10.

## PROCEDURAL BACKGROUND

On October 18, 2013, Plaintiff filed a complaint alleging a single cause of action for mail and wire fraud in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Compl. On the same day, Plaintiff filed a "notice of related case" requesting that the case be transferred to the undersigned Judge because the present action is related to *Low v. Trump University, LLC*, No. 10-cv-940-GPC-WVG. ECF No. 3.[2]

On February 21, 2014, the Court denied Defendant's motion to dismiss. ECF No. 21. On November 27, 2014, the Court granted Plaintiff's motion for class certification. ECF No. 53. The Court noted that Plaintiff's "theory of recovery under RICO is that Defendant committed 'fraud and racketeering' by marketing Trump University 'Live Events' as an institution with which he was integrally involved as well as 'an actual university with a faculty of professors and adjunct professors.'" *Id.* at 5–6 (citation

---

[2] Filed on April 30, 2010, the initial complaint in *Low* alleged ten causes of action under state consumer protection statutes and common law. *Low*, ECF No. 1. On October 7, 2013, the Court denied *Low* plaintiffs' motion to modify the scheduling order in that case to file a fourth amended complaint to include a RICO cause of action. *Low*, ECF No. 248. *Low* is currently set for trial on November 28, 2016. *Low*, ECF No. 478.

omitted). The Court certified the following class:

> All persons who purchased Live Events from Trump University throughout the United States from January 1, 2007 to the present.[3]

*Id.* at 22–23.

On September 21, 2015, the Court granted in part and denied in part Plaintiff's motion for approval of class notice and directing class notice procedures. ECF No. 130; *Low*, ECF No. 419. On November 15, 2015, the opt-out period expired. *See id.* at 11.

On April 22, 2016, Defendant filed the instant motion. Def. Mot., ECF No. 180.[4] On June 3, 2016, Plaintiff responded. Pl. Resp., ECF No. 220. On June 17, 2016, Defendant replied. Def. Reply, ECF No. 248. A hearing on the motion was held on July 22, 2016. ECF No. 263.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to

---

[3] Excluded from the Class are Trump University, its affiliates, employees, officers and directors, persons or entities that distribute or sell Trump University products or programs, the Judge(s) assigned to this case, and the attorneys of record in the case. ECF No. 53, at 23.

[4] On the same day, Defendant also filed a motion for decertification, ECF No. 192, and parties filed a number of motions seeking to exclude various experts, ECF Nos. 181, 184, 187, 188, 189. These motions are currently pending before the Court.

establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

## DISCUSSION

RICO's civil action provision states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). In turn, section 1962(c) renders it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Liability under § 1962(c) thus requires (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). In addition, a

plaintiff may only recover "to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Id.*

"'Racketeering activity' is any act indictable under several provisions of Title 18 of the United States Code, *see* 18 U.S.C. § 1961, and includes the predicate act[s] of mail fraud under 18 U.S.C. § 1341" and wire fraud under 18 U.S.C. § 1343. *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987); *see also United States v. Woods*, 335 F.3d 993, 997 (9th Cir. 2003). In order to establish liability for mail and wire fraud, plaintiffs must prove four elements: "(1) that the defendant knowingly devised or knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) that the statements made or the facts omitted as part of the scheme were material; (3) that the defendant acted with the intent to defraud; and (4) that in advancing or furthering or carrying out the scheme, the defendant used the mails/wires or caused the mails/wires to be used." *Woods*, 335 F.3d at 997.

Defendant makes four arguments as to why summary judgment should be granted in his favor. Specifically, Defendant argues that (1) Plaintiff seeks "an unprecedented expansion of RICO law"; (2) Plaintiff fails to establish that Defendant conducted the affairs of TU; (3) Plaintiff fails to establish that the statements made or the facts omitted as part of the scheme to defraud were material; and (4) Plaintiff fails to establish that Defendant "knowingly participated" in a scheme to defraud. Def. Mot. 8–24. Because the Court finds none of Defendant's arguments persuasive, the Court **DENIES** Defendant's motion for summary judgment.

### I. The Scope of Civil RICO

Defendant argues that "[t]his case epitomizes the pervasive abuse of civil RICO." Def. Mot. 1. Defendant contends that "RICO was never intended to provide a 'federal cause of action and treble damages' for every plaintiff," Def. Mot. 1 (citation omitted), and that "garden-variety business disputes" should not be "squeeze[ed]" into civil RICO actions, *id.* at 8 (citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992)).

Essentially, Defendant makes a policy argument that the civil RICO provision should be read narrowly so as to avoid providing plaintiffs with "an unusually potent weapon" in the form of RICO's treble damages remedy. Def. Mot. 9 (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)). And indeed, an examination of the caselaw reveals that a number of courts have previously struggled with the ultimate scope of RICO's civil action provision. *See, e.g.*, *Odom v. Microsoft Corp.*, 486 F.3d 541, 545–47 (9th Cir. 2007). However, as the Ninth Circuit has recognized, the Supreme Court has ruled in favor of an expansive interpretation of civil RICO in a series of cases. *See id.* (discussing cases).

For instance, in *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985), the Supreme Court rejected the Second Circuit's attempt to read RICO to impose liability only against defendants who had been criminally convicted, and only for what the court called "racketeering injury." The Court noted that the Second Circuit's decision was motivated by the view that a narrow construction of RICO's civil action provision was necessary to avoid "intolerable practical consequences." *Id.* at 490. The Court found, however, that a "less restrictive reading" was required. It wrote:

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes . . . ."
> 
> . . .
> 
> Underlying the Court of Appeals' holding was its distress at the "extraordinary, if not outrageous," uses to which civil RICO has been put. Instead of being used against mobsters and organized criminals, it has become a tool for everyday fraud cases brought against "respected and legitimate 'enterprises.'" Yet Congress wanted to reach both "legitimate" and "illegitimate" enterprises. The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences.
> 
> . . .
> 
> It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster. Yet this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress.

*Id.* at 497–99 (citations omitted). The Court "recognize[d] that, in its private civil version, RICO is evolving into something quite different from the original conception of its enactors." *Id.* at 500. However, the Court found that,

> Though sharing the doubts of the Court of Appeals about th[e] increasing divergence [in the prevalence of the use of civil RICO against "respected and legitimate 'enterprises'" as opposed to "mobsters and organized criminals"], we cannot agree with either its diagnosis or its remedy. The "extraordinary" uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of "pattern." We do not believe that the amorphous standing requirement imposed by the Second Circuit effectively responds to these problems, or that it is a form of statutory amendment appropriately undertaken by the courts.

*Id.*

Subsequently, some scholars have questioned the accuracy of the Supreme Court's reading of RICO's legislative history. *See, e.g.*, Paul Batista, *Civil RICO Practice Manual*, § 2.04. But while the Court has narrowed the reach of civil RICO in specific ways, such as by imposing a causation requirement, *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992), it has not deviated from its general admonition that "RICO is to be read broadly," *see Odom*, 486 F.3d at 547 (quoting *Sedima*, 473 U.S. at 497) (citing *Cedric Kushner Promotions v. King*, 533 U.S. 158 (2001); *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249 (1994)).

Defendant argues that courts have often reiterated that "allegations of routine commercial relationships [are in]sufficient to support a RICO claim." Def. Mot. 9 (quoting *Gomez v. Guthy-Renker, LLC*, No. EDCV1401425JGBKKX, 2015 WL 4270042, at *8 (C.D. Cal. July 13, 2015)). However, closer examination reveals that in cases employing such language, plaintiffs have failed to establish a required element in their RICO claim. *See, e.g., id.* at *9 (finding that a routine contract for services did not constitute a distinct enterprise); *Turner v. New York Rosbruch/Harnik, Inc.*, 84 F. Supp. 3d 161, 170 (E.D.N.Y.

2015) (finding that plaintiffs had failed to allege defendant's knowing participation); *see also Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (finding that plaintiff tenant had failed to allege financial loss which would be compensable under RICO). In other words, in such cases, courts have characterized the activity at issue as a "routine commercial relationship[]" precisely *because* the plaintiff has failed to meet a required element in their RICO claim.

Ultimately, while Defendant may believe that, as a policy matter, civil RICO ought not be extended to consumer class action cases, *see* Hr'g Tr. at 18, ECF No. 264, it is not for this Court to effectuate Defendant's policy preferences in contravention of the settled approach of the higher courts. The Court declines to "[undertake] a form of statutory amendment" of the RICO statute by imposing an "amorphous . . . requirement" that civil RICO not be extended to the specific category of consumer class action cases.

## II.   Whether Defendant Conducted the Enterprise of TU

Defendant argues that he did not "conduct" the affairs of the alleged enterprise of TU. Def. Mot. 10. Defendant contends that under *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993), the "conduct" element requires that a defendant have "participated in the operation or management of the enterprise itself," and that Defendant's involvement in TU did not rise to level of "direct[ing] the operations or management of TU." Def. Mot. 10–11.

Specifically, Defendant argues that Defendant's role in "planning and launching TU," "invest[ing] his own money," "control[ling] a majority ownership stake in TU," "review[ing] financial documents," conducting "status meetings with [TU President Michael] Sexton," and "review[ing] advertisements 'very quickly'" constituted only "ordinary business conduct by a principal investor and top executive," not Defendant "direct[ing] the operations or management of TU." Def. Mot. 11–12.

Plaintiff responds that Defendant exercised substantial control over various aspects of TU, including most notably the marketing scheme at issue in this case. Plaintiff points

to Defendant's deposition testimony, where he testified that he was "not aware" of any marketing materials for TU bearing his name, likeness, or signature that he did not approve, Trump Dep. 279:18–280:16, Pl. Resp., Ex. D,[5] as well as the testimony of Michael Bloom, TU's Chief Marketing Officer, as to the "very hands-on" nature of Defendant's involvement with TU's marketing materials, Bloom Dep. 73:3–74:2, Pl. Resp., Ex. H.[6]

      The Court agrees with Plaintiff that the evidence in the record raises a genuine issue of material fact as to whether Defendant participated in the operation or management of the enterprise. Defendant's argument that "Defendant did not direct the operations or management of TU" misstates the holding of *Reves*. Def. Mot. 11. In order to satisfy the

---

[5] *See* Trump Dep. 279:18–280:16 ("Q. Are you aware of any marketing materials for Trump University bearing your name that you didn't approve?
    A. I think they show them to me very quickly. I didn't spend a lot of time on it. But I think they showed them to me quickly. Yes, I see these ads.
    Q. That's a no, you're not aware of any that you didn't approve; correct?
    A. I don't know. I mean, I don't know what the—I can't answer that question. I think I looked at these two.
    Q. Are you aware of any marketing materials for Trump University bearing your name that you didn't approve?
    A. I'm not aware.
    Q. Any marketing materials for Trump University bearing your picture that you did not approve?
    A. I'm not aware of any, no.
    Q. Any marketing materials for Trump University bearing your signature that you did not approve?
    A. I'm not aware of any, no.").

[6] *See* Bloom Dep. 73:3–74:2 ("It was the morning, the morning when we had the first newspaper advertisement that I was involved with appearing in one of the New York newspapers, so it was coming out on that particular day, and I remember being at my desk very early in the morning and getting a call from Mr. Trump very early in the morning saying that he—this is, you know, 7 o'clock or thereabout in the morning and I remember him saying that he had seen the advertisement and was wondering who placed the advertisement. He liked the advertisement, but who placed the advertisement, and I said: Well, why do you ask?  He said: Because it's on an even numbered page, and when you open a newspaper in the beginning, you want to be on an odd numbered page so because it's a better position, and at that point—and I said: You know, Mr. Trump, you are absolutely correct and that will never happen again, and at that point I realized that, you know, when it actually comes to placing of a newspaper, that's probably one of the most important questions you need to ask, and, you know, I remember coming off of that phone call saying to myself that he was, you know, very, very astute and very hands-on to be able to look at that himself and be interested in knowing, you know, where that ad is placed because that is one of the most important factors, you know, in a newspaper ad.").

conduct element, *Reves* did not require that a defendant was the *exclusive* director of the operations or management of the enterprise, but that a defendant have "*participated* in the operation or management of the enterprise." 507 U.S. at 183 (emphasis added). As the Supreme Court observed in construing the statutory language,

> Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some part* in directing the enterprise's affairs is required.

*See id.* at 179 (emphasis added).

In *United States v. Shryock*, 342 F.3d 948, 986 (9th Cir. 2003), the Ninth Circuit found that a district court's failure to clarify the conduct element by specifying that a defendant had to be involved in the operation or management of the enterprise was harmless error where it was beyond any reasonable doubt that defendant had met *Reves*' operation or management test by "serv[ing] as a messenger between incarcerated members and members on the street, and help[ing to] organize criminal activities on behalf of the organization."

The cases cited by Defendant to support the proposition that the activity pointed to by Plaintiff does not amount to "some part" in the operation or management of the enterprise are unpersuasive. For instance, in *Taylor v. Bob O'Connor Ford Inc.*, 1999 U.S. Dist. LEXIS 4028, at *8 n.4 (N.D. Ill. Mar. 25, 1999), the court found that there were insufficient allegations in the complaint as to how the defendant president and principal shareholder participated in the scheme to defraud, as opposed to the management of the companies at issue in general. In *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011), the court found that plaintiffs had failed to plead their RICO claim with sufficient particularity. And in *Andreo v. Friedlander*, 660 F. Supp. 1362, 1370 (D. Conn. 1987), the court found that the defendant's participation was unknowing.

Here, however, as Plaintiff points out, it is precisely the marketing materials

reviewed and approved by Defendant that form the basis of the fraud alleged by Plaintiff; particularity is not at issue; and as discussed *infra* in Part IV, Plaintiff raises a genuine issue of material fact as to whether Defendant's participation was knowing. Thus, the Court finds that based on the evidence in the record, whether Defendant played "some part" in directing the affairs of TU is a genuine issue of material fact.

### III. Whether the Statements Made or Facts Omitted as Part of the Scheme Were Material

Defendant argues that Plaintiff cannot establish that Defendant engaged in racketeering activity, because in order to establish liability for the predicate acts of mail fraud and wire fraud, Plaintiff must prove "that the statements made or the facts omitted as part of the scheme [to defraud] were material." Def. Mot. 13–14 (citing *Woods*, 335 F.3d at 997). Defendant contends that Plaintiff cannot make this showing because (1) the representations made were non-actionable puffery; and (2) even if the representations made were not puffery, they were not false or misleading.

Neither of Defendant's arguments are persuasive. First, as stated in this Court's Order Denying Defendant's Motion to Dismiss,

> A statement is considered "mere puffery" when the statement is general rather than specific and thus "extremely unlikely to induce consumer reliance." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1052–54 (9th Cir. 2008) (finding a statement that a company would deliver flexibility and lower costs was "mere puffery," while finding actionable a statement that contracts intended to be for a fixed term of sixty months would expire after that term). In other words, "misdescriptions of specific or absolute characteristics" are actionable while advertising "which merely states in general terms that one product is superior is not actionable." *Cook, Perkis & Liehe v. N. Cal. Collection Serv., Inc.,* 911 F.2d 242, 246 (9th Cir. 1990) (internal quotations and citation marks omitted).

ECF No. 21, at 10. In that Order, this Court found that,

> [A]lthough many of Plaintiff's allegations challenged by Defendant as "mere puffery" contain classic "seller's talk," . . . the gravamen of Plaintiff's allegations is that Trump's advertising falsely marketed Trump University as both an institution with which Donald Trump was integrally involved as well

as "an actual university with a faculty of professors and adjunct professors." Rather than challenging Trump's subjective and general claims as to quality, Plaintiff challenges whether Trump University delivered the specific or absolute characteristics of (1) Donald Trump involvement; and (2) an "actual university."

*Id.* at 10–11 (citations omitted).

Defendant provides no rationale why the Court should revisit this decision, except for the contention that "university" can have varying meanings, including the use of the term for so-called corporate "universities" such as Disney University and Hamburger University (McDonald's). Def. Mot. 17–19. Defendant points to evidence in the record that students testified to varying understandings of what "university" meant. Def. Mot. 17 (citing testimony). However, Plaintiff points to evidence in the record that Defendant's statements in the Main Promotional Video, as well as TU's "Marketing Guidelines," encouraged TU students to associate TU with accredited universities rather than so-called corporate "universities." *See* Main Promotion Video, Pl. Resp., Ex. L ("We're going to teach you better than the business schools are going to teach you and I went to the best business school."); TU Marketing Guidelines, Pl. Resp., Ex. P, TU-DONNELLY0000016–17 (describing the "Trump University Community" as including "Staff," "Faculty," "Instructors," and "Program Directors (Trump University's Admissions Department)"; including under "Catch Phrases/Buzz Words" "Ivy League Quality," and under "Tone" "Thinking of Trump University as a real University, with a real Admissions process—i.e., not everyone who applies, is accepted"; and encouraging TU employees to "[u]se terminology such as" "Enroll," "Register," and "Apply").

The Court finds that Plaintiff has raised a genuine issue of material fact as to the materiality of the "university" representation. At best, Defendant's evidence as to the "university" representation demonstrates that whether the representation of TU as a "university" was material is a question of fact best decided by the jury. *Cf. Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (finding, in the context of California's consumer laws, that whether a business practice is deceptive generally

presents a question of fact).

Second, Defendant argues that even if the representations were not puffery, they were not false or misleading. Defendant asserts, with no reference to the record, that he was "integrally involved in the instructor and mentor selection process." Def. Mot. 20. However, Plaintiff points to extensive evidence in the record of Defendant's unfamiliarity with the names, faces, and voices of TU instructors and the content of TU seminars, as well as to Defendant's explicit admissions that he did not personally meet, interview, or select TU instructors and mentors. *See, e.g.*, Trump Dep. 100:23–125:5; *id.* at 228:15–24; *id.* at 413:21–414:1; *id.* 429:23–430:1 ("Q. . . . Before you say my handpicked instructor is going to be there, you could have sat down and personally interviewed the person, right? A. I guess I could have."); *id.* at 477:6–478:8 ("Q. You didn't personally select these instructors, correct? A. No. Q. That's correct? A. That is correct." *Id.* at 477:6–10.). The Court thus finds that Plaintiff has raised a genuine issue of material fact as to whether Defendant's representation of "integral involvement" was false or misleading.[7]

### IV. Whether Defendant Knowingly Participated in a Scheme to Defraud

Finally, Defendant argues that Plaintiff cannot establish that he "knowingly devised or knowingly participated in a scheme or plan to defraud." *Woods*, 335 F.3d at 997. Defendant argues that this element requires Plaintiff to present evidence that Defendant had a "specific intent to deceive or defraud." Def. Mot. 22–23 (citing *United States v. Harkonen*, 510 F. App'x 633, 636 (9th Cir. 2013)). Defendant argues that Plaintiff cannot make this showing, because the evidence in the record establishes that Defendant invested in TU because he "loved the educational aspect of the business," "TU was not a large investment for Defendant," "Defendant vigilantly protected the reputation of the Trump

---

[7] Defendant also argues that the use of the university moniker was not false or misleading because by using the term "university," Defendant was not representing that TU was a university "equivalent to a four-year, degree-granting institution." Def. Mot. 20. Essentially, Defendant is again arguing that the term "university" can have varying meanings. But again, at best, Defendant's argument demonstrates that whether the representation of TU as a "university" was material is a question of fact best decided by the jury.

'Brand,'" "Defendant believed TU was providing a good program because he was informed about the many positive student reviews," and "Defendant knew and relied on TU's hired counsel and compliance team to review marketing materials for legal compliance." Def. Mot. 23 (citations omitted).

However, because "[d]irect proof of knowledge and fraudulent intent—of what a person is thinking—is almost never available . . . [the Ninth Circuit] ha[s] repeatedly held that the intent to defraud may be proven through reckless indifference to the truth or falsity of statements" in the context of federal fraud statutes. *United States v. Dearing*, 504 F.3d 897, 902–03 (9th Cir. 2007) (first alteration in original) (citing *United States v. Munoz*, 233 F.3d 1117, 1136 (9th Cir. 2000) (mail fraud); *United States v. Ely*, 142 F.3d 1113, 1121 (9th Cir. 1997) (bank fraud)). Here, as discussed *supra* in Part III, Plaintiff has pointed to extensive evidence in the record that Defendant did not personally meet, interview, or select TU instructors or mentors, *see, e.g.*, Trump Dep. 100:23–125:5; *id.* at 228:15–24; *id.* at 413:21–414:1; *id.* at 429:23–430:1; *id.* at 477:6–478:8, even while the representation that TU instructors or mentors were "handpicked" by Defendant was made both by Defendant himself in the Main Promotional Video, as well as in marketing materials approved by Defendant, *see, e.g.*, Main Promotional Video, Pl. Resp., Ex. L ("[T]hese are all people that are handpicked by me."); Special Invitation From Donald. J. Trump, Pl. Resp., Ex. F ("[M]y hand-picked instructors will share my techniques, which took my entire career to develop.").

Thus, the Court finds that Plaintiff has raised a genuine issue of material fact as to whether Defendant knowingly participated in the scheme to defraud.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment, ECF No. 180, is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 2, 2016

Hon. Gonzalo P. Curiel
United States District Judge