1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

8   SONNY LOW, J.R. EVERETT and          )   No. 3:10-cv-0940-GPC-WVG
9   JOHN BROWN, on Behalf of             )
    Themselves and All Others Similarly  )   **ORDER GRANTING**
    Situated,                            )   **DEFENDANT'S MOTION TO**
10                                        )   **AMEND PROTECTIVE ORDER**
                        Plaintiffs,       )
11                                        )   [ECF No. 485]
            vs.                           )
12                                        )
    TRUMP UNIVERSITY, LLC, a New          )
13  York Limited Liability Company, and   )
    DONALD J. TRUMP,                      )
14                                        )
                        Defendants.       )
15  _____  )

16  ART COHEN, Individually and on        )   No. 3:13-cv-02519-GPC-WVG
    Behalf of All Others Similarly Situated, )
17                                        )   **ORDER:**
                        Plaintiff,        )
18                                        )   **GRANTING DEFENDANT'S**
            vs.                           )   **MOTION TO AMEND**
19                                        )   **PROTECTIVE ORDER**
    DONALD J. TRUMP,                      )
20                                        )   **DENYING MEDIA**
                        Defendant.        )   **INTERVENORS' MOTION TO**
21                                        )   **INTERVENE AND FOR AN**
                                          )   **ORDER MODIFYING**
22                                        )   **STIPULATED PROTECTIVE**
                                          )   **ORDER**
23                                        )
                                          )   **GRANTING IN PART AND**
24                                        )   **DENYING IN PART PLAINTIFF'S**
                                          )   **EX PARTE APPLICATION FOR**
25                                        )   **LEAVE TO FILE ELECTRONIC**
                                          )   **EXHIBITS**
26                                        )
                                          )   [ECF Nos. 230, 233, 238]
27  _____  )

28
                                              3:10-cv-0940-GPC-WVG
                                    -1-       3:13-cv-02519-GPC-WVG

Before the Court are three related motions concerning the public dissemination of the videotaped depositions of Defendant Donald J. Trump ("Defendant") taken on December 10, 2015, and January 21, 2016.

First, before the Court is non-party press organizations Cable News Network, Inc. ("CNN"); CBS Broadcasting Inc.; CBS Interactive Inc.; Tribune Publishing Company; NBCUniversal Media, LLC; ABC, Inc.; The New York Times Company; and WP Company LLC d/b/a The Washington Post's (collectively, the "Media Intervenors") motion, in *Cohen v. Trump*, No. 3:13-cv-02519-GPC-WVG ("*Cohen*"), to intervene and for an order modifying the stipulated First Amended Protective Order to remove the confidentiality designations to portions of the videotaped depositions. Motion of Media Intervenors to Intervene and for an Order Modifying Stipulated Protective Order ("Media Mot."), *Cohen*, ECF No. 233.[1]

Second, before the Court is Defendants Trump University, LLC ("TU") and Donald J. Trump's (collectively, "Defendants") motion, in *Cohen* and the related case *Low v. Trump University*, No. 3:10-cv-00940-GPC-WVG ("*Low*"), to amend the protective order operative in both cases to (1) prohibit the filing of any videotaped deposition, unless under seal; and (2) bar the dissemination of any videotaped deposition. Defendant's Motion to Amend Protective Order ("Def. Mot."), *Low*, ECF No. 485/*Cohen*, ECF No. 238.

Third, before the Court is Plaintiff's June 9, 2016 *ex parte* application for leave to file electronic exhibits ("Pl. App."). *Cohen*, ECF No. 230.

The motions have been fully briefed. *See* Defendants' Response to Media Intervenors' Motion to Intervene and for an Order Modifying Stipulated Protective Order ("Def. Resp."), *Cohen*, ECF No. 251; Media Intervenors' Consolidated Reply in Support of Motion to Intervene and for Order Modifying Stipulated Protective

---

[1] On June 15, 2016, Fox News Network, LLC joined Media Intervenors' motion. *Cohen*, ECF No. 237.

Order and Opposition to Defendants' Motion to Amend Protective Order ("Media Reply"), *Cohen*, ECF No. 253; Plaintiffs' Response in Opposition to Defendants' Motion to Amend the Protective Order ("Pl. Resp."), *Low*, ECF No. 492/*Cohen*, ECF No. 254; Defendants' Consolidated Reply in Support of Motion to Amend Protective Order ("Def. Reply"), *Low*, ECF No. 494/*Cohen*, ECF No. 255; Defendant's Response in Opposition to Plaintiff's *Ex Parte* Application for Leave to File Electronic Exhibits ("Def. App. Resp."), *Cohen*, ECF No. 235; Plaintiff's Reply to Defendant's Opposition to Plaintiff's *Ex Parte* Application for Leave to File Electronic Exhibits ("Pl. App. Reply"), *Cohen*, ECF No. 236. A hearing on the motions was held on July 13, 2016. *Low*, ECF No. 497/*Cohen*, ECF No. 261.

Upon consideration of the moving papers, oral argument, and the applicable law, and for the following reasons, the Court **DENIES** Media Intervenors' motion to intervene and for an order modifying the stipulated protective order; **GRANTS** Defendants' motion to amend the protective order; and **GRANTS IN PART** and **DENIES IN PART** Plaintiff's *ex parte* application for leave to file exhibits.

## PROCEDURAL BACKGROUND

On November 7, 2011, Magistrate Judge Gallo granted the parties' joint motion for a protective order in the *Low* case. *Low*, ECF No. 91. On March 21, 2014, after Plaintiff Art Cohen filed his case, Judge Gallo granted the parties' joint motion to amend the *Low* protective order so as to govern both cases. First Amended Protective Order ("Protective Order"), *Low*, ECF No. 316.

Under the terms of the Protective Order, the parties may unilaterally designate as confidential a "deposition or portions of the deposition" without permission from the Court, and without a particularized showing of good cause. *See id.* at 3 ("[T]he deposition or portions of the deposition must be designated as containing Confidential Information subject to the provisions of this Order; such designation must be made on the record whenever possible, but a party may designate portions

1   of depositions as containing Confidential Information after transcription of the
2   proceedings; [A] party will have until fourteen (14) days after receipt of the
3   deposition transcript to inform the other party or parties to the action of the portions
4   of the transcript to be designated "CONFIDENTIAL" or "CONFIDENTIAL – FOR
5   COUNSEL ONLY." (second alteration in original)). The Protective Order prohibits
6   parties from filing a deposition with the court that was designated as "confidential"
7   "unless it can be accomplished under seal, identified as being subject to this Order,
8   and protected from being opened except by order of this Court." *Id.* Moreover, the
9   Protective Order restricts parties receiving "confidential" information from
10  disclosing it "to anyone other than those persons designated within this order . . . ."
11  *Id.*

12    On December 10, 2015, and January 21, 2016, Plaintiff Cohen ("Plaintiff")
13  deposed Defendant in the *Cohen* case. *Cohen*, ECF Nos. 157, 172. Defendant
14  initially sought to designate the entirety of the deposition transcripts as confidential,
15  but withdrew his designations following a challenge from Plaintiff except as to three
16  categories of information: (1) Defendant's past praise of public figures; (2) a
17  licensing agreement between TU and a third party; and (3) Defendant's profits from
18  TU. *Cohen*, ECF No. 172 at 1. On March 14, 2016, Judge Gallo found that the first
19  category was not entitled to a confidential designation, but upheld the designation
20  for the second category and a portion of the third. *Id.* at 5, 7, 9. In accordance with
21  this finding, Judge Gallo ordered the de-designation of approximately 29 pages of
22  the deposition transcript, permitting Defendant to maintain confidentiality
23  designations for only approximately three pages of the deposition transcript, as well
24  as for certain numeric figures. *Id.* at 6–9.

25    On June 3, 2016, Plaintiff Cohen submitted his opposition to Defendant's
26  motion for summary judgment in the *Cohen* case, including as exhibits 48 video files
27  of discrete portions of Defendant's depositions. *Cohen*, ECF Nos. 220, 227-1 at 2–

28

3:10-cv-0940-GPC-WVG
3:13-cv-02519-GPC-WVG

4. On June 8, 2016, the Court found that in so doing, Plaintiff failed to comply with Section 2.k of the Court's Electronic Case Filing Administrative Policies and Procedures Manual, which requires parties to seek leave of the Court to allow the non-electronic filing of exhibits when they are not convertible to "electronic" (*i.e.*, "Portable Document Format" or "PDF") form. *Cohen*, ECF No. 228 at 1. Accordingly, the Court did not permit these video files to be entered into the record, but instead returned them to Plaintiff. *Id.* at 2.

Later that same day, Plaintiff filed an *ex parte* application for leave to submit the above 48, and two additional, video files as exhibits supporting his opposition to Defendant's motion for summary judgment. *Cohen*, ECF No. 230.

On June 10, 2016, Media Intervenors filed the instant motion, seeking the public filing and dissemination of the complete transcripts and videotapes of Defendant's December 10, 2015, and January 21, 2016 depositions. *Cohen*, ECF No. 233. On June 15, 2016, Defendants filed their related motion to amend the protective order to (1) prohibit the filing of any videotaped deposition, unless under seal; and (2) bar the dissemination of any videotaped deposition. *Low*, ECF No. 485/*Cohen*, ECF No. 238. Therein, Defendants withdrew the remaining confidentiality designations related to Defendant's deposition testimony. *Id.* at 1.

## DISCUSSION

### I.   Media Intervenors' and Defendants' Motions

#### A.   Legal Standard

"As a general rule, the public is permitted 'access to litigation documents and information produced during discovery.'" *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) (quoting *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002)) (citing *San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) ("It is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary,

3:10-cv-0940-GPC-WVG
3:13-cv-02519-GPC-WVG

1  presumptively public.")). However, under Rule 26, "[t]he court may, for good cause,

2  issue an order to protect a party or person from annoyance, embarrassment,

3  oppression, or undue burden or expense." *Id.* (alteration in original) (quoting Fed.

4  R. Civ. P. 26(c)(1) (internal quotation marks omitted)). "The party opposing

5  disclosure has the burden of proving 'good cause,' which requires a showing 'that

6  specific prejudice or harm will result' if the protective order is not granted." *Id.*

7  (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir.

8  2003)).

9       "While courts generally make a finding of good cause before issuing a

10  protective order, a court need not do so where (as here) the parties stipulate to such

11  an order." *Id.* Where "the protective order was a stipulated order and no party ha[s]

12  made a good cause showing, then the burden of proof . . . remain[s] with the party

13  seeking protection." *Id.* (alterations in original) (quoting *Phillips*, 307 F.3d at 1211

14  n.1) (internal quotation marks omitted); *see also Foltz*, 331 F.3d at 1138 (noting that

15  "[r]eliance will be less with a blanket [protective] order, because it is by nature

16  overinclusive" (alterations in original) (quoting *Beckman Indus., Inc. v. Int'l Ins.*

17  *Co.*, 966 F.2d 470, 476 (9th Cir. 1992))). Therefore, where the release of documents

18  subject to a stipulated order is contemplated, "the party opposing disclosure has the

19  burden of establishing that there is good cause to continue the protection of the

20  discovery material." *Id.*

21       The Ninth Circuit has delineated a two-step process for determining whether

22  there is good cause to continue the protection of disputed discovery material:

23       First, [the court] must determine whether "particularized harm will
24       result from disclosure of information to the public." As we have
         explained, "[b]road allegations of harm, unsubstantiated by specific
25       examples or articulated reasoning, do not satisfy the Rule 26(c) test."
         Rather, the person seeking protection from disclosure must "allege
26       specific prejudice or harm." Second, if the court concludes that such
27       harm will result from disclosure of the discovery documents, then it

28

must proceed to balance "the public and private interests to decide whether [maintaining] a protective order is necessary."

*Id.* (second and third alterations in original) (footnote omitted) (citations omitted).

In balancing the public and private interests, the Ninth Circuit directs courts to consider the factors identified by the Third Circuit in *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995):

> (1) [W]hether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Id.* at 424 n.5 (quoting *Glenmede Trust*, 56 F.3d at 483). The *Glenmede* court recognized, however, that these seven factors "are neither mandatory nor exhaustive." Ultimately,

> Discretion should be left with the court to evaluate the competing considerations in light of the facts of individual cases. By focusing on the particular circumstances in the cases before them, courts are in the best position to prevent both the overly broad use of [confidentiality] orders and the unnecessary denial of confidentiality for information that deserves it . . . .

*Glenmede Trust*, 56 F.3d at 483 (quoting Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 492 (1991) (footnote omitted)).

**B.   Analysis**

Media Intervenors seek the public filing and dissemination of the complete transcripts and videotapes of the depositions of Defendant taken on December 10,

2015, and January 21, 2016. Media Mot. 1. Plaintiff does not oppose Media Intervenors' motion. Pl. Resp. 1. Defendants do not oppose Media Intervenors' motion as to the transcripts of the depositions, and have withdrawn all confidentiality designations related to the transcripts of Defendant's deposition testimony. Def. Resp. 1. Thus, the sole remaining dispute concerns the videos of Defendant's depositions.

The protective order operative in these two cases is a stipulated or "blanket" protective order, since it was obtained "without making a particularized showing of good cause with respect to any individual document." *See Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1351 n.1 (9th Cir. 2013) (quoting *Foltz*, 331 F.3d at 1138) (internal quotation marks omitted). As such, Defendants have the burden of demonstrating that there is good cause to maintain the confidentiality of the deposition videos. *See also* Def. Reply 3 (recognizing that "[t]he good cause standard applies here").

### 1.    Specific Prejudice or Harm

Defendants advance a number of theories as to how the release of the deposition videos could cause specific prejudice or harm to the Defendant. However, the gravamen of Defendants' opposition, and the argument focused on by Defendants' counsel at the hearing, is that releasing the deposition videos would pose a "threat to the integrity and fairness of the trial proceedings." Hr'g Tr. 5, July 13, 2016, *Low*, ECF No. 498/*Cohen*, ECF No. 262.

Defendants argue that "allowing public access to the video depositions creates a significant risk of irrevocably tainting the jury pool." Def. Mot. 2. Defendants suggest that due to the "media frenzy" around this case and the risk that videos can be "cut and spliced and used as 'sound-bites' on the evening news or sports shows," releasing the videos could impact Defendants' ability to receive a fair trial. *Id.* (citing

1  *Felling v. Knight*, No. IP01-0571-C-T/G, 2001 WL 1782360, at *3 (S.D. Ind. Dec.
2  21, 2001)).

3      The Court finds that Defendants' argument has some merit. Courts have
4  expressed caution about the release of litigation documents in audio or video form,
5  which are "subject to a higher degree of potential abuse" than written transcripts.
6  *Felling*, 2001 WL 1782360, at *3. For instance, in *Nixon v. Warner*
7  *Communications, Inc.*, 435 U.S. 589 (1978), the Supreme Court acknowledged a
8  concern that releasing the Watergate audiotapes could open the door to the
9  audiotapes' contents being "distort[ed] through cutting, erasing, and splicing of [the]
10  tapes" by the media. *Id.* at 601. However, the Court then found that it need not
11  balance this concern with the public interest in "understanding . . . an immensely
12  important historical occurrence," because the question of whether to release the tapes
13  could be decided on the basis of the Presidential Recordings Act, a statute not at
14  issue here. *Id.* at 602–03.

15      Here, the proceedings in this case have been subject to a high degree of public
16  scrutiny. *See* Media. Mot. Exs. A–E. Given the context of the case and the timing of
17  Media Intervenors' request, it is nigh-inevitable that "cut[]" and "splic[ed]"
18  segments of Defendant's deposition videos would appear in both media reports and
19  in political advertisements aired nationwide prior to the trial date in November,
20  increasing the likelihood that prospective jurors would be exposed to information
21  about the case, as well as to evidence that could be introduced at trial to impeach
22  Defendant's testimony.

23      Media Intervenors and Plaintiffs argue that because Defendants have not
24  identified which specific portions of the videos would be especially damaging, the
25  harms asserted by Defendants are "abstract" and "speculative." Hr'g Tr. 16, 26; *see*
26  *also* Pl. Resp. 11, Media Reply 1. However, in order to establish specific prejudice
27  or harm in the context of videos, Defendants are not required to point to a specific

28

3:10-cv-0940-GPC-WVG
3:13-cv-02519-GPC-WVG

portion of the videos that would be especially damaging if released. Instead, courts have recognized that the specific harm derives from the nature of the video medium itself. *See, e.g.*, *U.S. v. Dimora*, 862 F. Supp. 2d 697, 711 (N.D. Ohio 2012) (recognizing that the fact that the "exhibits are videos increases the probability that they will be widely disseminated and thus taint the jury pool"); *United States v. McDougal*, 103 F.3d 651, 658 (8th Cir. 1996) (finding a "potential for misuse of the [video]tape . . . through cutting, erasing, and splicing" (citing *Nixon*, 435 U.S. at 401)); *cf. United States v. Poindexter*, 732 F. Supp. 170, 172 (D.D.C. 1990) (finding no dispute that "should copies of the tape itself be made freely available, the breadth of the publicity would be increased manifold"). The Court thus finds that Defendants have established that particularized harm will result from disclosure of the deposition videos to the public.

## 2.    Balancing the Public and Private Interests

Having established that particularized harm will result from disclosure of the deposition videos, the Court must balance the public and private interests to determine whether release of the videos is nonetheless warranted. As Defendants' counsel acknowledged at the hearing, "the cases in this area . . . are very circumstance– and fact–specific." Hr'g Tr. 5. In cases where courts have considered whether to release disputed materials, they have almost always engaged in granular scrutiny of the nature of the content at issue, the circumstances of the case, and the realities on the ground, before fashioning relief that balances the private and public interests at stake.

That said, when examining the precedents offered by Defendants and Media Intervenors, a number of broad principles can be discerned in the case law. First, courts have sometimes restricted access to video depositions to protect parties from the potential for embarrassment, but not where there is a significant and legitimate public interest in the content of those depositions. *Compare Lopez v. CSX*

1  *Transportation, Inc.*, No. 3:14-257, 2015 WL 3756343, at *7 (W.D. Penn. June 16,

2  2015) (barring dissemination of video depositions of defendant corporation's

3  employee where the train accident at issue in the case did not implicate significant

4  public policy concerns), *with Condit v. Dunne*, 225 F.R.D. 113, 118–20 (S.D.N.Y.

5  2004) (releasing video depositions where the case was one of "public concern"

6  because it involved a "then-sitting United States Congressman in the discharge of

7  his duties," and where court found that "any tainting of the jury pool can be remedied

8  through voir dire"), *Felling v. Knight*, 211 F.R.D. 552, 554–55 (S.D. Ind. 2003)

9  (initially sealing video depositions of non-parties in lawsuit involving battery

10  allegations against Bobby Knight, the well-known Indiana college basketball coach,

11  to protect those non-parties from potential embarrassment, and then releasing the

12  video depositions after the case settled, both on the grounds that the potential for

13  embarrassment had decreased following settlement of the case, and on the grounds

14  that any remaining potential for embarrassment was "outweighed by the public's

15  right to know," since "[s]eemingly few topics in the state of Indiana have generated

16  more attention or public debate in recent times than the events surrounding Knight's

17  termination"), *and Flaherty v. Seroussi*, 209 F.R.D. 295, 300 (N.D.N.Y. 2001)

18  (releasing video depositions of mayor and other public officials where the

19  underlying litigation alleged improper official action, since the public interest

20  outweighed any interest in preventing "modest embarrassment" to the mayor).

21         Second, courts have tended to restrict access to video depositions of

22  celebrities where the improper purpose for which the deposition is sought is

23  commercial gain or prurient interest in exposing the details of a celebrity's personal

24  life. *See Paisley Park Enterprises, Inc. v. Uptown Productions*, 54 F. Supp. 2d 347,

25  348–49 (S.D.N.Y. 1999) (barring public dissemination of deposition video of

26  musical artist Prince where Prince was a third party to the intellectual property

27  dispute, the dispute itself was not of public interest, and the defendants' desire to

28

circulate the video was "commercially motivated"); *see also Stern v. Cosby*, 429 F. Supp. 2d 417, 422 (S.D.N.Y 2007) (finding judicial efficiency would be impaired by public dissemination of deposition video of author of "Blonde Ambition: The Untold Story Behind Anna Nicole Smith's Death" where author was defendant in libel action and dissemination would contribute to "circus-like atmosphere" produced by "exploitive media" and "celebrity gossip" talk shows).

Third, courts have found a diminished privacy interest where the party opposing release is a public figure experienced in dealing with the media. *See Estate of Rosenbaum v. City of New York City*, 1993 U.S. Dist. LEXIS 15908, at *7 (E.D.N.Y. Aug. 13, 1993) (permitting news media to be present at the depositions of the Mayor and other city officials where "the case [was] of high public interest, th[e] depositions . . . sought are depositions of parties, not of third persons[,] . . . the parties whose depositions at issue are parties experienced in dealing with the media . . . [and] these parties have themselves already spoken out . . . on a number of occasions to members of the press"); *see also Constand v. Cosby*, 112 F. Supp. 3d 308, 315–16 (E.D. Pa. 2015) (finding a diminished privacy interest where the "party seeking to use [that privacy interest] as a shield is a public person subject to legitimate public scrutiny," and where that party "has freely entered the public square and thrust himself into the vortex of these public issues," *id.* at 315–16 (citations omitted) (internal quotation marks omitted)).

Fourth, courts have historically extended special protections to the deposition testimony of sitting and former Presidents for reasons connected with protecting the interests of the Presidency and preserving the separation of powers. *See United States v. McDougal*, 103 F.3d 651, 657–58 (8th Cir. 1996); *Jones v. Clinton*, 12 F. Supp. 2d 931, 938 (E.D. Ark. 1998); *United States v. Poindexter*, 732 F. Supp. 170, 173 (D.D.C. 1990).

1   Fifth, courts have tended to accord a lower presumption of public access to

2   discovery materials not yet entered into evidence, as compared to evidence or

3   exhibits attached to dispositive motions or introduced at trial. *Compare, e.g.*, *Stern*,

4   529 F. Supp. 2d at 421 (finding that "the presumption of public access—if any—

5   that attaches to the transcript and video tape is low, at best[, and n]o such

6   presumption attaches at all to the videotape" where the transcript and videotape of

7   the defendant's deposition were "merely materials generated in discovery [and we]re

8   not relevant to [an]y 'performance' of a 'judicial function,'" *id.* at 421–22 (citation

9   omitted)), *with In re Application of Nat'l Broad. Co.*, 635 F.2d at 952 ("Once the

10  evidence has become known to the members of the public, including representatives

11  of the press, through their attendance at a public session of court, it would take the

12  most extraordinary circumstances to justify restrictions on the opportunity of those

13  not physically in attendance at the courtroom to see and hear the evidence, when it

14  is in a form that readily permits sight and sound reproduction.").[2]

15  Sixth, courts have found a greater potential for harm where trial is imminent,

16  or where there is reason to believe that media scrutiny will be on-going rather than

17  dissipate or lessen with time. *Compare Dimora*, 862 F. Supp. 2d at 706–07 (finding

18  that releasing video exhibits shown at trial would "implicate the due process rights

19  of Dimora and others" where Dimora could still exercise his right to appeal, was a

20  defendant in another pending case involving substantially similar conduct, and a

21  number of other cases stemming from the same corruption investigation were also

22  pending), *and Poindexter*, 732 F. Supp. at 172 (finding that release of videotape of

23  former President Reagan's testimony eleven days before trial "would be likely both

24

---

25  [2] *But see Apple Ipod Itunes Antitrust Litig.*, 75 F. Supp. 3d 1271, 1275 (N.D. Cal.

26  2014) (barring copying of pre-taped trial testimony on the grounds that the public
    and the media had already had full access to the information contained in the videos

27  when the videos were presented at trial), *and Dimora*, 862 F. Supp. 2d at 705 (barring

28  copying of video evidentiary exhibits on same grounds).

1  significantly to complicate the process of jury selection and to create possible
2  *Kastigar* problems"), *with Condit*, 225 F.R.D. at 118 (finding, "well before the
3  beginning of trial," that "[e]ven assuming part or all of the video is disseminated to
4  the public, memories fade, and moreover . . . any tainting of the jury pool can be
5  remedied through voir dire"), *and Felling*, 211 F.R.D. at 554 (finding that, following
6  settlement of the case, "the 'potential embarrassment the [deponents] would suffer
7  at seeing themselves on the evening news' ha[d] significantly lessened or outright
8  disappeared," such that good cause no longer existed to seal deposition videos).

9      Applying these principles to the present case, several factors weigh in favor
10  of disclosure. First, there is a degree of legitimate public interest in the content of
11  the deposition videos. Here, Media Intervenors argue that since Defendant is the
12  Republican nominee in the 2016 presidential race, "has made the litigation itself a
13  campaign issue," and has "emphasized his business record and negotiating skills as
14  his main qualifications to serve as President of the United States," the public interest
15  in understanding the judicial process is unusually strong in this case. Media Mot. 19.
16  Defendants respond that even if this were so, the content of the video depositions is
17  "entirely duplicative" of the content of the written transcripts already publicly
18  available. Def. Mot. 1. However, as *Poindexter* acknowledges, the "public's right to
19  know" can encompass demeanor evidence when the subject matter of the litigation
20  is one of public interest. *See* 732 F. Supp. at 172 (acknowledging that the "public's
21  right to know" encompassed both "what . . . former President [Reagan] said last
22  week" concerning the Iran-Contra scandal in a videotaped deposition, "and even
23  how he looked and behaved when he said what he said").

24      Second, unlike in *Paisley Park* and *Stern*, the media is not motivated by the
25  improper purpose of a prurient interest in the private life of a celebrity, but by a
26  legitimate interest in "providing the electorate with valuable insight into the
27  demeanor of the . . . Republican presidential nominee." Media Mot. 21.

28

3:10-cv-0940-GPC-WVG
3:13-cv-02519-GPC-WVG

1    Third, Defendant arguably has a diminished privacy interest as someone who
2    is a "public figure experienced in dealing with the media," *Rosenbaum*, 1993 U.S.
3    Dist. LEXIS 15908, at *7, and who "has freely entered the public square and thrust
4    himself into the vortex of these public issues," *Constand*, 112 F. Supp. 3d at 316.
5    *See* Media Mot. Exs. A–E; Pl. Resp. 5–6.

6    On the other hand, several factors weigh against disclosure. First, since the
7    deposition videos are "merely materials generated in discovery" that are not
8    currently relevant as to the "performance" of a "judicial function" and have "little or
9    no bearing" on any exercise of the Court's Article III judicial power, the presumption
10   of public access that attaches to the deposition videos is substantially weaker than if
11   the videos constituted evidence or exhibits properly attached to dispositive motions
12   or introduced at trial. *Stern*, 529 F. Supp. 2d at 421–22 (citations omitted) (internal
13   quotation marks omitted).

14   Second, there is a greater potential for harm to result from the release of the
15   deposition videos because of the high likelihood that media scrutiny in this case will
16   be on-going. Although here, trial is three months away, rather than eleven days like
17   in *Poindexter*, unlike in *Condit*, there is no reason to believe that "memories will
18   fade" before the beginning of trial. 225 F.R.D. at 118. Rather, there is every reason
19   to believe that release of the deposition videos would contribute to an on-going
20   "media frenzy" that would increase the difficulty of seating an impartial jury.

21   In weighing these factors, the Court is mindful of the Supreme Court's
22   instruction that "the court . . . has a responsibility to exercise an informed discretion
23   as to release of the tapes, with a sensitive appreciation of the circumstances that led
24   to their production[,]" and that there "exist[s] a danger that the court could become
25   a partner in the use of the [disputed] material to 'gratify private spite or promote
26   public scandal,' with no corresponding assurance of public benefit." *Nixon*, 435 U.S.
27   at 603 (citation omitted). The core question is whether the public's interest in
28

viewing the demeanor of Defendant in the deposition videos outweighs the impairment to judicial efficiency likely to result. The Court concludes that it does not. While there is a degree of legitimate public interest in the demeanor of the Defendant in the deposition videos, it is not a substantial interest. To the extent that the public seeks to understand the substance of the litigation and the conduct of the judicial process, the written transcripts of Defendant's depositions, Pl. Resp., Exs. 1–2, information made public by the Court, *Cohen*, ECF No. 211, and information reported in the media, Media Mot., Exs. A–E, provide a detailed portrait of the underlying facts, claims, and defenses in both cases, including the substance of Defendant's responses to Plaintiffs' counsel's questions under oath.

At the same time, a realistic appraisal of the context of the case necessitates the conclusion that releasing the deposition videos would impair judicial efficiency by increasing the likelihood that prospective jurors would be exposed to information about the case, as well as to evidence that could be introduced at trial to impeach Defendant's testimony. Media Intervenors suggest that courts have found that even extensive publicity does not necessarily prevent a party from getting a fair trial, and that any such risk can be mitigated by the use of jury management tools, such as voir dire. Media Mot. 8 (citing cases). While that may be, the Court is loath to increase the difficulty of the challenge of seating an impartial jury in order to achieve a limited public benefit.[3]

Thus, the Court finds that Defendants have established good cause to bar the further dissemination of the deposition videos. Ultimately, "[v]ideotaped

---

[3] Plaintiffs also suggest that Defendants are not in a position to make any arguments about tainting the jury pool, given the "unprecedented public campaign to poison the jury pool by denigrating this case, these proceedings, and Class Representatives" conducted by Defendant. Pl. Resp. 13; *see also* Hr'g Tr. 26. However, this argument does not bear on the degree of legitimate public interest in the deposition videos. Even assuming *arguendo* that the specific prejudice or harm is thereby diminished, that harm would still outweigh the low public interest in the deposition videos here.

3:10-cv-0940-GPC-WVG
3:13-cv-02519-GPC-WVG

depositions are permitted to facilitate the presentation of evidence to juries; they are not intended to provide 'a vehicle for generating content for broadcast and other media.'" *Stern*, 529 F. Supp. at 422–23 (quoting *Paisley Park*, 54 F. Supp. 2d at 349).

Accordingly, the Court **DENIES** Media Intervenors' motion to intervene and for an order modifying the stipulated First Amended Protective Order to remove the confidentiality designations to portions of the videotaped depositions, and **GRANTS** Defendants' motion to amend the protective order operative in both *Low* and *Cohen* to (1) prohibit the filing of any videotaped deposition, unless under seal; and (2) bar the dissemination of any videotaped deposition.

## II. Plaintiff's *Ex Parte* Application

Plaintiff makes two arguments supporting his *ex parte* application for leave to file the video exhibits. As an initial matter, Plaintiff argues that Section 2.k does not apply to the video exhibits, because Section 2.k refers to "exhibits . . . not convertible to electronic form," while the video exhibits are "electronic files" and "the only form in which they have ever existed is electronic." Pl. App. 2.

However, when Section 2.k is examined in the context of the Manual, it is clear that the rule's reference to "exhibits . . . not convertible to electronic form" refers to all exhibits that cannot be rendered in a "Portable Document Format" (".pdf") format. .pdf is the only document format supported by the Case Management/Electronic Case Filing System ("CM/ECF"), the Internet-based system for filing documents and maintaining court case files in this District. In Section 1.d, the Manual states that "ELECTRONIC FILING means uploading a document directly from the registered user's computer in 'Portable Document Format' (.pdf), using the CM/ECF system to file that document in the court's case file." *See* Manual, Section 1.d. In turn, Section 2.k states that "[e]xhibits must be submitted electronically in CM/ECF as attachments." Section 2.k then states that "[a] party

may seek leave of the court to allow the non-electronic filing of exhibits when they are not convertible to electronic form (e.g. videotapes, maps, etc.)." Thus, the Manual contemplates that typically, exhibits will be filed in .pdf format using the CM/ECF system. Where an exhibit cannot be submitted to CM/ECF because it is not convertible to .pdf format, a party must seek leave of the court before filing that exhibit. Thus, under Section 2.k, Plaintiff must seek leave the court to file the video exhibits.[4]

Next, Plaintiff argues that even if Section 2.k applies, Plaintiff should be granted leave to file the video exhibits, because they offer additional evidentiary support for his oppositions to Defendant's motions, especially Plaintiff's opposition to Defendant's motion for summary judgment. Pl. App. 2. The Court will evaluate the merits of this argument for each of Plaintiff's proffered video exhibits in turn.

First, in Exhibit D to Plaintiff's opposition to Defendant's motion for summary judgment, Plaintiff offers selected excerpts from two depositions of the Defendant in both transcript and video form. Plaintiff argues that the video form of the deposition excerpts should be considered by the Court because "[Defendant] made many spontaneous and *ad hominem* remarks that are not reflected in the paper transcript of his depositions" and "[Defendant's] tone, facial expressions, gestures, and body language are also not reflected in the paper transcripts, yet they speak volumes to, *inter alia*, Trump's complete and utter unfamiliarity with the instructors

---

[4] Indeed, the Court's interpretation of Section 2.k is supported by the previous actions of the parties themselves. As the Court observed in its June 8, 2016 Order, both parties have previously sought leave of the Court to file video exhibits in both *Low* and *Cohen*. *See Low*, ECF Nos. 118, 120, 299, 304; *Cohen*, ECF Nos. 35, 36. Indeed, Plaintiff's counsel admits that they first sought the agreement of Defendant to file a joint motion seeking leave of the Court to file the video exhibits pursuant to Section 2.k. Pl. App. 2; *see also* Def. App. Resp. 4. It was only after "[D]efendant would not agree to a joint motion" that "Class Counsel carefully reviewed Section 2.k [and] concluded that it does not apply to Exhibits D, L, or M." Pl. App. 2.

1   and 'instruction' that student-victims received, instead of 'my hand-picked

2   instructors [teaching] my techniques, which took my entire career to develop,"

3   which is what [Defendant] promised." Pl. App. 3 (third alteration in original).

4         However, the Court has reviewed both the written transcript and the video

5   clips proffered by Plaintiff and finds that the transcript appears to be a substantially

6   accurate record of the remarks made by Defendant during his depositions. Indeed,

7   the Court observes that Plaintiff provides no specific examples of any "spontaneous

8   [or *ad hominem* remarks" made by Defendant that are reflected in the video clips

9   and not the transcript, either in this application or in Plaintiff's opposition to

10  Defendant's motion for summary judgment. *See* Pl. App. 3; Plaintiff's Opposition

11  to Defendant's Motion for Summary Judgment ("Pl. MSJ Opp."), *Cohen*, ECF No.

12  220. Similarly, nowhere in Plaintiff's opposition to Defendant's motion for summary

13  judgment does Plaintiff rely on Defendant's "tone, facial expressions, gestures, [or]

14  body language," rather than the substance of Defendant's statements as reflected in

15  the transcript, to support his opposition. *See* Pl. MSJ Opp. *passim*.[5] As Defendant

16  observes, parties have never previously sought to submit video footage of any

17  deposition. Def. App. Resp. 1–2. Plaintiff's desire "not . . . to leave anything to

18  chance" does not justify the filing of duplicative video evidence where a written

19  transcript fairly reflects the evidence actually relied upon by Plaintiff at the summary

20

21

---

22  [5] In his reply, Plaintiff similarly argues that "[s]eeing and hearing [the deposition]

23  testimony will . . . allow the Court to confirm that [Defendant] was fully engaged in
    the deposition; he was not rushed into giving answers; he was not shouted down;

24  and he was not glib, but rather unhappy about the admissions he had no choice to

25  make." Pl. App. Reply 1. The Court's chamber rules make no provision for replies
    for *ex parte* motions. *See* Curiel Civil Procedures 2. However, even if the Court were

26  to consider the Plaintiff's reply, Defendant correctly observes that such evidence of
    Defendant's demeanor would go to credibility, which is not a proper consideration

27  at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

28  255 (1986).

3:10-cv-0940-GPC-WVG
3:13-cv-02519-GPC-WVG

1  judgment stage. Pl. App. 3. The Court accordingly **DENIES** Plaintiff's application

2  to file Exhibit D in video form.

3       Second, in Exhibit L to Plaintiff's opposition to Defendant's motion for

4  summary judgment, Plaintiff proffers the "Main Promotional Video" filmed by

5  Defendant to advertise Trump University ("TU") and a transcript thereof. Again, the

6  Court observes that a transcript has been provided, and Plaintiff relies on the

7  substance of Defendant's statements as reflected in the transcript, rather than

8  imagery from the video, to support his opposition. *See, e.g.*, Pl. MSJ Opp. 4–5.

9  However, the Court also notes that parties jointly sought, and the Court granted,

10  leave to file this exact video as an exhibit on at least two previous occasions, *see*

11  *Low*, ECF Nos. 118, 120; *Cohen*, ECF Nos. 35, 36, and that unlike in the case of the

12  deposition testimony, the video does contain imagery that is not fully captured by

13  the transcript. The Court thus **GRANTS** Plaintiff's application to file Exhibit L in

14  video form.

15       Third, in Exhibit M to Plaintiff's opposition to Defendant's motion for

16  summary judgment, Plaintiff proffers a video of a former TU "top instructor," James

17  Harris, seemingly advertising a non-TU related real estate investment scheme called

18  "WebaForce." In his application, Plaintiff provides no rationale for why this video

19  should be filed as an exhibit. *See* Pl. App. 3. In Plaintiff's opposition to Defendant's

20  motion for summary judgment, Plaintiff relies on this video once, to support the

21  proposition in the factual background section of his brief that "the 'instructors'

22  [Defendant] hired for TU were primarily high-pressure salesmen." Pl. MSJ Opp. 6.

23  (In the same section of his brief, Plaintiff also points to other evidence that Mr. Harris

24  was a convicted felon. *Id.*) Plaintiff offers no explanation, either in this application

25  or in his briefing, of how the "Webaforce" video is relevant evidence for the

26

27

28

1   purposes of deciding Defendant's motion for summary judgment.[6] The Court thus

2   **DENIES** Plaintiff's application to file Exhibit M in video form.

3                                       **CONCLUSION**

4          Accordingly, **IT IS HEREBY ORDERED** that:

5          1.     Media Intervenors' motion to intervene and for an order modifying

6                 the stipulated First Amended Protective Order to remove the

7                 confidentiality designations to portions of the videotaped depositions,

8                 *Cohen*, ECF No. 233, is **DENIED**.

9          2.     Defendants' motion to amend the protective order operative in both

10                *Low* and *Cohen* to (1) prohibit the filing of any videotaped deposition,

11                unless under seal; and (2) bar the dissemination of any videotaped

12                deposition, *Low*, ECF No. 485/*Cohen*, ECF No. 238, is **GRANTED**.

13         3.     Plaintiff's *ex parte* application for leave to file electronic exhibits,

14                *Cohen*, ECF No. 230, is **GRANTED** as to Exhibit L, and **DENIED** as

15                to Exhibits D and M. Specifically, counsel is allowed to non-

16                electronically file, via thumb drive, an electronic file of TU-

17                PLTF02441 – YouTube video found here:

18                http://www.youtube.com/watch?v=465T6EDzoH0, which

19                corresponds to Forge Decl., Exhibit L (the "Main Promotional

20                Video").

21         **IT IS SO ORDERED.**

22

23   Dated:  August 2, 2016

24                                                    Hon. Gonzalo P. Curiel

25                                                    United States District Judge

26

27   ───────────────────────
     [6] Similarly, Plaintiff omits any discussion of Exhibit M altogether in his reply. *See*

28   Pl. App. Reply.