1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  ART COHEN, Individually and on Behalf of All Others Similarly Situated, | Case No.:  3:13-cv-2519-GPC-WVG |
| 12 | |
| 13                                    Plaintiff, | **TENTATIVE ORDER:** |
| 14  v. | |
|     | **GRANTING IN PART AND** |
| 15  DONALD J. TRUMP, | **DENYING IN PART DEFENDANT'S** |
|     | **MOTION TO EXCLUDE THE** |
| 16                                    Defendant. | **OPINIONS AND TESTIMONY OF** |
|     | **MICHAEL A. KAMINS** |
| 17 | |
| 18 | **DENYING DEFENDANT'S MOTION** |
|     | **TO EXCLUDE THE OPINIONS AND** |
| 19 | **TESTIMONY OF PAUL HABIBI** |
| 20 | |
|     | **DENYING PLAINTIFF'S MOTIONS** |
| 21 | **TO EXCLUDE THE TESTIMONY** |
|     | **OF DEFENDANT'S REBUTTAL** |
| 22 | **EXPERTS DEFOREST MCDUFF,** |
|     | **PH.D; ALAN D. WALLACE, ESQ.;** |
| 23 | **AND JOEL STECKEL, PH.D** |
| 24 | |
| 25 | **GRANTING DEFENDANT'S** |
|     | **MOTIONS TO SEAL** |
| 26 | |
| 27 | **[ECF Nos. 181, 182, 184, 187, 188, 190]** |
| 28 | |

Before the Court are five motions to exclude the testimony of various expert witnesses filed by both parties. Defendant Donald J. Trump ("Defendant") seeks to exclude the testimony of two of Plaintiff's experts, Michael A. Kamins and Paul Habibi. *See* Defendant's Motion to Exclude the Opinions and Testimony of Michael A. Kamins ("Kamins Mot."), ECF No. 181; Defendant's Motion to Exclude the Opinions and Testimony of Paul Habibi ("Habibi Mot."), ECF No. 188. Plaintiff Art Cohen ("Plaintiff") seeks to exclude the testimony of three of Defendant's rebuttal experts, DeForest McDuff, Alan D. Wallace, and Joel Steckel. *See* Plaintiff's Motion to Exclude the Testimony of Defendant's Rebuttal Expert DeForest McDuff, Ph.D ("McDuff Mot."), ECF No. 184; Plaintiff's Motion to Exclude the Testimony of Defendant's Rebuttal Alan D. Wallace, Esq. ("Wallace Mot."), ECF No. 187; Plaintiff's Motion to Exclude the Testimony of Defendant's Rebuttal Expert Joel Steckel, Ph.D ("Steckel Mot."), ECF No. 189. The motions have been fully briefed.[1] A hearings was held on the motions on July 22, 2016. ECF No. 263. A further hearing on the motions is set for August 26, 2016. ECF No. 265.

Upon consideration of the moving papers, parties' oral arguments, and the applicable law, and for the following reasons, the Court provides this tentative decision: (1) **GRANTING IN PART** and **DENYING IN PART** Defendant's motion to exclude the testimony of Michael A. Kamins; (2) **DENYING** Defendant's motion to exclude the

---

[1] *See* Plaintiff's Opposition to Defendant's Motion to Exclude the Opinions and Testimony of Michael A. Kamins ("Kamins Resp."), ECF No. 223; Defendant's Reply in Support of Motion to Exclude the Opinions and Testimony of Michael A. Kamins ("Kamins Reply"), ECF No. 245; Plaintiff's Opposition to Defendant's Motion to Exclude the Opinions and Testimony of Paul Habibi ("Habibi Resp."), ECF No. 222; Defendant's Reply in Support of Motion to Exclude the Opinions and Testimony of Paul Habibi ("Habibi Reply"), ECF No. 246; Defendant's Opposition to Plaintiff's Motion to Exclude the Testimony of DeForest McDuff, Ph.D ("McDuff Resp."), ECF No. 217; Plaintiff's Reply in Support of Motion to Exclude the Testimony of Defendant's Rebuttal Expert DeForest McDuff, Ph.D ("McDuff Reply"), ECF No. 241; Defendant's Opposition to Plaintiff's Motion to Exclude the Testimony of Alan D. Wallace, Esq. ("Wallace Resp."), ECF No. 219; Defendant's Reply in Support of Motion to Exclude the Testimony of Defendant's Rebuttal Expert Alan D. Wallace, Esq. ("Wallace Reply"), ECF No. 242; Defendant's Opposition to Plaintiff's Motion to Exclude the Testimony of Joel Steckel, Ph.D ("Steckel Resp."), ECF No. 218; Plaintiff's Reply in Support of Motion to Exclude the Testimony of Defendant's Rebuttal Expert Joel Steckel, Ph.D ("Steckel Reply"), ECF No. 243.

3:13-cv-2519-GPC-WVG

testimony of Paul Habibi; (3) **DENYING** Plaintiff's motion to exclude the rebuttal testimony of DeForest McDuff; (4) **DENYING** Plaintiff's motion to exclude the rebuttal testimony of Alan D. Wallace; and (5) **DENYING** Plaintiff's motion to exclude the rebuttal testimony of Joel Steckel. The parties will be given the opportunity to address the tentative ruling at the scheduled hearing.

## BACKGROUND

The relevant facts in this case having been included in the Court's previous orders, the Court will not reiterate them in depth here. ECF No. 268. In short, this is a class action lawsuit under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1692(c), on behalf of individuals who purchased Trump University, LLC ("TU") real estate investing seminars, including the three-day fulfillment seminar and the Trump Elite programs. *See id.* at 4. Plaintiff alleges that Defendant and TU made material misrepresentations in advertisements, mailings, promotions, and free previews to lead prospective customers to purchase TU's fulfillment and elite programs. *See id.* at 2–4. Plaintiff alleges that TU customers, including Plaintiff himself, paid anywhere from $1,495 for a three-day fulfillment seminar up to $35,000 for the "Trump Gold Elite Program." *Id.* at 3.

On February 21, 2014, the Court denied Defendant's motion to dismiss. ECF No. 21. On October 27, 2014, the Court granted Plaintiff's motion for class certification. Order Granting Motion for Class Certification ("Class Cert. Order"), ECF No. 53. The Court noted that Plaintiff's "theory of recovery under RICO is that Defendant committed 'fraud and racketeering' by marketing Trump University 'Live Events' as an institution with which he was integrally involved as well as 'an actual university with a faculty of professors and adjunct professors.'" *Id.* at 5–6 (citation omitted). The Court certified the following class:

All persons who purchased Live Events from Trump University throughout

the United States from January 1, 2007 to the present.[2]

*Id.* at 22–23. On November 12, 2014, Defendant appealed the Court's class certification order. ECF No. 57. On February 2, 2015, the Ninth Circuit denied Defendant's appeal. ECF No. 59.

On September 21, 2015, the Court granted in part and denied in part Plaintiff's motion for approval of class notice and directing class notice procedures. ECF No. 130; *Low*, ECF No. 419. On November 15, 2015, the opt-out period expired. *See id.* at 11. On August 2, 2016, the Court denied Defendant's motion for summary judgment. ECF No. 268.

## LEGAL STANDARD

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence 702 to ensure specialized and technical evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 & n.7 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposes a special "gatekeeping obligation" on the trial judge).

An expert witness may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007).

## DISCUSSION

### I.   Plaintiff's Marketing Expert Michael A. Kamins

Kamins is a tenured professor, Director of Research, and Area Head of Marketing at the Harriman School of Business at Stony Brook University-SUNY. Throughout his career,

---

[2] Excluded from the Class are Trump University, its affiliates, employees, officers and directors, persons or entities that distribute or sell Trump University products or programs, the Judge(s) assigned to this case, and the attorneys of record in the case. Class Cert. Order 23.

Kamins has focused on how consumers interpret advertising and has conducted over 500 consumer surveys across various products and services. Kamins Report 4, Kamins Mot., Ex. 12. Kamins' expert report contains four components. First, Kamins finds that TU's advertising and promotional campaign focused almost exclusively on Defendant and targeted his biggest fans. Kamins Report 6–16. Second, Kamins finds that TU's marketing and sales strategies incorporated a variety of strategies to encourage prospective customers to make decisions using so-called "System 1" processing, i.e. an emotion-laden, rather than rational, thinking process. *Id.* at 16–39. Third, Kamins finds that TU's 98% approval rating is not the product of reliable questions or methodology. *Id.* at 39–42. Fourth, Kamins presents the results of a survey (the "Kamins Survey" or "Survey") of consumers purporting to demonstrate the importance of TU's representations that TU purchasers would learn Defendant's strategies from his "handpicked" instructors." *Id.* at 42–48.

## I.     The Kamins Survey

The bulk of Defendant's objections to Kamins' testimony revolve around the Kamins Survey.  Kamins designed an online panel survey and hired a marketing research firm, Spectrum Associates Market Research Incorporated ("Spectrum Associates"), to conduct it. *Id.* at 42. Kamins describes the Survey as having the following characteristics:

- Demographic/respondent background characteristic qualifying questions to ensure survey respondents: (a) were 21+ years of age; (b) had no one in the household who worked for a marketing research firm, advertising agency, or public relations firm; (c) had no one in the household who worked for a company that offers seminars on financial or real estate investing; and (d) had not participated or enrolled in a live seminar or mentorship program sponsored by TU in the past 10 years.
- Exposing those panel members who met the qualifiers listed above to two TU promotions and video promotion. . . .
- Asking everyone who viewed the promotions to answer a 9-point choice scale question ("1" meaning not at all likely and "9" meaning extremely likely) to determine if the respondent would be likely to enroll in a live class from TU if it was held at a convenient site and offered the potential to pay for itself quickly. Respondents who indicated they would be likely to enroll (6, 7, 8 or 9) continued on with the survey. Those who were

unlikely to enroll (1, 2, 3, 4) or neutral/non-committal (5 or answered "no opinion /don't know") were terminated from the survey.

- Asking those respondents who were likely to enroll about the impact of two claims in the promotion ("the opportunity to learn Donald Trump's real estate strategies and techniques," and "the opportunity to learn from professors hand-picked by Donald Trump") on their decision to enroll. These questions were worded as follows with respondents being given the opportunity to state that they had "no opinion" or "don't know" for each question: 1) Did the offer of learning Trump's strategies have a positive impact, a negative impact, or no impact on your decision to enroll in the live class? 2) Did the opportunity to be taught by Trump's hand-picked professors have a positive impact, a negative impact, or no impact on your decision to enroll in the live class?

- Asking those who answered Q.2 and Q.3 about their employment, education and household income.

*Id.* at 44 (citations omitted). A total of 126 individuals were surveyed. *Id.* at 42.

Kamins found that "overall, 87% reported that the opportunity to learn Trump's real-estate strategies positively impacted their decision to purchase a TU Live Event, and 83% reported that the offer of being taught by Trump's hand-picked professors positively impacted their purchase decision." *Id.* at 42. Kamins also found that "the positive impact is greater for those who show more intention to attend Live Events at TU. For example, for the materiality of the 'opportunity to learn Trump's strategies,' 94% of those who were 'very likely' to enroll in a live class from TU (i.e., scored an '8' or a '9') viewed this attribute positively, whereas 76% viewed it positively if they were 'likely' to enroll in a live class (i.e., scored a '6' or a '7')." *Id.* at 47.

Defendant argues that the Survey is flawed for a number of reasons, including: (1) the survey used an incorrect target universe; (2) the survey did not conduct a control group; (3) the survey took statements out of context; (4) Kamins did not provide the underlying data to his survey; (5) Kamins lacked control over his Survey; and (6) the survey created a demand effect. Kamins Mot. 4–14.

The Court finds that, to the extent that Defendant's criticisms have merit, they go to the weight that should be attributed to the survey by the factfinder, not to its admissibility.

*See Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (citing *Prudential Ins. Co. v. Gibraltar Financial Corp.*, 694 F.2d 1150, 1156 (9th Cir. Cal. 1982) ("Technical unreliability goes to the weight accorded a survey, not its admissibility.")); *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ("Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.")

First, Defendant argues that the Survey used an incorrect target universe of all those who: (a) were 21+ years of age; (b) had no one in the household who worked for a marketing research firm, advertising agency, or public relations firm; (c) had no one in the household who worked for a company that offers seminars on financial or real estate investing; and (d) had not participated or enrolled in a live seminar or mentorship program sponsored by TU in the past 10 years. Kamins Report 44. Defendant argues that this is not a representative sample of the class, because "potential TU customers must have some basic interest in entrepreneurship, continuing education, real estate, or business generally." Kamins Mot. 6. Defendant points to the testimony of TU's Chief Marketing Officer, Michael Bloom, that TU's marketing scheme included direct mail advertisements to lists of people who had purchased similar programs in the past. *Id.* (citing Bloom Dep. 54:17–25, 280:14–281:9, Kamins Mot., Ex. 6).

However, as Plaintiff points out, although one component of TU's marketing scheme may have entailed direct mail advertisements to targeted lists, TU's marketing scheme also incorporated print media, online, and radio advertising. Both the record and TU executive testimony establishes that TU placed advertisements in "mainstream" newspapers in order to achieve "the widest distribution in particular markets," while TU's internet advertising was targeted via "geographic location," but not according to any "demographic criteria." *See* Kamins Resp. 16; Kamins Resp., Exs. 18–20. In addition, many of TU's advertising slogans appear to be designed to appeal to everyday consumers who do not have a background in real estate. *See* Kamins Report 11 ("'Don't think you can profit in this

market. You can. And *I'll* show you how.' . . . 'Come to this FREE introductory class and you'll learn from ***Donald Trump's*** handpicked instructors a systematic method for investing in real estate that anyone can use effectively.' . . . '*I* can turn anyone into a successful real-estate investor, including you.'"). Where a company uses "broad marketing techniques . . . the general adult population may well be a sufficient proxy for the relevant market." *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998). Moreover, "[t]he selection of an inappropriate universe affects the weight of the resulting survey data, not its admissibility." *Id.* (quoting 6 McCarthy on Trademarks and Unfair Competition, § 32:162 (4th ed.)) (internal quotation marks omitted).

Second, Defendant argues that the Survey did not conduct a control group, such as by surveying a separate group of respondents presented with a stimulus that did *not* include TU's advertising. Kamins Mot. 8. Defendant argues that a control group is necessary in surveys designed to establish causation. Defendant proffers several instances in which Kamins-designed surveys have been rejected in other cases for the purposes of establishing causation, where Kamins either used an inappropriate control group or neglected to use a control group. *See id.* at 9 (citing *Apple v. Samsung*, No. 5:11-cv-01846-LHK (N.D. Cal. June 30, 2012), ECF No. 1157; *Munchkin, Inc. v. Playtex Products, LLC*, No. CV11-503-AHM(RZx) (C.D. Cal. May 1, 2012), ECF No. 285 at 30).

Plaintiff proffers a number of responses to these arguments. First, Plaintiff argues that by asking respondents to state whether the representations had a "positive impact," a "negative impact," "no impact," or "no opinion/don't know" on their interest in TU, the Survey investigates the materiality of Defendant's representations, rather than purporting to establish causation. Kamins Report 45. Plaintiff proffers *Fahmy v. Jay Z*, 2015 U.S. Dist. LEXIS 129446 (C.D. Cal. Sept. 24, 2015), as a case where a district court found that a Kamins-designed survey did not require a control group because it investigated materiality, rather than causation. In *Fahmy*, the survey asked respondents "whether they would be 'less likely' to attend a Jay-Z concert had they known *Big Pimpin'* would not be performed." *Id.* at *59. The district court found that the question of whether the

performance of *Big Pimpin'* was a "motivating factor" in consumers' interest in the Jay-Z concert was distinct from the question of "whether a causal nexus exists between Jay-Z concert revenues and *Big Pimpin'*." *Id.*

The Court finds this argument largely unpersuasive. Although the *Fahmy* court does draw a distinction between materiality and causation in a case with some factual similarities to the present case, Kamins appears to make findings as to causation on the basis of survey results in his Report. *See, e.g.*, Kamins Report 47 ("For the materiality of the 'opportunity to be taught by Trump's hand-picked instructors,' 93% of those who were 'very likely' to enroll viewed this attribute positive in their decision, whereas 69% viewed it positively for those who were 'likely' to enroll. . . . This result again provided statistical support for the notion that as potential attendees became more certain that they would attend a Live Event, the positive impact of being taught by Trump's hand-picked instructors became more positive and material to them in impacting their decision to attend the university.").

Plaintiff also argues that a number of courts have found that the lack of a control group is "precisely the sort[] of technical consideration that affect[s] only the weight, and not the admissibility of a survey." Kamins Resp. 17–18 (citing *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Sing.) Pte. Ltd.*, 2011 U.S. Dist. LEXIS 133502, at *13 (N.D. Cal. Oct. 27, 2011); *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, No. CV 13-02747 DMG (AGRx), 2014 U.S. Dist. LEXIS 184585, at *25–*26 (C.D. Cal. Oct. 7, 2014) ("[T]he lack of a control group alone does not render a confusion survey so fatally flawed as to be inadmissible."); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998) (admitting survey despite "object[ion] that plaintiff did not use a control group to take account of those respondents who are confused 'regardless of the stimuli present.'"), *aff'd*, 296 F.3d 894 (9th Cir. 2002). Plaintiff also contends that other features of the Kamins Survey, such as including "don't know" or "no opinion" responses to close-ended questions, and comparing the response rates for the two dependent measures, enhance the probative value of the Survey. *Id.* at 18 (*citing In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1078 (C.D. Cal. 2015) ("[The expert] used other

methods to prevent bias, e.g., including . . . 'don't know/can't recall' . . . as possible answers to closed-ended questions. This mitigates the significance of his decision not to employ other controls.")).

However, in the false advertising context, other district courts have suggested that "[c]ontrols are an essential feature of reliable survey evidence because they enable the surveyor to separate the wheat (the effect of the advertisement, alone, on the participant) from the chaff (the effect of 'the participant's prior knowledge and/or prior (mis)conceptions')." *See Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 601 (D.N.J. 2003) (citing *Am. Home Prods. Corp. v. Procter & Gamble Co.*, 871 F.Supp. 739, 749 (D.N.J. 1994)); *see also* 6 McCarthy, *supra*, § 32:187 (observing that, in the trademark context, "[a]s courts have become more sophisticated in evaluating trademark survey results, judges have come to expect that a proper survey will have a control"); E. Deborah Jay, *Ten Truths of False Advertising Surveys*, 103 Trademark Rep. 1116, 1140–46 (2013) (describing different control mechanisms).

The Court will entertain argument about this aspect of the Kamins Survey at the hearing.

Third, Defendant argues that the Survey constitutes a "distortion of market conditions" because Kamins presented only several pieces of TU advertising, rather than replicating the entire TU experience, including the 90-minute free preview and, in the case of those who purchased TU "Elite" programs, the impact of the three-day fulfillment seminars. *See* Kamins Mot. 10. However, "since no survey can perfectly reproduce the actual purchasing decision in which the customer puts his or her money behind the decision[, t]o require that a survey be taken "during the buying decision" is an impossible requirement tantamount to rejecting all survey evidence." 6 McCarthy, *supra*, § 32:163. It is true that "[t]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." *Id.* Moreover, by showing respondents representative TU print advertisements, as well as the 2-minute "Main Promotional Video" played at the beginning of the 90-minute

free preview, the Kamins Survey did present advertising that is substantially similar to that which would have been encountered by prospective TU customers, and which initially encouraged prospective TU customers to attend the 90-minute free preview. Kamins Report 44.

Fourth, Defendant charges Kamins with "not providing the underlying data to his survey." Kamins Mot. 11. What Defendant appears to mean by this is that although there were 126 respondents in the survey who indicated they were interested in TU after seeing the advertisements (responded 6, 7, 8, or 9 on the 9-point scale), Kamins did not include data on those who indicated either that they were not interested in TU or were unsure of their interest (responded 1, 2, 3, 4, or 5). However, Kamins did not include this data because those who responded 1, 2, 3, 4, or 5 did not continue with the rest of the Survey, since it made no sense to ask respondents if their interest in TU was stoked by TU's representations when they indicated a lack of interest in TU. Kamins Report 4.[3]

Fifth, Defendant argues that Kamins "lacked control" over the Survey because it was conducted by an independent marketing research firm, Spectrum Associates. Kamins Mot. 13. In *Munchkin Inc. v. Playtex Products, LLC*, No. CV11-503-AHM(RZx) (C.D. Cal. May 1. 2012), a Kamins-designed survey was excluded where the district court observed that Kamins "didn't know how [the survey] was administered[,] . . . didn't know how the panel was selected [and] didn't know what the statistical technique was that was used to weigh the survey and provide weight to it." *Id.*, ECF No. 285 at 29–30. However, *Munchkin* concerned an "omnibus" survey, where the results were weighted in order to replicate the U.S. population, and Kamins' lack of understanding of how that replication occurred raised

---

[3] Similarly, the Court finds *Cottonwood Fin. v. Cash Store Fin. Servs.*, No. 3:10-cv-01650-N (N.D. Tex. Oct. 12, 2012) distinguishable. In *Cottonwood,* a Kamins-designed survey was excluded because there was an "extremely large" percentage of "don't know" responses in reply to a question about whether the respondents believed "a foreign financial services company can be listed on the New York Stock Exchange (NYSE) when its name contains an existing US financial service company's trademark." *Cottonwood*, ECF No. 76 at 5. Here, the "don't know" category was not a response to knowledge regarding a factual question, but a component on a 9-point scale of personal interest (5/"no opinion/don't know"). Kamins Report 44.

serious questions as to the survey's reliability. *See id.*; *see also* Kamins Dep. 26:12–23, Kamins Resp., Ex. 1. No such concern applies here, where Kamins has described the methodology of the Survey, and no weighting of the results occurred.

Sixth, Defendant argues that the Kamins Survey "created a demand effect" where, by showing respondents the TU advertisements and then asking if the representations made in those advertisements had an impact on respondents' interest in TU, the Survey induced "respondents [to] naturally conclude[] that they were supposed to say they were likely to enroll because of Mr. Trump." Kamins Mot. 15. In *Sears, Roebuck & Co. v. Menard, Inc.*, No. 01 C 9843, 2003 WL 168642 (N.D. Ill. Jan. 24, 2003), a "consumer confusion" trademark case, the district court found that a Kamins-designed survey question created a demand effect where, after showing respondents clips of advertisements from both companies, the question stated, "Does it appear to you that one company borrowed the slogan 'where else' from the other?" *Id.* at *2. The court found that this question "suggested the similarity to respondents rather than testing whether respondents perceived it themselves." *Id.* However, here, the Kamins Survey asked:

> 2.    Did the opportunity to learn Donald Trump's real estate strategies and techniques have a positive impact, a negative impact, or no impact on your decision to enroll in the live class?
>
> 3.    Did the opportunity to learn from professors hand-picked by Donald Trump have a positive impact, a negative impact, or no impact on your decision to enroll in the live class?

Kamins Report, Attachment A, at 5. Unlike in *Sears*, the wording of both questions appears to be neutral and to evoke the possibility that the representations had either no or negative impact on respondent, rather than a positive impact. Defendant provides no authority to support the proposition that the Court should find that the structure of the Survey, rather than the wording of its questions, created a demand effect.

//

//

## II.   Kamins' Other Opinions

Defendant challenges the other components of the Kamins Report on a number of grounds, most of which the Court finds unpersuasive.

First, Defendant challenges Kamins' assumption of the truth of the factual allegations contained in the Complaint. Kamins Mot. 16. However, "it is customary for such experts [to] 'assume[] that the allegations in the complaint are true' for purposes of conducting [their] analysis, but offer[] no view as to whether or not there had been a fraudulent marketing scheme," since it is ultimately the role of the fact-finder to determine the veracity of the factual allegations contained in the Complaint, and hence the reliability of any expert report based thereon. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 30 (1st Cir. 2013); *see also, e.g.*, *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 U.S. Dist. LEXIS 58819, at *17 (N.D. Cal. May 3, 2016); *Resco Prods. v. Bosai Minerals Grp*, No. 06-235, 2015 U.S. Dist. LEXIS 124930, at *7 (W.D. Pa. Sept. 18, 2015); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-Civ-COOKE/TURNOFF, 2011 U.S. Dist. LEXIS 62969, at *10 (S.D. Fla. June 7, 2011).[4]

Second, Defendant argues that Kamins "did not disclose the foundation for his opinions," because although Kamins testified that he reviewed over one thousand TU student evaluations available on the website 98PercentApproval.com, he did not disclose this, nor identify precisely which student evaluations he reviewed in his report. Kamins Mot. 25. However, Kamins explicitly discloses that he was examining the evaluations available on this website in his report. Kamins Report 39. Moreover, as Plaintiff points out, this website was set up by Defendant himself, and Defendant's rebuttal expert relies on the same student evaluations from the website,

---

[4] Similarly, Defendant argues that Kamins ignored evidence that contradicted his conclusions in the report, Kamins Mot. 10, but "[t]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility," *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (quoting *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)) (internal quotation marks omitted).

so Defendant cannot claim unfamiliarity with the website's contents. McDuff Report 46, McDuff Mot., Ex. 1.

Third, Defendant argues that Kamins' criticisms of TU's purported 98% approval rating are "incorrect." Kamins Mot. 20. Defendant provides no legal argument why Kamins' criticisms of the 98% approval rating should be excluded. *See id.* at 20–22. That said, the Court questions the relevancy of Kamins' criticisms of how the 98% approval rating was derived to Plaintiff's case-in-chief. Should Defendant not place the purported 98% approval rating at issue at trial, the Court would be inclined to exclude testimony by Kamins on this issue.

Finally, Defendant argues that Kamins' opinions about TU's marketing scheme are "unreliable, irrelevant, and overtly prejudicial." Kamins Mot. 22. In the first two parts of his report, Kamins evaluates TU's advertising and the way TU events were run, concluding that (1) TU's marketing focused almost exclusively on Defendant and targeted his biggest fans; and (2) TU's marketing and sales strategies incorporated a variety of strategies to encourage prospective customers to make decisions using so-called "System 1" processing, i.e. an emotion-laden, rather than rational, thinking process. Kamins Report 6–37. For instance, Kamins cites academic research that demonstrates how techniques such as using the "University" moniker, playing the "Money, Money, Money" song at the beginning of the 90-minute free preview, and setting the room temperature for the free preview at 68 degrees, were designed to induce a more emotive decision making approach on the part of prospective TU customers. *Id.* at 18–21.

The Court finds that Kamins' first opinion, and in substantial part his second opinion, are relevant to demonstrating the materiality of TU's representations to prospective TU consumers, and reliable in that they are supported by Kamins' experience in marketing, as well as academic studies. *See, e.g.*, *Vazquez v. City of New York*, 2014 U.S. Dist. LEXIS 124483 (S.D.N.Y. Sept. 5, 2014) ("[A]lthough [the expert's] opinions may not rest on statistical studies or traditional scientific

methods, they are, nevertheless, based on data — including personal experience, interviews, review of police manuals and other primary sources, and review of academic literature — 'of a type reasonably relied upon by experts in various disciplines of social science.'" (citations omitted)).

With respect to Kamins' second opinion, in that the "System 1/System 2" framework appears to be well-supported by the academic literature, *see* Steckel Report, McDuff Mot., Ex. 6 ("For sure, Daniel Kahneman is on the Mount Rushmore of social scientists for much of his work exposing what could in retrospect be classified as examples of System 1 thinking."), the Court concludes that some of Kamins' findings are admissible. Specifically: (1) Section 2, "Trump's Use of the 'University' Moniker," is relevant in explaining the psychological effects of the use of the "university" moniker in encouraging System 1 thinking; (2) Section 3.a, "Manipulation of the Environment to Encourage System 1 Thinking and Maximize Sales," is relevant in providing background information for how the 90-minute free previews were conducted and the context of TU's sales; and (3) Sections 3.b, "Main Promotional Video," and 3.c, "Live Events Speakers Perpetuated the Myth of Trump's Handpicked Instructors," are relevant for showing how the 90-minute free previews reinforced the initial misrepresentations as to TU's university status and Defendant's handpicking of TU instructors. As to other aspects of Kamins' second opinion, the Court will consider their relevancy under Fed. R. Evid. 403 at trial.

## II.   Plaintiff's Real Estate Education Expert Paul Habibi

Habibi is a lecturer at the UCLA Anderson Graduate School of Management and the UCLA School of Law, as well as a real estate investor. Habibi Report 4, Habibi Mot, Ex. 12. Habibi has also taught real estate investment and development seminar courses at UCLA Extension, which offered a curriculum to students substantially similar to Habibi's MBA and law school courses, at a cost of $425. *Id.* The Habibi Report contains a detailed comparison of the content taught at TU live events with that offered by leading schools in real estate education, such as the Wharton School at the University of Pennsylvania, the

Haas School of Business at the University of California-Berkeley, and the Stern School of Business at New York University. *Id.* at 5–6. Habibi finds TU's live program materials did not provide students with the analytical tools to systematically make sound real estate investment decisions; sometimes promoted illegal, unethical, and/or risky investment strategies; and did not provide any strategies or techniques unique to Defendant. *Id.* at 6–7, 41. Habibi also reviewed the resumes of twenty-seven TU instructors, and found that TU's instructors and mentors primarily had experience in sales and motivational speaking rather than real estate investment or education. *Id.* at 9–10.

Defendant's primary critique of the Habibi Report is that it "set[s] up a straw man by improperly evaluating TU against leading academic institutes instead of other business seminars." Habibi Mot. 8. Defendant argues that the content taught by TU cannot be compared to the curriculums of leading real estate schools, since TU differed dramatically to those programs in its price, length of time, focus on practical instruction, provision of part-time education, accessibility, and the objectives of TU students. *Id.* at 8–10. Defendant argues that for-profit investment and entrepreneurship seminars, such as Rich Dad Education's "Rich Dad Poor Dad" and Dynetech's "Discovering Foreclosure Profits," are a more appropriate comparison to TU Live Events programming. *Id.* at 12–14.

However, the Court finds that to the extent that Habibi is comparing "apples to oranges," *id.* at 14 (quoting *Siegel v. Warner Bros. Entm't, Inc.*, 2009 U.S. Dist. LEXIS 66115, at *33 (C.D. Cal. July 8, 2009)), that is a comparison invited by Defendant. In the Main Promotional Video that was played at the beginning of each 90-minute free preview, Defendant states,

> We're going to have professors and adjunct professors that are absolutely terrific. Terrific people, terrific brains, successful. . . . The best. We are going to have the best of the best and honestly if you don't learn from them, if you don't learn from me, if you don't learn from the people that we're going to be putting forward — and these are all people that are handpicked by me — then you're just not going to make in terms of the world of success. And that's ok, but you're not going to make it in terms of success. I think the biggest step towards success is going to be: sign up for Trump University. We're going to

teach you about business, we're going to teach you better than the business schools are going to teach you and I went to the best business school.

ECF No. 220-7, Ex. L.

Many components of TU's marketing scheme and live events were designed to reinforce this comparison between TU and leading academic institutions. In the TU "Preview Script," TU's "[l]ecturer[s]" were directed to call themselves "a member of the faculty at Trump University," to state that,

> Mr. Trump went to the Wharton School at the University of Pennsylvania, and he knew that most people couldn't afford the time or tuition to do that. So he decided to create an organization that would provide a world-class education, coupled with a year long apprenticeship resulting in personal development and wealth building. He saw the opportunity to give a Wharton School education in 3 days followed by an Apprenticeship[,]

and to promise that "Trump University will be your Wharton!" Habibi Mot., Ex. 24, at 3, 5, 10. And as the Court previously observed in the Order Denying Defendant's Motion for Summary Judgment,

> TU advertisements utilized various forms of recognizable signs associated with accredited academic institutions, such as a "school crest" used on TU letterhead, presentations, promotional materials and advertisements, *see* Pl. Resp., Exs. E, F, I, L, P, as well as language comparing TU with such institutions, *see* . . . TU Marketing Guidelines, Pl. Resp., Ex. P, TU-DONNELLY0000016–17 (describing the "Trump University Community" as including "Staff," "Faculty," "Instructors," and "Program Directors (Trump University's Admissions Department)"; including under "Catch Phrases/Buzz Words" "Ivy League Quality," and under "Tone" "Thinking of Trump University as a real University, with a real Admissions process—i.e., not everyone who applies, is accepted"; and encouraging TU employees to "[u]se terminology such as" "Enroll," "Register," and "Apply").

ECF No. 268 at 2–3. By contrast, Defendant has not been able to point to any evidence that TU presented itself in its advertising or marketing materials as in competition with for-profit entrepreneurship seminars such as "Rich Dad Poor Dad." *See* Habibi Mot. 12–16.

Moreover, as Plaintiff points out, Habibi's assessment of the content of TU's live events does not solely rely on a comparison of that content with the curriculums of leading real estate schools. Habibi also draws on his experience teaching $425 real estate investment and development courses at the UCLA Extension School, which focused on beginning real estate investment education in a shorter time frame. *See* Habibi Report 4–5. Habibi used the introductory textbooks that he compares to the content of TU's live events not only in his MBA and law school courses, but also in his undergraduate classes, as well as in his classes for the UCLA Extension School. *See* Habibi Dep. 124:7–10, Habibi Resp., Ex. 12.

Finally, Defendant makes a number of arguments that the Habibi Report should be excluded because: Habibi (1) did not fully consider all sources of evidence; (2) failed to maintain the underlying data, used a "subjective" methodology, and only reviewed a selective portion of the resumes of TU's instructors and mentors; (3) was too speculative in his conclusions regarding the illegal and/or unethical nature of some TU investment strategies; (4) opined outside of his area of expertise; and (5) was "imprecise" in stating his credentials. Habibi Mot. 16–25.

The Court finds these arguments unpersuasive. First, Habibi relied on an extensive range of documents in his expert report, *see* Habibi Report, Ex. B, and the nature of the evidence relied upon by an expert goes to weight, not admissibility. *See Hangarter*, 373 F.3d at 1017 n.14.

Second, Habibi disclosed the source of the twenty-seven resumes he reviewed, *see* Habibi Report 10, "[subjective] opinions based on an expert's experience in the industry [are] proper," *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-cv-03613-EJD, 2015 U.S. Dist. LEXIS 9362, at *5 (N.D. Cal. Jan. 27, 2015) (collecting cases), and again, the nature of the evidence relied upon by an expert goes to weight, not admissibility.

Third, Habibi's opinions as to the illegal and/or unethical nature of such TU investment strategies as bandit signs, "and/or assigns" and "subject to" clauses, and acting as a real estate agent without a license are based on his extensive experience in real estate

3:13-cv-2519-GPC-WVG

investment. Habibi Report 3, 11. Although Habibi "is not a lawyer," Habibi Mot. 20, an expert in real estate investment would certainly have knowledge of the legality of different real estate investment strategies. Moreover, Wallace, one of Defendant's rebuttal experts, also concedes that both bandit signs and "and/or assigns" and "subject to" clauses "can be employed in an illegal or unethical manner," and that bandit signs are sometimes "banned by local ordinance." Wallace Report 17, McDuff Mot., Ex. 5.

Fourth, Defendant argues that Habibi is not qualified to opine about TU because he has never taught for-profit real estate seminars, Habibi Mot. 22–24, but Habibi has taught short-term introductory real estate investment and development classes focused on a "practical approach" to non-fulltime students, Habibi Report 4–5. Moreover, "Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert," *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994), and "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility," *Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1028 (E.D. Cal. 2011) (quoting *Robinson v. GEICO General Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir.2006)) (internal quotation marks omitted).

Fifth, Defendant argues that Habibi's resume contains "imprecision[s]" because (1) he characterized himself as having "lifetime tenure" at UCLA when in fact he has a "continuing appointment" with UCLA that is "automatically renewed" every year and allows him to teach "up to . . . nine classes a year if I so desire for the rest of my life," Habibi Dep. 28:14–24; (2) he stated that he was an "associate" at Bank of America in 2002 when in fact he was a "summer associate," Habibi Mot. 24; and (3) he claimed to have launched Arrowhead Residential Funds I- VI, which "implie[s] that [he] complied with securities laws," but when he was asked "whether he or the funds were licensed to issue securities or otherwise, he explained that these were actually 'the equivalent of friends and family funds.'" Habibi Mot. 25; Habibi Reply 10. Based on this evidence, it appears that (a) Habibi was substantially accurate in characterizing himself as having a lifetime appointment as a lecturer at UCLA; (b) it was not substantially misleading for Habibi to

have listed himself an associate at Bank of America in 2002; and (c) Defendant does not explain why Habibi having characterized himself as "[l]aunch[ing]" Arrowhead Residential Funds necessarily implies that he complied with securities laws in one particular manner. Moreover, even if Defendant's critiques were legitimate, the "discrepancies" Defendant purports to identify are not at all comparable to the misrepresentations made by experts in the cases cited by Defendant. *See, e.g.*, Habibi Mot. 25 n.1 (citing *In re WRT Energy Corp.*, 282 B.R. 343, 371 (Bankr. W.D. La. 2001) (excluding prior testimony of expert who falsely claimed to have a degree from Stanford University, observing that "[t]he court cannot trust the word of an expert who would brazenly lie about her credentials")).

### III.   Defendant's Rebuttal Experts DeForest McDuff, Alan Wallace, and Joel Steckel

Defendant's rebuttal experts offer a variety of critiques of the Kamins Report and the Habibi Report. *See* McDuff Report; Wallace Report; Steckel Report. McDuff, a Vice President of Intensity Corporation and an expert in applied business economics, critiques both Reports; Alan Wallace, a practicing real estate attorney, broker, and Adjunct Professor at UCLA Law School, critiques the Habibi Report; Steckel, a Professor of Marketing and the Vice Dean for Doctoral Education at the Leonard N. Stern School of Business, New York University, critiques the Kamins Report. *See id.*

"As long as defendant's rebuttal expert witnesses speak to the same subject matter the initial experts addressed and do not introduce novel arguments, their testimony is proper under Federal Rule of Civil Procedure 26(a)(2)(C) and related case law from District Courts in this circuit." *See Laflamme v. Safeway, Inc.*, No. 3:09-CV-00514, 2010 WL 3522378, at *3 (D. Nev. Sept. 2, 2010) (citing *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 636 (D. Hawaii 2008); *Trowbridge v. United States*, 2009 WL 1813767, at *11 (D. Idaho June 25, 2009)). Each of the rebuttal reports focuses on the various claims made by Plaintiff's experts, and rebuts them on the basis of each rebuttal expert's own areas of expertise. *See generally* McDuff Report; Wallace Report; Steckel Report. As such, the

Court finds that the bulk of Plaintiff's objections to Defendant's rebuttal testimony go to weight, not admissibility. *See Hangarter*, 373 F.3d at 1017 n.14. "Defendant's rebuttal experts reviewed the initial expert witness reports, among other materials, and developed their own reports in response. . . . Contradicting expert opinions, questioning methodology, and opining on methods and facts plaintiffs' experts did not consider are precisely the type of rebuttal testimony the court would expect." *Laflamme*, 2010 WL 3522378, at *3.

That said, the Court finds that there is a degree of overlap between the critiques offered by the three rebuttal experts. *Compare* McDuff Report 8–37, *with* Wallace Report; McDuff Report 37–43, *with* Steckel Report. To the degree that the testimony of the three rebuttal experts becomes cumulative at trial, the Court would be inclined to exclude it. However, at present, the Court finds that Defendant is entitled to present the critiques of the Plaintiff's expert testimony offered by the rebuttal experts.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.  Defendant's Motion to Exclude the Opinions and Testimony of Michael A. Kamins, ECF No. 181, is **GRANTED IN PART** and **DENIED IN PART**;

2.  Defendant's Motion to Exclude the Opinions and Testimony of Paul Habibi, ECF No. 188, is **DENIED**;

3.  Plaintiff's Motion to Exclude the Testimony of Defendant's Rebuttal Expert DeForest McDuff, Ph.D, ECF No. 184, is **DENIED**;

4.  Plaintiff's Motion to Exclude the Testimony of Defendant's Rebuttal Alan D. Wallace, Esq., ECF No. 187, is **DENIED**; and

5.  Plaintiff's Motion to Exclude the Testimony of Defendant's Rebuttal Expert Joel Steckel, Ph.D, ECF No. 189, is **DENIED**;

6.  Defendant's Motions to Seal, ECF Nos. 182, 190, are **GRANTED**.

**IT IS SO ORDERED.**

Dated:  August 25, 2016

Hon. Gonzalo P. Curiel
United States District Judge